## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| In Re: | Case No. 3:15-md-2626-J-20JRK |
|---|---|
| DISPOSABLE CONTACT LENS ANTITRUST | Judge Harvey E. Schlesinger |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | |

## O R D E R

Starting in June 2013, Defendant contact lens manufacturers, Alcon Laboratories, Inc.

("Alcon"), Johnson & Johnson Vision Care, Inc. ("JJVC"), Bausch & Lomb Inc. ("B&L"), and

CooperVision, Inc. ("CV") (collectively "Manufacturer Defendants") imposed mandatory minimum

prices on a number of disposable contact lens products. Plaintiffs, who are consumers of disposable

contact lenses, have sued the Manufacturer Defendants and distributor ABB Concise Optical Group,

LLC ("ABB"), alleging that Defendants' conduct violates Section 1 of the Sherman Antitrust Act, and

various state statutes. This multi-district litigation ("MDL") class action antitrust case is before the

Court on Manufacturer Defendants' Motion and Memorandum of Law in Support of Their Motion to

Dismiss Plaintiffs' Corrected Consolidated Class Action Complaint (Doc. 145; Manufacturers'

Motion), and Defendant ABB Optical Group's Motion to Dismiss Plaintiffs' Corrected Consolidated

Class Action Complaint and Memorandum of Law in Support of Same. (Doc. 146; ABB's Motion).

Plaintiffs filed Plaintiffs' Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss.

(Doc. 185; Plaintiffs' Response). The Manufacturer Defendants filed a Reply Memorandum of Law in

Support of Their Motion to Dismiss Plaintiffs' Corrected Consolidated Class Action Complaint (Doc.

1

191; Manufacturers' Reply), and ABB filed Defendant Optical Group's Reply in Support of Motion to Dismiss Plaintiffs' Corrected Consolidated Class Action Complaint and Memorandum of Law in Support of Same.  (Doc. 190; ABB's Reply).  The Court heard argument of counsel regarding the Motions at a hearing, conducted on March 31, 2016, the record of which is incorporated herein.  See (Doc. 210; Clerk's Minutes); (Doc. 214; Transcript).

## I.      Background

This multidistrict antitrust litigation was centralized before this Court on June 10, 2015, by order of the United States Judicial Panel on Multidistrict Litigation ("MDL Panel").  (Doc. 1; Transfer Order).  It arises out of pricing policies adopted by contact lens manufacturers with regard to the distribution and sale of certain contact lens products.  The operative complaint, Plaintiffs' Corrected Consolidated Class Action Complaint (Doc. 135; Complaint), filed on November 23, 2015, is a six-count Complaint brought by fourteen individual Plaintiffs suing on behalf of themselves, and on behalf of a class of Plaintiffs consisting of "all persons and entities in the United States who made a retail purchase . . . of disposable contact lenses ("contact lenses") manufactured by [the Manufacturer Defendants] . . . subject to one of the 'Unilateral Pricing Policies' ('UPPs') described herein from June 1, 2013 to the present."  Complaint ¶ 1; see also id. ¶¶ 42-45, 48.  The individual Plaintiffs ("Plaintiffs") are: Rachel Berg, Miriam Pardoll, Elyse Ulino, Jennifer Sineni, Susan Gordon, Cora Beth Smith, Brett Watson, Kathleen Schirf, Tamara O'Brien, John Machikawa, Amanda Cunha, Alexis Ito, Catherine Dingle, and Sheryl Marcan.  Complaint ¶¶ 28-41.

## II.     The Complaint

### A.      Introduction

The focus of Plaintiffs' claims is the implementation and enforcement of "Unilateral Pricing

Policies" ("UPPs") adopted and enforced by the Manufacturer Defendants, as they apply to the market for disposable (soft) contact lenses ("contact lenses").  Disposable contact lenses comprise 90% of the contact lenses sold in the United States.  See Complaint ¶ 64.  Plaintiffs characterize these pricing policies as a "minimum resale price maintenance scheme" ("MRPM").  Complaint ¶ 9.  For ease of reference, and without passing judgment on the import of the name, the Court will refer to these pricing policies as "UPPs."  When considering a motion to dismiss, "the court is limited to what appears on the face of the complaint."  Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1340 (11th Cir. 2010).  The Court must accept all factual allegations in the Complaint as true, consider the allegations in the light most favorable to the Plaintiffs, and accept all reasonable inferences that can be drawn from such allegations.  Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003); Jackson v. Okaloosa Cty., Fla., 21 F.3d 1531, 1534 (11th Cir. 1994).  The facts recited here are drawn from the Complaint, which may well differ from those that ultimately could be proved.

Plaintiffs allege that

> the Manufacturer Defendants conspired with each other and with Defendant [ABB], a wholesaler, as well as independent eye care professionals ("ECPs") (e.g. optometrists and ophthalmologists who sell contact lenses to consumers) and their trade association, the American Optometric Association ("AOA"), to impose minimum resale prices on certain contact lens lines by subjecting them to UPPs, thereby reducing or eliminating price competition on those products from "big box" stores. . . , buying clubs . . . , and internet based retailers . . . (collectively, "Discount Retailers") by preventing them from discounting those products.

Complaint ¶ 2.  Plaintiffs further allege that "the Manufacturer Defendants, working with ABB, conspired to eliminate discounting of contact lenses by ensuring that all retailers charged the same minimum price."  Id. ¶ 3.

3

The backdrop for the UPPs is the unique construct of the contact lens industry, where ECPs both prescribe and sell a specific contact lens and brand to consumers.  Plaintiffs allege that:

> 5.     Competition in the market for contact lenses in the United States is distorted by the unique role played by ECPs.  Unlike prescription drugs, which are prescribed by doctors but sold only by pharmacies, ECPs both prescribe and sell contact lenses.  When an ECP writes a prescription for a patient, that ECP prescribes not only the type and power of the lenses, but also the particular brand.  Unless the patient comes back for another eye examination, or switches ECPs, he or she has to buy the prescribed brand of lenses for the length of the prescription, typically from one to two years.
>
> 6.     The power to prescribe makes ECPs the gatekeepers of the disposable contact lens market.  ECPs have the power and the economic incentive to prescribe lenses that provide them the largest profit margins.  Contact lens manufacturers understand these incentives all too well.  ECPs will refuse to prescribe a manufacturer's lenses if their profit margins are undercut by efficient retailers such as the Discount Retailers. . . . The economic purpose of the UPPs is to insulate ECPs from price competition from the more efficient distributors, such as the Discount Retailers.

Complaint ¶¶ 5, 6; see also id. ¶ 65.

Plaintiffs allege a complex "interwoven" conspiracy in which

> ABB worked with the Manufacturer Defendants to develop UPPs for several of the most advanced and/or most popular lines of contact lenses sold by the Manufacturer Defendants.  Over the course of 15 months commencing in June of 2013, each Manufacturer Defendant implemented this strategy in the form of a [UPP] . . . [promulgating] a minimum retail price for its affected product(s) and threaten[ing] to curtail the supply of some of its contact lens lines to retailers who sell below the mandated price.

Complaint ¶ 9.  "The Manufacturer Defendants agreed to limit retail price competition only after extensive consultation with independent ECPs and their agent ABB."  Id. ¶ 11.

Plaintiffs allege that the UPPs harm competition by increasing prices for contact lenses subject

to the UPPs, and depriving consumers of the ability to shop around for retail discounts on contact lenses. Id. ¶ 159. For example, the price of JJVC affected products rose between 40% and 112% from the lowest internet price prior to the implementation of UPPs, to the post-UPP price. Id. ¶ 160. Other brands also experienced significant price increases. Id. ¶¶ 163-69 (recounting specific price increases by Manufacturer Defendants). The UPPs have been estimated to cost consumers as much as an extra $2 billion annually. Id. ¶ 170. The adverse impact to consumers has been the subject of Congressional hearings, see id. ¶ 171, and state inquiries. See id. ¶¶ 147, 170.

**B.      THE UPPs**

UPPs prohibit contact lens retailers from offering discounts on the covered products, where the discounted price would be below the UPP price. Complaint ¶ 105. Carol Alexander ("Alexander"), Director of Professional Affairs at JJVC, has stated publically that the UPPs "represent 'a significant change from traditional contact lens pricing policies,'" and constitute a "'Fundamental Shift to the optical industry.'" Complaint ¶ 113. See also id. ¶ 117 (UPPs represent "'one of the monumental changes in contact lenses,'" according to an ECP who is also a consultant for Manufacturer Defendants).

The first UPP was announced by Alcon in June 2013, for its DAILIES TOTAL I® product. Alcon extended the UPP in January 2014, to two other products, DAILIES® AquaComfort Plus® Multifocal, and DAILIES® AquaComfort Plus® Toric contact lenses. Complaint ¶ 97; see also id. ¶ 9. Then in June 2014, Alcon extended a UPP to a fourth product, AIR OPTIX® COLORS contact lenses. Id. ¶ 97.

In February 2014, B&L implemented a UPP for its ULTRA™ line of contact lenses, and in June 2014, B&L imposed a UPP on its Biotruc® ONEday for Presbopia lenses. Complaint ¶ 98.

5

In June, 2014, JJVC announced UPPs for a number of contact lens products: 1-Day ACUVUE® MOIST®; 1-Day ACUVUE® MOIST® for ASTIGMATISM; 1-Day ACUVUE® TruEye®; ACUVUE® OASYS® with HYDRACLEAR®; ACUVUE® OASYS® for ASTIGMATISM; and ACUVUE® OASYS® for PRESBYOPIA. These policies became effective on July 1, 2014 for a six-month supply of ACUVUE® OASYS® with HYDRACLEAR® and on August 1, 2014 for the remaining contact lens lines. Complaint ¶ 99. "At the same time, JJVC announced that it would discontinue contact lens lines that would not be subject to a UPP." Id. "According to JJVC, its UPP will impact roughly 9.66 million consumers or 69% of the 14 million consumers of JJVC contact lenses." Id. ¶ 100.

Subsequently, JJVC expanded the contact lens lines to which UPPs apply to include: 1-Day ACUVUE® MOIST® MULTIFOCAL and 1-Day ACUVUE® DEFINE®, and has discontinued non-UPP contact lens lines, leaving only three ACUVUE® products not subject to a UPP. Complaint ¶ 101.

In September 2014, CV implemented a UPP with respect to its Clariti contact lens lin, which it acquired through its purchase of another contact lens company in August 2014. CV continued the UPP which had first been established in January 2014 on the Clariti line by the acquired company. Complaint ¶ 104. Subsequently, CV adopted a UPP for its MyDay line of contact lenses. Id.

By July 2014, UPPs affected 40% of the contact lens market, and were predicted to affect 80% by the end of 2015, in part because ECPs would have an incentive to write prescriptions for contact lenses subject to a UPP. Complaint ¶¶ 12, 162. Jim Murphy ("Murphy"), Vice President of Alcon, described Alcon's UPP as "'a win' for the manufacturers and the doctors, as well as (supposedly) consumers." Complaint ¶ 14.

6

### C.   Manufacturer Defendants' Vertical Agreements With ECPs

Plaintiffs allege that the Manufacturer Defendants, ABB, and the independent ECPs "all share an interest in not reducing the retail price of contact lenses and limiting competition from Discount Retailers." Complaint ¶ 4. They allege that the ECPs' motive for "colluding" or agreeing with the Manufacturer Defendants to develop UPPs was "to increase profit margins, combat price discounts for Discount Retailers, and eventually, eliminate price competition at the retail level altogether." With UPPs in place, ECPs could charge at or above the UPP minimum price for the protected product, and remain competitive. Id. ¶ 114. The ECPs' concern was prompted, in part, by the Fairness to Contact Lens Consumers Act ("FCLCA"), enacted December 6, 2003. The FCLCA requires ECPs to provide their patients with copies of their contact lens prescriptions so that the patients can purchase contact lenses from a retailer other than the ECP. Id. ¶ 66. A January 2015 trade magazine article noted that "'[t]he FCLCA was of great concern because many believed that a great number of patients would start purchasing their contact lenses from alternative sources, affecting the profitability of contact lenses for practitioners.'" Id. ¶ 69; see also id. ¶¶ 70-72 (alleging that many ECPs disobeyed the law and did not provide copies of their prescriptions to their patients).

Plaintiffs allege that the Manufacturer Defendants' motive to "collude" with the ECPs was "because a prescription from an ECP is required for the Manufacturer Defendants to sell their contact lens lines." Complaint ¶ 114; see also id. ¶ 115. These desires were communicated through articles in professional journals, social media channels, and ECP meetings with industry representatives. Id. ¶ 115 (citing to "Huge applause" among "300+" ECPs when B&L announced its UPP at the launch of B&L's new ULTRA product).

In her June 24, 2014 letter to ECPs announcing the initiation of JJVC's UPP policy for a

number of products, including "strategic brands" ACUVUE® products, Laura Angelini ("Angelini"),

President of JJVC, recounted the impetus for JJVC's adopting UPPs.  Complaint ¶¶ 102, 122.  On June

24, 2014, Angelini wrote to ECPs:

> "When I last communicated with you about six months ago, I shared that
> [JJVC] was in the process of carefully assessing our overall strategy so
> that we could best meet the needs of our customers, and asked for your
> feedback on what we were doing well and areas where we could
> improve.  Thanks to your open and candid responses, we were able to
> define our strategy and implement the changes and actions you told us
> were needed. . . You, the [ECP] who prescribes our products, have our
> unwavering support for your clinical, business, and patient needs. . . . To
> further demonstrate our commitment to prescribers, beginning this week,
> many of you will begin to hear from your JJVC Sales Representative
> about our new pricing strategy within the United States.  This includes a
> [UPP]. . . . We believe the multifaceted nature of this new pricing
> strategy and the variety of elements that comprise the program will allow
> you to refocus the critical doctor/patient conversation on eye health and
> product performance, rather than cost."

Complaint ¶ 122 (citation omitted).  According to an article in a trade publication, Angelini announced

the company's "Enterprise Strategy" involving UPPs as a "'roadmap to the future.'"  Id. ¶ 102.

Angelini said that pursuant to the UPPs, "'all wholesale customers will receive the same pricing for

certain existing contact lenses . . . ,'" minimum retail prices will be set, and manufacturer's rebates will

be eliminated.  Id.  The article reported that

> "Angelini described the new pricing as a 'holistic multifaceted pricing
> policy to refocus the conversation between the doctor and the patient on
> eye health and product performance rather than price.  This gives the
> optometrist the ability to improve his or her capture rate in the office . . .
> . Now the patient has no incentive to shop around.'"

Id.  JJVC said it was demonstrating support "'for the profession and the professional - Prescribers,

Portfolio and Preferred Partners.'"  Id.  In a follow-up letter to ECPs dated December 17, 2014,

Angelini confirmed that JJVC had extended an invitation a year earlier to "'share your thoughts' on

8

how JJVC 'could build and enhance our partnerships to help you meet the evolving needs of your patients and practices," and that the ECPs "feedback was instrumental in helping [JJVC] create [its] Enterprise Strategy," which included the new UPPs. Complaint ¶ 123. Angelini invited ECPs to continue to provide "feedback" to her and to JJVC's management team '"at anytime.'" Id.

Robert Ferrigno, President North America for CV ("Ferrigno"), said that CV conducted 12 focus groups and met with 100 ECPs before adopting its UPP, saying '"There was a strong voice that UPP is an important requirement for independent eyecare practitioners,'" and that '"[i]t was important that we understood the voice of the independents, and we're responding to it.'" Complaint ¶ 124 (citation and emphasis omitted).

Likewise, ECPs embrace and support UPPs. Complaint ¶¶ 115, 117, 118, 119. Polls of ECPs found that 82-85% of the ECPs questioned supported UPPs. Id. ¶ 119. For instance, one ECP, also a consultant for Alcon, "stated that the new pricing policies are 'fantastic' because they set 'an even playing field and it also does not support companies who want to price cut their products in an effort to increase utilization. . . . [A]s a doctor, it allows me to let patients know they won't find the lenses cheaper anywhere else.'" Id. ¶ 118. Another ECP stated in a published article that

> "The response to these UPPs fell into two camps. Practitioners were
> overjoyed - UPP instantly created a perfectly level playing field,
> eliminating the volume discounts for online retailers. Opponents,
> including big discounters like Costco and 1-800-CONTACTS, say the
> policies amount to illegal price-fixing and are restricting consumer
> choice."

Complaint ¶ 120 (citation omitted); see also id. ¶ 129 (ECP quoted as saying that ECPs benefit from the '"level playing field,'" and Manufacturers benefit '"because retail price erosion can be stopped.'"). Additionally, the American Optometric Association ("AOA"), the ECP's trade association, has been

9

highly supportive of the Manufacturer Defendants' implementation of UPPs,. Complaint ¶ 121. As expressed by one ECP (Gary Gerber), the UPPs "guarantee doctors 'a margin they have not seen for 20 years.'" Complaint ¶ 14.

### D.   Enforcement

JJVC sent to its customers, including ECPs and other retailers, a Policy Letter, enforcing the UPPs, saying that "'[b]ecause an advertisement to beat any price logically commits a reseller to beat even a price that is already below the UPP price, [JJVC] will regard an advertisement promising to beat any price or using similar words to be an advertisement to sell for less than UPP Price.'" Complaint ¶ 103. In November 2014, JJVC expanded enforcement of the UPPs, issuing a circular to its customers that stated "'[i]f you sell product below the UPP price, [JJVC] and its authorized distributors [such as ABB] will refuse to accept new orders from you. In addition, [JJVC] will exercise its right to repurchase your current inventory of products subject to the UPP price.'" Id. ¶ 107.

Dr. Milicent Knight ("Knight"), head of Professional Affairs for JJVC, stated that JJVC "'has three separate processes for proactive Market Price monitoring,'" including internal employees and independent firms monitoring pricing and advertising for UPP violations. Complaint ¶¶ 105, 106. "'If a customer is found to be in violation of the UPP, then [JJVC] will no longer sell products subject to the policy to that customer.'" Id. ¶ 106; see also id. ¶ 112 (JJVC required reseller Costco Wholesale Corporation to maintain retail prices for the subject contact lenses at or above the UPP, and the in-store gift card or credit could not be used to purchase the lenses).

Alcon sought the written consent of ECPs to its UPPs. "[O]ne optometrist" posted on social media that "an Alcon representative 'made a special appointment with me to discuss UPP and to have me sign paperwork indicating that I understood and agreed to the policy.' Another ECP on the same

10

website confirmed that this was Alcon's standard practice." Complaint ¶ 97.

Alcon provided testimony to Congress regarding its UPPs as follows:

> "As a result of this situation, Alcon chose to create an environment in
> which ECPs might more likely spend time learning about the new
> technology and explaining it to patients, all while having the opportunity
> to make a reasonable profit margin. It did so by adopting its [UPP] . . .
> when it launched DAILIES TOTAL 1® in 2013. That policy provided
> that Alcon would not supply DAILIES TOTAL 1® to customers who
> resold it for less than the price announced by Alcon."

Complaint ¶ 108; see also id. ¶ 111.

B&L communicated to its customers that

> "[E]ach customer is free to advertise or charge whatever price it wants,
> but should understand that [B&L] will cease to supply, and will prohibit
> its authorized distributors from supplying [B&L] Ultra® contact lenses
> to any customer that resells or advertises [B&L] Ultra® contact lenses to
> the end consumer (e.g. patient) for sale at less than the [UPP]."

Complaint ¶ 109.

Plaintiffs allege that Angel Alvarez ("Alvarez"), ABB's CEO "has stated publically that the

Manufacturer Defendants are very serious about policing their respective UPPs," and that ECPs have

received warnings for violating them. Complaint ¶ 111. "He said manufacturers are 'holding the gun'

and are willing to lose business in order to police their UPPs." Id.

Plaintiffs allege that Manufacturer Defendants have carried out the threat to "cut off" a reseller,

whether an ECP, or discount online vendor, who sold lenses below the UPP price. Complaint ¶ 110.

According to Gary Gerber ("Gerber"), an ECP writing in an article published in the June 2014 edition

of the trade journal Review of Cornea & Contact Lenses, "'The hope is that all manufacturers with

UPP lenses will follow suit, should other resellers not play by the rules.'" Id. ¶ 110.

Additionally, Plaintiffs allege that ECPs have assisted in the enforcement of the UPPs, as has

been posted on social media sites, giving "instances of ECPs informing Alcon's sales representatives about potential violations and requesting that Alcon take action." Complaint ¶ 125.

E.    **Manufacturer Defendants' Horizontal Agreement**

Plaintiffs allege that the Manufacturer Defendants, "facing pressure from ECPs and ABB about competitive threats posed by the Discount Retailers, . . . agreed with one another and with ABB and the independent ECPs to impose UPPs on their most advanced and most popular contact lens lines." Complaint ¶ 133. In support of this allegation, Plaintiffs cite to "plus factors," including allegations of "Industry Structure," "Opportunities to Conspire," "Information Exchanges," "ABB's and Independent ECPs' Conduct," "Acts Contrary to Economic Self Interest," "Pretextual Reasons for UPPs," "Motive to Conspire, Including Assurances That Competitors Will Also Act," "Abrupt, Near Contemporaneous and Fundamental Shift in Pricing Policies," and "Past Conspiratorial Conduct." Complaint ¶¶ 135-158.

Specifically, Plaintiffs allege that the four Manufacturer Defendants control 97% of the market for contact lenses in the United States, and that the industry has high barriers for entry, making it an industry conducive to collusion. Complaint ¶¶ 73-75, 135. Individually, this breaks down to the following market shares: B&L 7.2%; CV 23.9%; Alcon 30.6% and JJVC 35.3%. Complaint ¶ 73. The Manufacturer Defendants had "regular opportunities to meet, exchange information, and signal their intentions" at meetings and through publications of industry organizations of which they were members, the Contact Lens Manufacturers' Association ("CLMA"), and the Contact Lens Institute ("CLI"). Id. ¶¶ 136–42. The CLI actively collects and provides participants with market and sales data for strategic planning. Id. ¶¶ 139-40. Chris Holloway, Global Business Analytics Manager for CV, stated that this information offers "'valuable insights in order to help us ga[u]ge where the market is

12

heading and ultimately help with the possible strategic approaches we might make in the future.'"
Additionally, the consulting service compiling the market date "'acts as a partner to ensure that all
manufacturers are working together so that we can make the statistical programme as effective as
possible.'" Id. ¶ 141.  The UPPs at issue here were all implemented by Manufacturer Defendants over a
15 month period, (and actually CV's September 2014 UPP was initially implemented by a predecessor
in January 2014, compressing the total time span to 12 months), representing a "'significant change'"
and a "'fundamental shift'" in the contact lens market.  Id. ¶¶ 104, 157.

UPPs individually are contrary to each Defendant Manufacturer's independent economic self-
interest.  Complaint ¶ 144.  According to testimony provided to Congress regarding the UPP
arrangement, a UPP "'makes sense for a manufacture[r] only if it can be confident that other
manufacturers will be taking similar action, and won't be taking competitive advantage.'" Id.
Additionally, as observed by CV President and CEO Robert Weiss ("Weiss"), the downside of UPPs is
the challenge of enforcement, consumer activism and negative public perceptions generating legislative
"backlash," and alienation of larger customers who want greater pricing freedom.  Complaint ¶ 145;
see also id. ¶¶ 146-47 (specific examples of actual investigations, consumer outcry, and "legislative
backlash" following Manufacturer Defendants' implementation of the UPPs).  Additionally, Plaintiffs
allege that the Manufacturer Defendants experienced slower sales growth in 2014, citing to JJVC's
annual report, and to CV's statement in September 2015 that the "market is being 'negatively
impacted' by UPPs."  Complaint ¶ 149; see also id. ¶ 150 (ABB's Alvarez states that "Manufacturer
Defendants are willing to lose business in order to enforce their UPPs.").  Plaintiff alleges that the
Defendant Manufacturers' exhortations that UPPs contribute to patients' health is pretextual, and
indeed, under oath, an industry representative appearing before a Utah Senate legislative committee

13

could not provide an example of health risks associated with the sale of contact lenses by Discount Retailers as opposed to ECPs.  Complaint ¶¶ 152-55.

Plaintiffs allege that each Manufacturer Defendant had a motive for adopting UPPs "to maintain high retail prices for its contact lenses" and "to encourage independent ECPs to prescribe their contact lenses."  Complaint ¶ 156.  They cite at length to the history of contact lens prescription and pricing controversies, starting in 1996.  Id. ¶¶ 15-20, 65–68, 91–95.

F.    **ABB's Role**

ABB is the largest distributor of contact lenses in the United States and services more than two-thirds (more than 19,000) of the independent ECPs who sell contact lenses to their patients.  Complaint ¶¶ 4, 7, 46, 135.  ABB's focus is to raise the profit margins for independent ECPs, as the "'category captain ,'" helping ECPs manage the contact lens portion of their business, with a goal of helping ECPs "'make more money.'"  Id. ¶ 7.  ABB surveys ECPs regarding pricing of contact lens products, publishes these results, and advises ECPs that they should charge as much as possible for contact lenses to maximize their contact lens profit margin.  Id. ¶¶ 7, 96.  In the third quarter of 2014, the ABB publication Profit Advisor, which was sent to independent ECPs, advised and encouraged ECPs to charge more for contact lenses than the UPPs, without fear because the UPP is the minimum price any retailers can charge.  At worst, a patient will ask the ECP to match the lowest price offering of the lens, which is the UPP.  "'As a result of UPP, . . . the prescribing practitioner will be able to obtain a higher percentage of patient revenue.'"  Complaint ¶ 130; see also id. ¶ 131 (Alvarez states on September 13, 2014 that ECPs should charge more than the UPP price).  Plaintiffs allege that "ABB acts as an agent for its 19,000 independent ECP customers," and benefits from UPPs because the pricing policies result in consumers purchasing replacement lenses from ECPs who are ABB's clients.  Complaint ¶ 7.

14

ABB's Alvarez called UPPs "one of the best developments of the last 20 years because they help ECPs

raise profit margins." Id. ¶ 14.

In addition to serving ECPs, ABB openly works with Defendant Manufacturers regarding

pricing issues.

> 126.    ABB played a principal role on behalf of ECPs to cause the
> Manufacturer Defendants to develop and implement the UPPs.  As early
> as February 2013 - before any of the Manufacturer Defendants had
> instituted UPPs - [ABB CEO] Alvarez stated publically that ABB's focus
> was to be "aligned with manufacturers."  Subsequent press statements by
> Alvarez confirmed ABB's integral role in developing the UPPs.

> 127.    [Alvarez] issued a statement . . . regarding [ABB's] stance on
> UPPs.

>> "'ABB has been working closely with manufacturers to
>> develop unilateral pricing policies, which we believe
>> enable a better overall patient experience by supporting
>> competitiveness of prescribing practitioners,' Alvarez
>> said.  'Contact lens fitters have always been and will
>> always be a focus of our organization.  We do everything
>> possible to help them succeed. [Emphasis omitted.].'"

> 128.    ABB also issues publications that allow independent ECPs (and
> the Manufacturer Defendants) to monitor the pricing of contact lenses in
> order to ensure that prices set pursuant to UPPs are being followed. . . .

Complaint ¶¶ 126-28.

Plaintiffs allege that ABB acted as a conduit of information between the Manufacturer

Defendants, and that "on information and belief, ABB, acting on behalf of its many thousands of ECP

clients, and the ECPs communicated to each Manufacturer Defendant its competitors' position on

UPPs." Complaint ¶ 143. Thus, "ABB was in a position to communicate to each Manufacturer

Defendant before it implemented a UPP that its competitors also intended to do so," and thus served as

the "hub" in a "hub and spoke" conspiracy. Id. ¶ 156.

15

Plaintiffs brings the following claims (the claims are mis-numbered in the Complaint):

| | |
|---|---|
| First Cause of Action: | Claim of Violation of 15 U.S.C. §§ 1 and 3 (Per Se Violation of the Sherman Act) ["Count 1"] |
| Second Cause of Action: | Claim for Violation of 15 U.S.C. §§ 1 and 3 (Rule of Reason Violations of the Sherman Act) ["Count 2"] |
| Third Cause of Action: | Claim for Violation of the California Cartwright Act ["Count 3"] |
| Third Cause of Action: | Claim for Violation of the Maryland Antitrust Act ["Count 4"] |
| Sixth Cause of Action: | Claim for Violation of the California Unfair Competition Law ["Count 5"] |
| Seventh Cause of Action: | Claim for Violation of the Maryland Consumer Protection Act. ["Count 6"] |

## III.   Standard of Review

When considering a motion to dismiss brought pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure (Rule(s)), the Court must accept all factual allegations in the complaint as true, construing the allegations and drawing all reasonable inferences in the light most favorable to the plaintiff.  See, e.g., Davidson v. Capital One Bank (USA), N.A., 797 F.3d 1309, 1312 (11th Cir. 2015); Miljkovic v. Shafritz & Dinkin, P.A., 791 F.3d 1291, 1297 (11th Cir. 2015); Jacobs, 626 F.3d at 1333. Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007).  Normally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

Of course, "the tenet that a court must accept as true all of the allegations contained in a

16

complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In

considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are

merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their

veracity and then determine whether they plausibly give rise to an entitlement to relief.'" Am. Dental

Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting Iqbal, 556 U.S. at 679)).

**IV.     Antitrust Pleading Standards**

"Section 1 of the Sherman Act makes unlawful '[e]very contract, combination in the form of

trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.'" Jacobs,

626 F.3d at 1333 (quoting 15 U.S.C. § 1). Section 1 applies both to agreements between companies

that directly compete with one another, called "horizontal" agreements, and to agreements between

businesses operating at different levels of the same product's production chain or distribution chain,

known as "vertical" agreements. Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.,

376 F.3d 1065, 1071 (11th Cir.2004). In order to establish a Section 1 violation, the plaintiff must

show (1) a contract, combination, or conspiracy among two or more separate entities that (2)

unreasonably restrains trade, (3) affects interstate or foreign commerce, and (4) causes antitrust injury

and damages. See Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1455, 1459 (11th Cir.1991); 15

U.S.C. § 1. "Section One applies only to agreements between two or more businesses; it does not

cover unilateral conduct." Spanish Broad. Sys. of Fla., 376 F.3d at 1071.

The Manufacturer Defendants argue that Plaintiffs have alleged no specific facts which support

an inference of agreement between the Manufacturer Defendants, ABB, and the ECPs. They invite the

Court to consider "'obvious alternative explanation[s]'" for Defendants' conduct. (Doc. 145 at 15, 23-

24, 31 (quoting Twombly, 550 U.S. 555-57, 565, 567)); (see also Doc. 146 at 2-3 (ABB Motion), and

assert that Plaintiffs' complaint must allege "'additional facts that tend to exclude independent self-interested conduct as an explanation for defendants' parallel behavior.'" (Doc. 145 at 27 (quoting Twombly, 550 U.S. at 552)); see also id. at 31 (citing Jacobs, 626 F.3d at 1342-43); (Doc. 191 at 10) (same). Manufacturer Defendants contend that Plaintiffs' allegations do not plead the necessary element of agreement, because the facts alleged "are entirely consistent with permissible unilateral conduct." (Doc. 191 at 6). ABB concurs, arguing that pursuant to the Eleventh Circuit's decision in Jacobs, Plaintiffs' allegations must show why it is "more plausible" that a manufacturer and distributor would enter into an illegal price-fixing agreement than engage in lawful conduct to maximize profits. (Doc. 146 at 3-4 (citing Jacobs, 626 F.3d at 1342-43). ABB contends that its alleged conduct is equally "'consistent with permissible competition'" and thus cannot support an antitrust conspiracy theory. (Docs. 146 at 3 and 190 at 3 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 597 n.21 (1986)). Plaintiffs respond that consideration of "alternative explanations" for Defendants' conduct is not "ripe" for resolution on a motion to dismiss the complaint, and that the Court, at this stage, "should not determine which explanation of allegedly conspiratorial conduct is most plausible." (Doc. 185 at 23, 45; see also id. at 42).

In Twombly, the Supreme Court updated the standard of review on motion to dismiss, abrogating the previous "no set of facts" notice pleading standard enunciated in Conley v. Gibson, 355 U.S. 41 (1957). See Arthur v. JP Morgan Chase Bank, NA, 569 F. App'x 669, 681 (11th Cir. 2014); Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 714-15 (11th Cir. 2014). The Twombly Court requires a Complaint to state claims that are "plausible," as opposed to "conceivable," by alleging "only enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. Significantly, the Supreme Court decided Twombly in the context of an anti-trust case.

18

The Court first reviewed pleading standards required by the Federal Rules of Civil Procedure, instructing that Rule 8 "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Twombly, 550 U.S. at 555 (citation omitted). A complaint "does not need detailed factual allegations," but it does require "more than labels and conclusions." Id. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. (citations omitted).

> In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. [Footnote omitted]. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely.". . . . [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.
>
> . . .
>
> A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief."

Twombly, 550 U.S. at 556-57 (citations omitted) see also id. at 553-54 ("Even 'conscious parallelism,' a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful." (internal quotations and citations omitted)).  The Court observed, that "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." Id. at 557.  Indeed, parallel behavior that is the result of "chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," does not state a § 1 claim. Id. at 556 n.4.  The Court said that the sufficiency of the allegations "turns on the suggestions raised by this conduct when viewed in light of common economic experience." Id. at 565.  The Court declined to apply a heightened pleading standard to antitrust cases, instead holding that the facts alleged are subject to Rule 8(a)'s general requirement of a "short and plain statement" of facts supporting a plausible claim. Id., 550 U.S. at 554-55, 569 n.14,  570.

The Twombly Court acknowledged that dismissal of an insufficient antitrust complaint prior to discovery may be appropriate.

> Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, cf. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464 (1962), but quite another to forget that proceeding to antitrust discovery can be expensive.  As we indicated over 20 years ago in Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 328 n.17 (1983), "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." See also Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984) ("[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when

there is no reasonable likelihood that the plaintiffs can construct a claim
from the events related in the complaint") . . . .

Twombly, 550 U.S. at 558.

Applying these standards, the Twombly Court determined that the plaintiff's claim of

conspiracy in restraint of trade came up short, 550 U.S. at 564, finding that there was an "obvious

alternative explanation" to the conduct alleged. Id. at 567. The Court held that the antitrust complaint

was due to be dismissed because plaintiffs "rest[ed] their § 1 claim on descriptions of parallel conduct

and not on any independent allegation of actual agreement . . . ," and did not allege "a plausible

suggestion of conspiracy." Id. at 564, 566. "[T]here is no reason to infer that the companies had

agreed among themselves to do what was only natural anyway." Id. at 566. The Court held that "the

complaint warranted dismissal because it failed in toto to render plaintiffs' entitlement to relief

plausible." Id. at 569 n.14.

Defendants also cite to the Eleventh Circuit's decision in Jacobs,  626 F.3d 1327, which is

binding on the Court in this MDL case. See Murphy v. F.D.I.C., 208 F.3d 959, 966 (11th Cir. 2000).

In Jacobs, a consumer who purchased a mattress brought an antitrust complaint against the mattress

manufacturer, alleging a vertical and horizontal conspiracy.  The Eleventh Circuit affirmed the district

court's dismissal of the complaint.  Citing the Supreme Court's directive in Twombly, the Eleventh

Circuit focused upon "plausibility," as the key, and the requirement that "well-pled allegations must

nudge the claim across the line from conceivable to plausible." 626 F.3d at 1333, 1342 (internal

quotations and citation omitted).  The Court examined the Complaint "for a sufficient quantum of

allegations to plausibly suggest" an agreement to restrain trade in violation of the Sherman Act. Id. at

1333.  The Court stated that plaintiff

> had the burden to present allegations showing why it is more plausible
> that [defendant] and its distributors - assuming they are rational actors
> acting in their economic self-interest - would enter into an illegal price-
> fixing agreement (with the attendant costs of defending against the
> resulting investigation) to reach the same result realized by purely
> rational profit-maximizing behavior.  Put another way, the potential costs
> of fixing prices with its distributors would outweigh any benefits that
> [defendant] would realize by doing so, particularly where independent
> economic activity would yield the same benefits with none of the costs.

Jacobs, 626 F.3d at 1342.  The Jacobs Court found the allegations in the antitrust complaint were not

suggestive enough to render a § 1 conspiracy plausible, "when the inference of conspiracy [was]

juxtaposed with the inference of economic self-interest." Id. at 1343.

The Circuit Courts of Appeal are split on the question of whether competing inferences may be

balanced at the motion to dismiss stage. Compare In re Musical Instruments & Equip. Antitrust Litig.,

798 F.3d 1186, 1189, 1193-94 (9th Cir. 2015); Jacobs, 626 F.3d at 1342-43, with SD3, LLC v. Black &

Decker (U.S.) Inc., 801 F.3d 412, 424-26 (4th Cir. 2015), as amended on reh'g in part (Oct. 29, 2015),

pet. for cert. filed, No. 15-942, 84 USLW 3423 (U.S. Jan. 27, 2016); Anderson News, L.L.C. v. Am.

Media, Inc., 680 F.3d 162, 184-85 (2d Cir. 2012), cert. denied, 133 S.Ct. 846 (2013).  With these

precepts in mind, the Court examines Plaintiff's claims in light of the facts alleged, accepting all

factual allegations in the complaint as true, and construing the allegations and drawing all reasonable

inferences in the light most favorable to Plaintiffs.

**V.**     **Claims Alleging Violation of the Sherman Antitrust Act (Counts 1 and 2)**

Antitrust law differentiates between vertical and horizontal price restraints. "Restraints imposed

by agreement between competitors have traditionally been denominated as horizontal restraints, and

those imposed by agreement between firms at different levels of distribution as vertical restraints."

Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 730 (1988) (footnote omitted).  With limited

exceptions, horizontal agreements are per se unlawful, whereas vertical restraints are unlawful only if an assessment of market effects, known as the "rule of reason" analysis, reveals that the vertical agreements unreasonably restrain trade. See Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885-86, 907 (2007). Under the "rule of reason," "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Id. at 885 (citation omitted).

The Supreme Court in United States v. Colgate, 250 U.S. 300 (1919) recognized that the Sherman Antitrust Act "does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell. The trader or manufacturer . . . carries on an entirely private business, and can sell to whom he pleases." Id. at 307 (internal quotations and citation omitted). "Under Colgate, the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984).

Vertical and horizontal price arrangements may intersect. See United States v. Apple, Inc., 791 F.3d 290, 314 (2d Cir. 2015), cert. denied, 136 S. Ct. 1376 (2016). For example, "[a] group of retailers might collude to fix prices to consumers and then compel a manufacturer to aid the unlawful arrangement with resale price maintenance. In that instance the manufacturer does not establish the practice to stimulate services or to promote its brand but to give inefficient retailers higher profits. Retailers with better distribution systems and lower cost structures would be prevented from charging lower prices by the agreement." Leegin, 551 U.S. at 893.

23

A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, per se unlawful. . . . To the extent a vertical agreement setting minimum resale prices is entered upon to facilitate either type of cartel, it, too, would need to be held unlawful under the rule of reason. This type of agreement may also be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel.

Id. The Ninth Circuit Court of Appeals describes this intersection as follows:

[T]he line between horizontal and vertical restraints can blur. One conspiracy can involve both direct competitors and actors up and down the supply chain, and hence consist of both horizontal and vertical agreements[.] . . . . [O]ne such hybrid form of conspiracy [is] sometimes called a "hub-and-spoke" conspiracy.

. . .

A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes.

. . .

A hub-and-spoke conspiracy is simply a collection of vertical and horizontal agreements. And once the conspiracy is broken into its constituent parts, the respective vertical and horizontal agreements can be analyzed either under the rule of reason or as violations per se. [Footnote omitted.].

In re Musical Instruments, 798 F.3d at 1192-93. However, when considered as a whole, "all participants in 'hub-and-spoke' conspiracies [are] liable when the objective of the conspiracy was a per se unreasonable restraint of trade." United States v. Apple, Inc., 791 F.3d at 322 (citations omitted); see also id. at 323 (finding that the "relevant agreement in restraint of trade" was not Apple's (the hub) vertical contracts with the publisher defendants (spokes), but rather "the horizontal agreement that Apple organized among the Publisher Defendants to raise ebook prices," which was "per se unreasonable."). Simply stated, a "hub-and-spoke" conspiracy involves "an entity at one level of the

24

market structure, the 'hub,' [that] coordinates an agreement among competitors at a different level, the

'spokes.' . . . . These arrangements consist of both vertical agreements between the hub and each spoke

and a horizontal agreement among the spokes to adhere to the hub's terms, often because the spokes

would not have gone along with the vertical agreements except on the understanding that the other

spokes were agreeing to the same thing." United States v. Apple, Inc., 791 F.3d at 314 (internal

quotations and citations omitted) (emphasis in original).  "[V]ertical agreements, lawful in the abstract,

can in context 'be useful evidence for a plaintiff attempting to prove the existence of a horizontal

cartel.'"  Id. at 319-20 (quoting Leegin, 551 U.S. at 893).

    The decisions in United States v. General Motors Corp., 384 U.S. 127 (1966) and Toys "R" Us,

Inc. v. FTC, 221 F.3d 928 (7th Cir. 2000) illustrate a "hub-and-spoke" conspiracy involving

agreements to set minimum prices so as to avoid or nullify competition from discounting retailers.  In

General Motors, car manufacturer General Motors coordinated a group of car dealerships with the goal

of preventing other dealers from selling the manufacturer's vehicles at a discount.  At a meeting of the

dealership association, the member dealers "discussed the problem and resolved to bring it to the

attention of" the manufacturer.  384 U.S. at 133.  The dealers agreed to "flood" General Motors with

letters and telegrams "asking for help" regarding the discounters.  Id. at 134.  General Motors

responded to the complaining dealers, and confronted those dealers who were trading with discounters.

"These brief meetings were wholly successful in obtaining from each dealer his agreement to abandon

the practices in question."  Id. at 135.  General Motors, the dealer associations and a number of

individual dealers, in a "joint effort," policed and enforced the agreements.  Id. at 136.  The Court

reversed judgment for General Motors and dealer associations, holding:

        We have here a classic conspiracy in restraint of trade: joint,

25

> collaborative action by dealers, the appellee associations, and General
> Motors to eliminate a class of competitors by terminating business
> dealings between them and a minority of Chevrolet dealers and to
> deprive franchised dealers of their freedom to deal through discounters if
> they so choose.

General Motors Corp., 384 U.S. at 140.  The Supreme Court rejected the argument that each co-

conspirator "acted to promote its own self-interest;"

> Neither individual dealers nor the associations acted
> independently or separately.  The dealers collaborated, through the
> associations and otherwise, among themselves and with General Motors,
> both to enlist the aid of General Motors and to enforce dealers' promises
> to forsake the discounters.  The associations explicitly entered into a joint
> venture to assist General Motors in policing the dealers' promises, and
> their joint proffer of aid was accepted and utilized by General Motors.

Id. at 143.  An "explicit agreement is not a necessary part of a Sherman Act conspiracy - certainly not

where, as here, a joint and collaborative action was pervasive in the initiation, execution, and

fulfillment of the plan."  Id. at 142-43.  The Court concluded that the multi-layered conspiracy resulted

in a per se violation of the Sherman Act, where "inherent in the success of the combination . . . was a

substantial restraint upon price competition," and "one of the purposes behind the concerted effort to

eliminate sales of new Chevrolet cars by discounters was to protect franchised dealers from real or

apparent price competition."  Id. at 146-47.

The case Toys "R" Us, supra, also describes a "hub and spoke" conspiracy.  Toys "R" Us

(TRU), a giant retailer of toys, sought a solution to its continuing lost sales to discount club

"warehouse" stores, which sold popular toys at prices that TRU could not match.  Toys "R" Us, 221

F.3d at 931.  To combat the problem, TRU entered into separate vertical agreements with major toy

manufacturers, in which the manufacturers agreed to limit their sales of certain toys to the warehouse

stores.  Id. at 931–32.  In reaching these agreements, TRU "was careful to meet individually" with each

26

manufacturer. Id at 932. Still, TRU told each manufacturer that it would be proposing similar terms to the others, and each manufacturer agreed to the terms "'on the condition that their competitors would do the same.'" Id. (citation omitted). TRU then enforced the agreements with each manufacturer, and "served as the central clearinghouse for complaints about breaches in the agreement." Id. at 933. The Federal Trade Commission ("FTC") found both that the individual vertical agreements violated the antitrust laws, and that the horizontal agreement among the manufacturers to limit sales to the warehouse stores was per se illegal. Id.

The Seventh Circuit affirmed the FTC's decision that the network of agreements between Toys "R" Us and two manufacturers to restrict the distribution of products to warehouse club stores was a per se conspiracy that violated antitrust laws, finding that an inference of conspiracy was supported by the fact that the agreement to limit sales to the warehouse stores was "an abrupt shift from the past." Toys "R" Us, 221 F.3d at 935. The court found that the warehouse stores' share of toy sales had been growing prior to the agreements, and that the manufacturers would not normally be expected to "deprive [themselves] of a profitable sales outlet." Id. Because one manufacturer unilaterally limiting its sales to the warehouse stores would risk losing sales to its competitors, the agreements with TRU were found to be contrary to an individual manufacturers economic interest, unless the other manufacturers had agreed to accept the same deal. Id. at 936.

Then, addressing the manufacturer' reluctance to give up their sales to the fast-growing profitable discount warehouses, the court upheld the FTC's determination that Toys "R" Us "orchestrated a horizontal agreement" among the large toy manufacturer to boycott the clubs. Id. at 932. This resulted in "the sudden adoption of measures under which they decreased sales to the clubs," despite the fact that this ran against the manufacturers' economic self interest. Id. The evidence

27

established that TRU facilitated this horizontal agreement among manufacturers by communicating with each manufacturers seriatim, assuring each that its agreement to limit sales to the warehouse stores would be met with similar acquiescence by its competitors. Id. ("TRU communicated the message 'I'll stop if they stop' from manufacturer to competing manufacturer.").

A. **First Cause of Action: Claim of Violation of 15 U.S.C. §§ 1 and 3 (Per Se Violation of the Sherman Act) ["Count 1"]**

"[C]ertain horizontal agreements 'always or almost always tend to restrict competition and decrease output.'" In re Musical Instruments, 798 F.3d at 1191 (quoting Broadcast Music, Inc. v. CBS, 441 U.S. 1, 19–20, (1979)). "Classic examples include agreements among competitors to fix prices, divide markets, and refuse to deal." Id. (citing United States v. Trenton Potteries Co., 273 U.S. 392, 397-98 (1927) (horizontal price fixing); United States v. Topco Assocs., 405 U.S. 596, 608 (1972) (horizontal market division); Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 293-94 (1985) (concerted refusal to deal)). Once a horizontal agreement is established, "no further inquiry into the practice's actual effect on the market or the parties' intentions is necessary to establish a § 1 violation." Id. at 1192 (citing N. Pac. Ry. v. United States, 356 U.S. 1, 5 (1958)). A horizontal conspiracy either alone, or as part of a "rimmed hub-and-spoke conspiracy," defined as "a collection of vertical agreements joined by horizontal agreements," is a per se violation of § 1 of the Sherman Act. Id. at 1192 n.3.

"Under Twombly, parallel conduct, such as competitors adopting similar policies around the same time in response to similar market conditions, may constitute circumstantial evidence of anticompetitive behavior." In re Musical Instruments, 798 F.3d at 1193 (citing (Twombly, 550 U.S. at 553-54). "But mere allegations of parallel conduct - even consciously parallel conduct - are

28

insufficient to state a claim under § 1.  Plaintiffs must plead 'something more,' 'some further factual enhancement,' a 'further circumstance pointing toward a meeting of the minds' of the alleged conspirators."  Id. (citing (Twombly, 550 U.S. at 557, 560).

Where no direct evidence of a horizontal agreement exists, the Court evaluates circumstantial evidence, so-called "plus factors," "that remove [plaintiffs'] evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious parallelism."  Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1301 (11th Cir. 2003); see also United States v. Apple, Inc., 791 F.3d at 315; In re Text Messaging Antitrust Litig., 630 F.3d 622, 629 (7th Cir. 2010) ("Circumstantial evidence can establish an antitrust conspiracy." (citing cases)).  "It is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators, and from other circumstantial evidence (economic and otherwise), such as barriers to entry and other market conditions."  Williamson Oil Co., 346 F.3d at 1299-1300 (internal quotations and citations omitted).  "Whereas parallel conduct is as consistent with independent action as with conspiracy, plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."  In re Musical Instruments, 798 F.3d at 1194 (citing Twombly, 550 U.S. at 557 n.4).  If pleaded, "plus factors" can place parallel conduct "in a context that raises a suggestion of preceding agreement."  Twombly, 550 U.S. at 557.

> Circumstances that may raise an inference of conspiracy include a
> common motive to conspire, evidence that shows that the parallel acts
> were against the apparent individual economic self-interest of the alleged
> conspirators, and evidence of a high level of interfirm communications
> . . . .  Parallel conduct alone may support an inference of conspiracy,
> moreover, if it consists of complex and historically unprecedented
> changes in pricing structure made at the very same time by multiple

29

competitors, and made for no other discernible reason.

United States v. Apple, Inc., 791 F.3d at 315 (internal quotations and citations omitted). The Court is

obligated to give Plaintiffs "the full benefit of their proof without tightly compartmentalizing the

various factual components . . . ." Williamson Oil Co., 346 F.3d at 1301 internal quotation marks and

citation omitted).

Manufacturer Defendants argue that the controversy in the contact lens industry lies between

the ECPs and the Discount Retailers, and that the Plaintiffs have taken sides in favor of the Discount

Retailers. (Doc. 145 at 12-13, 18). The Manufacturer Defendants contend that they "have not

exercised their independent discretion in the same way, much less engaged in conduct plausibly

suggesting that each manufacture's exercise of its discretion was other than purely unilateral." Id. at 13

(emphasis omitted). Specifically, they assert that "[t]here are no allegations that the Manufacturer

Defendants' UPPs cover the same types of contact lenses (e.g. daily verses weekly lenses, or lenses

employing particular technologies) or set prices for competing lenses at the same level," or that they

were adopted at the same time. Id. at 18 (citing Complaint ¶¶ 97-99, 101, 104 (allegations regarding

the Manufacturer Defendants' adoption of UPPs)); see also id. at 19-20 (allegations regarding the

adoption of UPPS "are facially inconsistent with any agreement 'to eliminate discounting of contact

lenses.'"); 28-30. Defendant Manufacturers contend that "there are no actual facts pled that support the

allegation of horizontal collusion among manufacturers," or "of even a single communication among

the Manufacturer Defendants concerning their UPPs. Nor do the few facts pled indicate parallel

conduct." Id. at 15; (see also (Doc. 191 at 13-15). Additionally, Defendants argue that the Complaint

fails to allege "any factual allegations to support the argument that ABB facilitated collusion among the

manufacturers." (Doc. 145 at 16); see also id. at 22. Though not conceding that Plaintiffs have

alleged parallel conduct, see id. at 28, Manufacturer Defendants argue that "[c]onsciously parallel conduct is lawful behavior, reflecting independent decisions by firms dealing with similar market challenges." Id. at 27; see also id. at 30 (allegations are insufficient to support "anything more than 'rational competitive business strategy unilaterally prompted by common perceptions of the market.'" (citation omitted)); 31-32 (setting forth alternative explanations for the UPPs).

Manufacturer Defendants dispute that the so-called "plus factors" alleged by Plaintiffs suggest a horizontal conspiratorial agreement to implement UPPs, arguing that the motive to achieve higher prices is not illegal; participation in trade associations is not an indication of conspiracy; foreign investigations into the contact lens industry involve vertical conduct and foreign laws, and thus are not relevant to manufacturers a horizontal conspiracy; and that UPPs are not against the self-interest of the manufacturers because they "incentivize" ECPs to prescribe the manufacturers' lenses. (Doc. 145 at 32-36); (Doc. 191 at 16-18). Addressing Plaintiffs' "hub-and-spoke" theory of antitrust conspiracy, Manufacturer Defendants argue that the absence of an agreement between them results in a "rimless wheel," which as a matter of law fails to establish an actionable antitrust horizontal conspiracy. (Doc. 145 at 16, 36-39); (Doc. 191 at 6, 10).

Plaintiffs respond that in addition to direct evidence of agreement among the Defendants, in the form of statements made by their respective representatives, the allegations set forth in the Complaint cite to circumstantial evidence in the form of "plus factors," which create a plausible inference of a horizontal agreement to restrain trade.  (Doc. 185 at 28-45). See Complaint ¶¶ 135-158

The Complaint alleges that the Manufacturer Defendants' imposition of UPPs on some of their contact lens products, during a short period of time (including announcements by three Manufacturer defendants covering eight (8) product lines in one month, June 2014), was parallel conduct.  Complaint

31

¶¶ 97-101, 104. The UPPs were unprecedented in the contact lens industry, and represented a "fundamental shift" in the pricing model. Id. ¶¶ 113, 157. See SD3, 801 F.3d at 427 ("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'" (citation omitted)); Toys "R" Us, 221 F.3d at 935 (observing that manufacturers' "decision to stop dealing with the warehouse clubs [was] an abrupt shift from the past," contributing to an inference of a horizontal agreement among manufacturers in the context of a hub-and-spoke conspiracy).

Plaintiffs allege that the Manufacturer Defendants' motive to uniformly enact UPPs was not only to maintain high retail prices, but also to provide an encouragement and incentive for ECPs to prescribe their product. Complaint ¶¶ 156, 162. The change in price structure was "fundamental" and sufficiently contemporaneous, occurring primarily within a six month period in 2014. Id. ¶ 97-99, 104. JJVC acknowledged that it had been considering the pricing strategy at least since December 2013, assessing its overall strategy and soliciting "feedback" from ECPs. Complaint ¶¶ 122, 123. "[C]omplex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason," support a plausible inference of conspiracy. Twombly, 550 U.S. at 557 n. 4 (citation omitted).

The UPPs are contrary to the Manufacturer Defendants' economic self-interest, if not adopted in tandem. A singular UPP would result in the applicable individual brand trading on the market at a much higher price than the competitor brands marketed at a discount by Discount Retailers, and also preclude Discount Retailers from selling the UPP-restricted product at the lower price, reducing the manufacturer's potential sales outlets and volume. See Complaint ¶ 144 (citing testimony that a UPP policy "makes sense for a manufacture[r] only if it can be confident that other manufacturers will be taking similar action, and won't be taking a competitive advantage."); ¶ 111 (ABB CEO states that

32

manufacturers are "willing to lose business" in policing and enforcing the UPPs.). See generally Toys "R" Us, 221 F.3d at 935 (finding it "suspicious for a manufacturer to deprive itself of a profitable sales outlet."). Additionally, the growth of sales slowed following implementation of the UPPs, as one manufacturer analyst conceded that the contact lens market had been "'negatively impacted'" by UPPs, as prices went up. Id. ¶¶ 149, 159-64.

Parallel conduct infers a conspiracy where the plaintiff establishes that each defendant engaged in the parallel action contrary to its economic self-interest, and plus factors tend to establish that the "defendants were not engaging merely in oligopolistic price maintenance or price leadership but rather in a collusive agreement to fix prices or otherwise restrain trade." City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 570 71 (11th Cir. 1998). The facts here are in stark contrast to those in Musical Instruments, 798 F.3d at 1195, where a single dominant retailer pressured guitar manufacturers to adopt and enforce minimum-advertised-price policies which would prevent discounters from undercutting the dominant retailer. The Court in Musical Instruments determined that the guitar manufacturers' response was a result of the interdependent market, and that "so long as prices can be easily readjusted without persistent negative consequences, one firm can risk being the first to raise prices," and the seriatim "parallel conduct" was attributable to a "follow the leader" process where "supracompetitive prices and other anticompetitive practices, once initiated, can spread through the market without any prior agreement." 798 F.3d at 1195. Here, the Manufacturer Defendants were responding to the concerns of thousands ECPs (through their agent ABB) who possessed the power to prescribe contact lens products. Unlike Muscial Instruments, a single contact lens UPP would be more difficult to reverse, and could result in product suicide if consumer patients insisted on a more economic contact lense alternative to the single UPP-protected product. No single

reasonable manufacturer would drastically increase its prices and restrict its available sales without assurances that others would follow suit. And indeed, the Manufacturer Defendants all conformed within the first six months of 2014 (with CV purchasing a brand that had implemented a UPP in January 2014). Plaintiffs' allegations plausibly establish that the UPPs were contrary to the economic self interest of the Manufacturer Defendants, absent agreement. The evidence may prove otherwise that the UPPs were a result of lawful conscious parallelism.

The Plaintiffs also allege the that Manufacturer Defendants and ABB had sufficient opportunity to exchange information at trade shows, through trade publications, and by direct communication. Complaint ¶¶ 2, 110, 121, 122, 136, 138-142. Indeed, the Complaint alleges that price information was exchanged freely. Id. ¶¶ 139-42. While this information exchange, standing alone does not create an inference of an illegal agreement, see Am. Dental Ass'n, 605 F.3d at 1295-96 ("[P]articipation in trade organizations provides no indication of conspiracy."), the fact of its existence indisputably facilitates and supports an inference of an agreement. See In re Text Messaging Antitrust Litig., 630 F.3d at 628 ("[T]he allegation in the complaint that the defendants belonged to a trade association and exchanged price information directly at association meetings . . . identifies a practice, not illegal in itself, that facilitates price fixing that would be difficult for the authorities to detect.").

The Plaintiffs allege that Manufacturer Defendants' justification that UPPs promote patient health is pretextual, see Complaint ¶¶ 152-55, contributing to the inference of a purposeful agreement to restrain trade. See Bolt v. Halifax Hosp. Med. Ctr., 891 F.2d 810, 822 (11th Cir. 1990) (finding that plaintiff physician should have been permitted to introduce evidence in support of his Sherman Act antitrust claim that the defendants' reasons for revoking his staff privileges were pretexts.). Finally, the market structure as set forth in the Complaint where the Manufacture Defendants together control 97%

34

of the disposable contact lens market, and the independent ECPs control of the prescription process creates a symbiotic relationship ripe for collusion, as evidence by the history of the relationship between the Manufacturer defendants and the ECPs over the years. See Complaint ¶¶ 15-20, 65–68, 91–95, 158.

Manufacturer Defendants' UPPs are most effective and attractive to the Manufacturers only if they collectively shift their pricing structures and require all retailers to observe the mandated minimum prices, which ABB, on behalf of the ECPs, and the Manufacturer Defendants all knew would serve their interdependent purpose of creating higher retail prices. See United States v. Apple, Inc., 791 F.3d at 316 (Apple's proposed contracts (spokes) were attractive to Publishers "only if they collectively shifted their relationships with Amazon to an agency model."); Toys "R" Us, Inc. v. FTC, 221 F.3d at 935-36 (holding that exclusive-dealing agreements between a retailer and manufacturers that were contrary to the manufacturers' individual self-interest but consistent with their collective interest supported the inference of a horizontal conspiracy in which the retailer participated).

An "agreement" for purposes of § 1 of the Sherman Act, is "a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co., 465 U.S. at 764; see also United States v. Apple, Inc., 791 F.3d at 317. ABB's (as agent of the ECPs), and individual ECPs' direct pressure on the Manufacturer Defendants to implement mandatory UPPs and the Manufacturer Defendants' willingness to collectively oblige and participate, as alleged, creates a sufficient plausible inference of Defendants' conscious commitment to the goal of raising contact lens prices, restraining trade with Discount Retailers and returning a larger profit for ECPs. See United States v. Apple, Inc., 791 F.3d at 317. In addition to raising prices, which benefitted both the Manufacturer Defendants and ABB's clients, the ECPs, the UPPs served the interdependent purpose of fostering loyalty and

35

incentivizing ECPs to prescribe those lenses that were subject to the UPPs.  See United States v.
Apple, Inc., 791 F.3d at 317 ("Antitrust law has never required identical motives among conspirators
when their independent reasons for joining together lead to collusive action." (internal quotations and
citation omitted)).  Indeed, ABB as the ECPs' agent had as a goal to help ECPs to "make more
money," and acknowledged that it "worked closely" with the Manufacturer Defendants to develop the
UPPs.  Complaint ¶¶ 7, 127.  Considering the whole of Plaintiffs' allegations, it can be plausibly
inferred that ABB and its demand, on behalf of the ECPs, that Defendant Manufacturers implement
UPPs , at minimum consciously played a key roll in organizing, coordinating and facilitating the
Defendant Manufacturers' alleged agreement.

> The General Motors and Toys R Us decisions provide a blueprint for analysis of Plaintiffs'
claims.  Similar to General Motors, where distributors complained to General Motors about
discounters, the ECPs complained to the Manufacturer Defendants individually and through their agent
ABB, that the Discount Retailers were hurting the ECPs' sales of contact lenses by undercutting the
ECPs' retail prices and profit margins.  The Manufacturer Defendants surveyed ECPs and sought feed
back, and in response, implemented UPPs.  Likewise, just as dominant toy retailer Toys "R" Us, acting
as a "hub," sequentially entered into vertical agreements with manufacturers restricting the sales of toys
in Toys "R" Us' favor, and then coordinating the toy manufacturers' adherence to these vertical
agreements by assuring them that all of the primary manufacturers were similarly committed, the
plausible inference from Plaintiffs' allegations is that ABB, acting as agent to dominant retailers ECPs
(who control two-thirds of the retail disposable contact lens submarket, Complaint ¶ 184, as "hub"
facilitated and assisted in the enforcement of the vertical agreements between the Manufacturer
Defendants and ECP retailers, in the form of mandatory UPPs to which retailers were required to

adhere. Additionally, ABB acknowledged that it worked "closely with manufacturers to develop unilateral pricing policies, which we believe enable a better overall patient experience by supporting competitiveness of prescribing practitioners," Complaint ¶ 127, making it plausible to infer that ABB communicated with each Manufacturer Defendant, before the manufacturer implemented a UPP, that its competitors also intended to do so also. See Complaint ¶ 156. Additionally, ABB, as agent for 19,000 ECPs, and acting as "hub," provided the Manufacturer Defendants the additional incentive to agree both vertically and horizontall to the adoption and enforcement of UPPs because ECPs would be more likely to prescribe UPP-protected contact lens products to their patients, a unique benefit provided by the disposable contact lens market to both the ECPs and the Manufacturer Defendants.

The implementation of the alleged conspiracy began In June 2013 with Alcon's announcement of a UPP for one of its products. If the drastic sea-change in pricing of contact lenses stopped here, the Court would be examining no more than an alleged vertical agreement between Alcon and the ECPs through ABB, and would necessarily consider Alcon's 30.6% market share as a factor in determining whether the adoption of the UPP was indeed a lawful independent action under Colgate. But the parade of UPPs did not stop there. In 2014, the four Defendant Manufacturers all followed suit so that by the end of 2014, some 40% of the entire contact lens market in the United States was under the grip of a UPP, with the predicted expansion to 80% by the end of 2015, because ECPs would have an incentive to write prescriptions for contact lenses subject to a UPP, and the Manufacturers were discontinuing other product lines. Complaint ¶¶ 12, 99, 162. The factual allegations establish that each Manufacturer Defendant knew of the ECPs' complaints, ABB's pressure on behalf of the ECPs to adopt UPPs, and the fact that each other Manufacturer Defendant was indeed adopting UPPs for a significant percentage of the contact lens market, all reminiscent of the General Motors' distributors.

The inference from Plaintiffs' allegations is that each Manufacturer Defendant was well apprised of the other's plans for implementation of UPPs through public announcements, trade publications, social media, and ABB's representation of the ECPs.

The UPPs were actively enforced by the Manufacturer Defendants, ABB and ECPs alike, a fact also known by all Manufacturer Defendants, and any retailer not complying with the mandatory minimum price, faced elimination from the competition to sell the contact lens products. Plaintiffs' allegations plausibly infer participation in a horizontal conspiracy by all.

> [T]here is no such possibility for confusion in the hub-and-spoke context, where the vertical organizer [ABB as agent for ECPs] has not only committed to vertical agreements, but has also agreed to participate in the horizontal conspiracy. In that situation, the court need not consider whether the vertical agreements restrained trade because all participants agreed to the horizontal restraint.

United States v. Apple, Inc., 791 F.3d at 325.

If the Defendant Manufacturers' conduct in implementing and enforcing their respective UPPs is indeed valid independent conduct permissible under Colgate, the evidence will show that. But at this juncture, the Court concludes that construing the factual allegations of the Complaint in favor of Plaintiffs, The Court finds that the allegations raise a reasonable expectation that discovery will reveal evidence of illegal agreement, and that the Manufacturer Defendants' parallel conduct when considered in context raises a suggestion of a preceding agreement. See Twombly, 550 U.S. 556-57; see also United States v. Apple, Inc., 791 F.3d at 319-20 ("[V]ertical agreements, lawful in the abstract, can in context 'be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel,' . . . particularly where multiple competitors sign vertical agreements that would be against their own interests were they acting independently." (quoting Leegin, 551 U.S. at 893)). Pieced together not only

from the context of Defendants' conduct, and also from specific statements made by Defendants' representatives, see Complaint ¶¶ 111, 113, 123, 124, 126, 127, 130, 143, Plaintiffs have alleged plausible grounds for inferring a preceding agreement between Manufacturer Defendants to enact UPPs in restraint of trade. See Twombly, 550 U.S. at 556-57.

Even weighing the "plausibility" of illegal conduct versus lawful Colgate conduct, which Defendants urge the Court to do under Jacobs, 626 F.3d at 1342, the Court concludes that the inferences drawn in favor of Plaintiffs from the facts alleged in the Complaint outweigh the "plausibility" that Defendants were acting out of lawful "economic self interest." Defendants' conclusory assertions that they were engaged in rational and lawful competitive business strategy independently prompted by common perceptions of the market, when juxtaposed with Plaintiffs' allegations, do not overcome the inference of unlawful agreement to restrain trade created by statements of Defendants' representatives, allegations of circumstantial "plus factors," and the overall context of the disposable contact lens market. See generally Williamson Oil Co., 346 F.3d at 1301 (At the summary judgment phase, "[i]n cases where the plaintiff establishes the existence of one or more 'plus factors,' these factors only create a rebuttable presumption of a conspiracy which the defendant may defeat with his own evidence." (quotation marks and citation omitted)). The competing inferences of lawful versus unlawful conduct start in "equipoise," Id.; accord Twombly, 550 U.S. at 556-57 ("[W]ithout further circumstance pointing toward a meeting of the minds, an account of defendant's commercial efforts stay in neutral territory."). Twombly does not impose a heightened pleading requirement on antitrust complaints. Nor does Twombly create a presumption in favor of defendants acting in their lawful economic self interest which Plaintiffs's allegations must overcome in order to survive a motion to dismiss.

Second, addressing Defendants' interpretation of Jacobs, the Court determines that based upon

Plaintiffs' allegations, it is more plausible that Defendants would enter into an illegal price-fixing conspiracy to prohibit Discount Retailers from undercutting the UPP price because doing so accomplishes a result not available through purely rational profit-maximizing behavior. See Jacobs, 626 F.3d at 1342-43. To be sure, prices for the contact lenses increased dramatically - as much as 43% to 112% - following implementation of the UPPs. See Complaint ¶¶ 84-88, 159-60, 163-69. Just as significant is the result that with UPPs in placed, ECPs have an incentive to prescribe UPP protected lenses to their patients, such that the impact of the UPPs is projected to grow from 40% of the market for disposable contact lenses to 80% of the market in just one year.  Complaint ¶ 162.  This results in both ECPs and patients developing a preference for and loyalty to the UPP-protected products they prescribe and wear, which would endure regardless of any economic consequences of any litigation or investigation spawned by the alleged illegal price fixing conduct.  Starting in equipoise, the allegations of Plaintiffs' Complaint which include direct evidence, "plus factors," and the context of Defendants' conduct, "nudge" the Plaintiffs' allegations of an illegal horizontal agreement among the Manufacturer Defendants "from conceivable to plausible" and allege enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.  Twombly, 550 U.S. at 556, 570; Jacobs, 626 F.3d at 1333.

**B.**   **Second Cause of Action: Claim for Violation of 15 U.S.C. §§ 1 and 3 (Rule of Reason Violations of the Sherman Act) ["Count 2"]**

   **1.**   **Sufficiency of the Claim**

In Leegin, 551 U.S. 877,, the Supreme Court examined the pros and cons of vertical price maintenance agreements, and held that "the rule of reason, not a per se rule of unlawfulness, would be the appropriate standard to judge vertical price restraints." 551 U.S. at 899; see also id. at 907 (overruling prior precedent).  Under the "rule of reason,"

> the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. . . . Appropriate factors to take into account include specific information about the relevant business and the restraint's history, nature, and effect. . . . Whether the businesses involved have market power is a further, significant consideration. . . . In its design and function the rule distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.

Leegin, 551 U.S. at 885-86 (internal quotation marks and citations omitted).

Applying the rule of reason to vertical price restraints, the Supreme Court observed that vertical price restraints "can have either procompetitive or anticompetitive effects, depending on the circumstances in which they are formed," Leegin, 551 U.S. at 894, and that it is up to the courts to eliminate their anticompetitive uses from the market. Id. at 897. The Court gave examples of both procompetitive, and anticompetitive effects that a vertical price restraint may have. On the positive side, "[m]inimum resale price maintenance can stimulate interbrand competition - the competition among manufacturers selling different brands of the same type of product - by reducing intrabrand competition - the competition among retailers selling the same brand." Id. at 890; see also id. at 891. Negatively, "[a] single manufacturer's use of vertical price restraints tends to eliminate intrabrand price competition." Leegin, 551 U.S. at 890. Additionally, vertical price restraints might be used to organize "cartels" at the retailer level, id. at 893, or may be abused by a powerful manufacturer or retailer. Id.

> A dominant retailer, for example, might request resale price maintenance to forestall innovation in distribution that decreases costs. A manufacturer might consider it has little choice but to accommodate the retailer's demands for vertical price restraints if the manufacturer believes it needs access to the retailer's distribution network. . . . A manufacturer with market power, by comparison, might use resale price maintenance to give retailers an incentive not to sell the products of smaller rivals or new entrants.

Id. at 893-94 (citations omitted). "If there is evidence retailers were the impetus for a vertical price

restraint, there is a greater likelihood that the restraint facilitates a retailer cartel or supports a dominant, inefficient retailer." Id. at 897-98. "If, by contrast, a manufacturer adopted the policy independent of retailer pressure, the restraint is less likely to promote anticompetitive conduct." Id. at 898. "The rule of reason asks whether, in the circumstances of the case, a restrictive practice imposes 'an unreasonable restraint on competition.'" Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555, 1569 (11th Cir. 1991) (quoting Cont'l T. V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977)).

> A restraint is unreasonable if it has an adverse impact on competition and cannot be justified as a procompetitive measure. . . . "[T]he rule of reason standard hinges the ultimate legality of a restraint on whether the plaintiff has demonstrated an anticompetitive effect which is not offset by a need to achieve a procompetitive benefit or justification."

Id. (citations omitted).

To establish a Section One claim analyzed under the Rule of Reason, a plaintiff must "prove (1) the anticompetitive effect of the defendant's conduct on the relevant market [footnote omitted], and (2) that the defendant's conduct has no pro-competitive benefit or justification." Spanish Broad. Sys., 376 F.3d at 1071 (citation omitted); see also Levine v. Cent. Florida Med. Affiliates, Inc., 72 F.3d 1538, 1551 (11th Cir. 1996). "[T]he 'test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.'" Levine, 72 F.3d at 1551 (quoting Chicago Bd. of Trade v. United States, 246 U.S. 231, 238 (1918)).

"Under rule of reason analysis, a plaintiff may show either actual or potential harm to competition," and must identify the relevant geographic and product market in which the harm occurs." Jacobs, 626 F.3d at 1336, 1339. The plaintiff has the burden of demonstrating damage to competition with "specific factual allegations." Id. at 1339 (citation omitted). "Higher prices alone are not the 'epitome' of anticompetitive harm . . . . Rather, consumer welfare, understood in the sense of allocative efficiency, is the animating

concern of the Sherman Act." Id. To establish potential harm, a plaintiff must "define the relevant market and establish that the defendants possessed power in that market," Levine, 72 F.3d at 1551, and make "specific allegations linking market power to harm to competition in that market." Spanish Broad. Sys., 376 F.3d at 1073; see also Jacobs, 626 F.3d at 1339.

The Manufacturer Defendants argue that Plaintiffs "failed to plead facts that 'plausibly suggest' the UPPs are not unilateral policies, in compliance with lawful Colgate policies, but instead are the result of vertical agreements between manufacturer and resellers." (Doc. 145 at 16); see also id. at 40 ("It is clear from the Complaint . . . that each Manufacturer Defendant took considerable care to structure its UPP to comply with the Colgate doctrine."); (Doc. 191 at 18). They contend that the "Complaint points to nothing more than the fact that some ECPs and ABB have been publically supportive of UPPs as beneficial to their business," and thus fails to state a § 1 claim. (Doc. 145 at 16). The Manufacturer Defendants contend that the Complaint alleges no specific facts regarding agreements between each Manufacturer Defendant and 19,000 ECPs or with ABB, and provides nothing more than "group pleading." Id. at 42-43. They maintain that an agreement cannot be inferred from a manufacturer's response to the complaints of a major dealer or the ECPs. Id. at 44.

Specifically, Defendants argue that Plaintiffs' allegation that the relevant product market is "the market for soft (disposable) contact lenses," Complaint ¶ 76, is "too broad and vague" to survive a motion to dismiss. (Doc. 145 at 47 (citing Leegin, 615 U.S. at 418 and Jacobs, 626 F.3d at 1336-37). Defendants contend that Plaintiffs "make no allegation concerning why the relevant market should be narrowly limited to "soft (disposable) contact lenses," and that Plaintiffs failed to address "the cross-elasticity of demand" between "soft (disposable) contact lenses" and potential substitutes such as eyeglasses or hard non-disposable contact lenses. (Doc. 145 at 47-48).

43

The Complaint alleges that the relevant product market is the market for disposable contact lenses, and the relevant geographic market is the United States.  Complaint ¶ 76.  The Complaint further alleges that "[t]he relevant product market is the Retail Submarket of the overall market for disposable contact lenses, which . . . can be further subdivided into distinct markets for each brand of contact lenses subject to a UPP.  Id. ¶ 183.  The soft (disposable) contact lenses are prescribed by ECPs for a period of one to two years, Complaint ¶¶ 5, 6, 65, and are the most popular contact lens style worn in the United States, accounting for approximately 90 % of the contact lenses worn in the United States.  Id. ¶ 64.  The Manufacturer Defendants together control 97% of this market.  Id. ¶¶ 73-75, 135.  Depending on the particular contact lens line, the contact lenses are replaced by the consumer either on a daily, weekly, or monthly basis.  Id. ¶ 64.  Plaintiffs' definition of the relevant product market precludes cross-elasticity of proposed substitutes such as eyeglasses or hard non-disposable contact lenses which do not have the properties described, as Defendants suggest.  Drawing on its "judicial experience and common sense," see Jacobs, 626 F.3d at 1333, the Court finds that Plaintiffs have sufficiently alleged the relevant product market with requisite specificity, in which the alleged harm to competition occurs.

Defendants argue next that Plaintiffs' vertical conspiracy claim against B&L, Alcon, and CV should be dismissed because Plaintiffs do not allege that each Manufacturer Defendant possesses sufficient market power to cause harm to competition, instead alleging that the Manufacturer Defendants collectively control 97% of the contact lens market.  (Doc. 145 at 46-49 (citing Complaint ¶¶ 61, 73, 135)).  Defendants contend that "the Complaint is devoid of any allegations that could sufficiently establish any Manufacturer Defendant's market power" noting that the individual market shares of B&L, CV and Alcon is 30% or less. Id. at 47-49; (Doc. 191 at 21).

As set forth above, the alleged vertical agreements are an integral part of a larger alleged hub-and-

44

spoke conspiracy, involving manufacturers who control 97% of the contact lens market, and ultimately ECPs. The UPPs reach at least 40% of the disposable contact lens market in the United States, and the reach of UPPs is projected to grow to 80% of the market as more ECPs prescribe the UPP-protected lenses, with the Manufacture Defendants acting as a block. In this context, Manufacturer Defendants may not deconstruct the larger alleged conspiracy to avoid liability for vertical conspiracies by arguing that each individually impacts less than a large percentage of market share. "'[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" United States v. Apple, Inc., 791 F.3d at 319 (quoting Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962)); see also Toys "R" Us, 221 F.3d at 930-31 (affirming an FTC decision that a network of vertical agreements violated antitrust laws, where dominant toy retailer TRU, that sells approximately 20% of all toys in the United States, entered into ten separate vertical agreements with major toy manufacturers, including the two largest manufacturers accounting for 10 to12% of the market, in a "hub-and-spoke" conspiracy in which the manufacturers agreed to limit their sales of certain toys to the warehouse stores). Moreover, even focusing on the vertical agreements alone, the independent ECPs, who, through their agent ABB, entered into the alleged vertical conspiracy, control two-thirds of the disposable contact lens retail market, Complaint ¶ 184, and thus possess market power as a "retailer cartel" or "dominant inefficient retailer," descried in Leegin as resulting in an anti-competitive effect on the relevant market. See Leegin, 551 U.S. at 897-98 ("If there is evidence retailers were the impetus for a vertical price restraint, there is a greater likelihood that the restraint facilitates a retailer cartel or supports a dominant, inefficient retailer."); see also Jacobs, 626 F.3d at 1336. Moreover, "parties who knowingly join an antitrust conspiracy, like any conspiracy, are liable to the same extent as other conspirators." MM Steel, L.P. v. JSW Steel (USA) Inc., 806 F.3d 835, 844 (5th Cir. 2015).

Defendants argue that Plaintiff have failed to allege the specific vertical agreements between the Manufacturer Defendants and ABB as agent for the ECPs. The Court disagrees. The Complaint sets forth allegations of a number of communications between ECPs, ABB, and the Manufacturer Defendants, regarding the enactment, implementation and enforcement of UPPs. Complaint ¶¶ 102, 103, 106, 107, 111, 114, 115, 117-32. JJVC sought and acted on "feedback" from ECPs, and acknowledged its "commitment to prescribers." Complaint ¶ 122. CV conducted "focus groups" with ECPs regarding pricing policies. Id. ¶ 124. Alcon adopted its UPPs to provide ECPs with "the opportunity to make a reasonable profit margin," and bragged that the UPPsS were "a win" for manufacturers and ECPs alike." Id. ¶¶ 14, 108. JJVC communicated to ECPs that its new pricing strategy would support ECPs' business needs and improve their "capture rate." Id. ¶ 102. And ABB confirmed that its primary goal is to represent ECPs and make their businesses more profitable, and that it "has been working closely with manufacturers to develop unilateral pricing policies." Id. ¶¶ 7, 127. The date of the statement does not detract from its import, as ABB suggests.

The allegations plausibly establish a flow of information up and down the distribution chain about UPPs, from the ECPs' pressure on the Manufacturer Defendants to relieve ECPs of the price competition and thus the siphoning of sales of contact lenses to the Discount Retailers, to the Manufacturer Defendants' dramatic response out of a concern for the ECPs' ability to make a profit on selling contact lens which in turn would incentivize ECPs to prescribe their lenses. The Manufacturer Defendants adopted UPPs in June 2013, January and February 2014, and peaking in June 2014 with three Manufacturer Defendants announcing UPPs applicable to at least eight product lines all in the same month, followed in September 2014 with CV continuing a UPP on a newly purchased product line with a UPP that had been enacted in January 2014. The Defendants along with ECPs communicated back and forth regarding UPPs, as is

46

evidenced by trade journals, social media, direct correspondence, and subsequent testimony, and all parties to the vertical agreements participated in enforcement of the UPPs. Additionally, Plaintiffs have alleged direct evidence of an actual negotiations and "agreement" between Manufacturer Defendant JJVC and retailer Discount Retailer Costco Wholesale Corporation.  Complaint ¶ 112. "[T]he fact that a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions. A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market." Monsanto Co., 465 U.S. at 762.  However, the Court must look beyond a defendant's bald denial of concerted action and analyze the substance of the factual allegations to determine if an agreement or concerted action is sufficiently pleaded. See DeLong Equip. Co. v. Washington Mills Abrasive Co., 887 F.2d 1499, 1515 (11th Cir. 1989). "Conspiracies are rarely evidenced by explicit agreements, and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators." Id.

At this stage of the proceedings, plaintiffs will often be unable to prove the existence of an express agreement, and thus may rely on inferences from the alleged conspirators' conduct. "Plaintiffs need not allege the existence of collusive communications in 'smoke filled rooms,'" . . . in order to state a § 1 Sherman Act claim. See In re Delta/AirTran Baggage Fee Antitrust Litig., 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010). An antitrust plaintiff must plead enough facts to state a claim for relief that is plausible on the face of the complaint. See Twombly, 550 U.S. at 556, 570. "Circumstances must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." Monsanto, 464 U.S. at 764 (internal quotation marks and citation omitted).  This involves "more than a showing that the distributor conformed to the suggested price.  It means as well that evidence must be

presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer." Id. at 764 n.9. The multiple allegations of communications suggest a common design and understanding, and meeting of the minds. Accepting the factual allegations in the Complaint as true, and construing the Complaint in the light most favorable to Plaintiffs, the allegations set forth above state a plausible claim that the Manufacturer Defendants entered into unlawful vertical agreements with ABB and the ECPs to restrain trade.

Defendants have not asserted any pro-competitive justification for the UPPs, other than to argue that they were acting independently in response to market conditions. Plaintiffs have alleged significant anti-competitive effects, including significant price increases; elimination of intrabrand competition among retailers selling the same brand; the restrictions on consumers' ability to "shop around;" the elimination of price competition from Discount Retailers; and the sluggish growth in the market, together creating a plausible inference of an unreasonable restraint on trade. See Complaint ¶ 102, 149, 150, 159, 160, 163-69, 170, 185. The factual allegations of Plaintiffs' Complaint are sufficient to plausibly establish that the Manufacturer Defendants and distributors "'had a conscious commitment to a common scheme to achieve an unlawful objective,'" see Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc., 818 F.2d 1530, 1535 (11th Cir. 1987) (quoting Monsanto, 465 U.S. at 764), and damage to competition as a result of Defendants' vertical agreements. The allegations nudge Plaintiffs' vertical conspiracy claim across the line from conceivable to plausible, Jacobs, 626 F.3d at 1333, and "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly, 550 U.S. The Court notes however, that a Rule 12(b)(6) motion to dismiss for failure to state a claim "merely tests the sufficiency of the complaint; it does not decide the merits of the case." Zlotnick v. Premier Sales Grp., Inc., 431 F. Supp. 2d 1290, 1293 (S.D. Fla. 2006), aff'd, 480 F.3d 1281 (11th Cir. 2007).

### 2.   Plaintiffs' Standing

Defendant Manufacturers argue that because none of the Plaintiffs have alleged that they purchased any individual manufacturer's contact lenses, they have failed to allege any facts establishing that they have standing to bring these vertical § 1 claims. (Doc. 145 at 17); (see also Doc. 214; Transcript at 66-67). Defendants argue that to have standing to assert a vertical antitrust claim pursuant to § 1, "'at least one named plaintiff must establish Article III standing' with respect to each product." Id. at 49-51 (quoting Toback v. GNC Holdings, Inc., No. 13-80526-CIV, 2013 WL 5206103, at *4 (S.D. Fla. Sept. 13, 2013) (analyzing a class action complaint brought pursuant to the Florida Deceptive and Unfair Trade Practices Act)). Manufacturer Defendants argue that "[e]ven if Plaintiffs' horizontal conspiracy allegations were sufficient . . . the mere allegation of conspiracy is insufficient to confer standing in the absence of information sufficient to show that at least one named plaintiff purchased each product supposedly included in the alleged conspiracy." (Doc. 191 at 22).

Plaintiffs allege that each named Plaintiff "purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period." Complaint ¶¶ 28-41.

Article III of the United States Constitution permits the court to hear only "Cases" and "Controversies." U.S. Const. art. III, § 2; see Warth v. Seldin, 422 U.S. 490, 498 (1975). Article III standing has three elements: (1) injury in fact to "'a legally protected interest'" that is "'(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;'" (2) "'a causal connection between the injury and the conduct complained of'" that is fairly traceable to the defendant's action; and (3) a likelihood that the injury will be redressed by a favorable decision. Fla. Family Policy Council v. Freeman, 561 F.3d 1246, 1253 (11th Cir. 2009) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)). "'At the pleading stage, general factual allegations of injury resulting from the defendant's

conduct may suffice'" to establish standing. Resnick v. AvMed, Inc., 693 F.3d 1317, 1323 (11th Cir. 2012) (quoting Lujan, 504 U.S. at 561); see also Clements v. LSI Title Agency, Inc., 779 F.3d 1269, 1273 (11th Cir. 2015) (same); Bischoff v. Osceola Cty., Fla., 222 F.3d 874, 878 (11th Cir. 2000) ("Therefore, when standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing.").

Antitrust standing "involves more than the 'case or controversy' requirement that drives constitutional standing." Todorov, 921 F.2d at 1448. It requires "an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws. . . . Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws." Id. (citations omitted); see also Omni Healthcare, Inc. v. Health First, Inc., No. 6:13-cv-1509-Orl-37DAB, 2015 WL 275806, at *7 (M.D. Fla. Jan. 22, 2015). The Eleventh Circuit employs a two-pronged test to determine whether a plaintiff has antitrust standing. See Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp., 604 F.3d 1291, 1299 (11th Cir.2010). "[F]irst, the plaintiff must have alleged an antitrust injury." Id. An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Second, "the plaintiff must be an efficient enforcer of the antitrust laws." Palmyra, 604 F.3d at 1299. The "efficient enforcer" requirement ensures that a "particular plaintiff will efficiently vindicate the goals of the antitrust laws." Todorov, 921 F.2d at 1452; see also Omni Healthcare, Inc. 2015 WL 275806, at *7.

Antitrust standing "can be established by showing that consumers paid higher prices for a product due to anticompetitive actions of a defendant, such as a horizontal market allocation scheme." In re Online DVD-Rental Antitrust Litig., 779 F.3d 914, 922 (9th Cir. 2015). Here, Plaintiffs' allegations plausibly

50

establish that the Plaintiffs who purchased contact lenses manufactured by the Manufacturer Defendants that were subject to a UPP during the Class Period paid a higher price for the product as a result of the UPPs.  As set forth above, they have properly alleged a "hub-and-spoke" antitrust conspiracy, involving a horizontal agreement between the Manufacturer Defendants.  See McCarn v. HSBC USA, Inc., No. 1:12-cv-00375 LJO SKO, 2012 WL 7018363, at *4 n.2 (E.D. Cal. May 29, 2012) (requiring plaintiff to properly allege hub-and-spoke conspiracy to "establish that any injury he suffered is fairly traceable to the actions of the Moving Defendants.").  Because the alleged horizontal co-conspirator Manufacturer Defendants are jointly and severally liable under Section 1 for any injury suffered by Plaintiffs, Plaintiffs are not required at this pleading stage to identify the product they purchased beyond the fact that it was subject to a UPP. See Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co., 81 F. Supp. 3d 1, 7 (D.D.C. 2015) (finding that because the alleged co-conspirators are jointly and severally liable, "Plaintiffs . . . need not identify, at this stage, to which co-conspirator they paid fuel surcharges" in order to plead standing); In re Polypropylene Carpet Antitrust Litig., 178 F.R.D. 603, 609 (N.D. Ga.1997) ("[I]n order for Plaintiffs to possess standing to act as class representatives, Plaintiffs must adduce evidence showing they purchased carpet from the named Defendants or their co-conspirators during the alleged conspiracy period.").  See generally Ward v. Apple Inc., 791 F.3d 1041, 1048 (9th Cir. 2015) (Antitrust conspirators are liable for the acts of their co-conspirators.);  Paper Sys. Inc. v. Nippon Paper Indus. Co., 281 F.3d 629, 633 (7th Cir. 2002) (observing that joint and several liability among participants in an antitrust conspiracy is a vital instrument for maximizing deterrence.).

## VI.    State Law Claims

### A.    Third Cause of Action: Claim for Violation of the California Cartwright Act ["Count 3"]

Plaintiffs allege that because "Defendants' conduct has occurred in substantial part in the State of California," it violates the California Cartwright Act (Cal. Bus. & Prof. Code §§ 16720 et seq.), "which prohibits combinations of two or more persons' capital, skill, or acts to restrict trade or commerce." Complaint ¶ 194-98. Plaintiffs allege that as a direct and proximate result of Defendants' conduct, members of the Plaintiff "California Subclass" paid more for contact lenses than they otherwise would have paid, paying prices that are "supra-competitive [and] artificially inflated." Id. ¶¶ 195-96. The parties treat Count 3 alleging a violation of the California Cartwright Act as being subject to the same standards as Plaintiffs' Section 1 Sherman Act antitrust claims. (See Doc. 145 at 52; (Doc. 185 at 57-61 (arguing that the Cartwright Act is "'broader in range and deeper in reach than the Sherman Act.'" (citation omitted))

For the reasons set forth above, Plaintiffs allege a plausible claim under the California Cartwright Act. See generally Cty. of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1160 (9th Cir.2001) ("The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act . . . was modeled after the Sherman Act."); In re Cipro Cases I & II, 348 P.3d 845, 858 (Cal. 2015) ("Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century." (citations omitted)).

### B.    Third Cause of Action: Claim for Violation of the Maryland Antitrust Act ["Count 4"]

Likewise, the parties agree that claims brought pursuant to the Maryland Antitrust Act, Md. Code

52

Ann., Com. Law § 11-201 et seq. are subject to the same analysis that applies to Plaintiffs' Sherman Act § 1 claims. (See Doc. 145 at 52, 53 ("Maryland and California state antitrust statutes require that plaintiffs plead the existence of an agreement in restraint of trade.")); (Doc. 185 at 61-62). Plaintiffs allege that "Defendants' conduct has occurred in substantial part in the State of Maryland," and that the "Maryland Plaintiffs and the members of the Maryland Subclass" have been injured by Defendants' conduct. Complaint ¶¶ 199-202.

For the reasons set forth above, Plaintiffs' Complaint sufficiently alleges a claim under the Maryland Antitrust Act. See generally Krause Marine Towing Corp. v. Ass'n of Md. Pilots, 44 A.3d 1043, 1053 (Md. Ct. Spec. App. 2012) (observing that Maryland's Antitrust Act "is essentially the same as § 1 of the Sherman Antitrust Act," and that "[d]ecisions of federal courts interpreting the Sherman Antitrust Act" guide the analysis of a claim brought pursuant to the Maryland Antitrust Act. (citations omitted)).

## C.   Sixth Cause of Action: Claim for Violation of the California Unfair Competition Law ["Count 5"]

Plaintiffs allege in Count 5 that Defendants' conduct, which "has occurred in substantial part in the State of California," constitutes "'unfair' business acts and practices" in violation of the California Unfair Competition Law ("UCL") (Cal. Bus. and Prof. Code §§ 17200 et seq.), that is likely to cause substantial injury to the California Plaintiffs and members of the California Subclass "that is not 'reasonably avoidable" by the California Plaintiffs and "is 'not outweighed' by the practices' benefits" to the Plaintiffs. Complaint ¶¶ 205, 207. Plaintiffs allege that "Defendants' anticompetitive agreements constitute unfair business acts or practices within the meaning of the UCL in that the justification for Defendants' conduct is outweighed by the gravity of the consequences to the general public." Id. ¶ 206. Plaintiffs allege that Defendants' "agreed-upon UPPs" are contrary to public policy and that their conduct is an "unfair" and

53

"unlawful' business practice" because it is contrary to the Sherman Act, the Cartwright Act and the Maryland Antitrust Act, as well as the spirit and the purpose of the FCLCA. Id. ¶¶ 208-10.

Defendants argue that Plaintiffs' failure to plead any agreement in restraint of trade, vertical or horizontal, defeats Plaintiffs' allegation that Defendants are liable for "unfair" and "unlawful" business practices under the UCL based on a violation of antitrust laws. (Doc. 145 at 52). They contend that their conduct, which is permissible under Colgate, "cannot be deemed 'unfair,'" and that Plaintiffs have not alleged that the UPPs interfered with FCLCA mandated patient access to prescriptions, and thus the FCLCA cannot be the underpinning for a UCL claim. Id. at 53.

The UCL provides that

> any person or entity that has engaged, is engaging or threatens to engage "in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code §§ 17201, 17203. "Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. The California Supreme Court has held that the UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co., 973 P.2d 527 (Cal. 1999) (internal quotations and citation omitted). The UCL "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." Id. (internal quotations and citation omitted). Further, the UCL creates "three varieties of unfair competition - acts or practices which are unlawful, or unfair, or fraudulent." Id.

Wilson v. Hewlett Packard Co., 668 F.3d 1136, 1140 (9th Cir. 2012). "The broad scope of the statute encompasses both anticompetitive business practices and practices injurious to consumers." Chavez v. Whirlpool Corp., 113 Cal. Rptr. 2d 175, 183 (Cal. Ct. App. 2001).

Plaintiffs' UCL claim is derivative of their Section 1 Sherman Antitrust Act and Cartwright Act claims. Thus, Count 5 of the Complaint alleges a plausible claim of violation of the California UCL for

the same reasons Counts 1, 2 and 3 allege plausible claims, as set forth above. E.g. Retrophin, Inc. v. Questcor Pharms., Inc., 41 F. Supp. 3d 906, 918 (C.D. Cal. 2014).

**D.    Seventh Cause of Action: Claim for Violation of the Maryland Consumer Protection Act ["Count 6"]**

Plaintiffs allege in Count 6 that under the Maryland Consumer Protection Act ("MCPA") (Md. Com. Law § 13-303(1)), "a trade practice is considered unfair when it results in a: (1) substantial injury; (2) that is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces; and (3) it must not be the type of injury that a consumer could reasonably have avoided." Complaint ¶ 214. Plaintiffs allege that Defendants' implementation of the UPPs constitutes an "unfair practice" under th MCPA causing the "Maryland Plaintiffs and the members of the Maryland Subclass to incur substantial additional actual damages in the form of increased prices paid for contact lenses at retail." Id. ¶ 215. Plaintiffs allege that Defendants' conduct violates the purpose and intent of the FCLCA, presents "insurmountable obstacles" to Plaintiffs' ability to obtain the lowest price for contact lens by interfering with the market, and is not outweighed by any countervailing benefits to Maryland consumers or to competition. Id. ¶¶ 216-19.

The Manufacturer Defendants argue that "'the MCPA proscription of unfair and deceptive acts does not include antitrust violations, because the unfair or deceptive trade practices prohibited by the MCPA do not include monopolistic conduct or other violations of [the Maryland Antitrust Act]." (Doc. 145 at 53 (Manufacturers' Motion at 44) (quoting In re New Motor Vehicles Canadian Exp. Antitrust Litig., 350 F. Supp. 2d 160, 188 (D. Me. 2004)). Thus, according to Defendants, because Plaintiffs allege a potential violation of the Maryland Antitrust Act, their MCPA claim fails. Id. Additionally, Defendants contend that Plaintiffs may not recover under the MCPA "for defendants' Colgate-compliant UPPs." Id. at 54.

55

Section 13-303 of Maryland's Code, Commercial Law, provides :

> A person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in:
>
>> (1) The sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services;
>>
>> (2) The offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services;
>>
>> (3) The offer for sale of course credit or other educational services;
>>
>> (4) The extension of consumer credit;
>>
>> (5) The collection of consumer debts; or
>>
>> (6) The purchase or offer for purchase of consumer goods or consumer realty from a consumer by a merchant whose business includes paying off consumer debt in connection with the purchase of any consumer goods or consumer realty from a consumer.

Md. Code Ann., Com. Law § 13-303.

Plaintiffs argue that the allegations of the Complaint "satisfy the catch-all general standard of that statute." (Doc. 185 at 62 (citing Md. Code Ann., Com. Law § 13-301(9)). The section provides:

> Unfair or deceptive trade practices include any:
>
>> . . .
>
>> (9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:
>>
>>> (i) The promotion or sale of any consumer goods, consumer realty, or consumer service;
>>>
>>> (ii) A contract or other agreement for the evaluation, perfection, marketing, brokering or promotion of an invention; or

56

> (iii) The subsequent performance of a merchant with respect
> to an agreement of sale, lease, or rental.

Md. Code Ann., Com. Law § 13-301 (9).  Plaintiffs contend that in addition to antitrust claims, they have

sufficiently alleged "deception, fraud, false pretense, false premise, misrepresentation, or knowing

concealment, suppression, or omission" in connection with the sale of contact lenses by alleging that: (1)

Defendants' conspiracy interferes with the relationship between ECPs and their patients and effects

medical judgment; (2) the Manufacturer Defendants made false statements regarding the risk to patients'

eye health caused by purchasing lenses from retailers other than ECPs; (3) ECPS failed to provide

prescriptions to their patients as required by law; and (4) ABB urged ECPs to charge more than the

UPP-mandated prices.  Id. at 63 (citing Complaint ¶¶ 6, 65, 130, 155, 219).  Plaintiffs cite to no legal

authority in support of their interpretation of the allegations of their antitrust Complaint.

Maryland courts, construing Section 13-303 have specifically rejected that the MCPA reaches

antitrust claims.

> Antitrust violations . . . are not listed in MCPA's list of prohibited activities.
> . . . Maryland has separate statutory schemes addressing antitrust and unfair
> or deceptive trade practices. . . The actionable unfair or deceptive trade
> practices listed in the [MCPA] do not include monopolistic conduct or other
> violations of [Maryland Antitrust Act].

Davidson v. Microsoft Corp., 792 A.2d 336, 345 (Md. Ct. Spec. App. 2002) (citation omitted); see also

In re Microsoft Corp. Antitrust Litig., 127 F. Supp. 2d 702, 724 n. 25 (D. Md. 2001).

Plaintiffs' Complaint sets forth allegations in support of their antitrust claims.  Plaintiffs allege that

they as consumers are injured by the conspiratorial agreements between Defendants, both vertical and

horizontal, which they contend unlawfully restrain trade, raise prices, and eliminate consumers' ability to

"shop around."    Plaintiff's theory of recovery is not based upon any of listed purported

Case 3:15-md-02626-HES-JRK   Document 243   Filed 06/16/16   Page 58 of 60 PageID 3004


"misrepresentations" or "omissions" by Defendant Manufacturers or ABB. The Court declines to adopt Plaintiffs' novel theory of liability under the MCPA. Because Section 13-303 does not provide a cause of action for antitrust claims, such as those asserted by Plaintiffs, Count 6 of the Complaint is due to be dismissed.

### Conclusion

This evaluation has proceeded exclusively on the face of the Complaint. Nothing said should be understood as a prediction of the facts that may turn up in discovery, nor an opinion about the likely fate of any possible alternative explanations for Defendants' conduct or defenses,. or the ultimate merits of Plaintiffs' claims. See Twombly, 550 U.S. at 556-57 ( "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." (Citation omitted)).

Upon due consideration, it is hereby

**ORDERED**:

1.     Manufacturer Defendants' Motion and Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Corrected Consolidated Class Action Complaint (Doc. 145) is **GRANTED IN PART AND DENIED IN PART** as follows:

A.     The Motion is **GRANTED** as it pertains to Seventh Cause of Action: Claim for Violation of the Maryland Consumer Protection Act ["Count 6"] of Plaintiffs' Corrected Consolidated Class Action Complaint (Doc. 135);

B.     The Motion is **DENIED** as it pertains to the: First Cause of Action: Claim of Violation of 15 U.S.C. §§ 1 and 3 (Per Se Violation of the Sherman Act) ["Count 1"]; Second Cause of Action: Claim for Violation of 15 U.S.C. §§ 1 and 3 (Rule of Reason Violations of the Sherman Act)

["Count 2"]; Third Cause of Action: Claim for Violation of the California Cartwright Act ["Count 3"]; Third Cause of Action: Claim for Violation of the Maryland Antitrust Act ["Count 4"]; and Sixth Cause of Action: Claim for Violation of the California Unfair Competition Law ["Count 5"].

   2. Defendant ABB Optical Group's Motion to Dismiss Plaintiffs' Corrected Consolidated Class Action Complaint and Memorandum of Law in Support of Same  (Doc. 146) is **GRANTED IN PART AND DENIED IN PART** as follows:

   A. The Motion is **GRANTED** as it pertains to Seventh Cause of Action: Claim for Violation of the Maryland Consumer Protection Act ["Count 6"] of Plaintiffs' Corrected Consolidated Class Action Complaint (Doc. 135);

   B. The Motion is **DENIED** as it pertains to the: First Cause of Action: Claim of Violation of 15 U.S.C. §§ 1 and 3 (Per Se Violation of the Sherman Act) ["Count 1"]; Second Cause of Action: Claim for Violation of 15 U.S.C. §§ 1 and 3 (Rule of Reason Violations of the Sherman Act) ["Count 2"]; Third Cause of Action: Claim for Violation of the California Cartwright Act ["Count 3"]; Third Cause of Action: Claim for Violation of the Maryland Antitrust Act ["Count 4"]; and Sixth Cause of Action: Claim for Violation of the California Unfair Competition Law ["Count 5"].

   3. Defendants Alcon Laboratories, Inc., Johnson & Johnson Vision Care, Inc., Bausch & Lomb Inc., CooperVision, Inc., and  ABB Concise Optical Group, LLC. each shall file an answer to Plaintiffs'

Corrected Consolidated Class Action Complaint (Doc. 135), within twenty (20) days of the date of entry of this Order.

      **DONE AND ORDERED** in Jacksonville, Florida, this ⁄⁄ day of June, 2016.

HARVEY E. SCHLESINGER
United States District Judge

jl

Copies to:

Counsel of Record