**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| In Re:<br><br>**DISPOSABLE CONTACT LENS ANTITRUST LITIGATION** | | **Case No. 1:15-md-2626-HES**<br><br>**Judge Harvey E. Schlesinger** |
|---|---|---|
| **THIS DOCUMENT RELATES TO:**<br><br>**All Class Actions** | | **PLAINTIFFS' INTERLINEATION TO CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. JURISDICTION AND VENUE .......................................................................... 10

III. PARTIES ............................................................................................................ 11

   A. Plaintiffs ......................................................................................................... 11

   B. Defendants....................................................................................................... 13

IV. CLASS ALLEGATIONS .................................................................................... 14

V. TRADE AND COMMERCE................................................................................ 17

VI. FACTUAL ALLEGATIONS .............................................................................. 18

   A. The Disposable Contact Lens Market .......................................................... 18

      1. The Nature of the Products and the Market in Which They are Sold. ........... 18

      2. The Disposable Contact Lens Market And Its Wholesale Submarket. .......... 21

      3. The Retail Submarket. .................................................................................... 23

      4. Pricing in Retail Channels .............................................................................. 25

   B. Prior Efforts by Manufacturers and Independent ECPs to Reduce Price

      Competition for Contact Lenses. .................................................................... 28

   C. Implementation of the UPPs. ......................................................................... 33

      1. Actions by Manufacturer Defendants............................................................. 33

2.   Role of ABB and ECPs in Developing and Agreeing to UPPs. ...................... 39

3.   The Manufacturer Defendants Jointly Agreed to Implement UPPs. .............. 48

4.   The Manufacturers Defendants' UPPs Harm Competition. .......................... 58

VII.   CAUSES OF ACTION. ........................................................................................ 64

FIRST CAUSE OF ACTION ...................................................................................... 64

SECOND CAUSE OF ACTION .................................................................................. 66

THIRD CAUSE OF ACTION ...................................................................................... 69

THIRD CAUSE OF ACTION ...................................................................................... 70

SIXTH CAUSE OF ACTION ...................................................................................... 71

SEVENTH CAUSE OF ACTION ................................................................................ 73

VIII.   PRAYER FOR RELIEF .................................................................................... 75

IX.   JURY TRIAL DEMAND .................................................................................... 77

## I.    INTRODUCTION

1.    Plaintiffs Rachel Berg, Miriam Pardoll, Elyse Ulino, Jennifer Sineni, Susan Gordon, Cora Beth Smith, Brett Watson, Kathleen Schirf, Tamara O'Brien, John Machikawa, Amanda Cunha, Alexis Ito, Catherine Dingle, Sheryl Marean, Pamela Mazzarella and Joe Felson ("Plaintiffs") bring this action under federal and certain state antitrust and consumer protection laws on behalf of themselves individually and on behalf of a Plaintiff class (the "Class") consisting of all persons and entities in the United States who made a retail purchase or purchases of disposable contact lenses ("contact lenses") manufactured by Defendants Alcon Laboratories, Inc. ("Alcon") (a division of Novartis AG ("Novartis")); Johnson & Johnson Vision Care, Inc. ("JJVC") (which operates in the United States under the "Vistakon" trade name); Bausch & Lomb Inc. ("B&L") (owned by Valeant Pharmaceuticals International, Inc. ("Valeant")); and CooperVision, Inc. ("CV") (collectively "Manufacturer Defendants") subject to one of the "Unilateral Pricing Policies" ("UPPs") described herein from June 1, 2013 to the present. Except with respect to the allegations relating to themselves, all of Plaintiffs' allegations herein are based on information or belief.

2.    Plaintiffs assert that the Manufacturer Defendants conspired with each other and with Defendant ABB Concise Optical Group, LLC ("ABB"), a wholesaler, as well as independent eye care professionals ("ECPs") (*e.g.*, optometrists and ophthalmologists who sell contact lenses to consumers) and their trade association, the American Optometric Association ("AOA"), to impose minimum resale prices on certain contact lens lines by subjecting them to UPPs, thereby reducing or eliminating price

competition on those products from "big box" stores (*e.g.*, those owned or operated by Wal-Mart Stores, Inc. ("Wal-Mart") and Meijer, Inc. ("Meijer")), buying clubs (*e.g.*, those run by Costco Wholesale Corporation ("Costco")), and internet-based retailers (*e.g.*, 1-800-Contacts and LensDiscounters.com) (collectively, "Discount Retailers") by preventing them from discounting those products.[1] As ECPs themselves have acknowledged, this new pricing scheme represents a "fundamental shift" in how contact lenses are sold to consumers.

3.      To be clear, Plaintiffs are not alleging that the Manufacturer Defendants, working with ABB, conspired to fix the prices of their respective contact lenses at the same level. Instead, the Manufacturer Defendants, working with ABB, conspired to eliminate discounting of contact lenses by ensuring that all retailers charged the same minimum price. As the United States Supreme Court stated in *Catalano, Inc. v. Target Sales*, 446 U.S. 643, 648 (1980), an "agreement to eliminate discounts" "falls squarely within the traditional *per se* rule against price fixing."

4.      The Manufacturer Defendants, ABB and the independent ECPs all share an interest in not reducing the retail price of contact lenses and limiting competition from Discount Retailers. The Manufacturer Defendants have also expressed concern about the discounts offered by online retailers, because they saw price-bargaining power shifting away from manufacturers towards big buyers. ABB, which is the largest distributor of contact lenses in the United States and which services more than two-thirds of ECPs, shares the Manufacturer Defendants' goal of not reducing retail prices. ECPs, which have

---

[1] The examples given are intended to be illustrative only.

traditionally sold contact lenses at prices much higher than Discount Retailers, similarly sought to limit such price competition.

5.     Competition in the market for contact lenses in the United States is distorted by the unique role played by ECPs. Unlike prescription drugs, which are prescribed by doctors but sold only by pharmacies, ECPs both prescribe and sell contact lenses. When an ECP writes a prescription for a patient, that ECP prescribes not only the type and power of the lenses, but also the particular brand. Unless the patient comes back for another eye examination, or switches ECPs, he or she has to buy the prescribed brand of lenses for the length of the prescription, typically from one to two years.

6.     The power to prescribe makes ECPs the gatekeepers of the disposable contact lens market. ECPs have the power and the economic incentive to prescribe lenses that provide them the largest profit margins. Contact lens manufacturers understand these incentives all too well. ECPs will refuse to prescribe a manufacturer's lenses if their profit margins are undercut by efficient retailers such the Discount Retailers. As a result, contact lens manufacturers have always done what they can to insulate ECPs from price competition. The economic purpose of the UPPs is to insulate ECPs from price competition from more efficient distributors, such as the Discount Retailers.

7.     Defendant ABB plays an important role in the contact lens industry. As its website states, "ABB OPTICAL GROUP is the nation's largest distributor of soft contact lenses. We supply more than two-thirds of Eye Care Professionals in America with brand name contact lenses; high grade ophthalmic and fully customizable Gas Permeable Lenses." ABB sells primarily to independent ECPs as opposed to ECPs employed by

chain optical stores such as LensCrafters. Independent ECPs charge the highest average prices for contact lenses compared to any other channel of distribution. ABB's unique role in the industry is buttressed by its single-minded focus on raising ECPs' profit margins. Angel Alvarez ("Alvarez"), ABB's CEO, describes his company as the "category captain" for ECPs, and says ABB is "helping them manage that [contact lens] portion of their business. . . . .We take very seriously the trust that they have." His stated goal is to help ECPs grow their practices and "make more money." ABB is not merely a wholesale distributor. It regularly surveys its ECP customers to find out how much they are charging their patients for each different type and brand of contact lenses. ABB then publishes the results of the surveys in its periodic *Retail Price Matrix* publication so that ECPs can make sure their prices are as high as their fellow practitioners. In its *Profit Advisor* newsletter, ABB also advises its ECP clients to charge as much as possible for contact lenses, above the UPP floor set by the Manufacturer Defendants. As the biggest customer of the Manufacturer Defendants, ABB acts as an agent for its 19,000 independent ECP customers. UPPs benefit ABB by causing more consumers to purchase replacement contact lenses from the independent ECPs who are ABB's clients.

8.  To accomplish their shared goals, the Manufacturer Defendants, ABB and the independent ECPs jointly agreed to alter the pricing model for contact lenses. Before June of 2013, each of the Manufacturer Defendants permitted retailers to determine the prices at which they would sell their contact lenses and did not preclude discounting of such products. Now, each of the Manufacturer Defendants prohibits retailers from selling certain lines of contact lenses below mandated prices. This draconian parallel change in

the pricing model would not have occurred in the absence of an agreement among the Defendants. Contact lenses are the ***only prescription medical device*** sold in the United States pursuant to a UPP.

9.      As part of this conspiracy, ABB worked with the Manufacturer Defendants to develop UPPs for several of the most advanced and/or most popular lines of contact lenses sold by the Manufacturer Defendants. Over the course of 15 months commencing in June of 2013, each Manufacturer Defendant implemented this strategy in the form of a minimum resale price maintenance ("MRPM") scheme that it misleadingly called a "UPP." Under this MRPM scheme, each Manufacturer Defendant promulgated a minimum retail price for its affected product(s) and threatened to curtail the supply of some of its contact lens lines to retailers who sell below the mandated price. Alcon was the first to do so in June of 2013 and expanded the number of contact lenses subject to the policy to four lines in succeeding months. B&L followed suit with respect to one of its major contact lens product lines in February of 2014. JJVC took a similar step with respect to at least eight of its contact lens product lines in June of 2014. And CV followed suit in September of 2014 with respect to one of its contact lens lines.

10.      This UPP scheme was anything but "unilateral." The conduct at issue here can be characterized similarly to how the United States Supreme Court characterized the conduct at issue in *United States v. General Motors Corp*., 384 U.S. 127, 148 (1966) ("*General Motors*"): "once the agreements were secured, General Motors both solicited and employed the assistance of its alleged co-conspirators in helping to police them. What resulted was a fabric interwoven by many strands of joint action to eliminate the

discounters from participation in the market, to inhibit the free choice of dealers to select their own methods of trade and to provide multilateral surveillance and enforcement. This process for achieving and enforcing the desired objective can by no stretch of the imagination be described as `unilateral' or merely `parallel.'" This Court quoted this language in describing the conduct of certain of the Manufacturer Defendants, the AOA and certain ECPs in the first class action litigation brought to challenge the industry's anti-discounting practices. *In re Disposable Contact Lens Antitrust Litig.*, MDL No. 1030, 2001 WL 493244, at *3 (M.D. Fla. Feb. 8, 2001) ("*MDL 1030 Order*"). Therefore, by referring to "UPPs" throughout this Complaint, Plaintiffs are merely using the name given by Defendants to those pricing policies and are in no way agreeing that they can fairly be characterized as "unilateral."

11.     The Manufacturer Defendants agreed to limit retail price competition only after extensive consultation with independent ECPs and their agent, ABB. Following implementation, the Manufacturer Defendants have enforced the UPPs through actual retaliation, as well as threats, warnings and other communications that ensure compliance with the agreements. Accordingly, when using the term "UPP" in this Complaint, plaintiffs are not accepting Defendants' self-serving mischaracterization of their own conduct.

12.     In testimony given at a hearing held on July 30, 2014 before the Subcommittee on Antitrust, Competition Policy and Consumer Rights of the United States Senate's Judiciary Committee investigating the practices at issue here ("Senate Hearing"), it was estimated that the UPPs implemented by Alcon, JJVC and B&L

6

encompassed 40% of the domestic contact lens market and that the Manufacturer Defendants would extend their UPPs to cover 80% of the market by the end of 2015.

13.     The UPPs were intended to eliminate discounting by Discount Retailers, thereby decreasing their ability to compete with independent ECPs who also sell contact lenses. The UPPs have had the desired effect, as reflected in statements by independent ECPs, ABB, and Discount Retailers.

14.     Thus, for example, Jim Murphy ("Murphy"), Vice-President of Alcon, described Alcon's UPP in a public podcast as, *inter alia*, "a win" for the manufacturers and the doctors, as well as (supposedly) consumers. Independent ECPs have enthusiastically endorsed UPPs. As Gary Gerber ("Gerber"), an influential independent ECP, put it, the agreements guarantee doctors "a margin they have not seen for 20 years." Likewise, ABB has also touted UPPs; Alvarez called them one of the best developments of the last 20 years, because they help ECPs raise profit margins.

15.     The UPPs (and the reference to their accomplishing the highest margins for ECPs in 20 years) have to be viewed in the context of successful prior industry efforts to suppress price competition for contact lenses. More than two decades ago, contact lens manufacturers conspired with ECPs to unlawfully restrict the supply of contact lenses to alternative sources of distribution (*e.g.*, mail-order houses). In 1996, 32 state attorneys general ("AGs") and consumers brought antitrust lawsuits against JJVC, B&L, CIBA Vision ("CIBA") (Alcon's predecessor), and the AOA to curtail these practices. The cases eventually settled and the challenged practices were subject to a five-year injunction, as described in further detail below.

16.     The UPPs also have to be viewed in the context of JJVC's and B&L's efforts to impose MRPM schemes on retailers in Europe and Asia, all of which have been successfully challenged by governmental competition authorities in various countries located in those regions.

17.     For example, in September of 2009, the German Federal Cartel Office ("FCO") levied a fine of €11.5 million against CIBA for fixing minimum resale prices of contact lenses and restricting internet and wholesale prices of its contact lenses. CIBA was found to have utilized an internal "price maintenance" program whereby it enforced minimum resale prices for contact lenses in violation of European Community and German law. The FCO said CIBA's actions amounted to a "particularly severe" threat to competition.

18.     Similarly, in December of 2010, the Japanese Fair Trade Commission ("JFTC") entered a cease and desist order against Johnson & Johnson K.K. for forcing its retailers not to display the selling price for certain of its ACUVUE® contact lenses—the same product line to which UPPs were applied in the United States.

19.     Likewise, in December of 2013, the Korean Fair Trade Commission ("KFTC") fined JJVC 1.806 billion Korean Won for entering into "discount dealership agreements" with retailers whereby the latter had to comply with minimum resale prices for certain of its ACUVUE® contact lenses and if such prices were not observed, the supply of such contact lenses could be terminated on a short-term basis. The KFTC noted that:

> Such measures taken by Johnson & Johnson were aimed at placing restrictions on the scope of dealers and raising the

effectiveness of resale price maintenance, because it was concerned that the consumer sale prices controlled by it could not be maintained, if an optical dealer was allowed to resell a product that the dealer purchased from the company at a lower price through a discount event to another optical dealer.

20.     Most recently, on May 29, 2014, it was reported that Manufacturer Defendants JJVC and B&L were fined by China's National Development and Reform Commission ("NDRC") for violating China's Anti-Monopoly Law. JJVC was fined 3.6 million Yuan and B&L was fined 3.7 million Yuan for requiring retailers to adhere to MRPM agreements, among other practices. The companies used means such as mandating retail prices and requiring coordinated promotional efforts among retailers to stabilize prices, according to the NDRC. As explained below, despite these repeated rebuffs by foreign competition authorities, within a month of the NDRC's decision, JJVC rolled out its UPPs on selected contact lenses in the United States.

21.     An article on OptometryStudents.com succinctly described what happened in the United States when UPPs were inaugurated for contact lenses:

> *In 2013, contact lens manufacturer Alcon (CIBA Vision) took action to end a pricing war that was pricing optometrists out of their own market. It enacted a minimum pricing policy called unilateral pricing policy (UPP).... By setting minimum prices for its contact lenses, Alcon reset the bar for manufacturers to compete on value and service rather than solely on price. Since then, Bausch & Lomb, CooperVision and Vistakon have followed suit.*
>
> In the past, discount and bulk merchandisers were able to cut the cost of premium contact lenses by selling a higher quantity at discounted rates, which allowed them to out price many small business and private practice optometrists. *However, after the enactment of UPP,*

9

> *manufacturers can cut off companies who sell UPP*
> *protected products for less than the minimum retail price.*

(Emphases added).

22.     UPPs represent merely the latest effort by the Manufacturer Defendants and independent ECPs to ensure that discounting of contact lenses does not occur. The victims, as in 1996, are the tens of millions of consumers who use contact lenses.

23.     The UPP practices of the Defendants constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1) and state antitrust and unfair competition laws.

24.     Defendants' conspiracy has caused Plaintiffs and class members to pay millions of dollars more for contact lenses than they otherwise would have paid.

**II.     JURISDICTION AND VENUE**

25.     Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and of the antitrust laws and unfair competition laws of California and Maryland.

26.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

27.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the Defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district.

## III.    PARTIES

### A.    <u>**Plaintiffs**</u>

28.    Plaintiff Rachel Berg is a citizen of the State of Wisconsin who purchased contact lenses manufactured by one of the Defendants that were subject to a UPP during the Class Period.

29.    Plaintiff Miriam Pardoll is a citizen of the State of Florida who purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

30.    Plaintiff Elyse Ulino is a citizen of the State of Florida who purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

31.    Plaintiff Jennifer Sineni is a citizen of the State of Missouri who purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

32.    Plaintiff Susan Gordon is a citizen of the Commonwealth of Pennsylvania who purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

33.    Plaintiff Cora Beth Smith is a citizen of the State of Tennessee who purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

34.    Plaintiff Brett Watson ("Watson") was a citizen of the State of Maryland

until September of 2015 and is now a resident of the District of Columbia. While he was a citizen of Maryland, he purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

35.     Plaintiff Kathleen Schirf ("Schirf") is a citizen of the State of Maryland who purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

36.     Plaintiff Tamara O'Brien ("O'Brien") is a citizen of the State of California who purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

37.     Plaintiff John Machikawa ("Machikawa") is a citizen of the State of California who purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

     a.   Plaintiff Pamela Mazzarella ("Mazzarella") is a citizen of the State of California who purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

     b.   Plaintiff Joe Felson ("Felson") is a citizen of the State of California who purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

38.     Plaintiff Amanda Cunha ("Cunha") was a citizen of the State of California until September of 2015 and is now a resident of the State of New Hampshire. While she was a citizen of California, she purchased contact lenses manufactured by one of the

Manufacturer Defendants that were subject to a UPP during the Class Period.

39.     Plaintiff Alexis Ito ("Ito") is a citizen of the State of California who purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

40.     Plaintiff Catherine Dingle is a citizen of the State of Vermont who purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

41.     Plaintiff Sheryl Marean is a citizen of the State of Maine who purchased contact lenses manufactured by one of the Manufacturer Defendants that were subject to a UPP during the Class Period.

**B.      Defendants**

42.     Defendant Alcon is a Delaware corporation headquartered in Fort Worth, Texas, that is owned by Novartis, a Swiss corporation. Alcon makes eye care products, including contact lenses.

43.     Defendant JJVC is a Florida corporation headquartered in Jacksonville, Florida. JJVC makes eye care products, including contact lenses.

44.     Defendant B&L is a New York corporation headquartered in Bridgewater, New Jersey; it is now owned by Valeant, a Canadian corporation.  B&L makes eye care products, including contact lenses.

45.     Defendant CV is a New York corporation headquartered in Pleasanton, California. CV makes eye care products, including contact lenses.

46.     Defendant ABB is a Delaware corporation headquartered in Coral Springs,

13

Florida that has its contact lens manufacturing operation and one of its distribution centers in Alameda, California. ABB states on its website that it "is the nation's largest distributor of soft contact lenses," and that it "suppl[ies] more than two-thirds of [ECPs] in America with brand name contact lenses, high grade ophthalmic and fully customizable Gas Permeable Lenses." ABB wholesales the contact lenses sold by the Manufacturer Defendants and services over 19,000 ECPs nationwide.

47. Various persons that are not named as Defendants herein have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof. Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date. There is a finite number of co-conspirators and Plaintiffs believe that their identities can be ascertained through Defendants' own records.

## IV.    CLASS ALLEGATIONS

48. Plaintiffs bring this action both on behalf of themselves, and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b) (3), on behalf of the following class (the "Class").

> All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by Alcon, JJVC, B&L, or CV from June 1, 2013 to the present (the "Class Period") for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" as described herein. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

49. The Class includes Subclasses of persons located in California and Maryland, who made retail purchases of disposable contact lenses subject to UPPs. These

14

will be referred to herein as the "California Subclass" and the "Maryland Subclass". In connection with those Subclasses, O'Brien, Machikawa, Mazzarella, Felson, Cunha, and Ito will be referred to herein as the "California Plaintiffs" and Watson and Schirf will be referred to as the "Maryland Plaintiffs."

50.     Plaintiffs do not know the exact number of Class and Subclass members because such information is in the exclusive control of Defendants. Plaintiffs believe that, due to the nature of the trade and commerce involved, there are most likely hundreds of thousands of Class members, geographically dispersed throughout the United States such that joinder of all class members is impracticable.

51.     Plaintiffs' claims are typical of the claims of the Class (or, where applicable, Subclasses) in that Class or Subclass members all purchased contact lenses subject to a Manufacturer Defendants' UPPs. All Class or Subclass members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the class.

52.     Numerous questions of law or fact arise from Defendants' anticompetitive conduct that are common to the Class or Subclasses, including but not limited to:

a.      Whether the Manufacturer Defendants engaged in a contract, combination, and/or conspiracy among themselves and with ABB and the ECPs to fix, raise, maintain, or stabilize prices of contact lenses sold in the United States;

b.      Whether the Manufacturer Defendants' UPPs operated as unreasonable restraints of trade;

      c.     Whether Defendants' conduct caused the prices of contact lenses sold in the United States to be sold at artificially high and supra-competitive levels;

      d.     Whether the Plaintiffs and the other members of the Class and Subclasses were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class and Subclass members; and

      e.     The scope of any injunctive relief to which Plaintiffs and the other members of the Class and Subclasses are entitled.

53.     These and other questions of law and fact are common to the Class and Subclasses and predominate over any questions affecting only individual Class members.

54.     Plaintiffs' claims are typical of the claims of the Class and Subclasses because Class and Subclass members purchased contact lenses covered by one or more of the Defendants' UPPs.

55.     Plaintiffs will fairly and adequately represent the interests of the Class and Subclasses in that they have no conflict with any other members of the Class and Subclasses. Furthermore, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

56.     Defendants have acted on grounds generally applicable to the Class and Subclasses, thereby making final injunctive relief appropriate with respect to the Class and Subclasses as a whole.

57.     This class action is superior to the alternatives, if any, for the fair and

efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. Prior class action litigation involving similar conduct with respect to a similar consumer class and the same types of products was successfully managed through trial in the case of *In re Disposable Contact Lens Antitrust Litig*., MDL No. 1030 (M.D. Fla.) ("MDL 1030").

58.     The prosecution of separate actions by individual Class and Subclass members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## V.     TRADE AND COMMERCE

59.     Based on evidence given at the Senate Hearing, nearly 41 million Americans wear contact lenses, spending approximately $4.2 billion annually on these products.

60.     During the Class Period, each Manufacturer Defendant (or one or more of its subsidiaries) and ABB sold contact lenses in the United States, its territories and the District of Columbia in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

61.     During the Class Period, the Manufacturer Defendants collectively controlled a majority of the United States contact lens market.

62.     Defendant ABB is the largest distributor of contact lenses in the United States. More than two-thirds of ECPs in the United States purchase contact lenses from ABB.

63.     The business activities of the Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VI.     FACTUAL ALLEGATIONS

### A.     The Disposable Contact Lens Market

#### 1.     The Nature of the Products and the Market in Which They are Sold.

64.     As noted above, for purposes of this Complaint, the term "contact lenses" refers to disposable contact lenses (including lenses for short-term use). Such lenses, which were introduced to the market in 1987, are the most popular contact lens style in the United States and account for approximately 90% of contact lenses sold in the United States. Depending on the contact lens line, these contact lenses are replaced either on a daily, weekly, or monthly basis. Daily contact lenses are designed to be worn for a single day; weekly contact lenses are designed to be replaced on a weekly basis; and monthly contact lenses are designed to be replaced every one to three months. Contact lenses include both spherical lenses, which contain a single refractive power, and specialty lenses, which are crafted to address specific vision conditions, such as toric lenses (for people diagnosed with astigmatism), and bifocal and multifocal contact lenses (for people diagnosed with presbyopia). As Murphy of Alcon admitted in the podcast referenced above, contact lenses are a commoditized product.

65.     The United States Food and Drug Administration ("FDA") first approved the use of soft contact lenses in 1971. Disposable contact lenses are a soft contact lens. Since that time, contact lenses have been treated as Class II (with respect to contact lenses for daily use) and Class III (with respect to contact lenses for more sustained use)

pharmaceutical devices that require a prescription from an ECP to purchase. 21 C.F.R. §§886.5925 (b)(1), (b)(2). The first generation of contact lenses required significant work on the part of an ECP to fit the lens, and as a result, most consumers purchased their contact lenses directly from their ECP. As contact lens technology improved, consumers were able to unbundle the purchase of their lenses from their eye exams because, in the words of a 2005 report by the Federal Trade Commission ("FTC") entitled *The Strength of Competition In The Sale of Rx Contact Lenses: An FTC Study* (the "2005 FTC Report"), "the replacement lens a consumer purchases pursuant to a prescription that specifies a brand will be identical, regardless of where it is purchased." However, to make it more difficult for patients to shop for replacement lenses, ECPs often refused to hand over a copy of their patient's prescription.

66.     That situation changed with the December 6, 2003 enactment of the Fairness to Contact Lens Consumers Act ("FCLCA") (15 U.S.C. §§ 7601 *et seq*.), which requires ECPs to provide patients copies of their contact lens prescriptions automatically so that they can purchase their contact lenses from a retailer other than their ECP. Section 4(f) of the FCLCA (15 U.S.C. § 7603(f)) also barred sellers from altering a contact lens prescription. The legislative history of the FCLCA made it clear that the legislation was intended to "promote[] competition, consumer choice, ***and lower prices*** by extending to contact lens wearers the same automatic right to copies of their own prescriptions and allows consumers to purchase contact lenses from the provider of their choice." (Emphases added). As Congressman Billy Tauzin stated in the debates preceding the enactment of the FCLCA:

> Back in the 1970s, the Federal Trade Commission enacted a rule that required eye care professionals to provide patients with a copy of their eyeglass prescription. That rule was necessary because doctors and optometrists would refuse to release prescriptions to consumers or would condition release on the purchase of eyeglasses. While the eyeglass rule radically changed the competitive landscape—today there is vibrant competition among eyeglass providers—contact lenses were not included in that rule. Today we see the same competitive problems festering in the contact lens marketplace as we saw in the eyeglasses market 25 years ago.

67.     Likewise, Congressman James Sensenbrenner explained that the FCLCA "ensures that unscrupulous eye doctors will no longer be able to hold consumers' contact lens prescriptions hostage" and that, "[p]roviding consumers with an automatic right to their prescriptions will allow them to shop around for contact lenses based on price, service, and convenience." He concluded by emphasizing the fundamental need for the FCLCA, explaining that "[c]ompetition among contact lens companies will result in lower prices, a greater choice of lens providers, and more convenient ways to fill contact lens prescriptions."

68.     In 2004, the FTC issued the Contact Lens Rule (16 C.F.R. Parts 315 and 456), which spells out the FCLCA's requirements. 60 Fed. Reg. 40502 (July 2, 2004). That rule reaffirms that ECPs must give a copy of the contact lens prescription to the patient at the end of every contact lens fitting--even if the patient does not request it. It contains other requirements that are intended to make it easier for the patient to take his or her prescription to an alternative source in order to reap the benefits of competition. As the FTC has stated, the FCLCA "increases consumers' ability to shop around when buying contact lenses."

69.     As a January 2015 article in *Contact Lens Spectrum* magazine noted, "[t]he FCLCA was of great concern because many believed that a great number of

patients would start purchasing their contact lenses from alternative sources, affecting the profitability of contact lenses for practitioners."

70.     The way many ECPs dealt with the FCLCA was to flagrantly disobey it.

71.     In 2008, *Contact Lens Spectrum* magazine published a prescriber survey showing that prescription release in 2007 was well under 50%.

72.     The same is true now. On September 3, 2015, the FTC published a notice concerning its decennial review of the Contact Lens Rule and solicited public comments. 80 Fed. Reg. 53272 (Sept. 3, 2015).  Among the comments received was one by 1-800-Contacts, which noted that the rule was regularly disobeyed by ECPs, as reflected in a survey of consumers it conducted in October of 2015. That survey indicated that of the 41 million contact lens wearers in this country, 14.5 million (36%) leave the prescriber's office without a copy of their prescription. Only 14 million (35%) are automatically provided with a copy of a prescription at the completion of a contact lens fitting. Eleven million contact lens wearers (29%) had to ask for a copy of the prescription after their last eye examination. And 46 percent (18.4 million) do not even know they have a right to a copy of their prescription. All of this noncompliance by ECPs has frustrated the very purpose of the statute.

### 2.      *The Disposable Contact Lens Market And Its Wholesale Submarket.*

73.     The Manufacturer Defendants are the four major contact lens manufacturers in the United States. According to testimony given by R. Joe Zeidner ("Zeidner"), the former General Counsel of 1-800-Contacts, at the Senate Hearing, the four Manufacturer Defendants collectively control 97% of the United States contact lens

market (measured by revenue) as reflected in the following chart:



Source: Hearing of the U.S. Senate Judiciary Committee, Subcommittee on Antitrust, Competition Policy and Consumer Rights (July 30, 2014)

74.     The contact lens manufacturing industry has grown even more concentrated in recent years, as large pharmaceutical companies have acquired contact lens manufacturers. For example, on January 7, 2005, CV finalized the acquisition of Ocular Services, Inc. ("OSI"). Similarly, in 2011, Novartis acquired Alcon, for roughly $12.9 billion. Likewise, Valeant entered this industry through its $8.7 billion acquisition of B&L in August 2013. And in August 2014, CV acquired Sauflon Pharmaceuticals Limited ("Sauflon").

75.     New entry is not likely to dilute this concentration. Barriers to entry, including manufacturing and development costs, as well as regulation by the FDA and states, are high. Apart from the four Manufacturer Defendants, other manufacturers in

this market are small and specialize in niche products or contact lenses for specific eye disorders. Profits in the industry have been estimated at 10.1%, with the Manufacturer Defendants enjoying the highest levels of profitability.

76.     For purposes of the allegations of this Complaint, the relevant product market is the market for soft (disposable) contact lenses and the relevant geographic market is the United States, given that contact lenses sold in this market are packaged specifically for such sales. This is the market analyzed in the 2004 FTC report entitled *Possible Anticompetitive Barriers To E-Commerce: Contact Lenses* (the "2004 FTC Report").

77.     As reflected in that report, the market encompasses various wholesale and retail channels of trade, which Plaintiffs contend constitute a distinct Wholesale Submarket. The Manufacturing Defendants control that submarket, as reflected in the sales figures cited above, and sell to distributors (such as ABB) or to Discount Retailers.

### 3.   *The Retail Submarket.*

78.     The disposable contact lens market also encompasses a Retail Submarket in which the Plaintiffs are consumers. Today, consumers with a prescription from an ECP can purchase their contact lenses from a variety of sources, including independent ECPs, national optical chains (*e.g.*, LensCrafters), mass merchandisers (*e.g.*, Wal-Mart and Target), wholesale clubs (*e.g.*, Costco), and online retailers (*e.g.*, 1-800-Contacts and LensDiscounters.com). The Retail Submarket can be further subdivided into distinct markets for each brand of contact lenses subject to a UPP.

79.     Cumulatively, 41 million Americans spend over $4.2 billion per year on

contact lenses in these various retail channels.

80.    The 2005 FTC Report presents data from both OSI and 1-800-Contacts on the share of filled prescriptions and sales for contact lenses through these various retail channels. The OSI figures were as follows:



81.    The data presented by 1-800-Contacts were as follows:



82.     The FTC concluded that both sets of data told the same story: "[m]anufacturers distribute the largest share of lenses through independent ECPs and the smallest through the online/mail-order channel."

83.     A more recent industry survey has estimated that retail chains' and mass merchandisers' share of contact lens sales will reach 20.5% in 2015, while online retailers' share will reach 9.2%.

### 4.  Pricing in Retail Channels

84.     Multiple studies conducted prior to implementation of the UPPs found that contact lenses were cheaper when purchased online or from big-box stores as opposed to independent ECPs.

85.     As noted in the 2004 FTC Report, a 1998 study found that the average price of a six-lens pack of contact lenses was roughly 19 percent more expensive when

purchased from an independent ECP instead of from one of the other categories of retailers.

| Price Comparison by Channel by Product | | | |
|---|---|---|---|
| Retailing Channels | Focus Toric | FreshLook | Acuvue 2 |
| ECP | $ 70.3 | $ 45.1 | $ 24.3 |
| Independent Optometrists | $ 70.9 | $ 46.7 | $ 24.4 |
| Ophthalmologists | $ 73.2 | $ 46.5 | $ 25.7 |
| Optical Retail Chains | $ 66.7 | $ 42.1 | $ 22.9 |
| Non-ECP | $ 56.1 | $ 35.2 | $ 19.0 |
| 1-800 Contacts | $ 59.0 | $ 35.0 | $ 20.0 |
| Mass Merchandisers | $ 53.2 | $ 35.4 | $ 18.1 |
| Difference between ECP and Non ECP Retailers ($) | $ 14.2 | $ 9.9 | $ 5.3 |
| Difference between ECP and Non ECP Retailers (%) | 25% | 28% | 28% |

Source: 2004 FTC report "The Strength of Competition in the Sale of Rx Contact Lenses: An FTC Study."

86.     In the 2005 FTC Report, the FTC examined the prices of a six-month supply of ten different contact lenses from 20 online retailers (including four hybrid retailers, or retailers with both an online and offline presence) and from 14 offline retailers in Northern Virginia. It found that contact lenses are, on average, "$15.48 less expensive online than offline" and that "[w]holesale clubs . . . [were] the least expensive channel overall, offering prices that averaged around $30 less than independent ECPs, around $9 less than all online outlets, and about $6 less than pure online retailers." The cumulative results of this study are set forth below.

| Channel | Average Price of All Lenses |
|---|---|
| **Non-ECPs** | |
| Pure Online Retailer | $87.77 |
| Hybrid Retailer | $106.38 |
| Wholesale Club | $83.18 |
| Mass Merchandiser | $108.38 |
| Non-ECP Average | $96.43 |
| **ECPs** | |
| Optical Chain | $109.20 |
| Independent ECP | $112.35 |
| ECP Average | $110.78 |
| | |
| *Price Difference* | *$14.34* |
| *% Difference* | *+14.9%* |

87.     Based in part on this study, the FTC concluded that the FCLCA's provision requiring ECPs to provide the patient with a prescription that the patient can then use elsewhere to purchase contact lenses had increased competition and reduced contact lens prices across the country.

88.     The significant price disparities between ECP pricing and mass merchandiser and online retailers (and resulting savings for the consumer) continued until the Defendants imposed UPPs.

89.     In addition to the actual pricing differences that existed prior to the UPPs, purchasing contact lenses from a brick-and-mortar retailer also imposes a time cost that is not present in purchases from online retailers. In a 2002 study presented to the Connecticut Department of Public Health, the FTC calculated that an hour-long trip to a

brick-and-mortar retailer had "an implicit time cost of between $10.96 and $26.00," which was "a markup of between 50 and 130 percent over the cost of a multipack."

90.    As stated in a July 2014 *Reuters* article, "'[t]he online channel is beginning to garner considerable attention from [ECPs]. Many are seeing this channel as a threat to traditional stores,' said Euromonitor. 'The pricing strategies on the Internet usually mean a much cheaper price than that found in physical stores.'"

### B.    Prior Efforts by Manufacturers and Independent ECPs to Reduce Price Competition for Contact Lenses.

91.    Because of the price competition engendered by the mass merchandisers and internet retailers, ECPs and contact lens manufacturers have repeatedly attempted to limit their impact. In 1996, in the First Contact Lens Litigation, consumers and 32 state AGs filed antitrust lawsuits against JJVC, B&L, CIBA, and the AOA. *See In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996). These lawsuits alleged that the contact lens manufacturers and the AOA (the independent ECPs' trade association) "conspired among themselves . . . to restrict the supply of replacement contact lenses to alternative channels of distribution." Specifically, the plaintiffs alleged a classic group boycott: that the manufacturers and the AOA restricted wholesale sales to "alternative suppliers" (*e.g.*, mail order houses and pharmacies), and that but-for this conspiracy, the plaintiffs would have paid lower prices for contact lenses. *MDL 1030 Order,* 2001 WL 493244, at *1.

92.    In 2001, this Court denied the various defendants' motions for summary judgment. *Id.* Employing both a *per se* analysis (and an alternative Rule of Reason analysis), the Court evaluated whether "a reasonable fact finder could conclude from the

evidence that the ECP community threatened to boycott any manufacturer who did not implement an ECP-only distribution policy and that [d]efendant manufacturers reached a tacit, if not express, agreement with the ECP community and each other to restrict sales to alternate channels." *Id.* at *3. In concluding that the plaintiffs had "proffered ample evidence" to overcome defendants' summary judgment motions, this Court pointed to the following pieces of evidence, among others:

> An outline of a January 17, 1992 meeting where Phillip Keefer "Listened to Eye care professionals" and "revised customer policy."….

> ****

> A Vistakon memo discussing the agenda for the AOA/Vistakon meeting that took place January 15, 1992 stating, *inter alia,* 'reduc[ing] the possible trend away from prescribing Acuvue/Surevue as a result of patients'[*sic*] buying lenses from outlets other then [*sic*] their own practitioner.'"

> A deposition excerpt wherein Vistakon's Consumer Products Director was asked why Vistakon changed its policy, stated "We couldn't sell our products and doctors were saying to sales reps, 'I am losing patients; therefore, I don't want to put any more new patients in Acuvue because they will walk out of my door.'"…

> A Vistakon Worldwide Franchise Report for 1991 (J 3020–21), which when discussing diversion, stated, "[diversion] is causing a major negative reaction from our customers, the doctors, many of whom are considering not fitting disposables. We are tightening our control of the product and will become more aggressive enforcing our policy."

> ****

> A memo written by Vistakon's D.R. Yadon, given to Vistakon sales personnel which is entitled "Vistakon Gets Tough on Diverters," discussing a "joint effort between the

manufacturers and professional organizations to address this [diversion] problem."…

A Memo written by Craig Scott, Vistakon's Vice President for Marketing to Phillip Keefer discussing "our action plan" regarding patient retention. . . . The stated objectives were to assist ECPs in retaining patients and to maintain ECPs' "positive attitude toward fitting new patients with Vistakon products." The two strategies listed to further those ends were to reduce the supply and the demand for diverted products. The memo went on to discuss, *inter alia,* disguising the prescription from the patient and also discussed obtaining AOA feedback on the aforementioned proposals.

Evidence Vistakon talked to and heard from groups of ECPs about disguising patient prescriptions. (Letter from Scott to Harkleroad)….

*Id*. at *5-6, *10.

93.    After this Court denied summary judgment, and following several weeks

of trial, the case completely settled. The settlement was summarized as follows on the

California AG's website:

Under the proposed settlement, Johnson & Johnson guaranteed to distribute at least $30 million of rebates to consumers. Bausch & Lomb also guaranteed to distribute at least $9.5 million of rebates and coupons. If less than the guaranteed amounts are distributed, each manufacturer agreed to pay into a settlement fund the difference between its guarantee and the amount actually distributed.

The consumer benefits package will include $50 off the purchase of four six packs of disposable lenses and $25 off the cost of an eye examination by an eye care professional plus an additional $25 off a future purchase of four or more lens six packs. Four six packs of lenses can cost consumers anywhere from about $75 to $100 or more.

In addition to offering consumers the benefits package, Johnson & Johnson agreed to pay $25 million in cash into a

settlement fund. In prior settlements in the litigation, Bausch & Lomb agreed to pay $8 million in cash and CIBA agreed to pay $5 million. The AOA agreed to pay $750,000 and 13 individuals agreed to pay $8,000 each. Attorneys fees and litigation expenses will be paid out of all these settlement funds and the defendants will not be making additional payments to cover the attorneys fees or other litigation expenses.

For consumers who formerly wore Johnson & Johnson contact lenses but no longer do so, Johnson & Johnson agreed to pay up to $5 million in cash or coupons. Those consumers will have the choice of $35 in cash or $50 in coupons upon filing of an appropriate claim form including proof of a valid prescription for Johnson & Johnson lenses, a receipt showing a purchase after January 1, 1988 or a statement from a patient's eye care practitioner that he or she purchased Johnson & Johnson disposable lenses. A full description of the criteria for payment is contained the notice and claim form. Plaintiffs will seek to establish a similar fund for people who have stopped wearing B&L and CIBA lenses.

Both Johnson & Johnson and Bausch & Lomb agreed to change their distribution practices. The applicable provision in the settlement with Johnson & Johnson provides:

Injunctive Relief: (a) Johnson & Johnson will sell and distribute its replacement contact lenses to alternative channels of distribution (as defined in this Settlement Agreement) for a period of five (5) years from the date this Settlement Agreement becomes final under paragraph 12 hereof. (b) Subject to subparagraph (a) above, Johnson & Johnson will sell to alternative channels of distribution in a commercially reasonable and non-discriminatory manner, provided that any such alternative channel of distribution, like any other authorized account, will sell contact lenses only to consumers based upon a valid prescription and in compliance with all federal and state laws and regulations regarding the sale or dispensing of contact lenses, and agrees not to substitute diagnostic lenses for a revenue-producing product.

31

Bausch & Lomb similarly agreed to sell to alternative channels of distribution in a commercially reasonable and non-discriminatory manner, provided that the alternative channel accounts meet the same terms and conditions of all other accounts.

Under its settlement, the American Optometric Association agreed not to ask or encourage a contact lens manufacturer to refuse to sell contact lenses to any channel of trade; not to encourage or support a refusal by optometrists, in writing prescriptions, to favor any manufacturer because its lenses are sold by outlets other than eye care professionals; not to claim, without scientific proof, that there is a link between eye health problems and the channel of trade from which contact lenses are purchased; not to oppose consumers getting their contact lens prescriptions on request, except on valid medical grounds and as consistent with state law; and to publish a letter from the AOA's president in the AOA News setting forth these agreements.

94.     While this settlement resolved the issues as to the discriminatory practices of JJVC, B&L and Alcon's predecessor, CV/OSI continued to engage in these practices. On September 15, 2006, the Trade and Consumer Protection Subcommittee of the House Energy and Commerce Committee held a hearing entitled *Contact Lens Sales: Is Market Regulation the Prescription?* Subsequently, CV/OSI abandoned the practice, effectively making the need for the legislation moot.

95.     The injunction agreed to as part of the settlement lasted only until 2005 in the United States and had no effect on the Manufacturer Defendants' foreign retail practices with respect to contact lenses. As explained above, two of the Manufacturer Defendants—JJVC and B&L—were fined by the FCO in 2009 and China's competition authority in 2014 for mandating minimum retail prices in violation of, respectively, European Community and German law and China's Anti-Monopoly Law. According to

the NDRC, the manufacturers used punitive measures, including fines and warnings, to ensure that retailers abided by the minimum price restraints. JJVC was also fined by the KFTC and JFTC for similar practices.

96.     Independent ECPs and ABB have engaged in other practices to limit retail price competition. For example, before the Manufacturer Defendants implemented UPPs, ABB not only facilitated the exchange of retail price information among ECPs, but also urged ECPs to adopt uniform pricing. ABB has published since 2006 a quarterly pricing survey, called the *Retail Price Monitor,* which calculates average prices for the biggest-selling contact lens lines. The survey relies on the prices of more than 450 ECP practices. As ABB has stated, the *Retail Price Monitor* "makes it easy" for ECPs to set contact lens prices and "maximize contact lens margins". ABB also operates yourlens.com, which independent ECPs can use to order contact lenses online, and which provides suggested retail prices. As stated in ABB's promotional materials, "Yourlens.com takes the guesswork out of setting your online prices by utilizing our Retail Price Monitor suggested prices."

**C.     Implementation of the UPPs.**

*1.     Actions by Manufacturer Defendants.*

97.     Alcon was the first of the Manufacturer Defendants to announce a UPP. Although Alcon initially announced a UPP for a single product line, today, Alcon has UPPs on four of its contact lens brands. In June of 2013, Alcon implemented its first UPP for its DAILIES TOTAL1® contact lenses. In January of 2014, Alcon extended its policy to two other lines of contact lenses: DAILIES® AquaComfort Plus® Multifocal and

DAILIES® AquaComfort Plus® Toric contact lenses. And in June of 2014, Alcon extended its UPP to AIR OPTIX® COLORS contact lenses. Alcon has sought the written consent of ECPs to its UPPs. According to one optometrist who wrote on "ODs on Facebook," an Alcon representative "made a special appointment with me to discuss UPP and to have me sign paperwork indicating that I understood and agreed to the policy." Another ECP on the same website confirmed that this was Alcon's standard practice.

98.     In February of 2014, B&L implemented a UPP for its ULTRA™ line of contact lenses. And in June of 2014, B&L extended its UPP to its Biotrue® ONEday for Presbyopia contact lenses.

99.     In June of 2014, JJVC announced UPPs for many of its major contact lens lines. At the same time, JJVC announced that it would discontinue contact lens lines that would not be subject to a UPP. The contact lens lines subject to a UPP are as follows: 1-Day ACUVUE® MOIST®, 1-DAY ACUVUE® MOIST® for ASTIGMATISM, 1-Day ACUVUE® TruEye®, ACUVUE® OASYS® with HYDRACLEAR®, ACUVUE® OASYS® for ASTIGMATISM, and ACUVUE® OASYS® for PRESBYOPIA. These policies became effective on July 1, 2014 for a six-month supply of ACUVUE® OASYS® with HYDRACLEAR® and on August 1, 2014 for the remaining contact lens lines.

100.     According to JJVC, its UPP will impact roughly 9.66 million consumers, or 69% of the 14 million consumers of JJVC contact lenses.

101.     Since this initial announcement, JJVC has expanded the number of its contact lens lines to which UPPs apply to include 1-DAY ACUVUE® MOIST®

MULTIFOCAL and 1-DAY ACUVUE® DEFINE®. It has also discontinued certain non-UPP contact lens lines, such as ACUVUE®, ACUVUE® ADVANCE, ACUVUE® ADVANCE PLUS, and ACUVUE® ADVANCE for ASTIGMATISM. The only contact lenses in the current ACUVUE® family that are not subject to UPPs are ACUVUE® 2, 1-Day ACUVUE®, and ACUVUE® OASYS® Bandage Lens.

102.    Laura Angelini ("Angelini"), President of JJVC, announced JJVC's UPP policy in a written communication to ECPs on June 24, 2014. A trade article published in *Vision Monday* described the announcement as follows:

> Last week, in a letter addressed to [ECPs] dated June 24, 2014, Laura Angelini, president, Johnson & Johnson Vision Care – North America, announced the company's launch of its "Enterprise Strategy" and "roadmap for the future," part of which includes resetting the price of specific contact lens products in the U.S. according to a new "unilateral pricing policy."
>
> Now, all wholesale customers will receive the same pricing for certain existing contact lenses already offered in the company's portfolio, Angelini told VMail. The policy applies to the company's number one reusable, Acuvue Oasys, its number one disposable, Acuvue Moist, and its 1-Day Acuvue TruEye, which Angelini described as the company's "strategic brands." The new policy also sets minimum retail pricing, which has been communicated to all its customers. In addition, manufacturer's rebates have been eliminated by building those discounts into the retail price of these legacy products rather than requiring customers to send in proof of purchase to obtain rebates.
>
> Angelini described this new pricing as a "holistic multifaceted pricing policy to refocus the conversation between the doctor and the patient on eye health and product performance rather than price. This gives the optometrist the ability to improve his or her capture rate in the office," she told VMail. ***"Now the patient has no incentive to shop around."***

> The letter to [ECPs] described the three areas in which the company would "demonstrate support for the profession and the professional—Prescribers, Portfolio and Preferred Partners."

(Emphases added).

103.    A policy letter prepared by JJVC and disseminated to its customers made it clear that "[b]ecause an advertisement to beat any price logically commits a reseller to beat even a price that already is below the UPP Price, [JJVC] will regard an advertisement promising to beat any price or using similar words to be an advertisement to sell for less than UPP Price."

104.    In September of 2014, CV became the last major contact lens manufacturer to implement a UPP. CV implemented a UPP with respect to its Clariti contact lens line, which it acquired through its purchase of Sauflon, another contact lens manufacturer, for $1.2 billion in August of 2014. In January of 2014, Sauflon had instituted a UPP on the Clariti line, and CV decided to maintain the UPP after it purchased Sauflon. Subsequently, CV instituted a UPP with respect to its MyDay line of contact lenses.

105.    Under these UPPs, contact lens retailers are not allowed to offer discounts on these lines where the discounted price would be below the UPP price. As Dr. Milicent Knight ("Knight"), head of Professional Affairs for JJVC, said at the Senate Hearing, "[r]etailers maintain the right to offer store coupons, rebates or promotions (discounts) under the ACUVUE Unilateral Pricing Policy, provided that the final net price for the product covered by the UPP remains at or above the UPP Minimum Retail Price, after

discounts are applied."

106. UPPs are enforced by the Manufacturer Defendants' threats to cut off supply to retailers that refuse to observe minimum price levels and through other coercive means. As Knight also explained to the United States Senate:

> Johnson & Johnson Vision Care, Inc. has three separate processes for proactive Market Price monitoring. First, there are internal resources (JJVC employees) dedicated to researching, confirming and notifying sellers of UPP violations. In addition, Johnson & Johnson Vision Care, Inc. has retained two (2) independent firms to assist in monitoring Market Prices. The first of these firms monitors all on-line pricing and advertising, the second conducts in-store price validations nationwide. All customer types, regardless of size, geography, distribution method, etc. are included in one or more of these monitoring efforts. If a customer is found to be in violation of the UPP, then Johnson & Johnson Vision Care, Inc. will no longer sell products subject to the policy to that customer.

107. JJVC expanded on its enforcement measures in a November 5, 2014 circular sent to its customers about its UPPs. That circular stated "[i]f you sell product below the UPP price, [JJVC] and its authorized distributors [such as ABB] will refuse to accept new orders from you. In addition, [JJVC] will exercise its right to repurchase your current inventory of products subject to the UPP price."

108. In a prepared statement presented at the Senate Hearing, Alcon made a similar point:

> As a result of this situation, Alcon chose to create an environment in which ECPs might more likely spend time learning about the new technology and explaining it to patients, all while having the opportunity to make a reasonable profit margin. It did so by adopting its Unilateral Pricing Policy, or UPP, when it launched DAILIES TOTAL1® in 2013. That policy provided that

37

Alcon would not supply DAILIES TOTAL1® to customers who resold it for less than the price announced by Alcon.

109.    B&L made a similar point in announcing its UPP:

[E]ach customer is free to advertise or charge whatever price it wants, but should understand that Bausch + Lomb will cease to supply, and will prohibit its authorized distributors from supplying, Bausch + Lomb Ultra® contact lenses to any customer that resells or advertises Bausch + Lomb Ultra® contact lenses to the end consumer (*e.g.*, patient) for sale at less than the MRP.

110.    The Manufacturer Defendants actually carry out these threats as to the contact lens lines where the ECP or retailer sells below the UPP. In an article that appeared in the *Review of Cornea & Contact Lenses* in June of 2014, Gerber stated:

Manufacturers employing UPP have the ability to "cut off" a doctor who does not abide by their pricing policy. Some practitioners question the ability and willingness of manufacturers to enforce these rules. To date, I'm aware of several instances where a manufacturer with a UPP has prohibited an online vendor from selling below the UPP. The hope is that all manufacturers with UPP lenses will follow suit, should other resellers not play by the rules.

111.    Similarly, Alvarez of ABB has stated publicly that the Manufacturer Defendants are very serious about policing their respective UPPs and that he knew firsthand that some ECPs had been given a "warning" for violating them. He said manufacturers are "holding the gun" and are willing to lose business in order to police their UPPs. Similarly, Murphy of Alcon confirmed that it warns violators that they are selling below the UPP price and gives them an opportunity to cure. After a third-party auditor confirms a violation, the retailer is communicated with and "asked to make a correction" within five days. Only if the violator refuses to increase its price does Alcon

38

punish the violation by prospectively denying access to the product for up to one year. The clear implication of Alcon's warning system is that a retailer who has sold contact lenses below the UPP price can regain access to the product by agreeing to abide by the UPP.

112.    JJVC stuck to its firm position in its negotiations with Costco over the implementation of UPPs that are recounted in the complaint in *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc*., No. 15-cv-00941 HSG (N.D. Cal.) ("*Costco Action*"), that is now a part of the actions transferred to this Court. That complaint relates how, once JJVC initiated its UPPs, it negotiated with Costco for many months about how they would be implemented in Costco's stores. The ultimate result of these negotiations was that club store retailers could issue store gift cards in connection with the purchase of contact lenses subject to UPPs so long as the retail price of such lenses was at or above the UPP and the gift card or in-store credit was not used to purchase the lenses. Exhibit E to the complaint in the *Costco* Action is an October 5, 2014 JJVC document entitled "Unilateral Price Policy--Club Store Retailer Amendment" that reflects this development.

113.    Carol Alexander ("Alexander"), a Director of Professional Affairs at JJVC, has stated publicly that UPPs represent a "significant change from traditional contact lens pricing policies." Alvarez has likewise indicated that the "Unilateral Pricing Policy will bring a Fundamental Shift to the optical industry", calling them a "business-focused industry shift that many manufacturers have implemented."

## 2.   *Role of ABB and ECPs in Developing and Agreeing to UPPs.*

114.    Independent ECPs colluded with the Manufacturer Defendants in

developing the UPPs. Independent ECPs did this in order to increase profit margins, combat price discounts from Discount Retailers, and eventually, eliminate price competition at the retail level altogether. Once that competition is eliminated, independent ECPs will be able to charge whatever price they desire for contact lenses, as the UPPs are a *minimum* rather than a *maximum* resale price. The Manufacturer Defendants agreed to collude with independent ECPs because a prescription from an ECP is required for the Manufacturer Defendants to sell their contact lens lines.

115.   Robert Atkinson ("Atkinson"), President of Information Technology and Innovation Foundation, testified at length on the collusion with ECPs at the Senate Hearing (footnotes omitted):

> But how do optometrists convey this desire to prescribe UPP lens to producers? . . . In the case of the eye care industry, the collusion may not be in a smoke-filled room, but it's collusion all the same. In this case, it's professional collusion through norms that is leading producers to adopt UPP policies.
>
> In the optometry profession these anticompetitive social norms are expressed in a variety of means, particularly in articles in professional journals and on social media channels that send a clear message to optometrists that they should prescribe doctors'-only lenses. For example, in an article in Review of Cornea and Contact Lens Gary Gerber, OD, writes:
>
> "One of the biggest benefits to practitioners of UPP is that it instantly creates a perfectly level playing field; volume discounts for large practices and online retailers go away. While this may create friction with buying groups, the benefits outweigh any ancillary issues. More importantly, however, it forces practices to focus on something other than price to keep prescriptions in their office—if all 'retailers' sell the lenses for the same price, the method and environment under which they are sold will be the factors

that determine where a patient decides to purchase their lenses."

He goes [on] to in essence to say, with UPP, optometrists will prescribe the UPP lens:

"Manufacturers also benefit from UPP because retail price erosion can be stopped. With a 'race to the bottom' from aggressive price cutting eliminated, motivations to fit a particular lens increase; this has the ability to support and protect brand equity. . . . All things being clinically equal (which of course they rarely are), savvy practitioners will give serious thought to prescribing UPP lenses. For example, if you have a patient with astigmatism and they can wear a UPP lens, and a non-UPP lens is clinically equivalent, a smart doctor will choose the UPP option."

Finally, he states what is obvious to everyone in the industry[:] "Finally, the actual price mandated by UPP has so far been higher than lenses that do not have a UPP. This has afforded higher profit margins and created a new sense of excitement surrounding contact lenses." Likewise, in an article in Review of Optometric Business, Paul Karpecki, OD, FAAO writes in favor of UPP, stating "One other exciting development: Independent practice optometry becomes reinvigorated with contact lens prescribing as a profitable specialty and practice differentiator."

We see similar statements on optometrist social media sites. On the Facebook site "ODs on Facebook", a post from a person listed as Steve Silberberg (who lists himself as "ODwire.org supporting member") on the topic "JJVC goes to universal pricing" writes with regard to having to give "No more rebates etc. and 1-800 etc. goes away if they all follow B&L Alcon and now J & J. Cooper next." In other words he is saying with UPPs competitors like 1-800 Contacts that sell for less will go out of business. And he is not so subtly encouraging CooperVision to also use UPP pricing. Another ODwire.org supporting member listed as Stephen McDaniel writes in response to JJVC adopting UPP pricing, "Wow, great news. Now I might actually fit more of their lenses. Hopefully Cooper gets on board with this soon." In other words, he is saying that he prescribes lenses based on what level of profit he makes. And he is

41

implying that if CooperVision doesn't also adopt UPP then he will not prescribe their lenses. Another member, listed as Joe DiGiorgio, OD, writes in response to a question of how to tell your patients that these prices of industry regulated lens: "I think I'll tell my patients that the onliner must have been selling counterfeit contacts. Why else would they suddenly raise their prices to what I'm selling them."

And they express this collective desire in meetings with industry representatives. For example, in the Facebook OD site, a person listed as Kerry Kordet Giedd ["Giedd"], writes, "At the Ultra launch last week with 300+ ODs from around the country present there was a Huge applause (honestly, it was quite an overwhelming response) when B&L (Bausch and Lomb) announced the UPP. Without a doubt they were largely pleasing their OD base when they followed Alcon's lead on the UPP. . . . I think B&L will gain far more than they lose in practitioner [*sic*] loyalty and support of this policy."

116.    Zeidner of 1-800-Contacts gave similar testimony at the Senate Hearing.

117.    ECPs have consistently spoken out in support of the Manufacturer Defendants' UPPs, touting their benefits both to ECPs and to the Manufacturer Defendants. Some of these ECPs are actually employed by the Manufacturer Defendants. Barry Eiden, O.D. ("Eiden"), for example, told an audience at the Global Contact Lens Forum that the new pricing policies represented "one of the monumental changes in contact lenses in my career." Eiden is employed as a consultant for Manufacturer Defendants Alcon, B&L and CV. He is also an independent ECP and the past Chair of the Contact Lens and Cornea Section of the AOA.

118.    Other independent ECPs paid by the Manufacturer Defendants have also lent support to the new pricing policies. For example, Giedd, who is referenced in Atkinson's testimony at the Senate Hearing, pledged her support in industry publications

at the same time that she was being paid as a consultant by Alcon and CV. Similarly, David L. Kading, O.D. ("Kading"), who consults for Alcon, stated that the new pricing policies are "fantastic" because they set "an even playing field and it also does not support companies who want to price cut their products in an effort to increase utilization." Kading further stated that "[a]s a doctor, it allows me to let patients know they won't find the lenses cheaper anywhere else."

119.    ECPs' support for the Manufacturer Defendants' UPPs is widespread and hardly limited to spokespersons paid by the Manufacturer Defendants. Other ECPs and their agents and trade associations have enthusiastically endorsed and supported the Manufacturer Defendants' UPPs, recognizing that they signal an end to retail price competition for contact lenses. A poll on Healio.com/Optometry posted after the Senate Hearing queried ECPs regarding the concept of the UPPs and, of 204 respondents, 85% said they supported them. Another poll, conducted by ABB, similarly found high approval by ECPs of the UPPs. According to Alvarez, 82% of the hundreds of doctors surveyed support them.

120.    The position of the ECPs was summed by Ernie Bowling, O.D., in an April 8, 2015 article published in *Optometry Times*:

> The response to these UPPs fell into two camps. ***Practitioners were overjoyed—UPP instantly created a perfectly level playing field, eliminating the volume discounts for online retailers.*** Opponents, including big discounters like Costco and 1-800 CONTACTS, say the policies amount to illegal price-fixing and are restricting consumer choice.

(Emphases added).

121.    The AOA, which was a defendant in MDL 1030, has also been highly

43

supportive of the Manufacturer Defendants' use of UPPs. Indeed, David Cockrell, President of the AOA, testified in support of the Manufacturer Defendants' actions at the Senate Hearing, and the AOA submitted written comments in support of those actions. AOA and state associations of optometrists have also been active in opposing legislative efforts in certain states to condemn the Manufacturer Defendants' use of UPPs. At least one state optometric association has noted "antitrust concerns" about discussing the Manufacturer Defendants' UPPs. AOA has also prepared talking points for independent ECPs to use in connection with such proposed legislation.

122.    JJVC publicly acknowledged the role that ECPs played in its formulation of a UPP. Angelini said that JJVC was motivated to implement its UPP based on feedback received from ECPs regarding price erosion. In the June 24, 2014 letter addressed to ECPs that is mentioned above, Angelini explained:

> When I last communicated with you about six months ago, I shared that Johnson & Johnson Vision Care, Inc., North America (JJVC), was in the process of carefully assessing our overall strategy so that we could best meet the needs of our customers, and ***asked for your feedback on what we were doing well and areas where we could improve. Thanks to your open and candid responses, we were able to define our strategy and implement the changes and actions you told us were needed. . . . You, the [ECP] who prescribes our products, have our unwavering support for your clinical, business, and patient needs. . . . To further demonstrate our commitment to prescribers, beginning this week, many of you will begin to hear from your JJVC Sales Representative about our new pricing strategy within the United States.*** This includes a Unilateral Pricing Policy (UPP) . . . . We believe the multifaceted nature of this new pricing strategy and the variety of elements that comprise the program will allow you to refocus the critical doctor/patient conversation on eye health and product performance, rather than cost.

(Emphases added).

123.    In a follow-up letter sent by Angelini to ECPs on or about December 17, 2014, she confirmed that JJVC had extended an invitation to ECPs a year previously to "share your thoughts" on how JJVC "could *build and enhance our partnerships* to help you meet the evolving needs of your patients and practices. Since then, your open and candid feedback *was instrumental* in helping us create Our Enterprise Strategy," which included the "new pricing strategy" of JJVC's UPPs. (Emphases added). Angelini welcomed continued feedback from ECPs, promising that they "can reach me and my leadership team at any time…."

124.    Robert Ferrigno, President North America for CV, made a similar point in connection with CV's adoption of a UPP on one of its product lines, saying his company held twelve focus groups and met with 100 ECPs before acting. He was also quoted in another article as follows: "There was a strong voice that UPP is an important requirement for independent eyecare practitioners," he said. "*It was important that we understood the voice of the independents, and we're responding to it.*" (Emphases added).

125.    One ECP on Gerber's September 13, 2014 "Power Hour" podcast noted that Manufacturer Defendants' representatives actively counsel ECPs on how to sell contract lenses under the UPPs. He stated, "you don't have to push the annual supply, because it doesn't matter – they [the parties] are going to spend the same amount of money, whether they do it in six month increments or two month increments." As the ECP explained, "[s]o, they kind of encourage you to get one box out of each eye and go

from there." ECPs have also been instrumental in helping to police the use of UPPs. The website "ODs on Facebook", for example, gives instances of ECPs informing Alcon's sales representatives about potential violations and requesting them to take action.

126.    ABB played a principal role on behalf of ECPs to cause the Manufacturer Defendants to develop and implement the UPPs. As early as February of 2013--before any of the Manufacturer Defendants had instituted UPPs--Alvarez stated publicly that ABB's focus was to be "aligned with manufacturers." A subsequent press statement by Alvarez confirmed ABB's integral role in developing the UPPs:

127.    Angel Alvarez, chief executive officer and founder of ABB Optical Group, issued a statement to PCON regarding the company's stance on UPPs.

> **"ABB has been working closely with manufacturers to develop unilateral pricing policies,** which we believe enable a better overall patient experience by supporting competitiveness of prescribing practitioners," Alvarez said. "Contact lens fitters have always been and will always be a focus of our organization. We do everything possible to help them succeed."

(Emphases added).

128.    ABB also issues publications that allow independent ECPs (and the Manufacturer Defendants) to monitor the pricing of contact lenses in order to ensure that prices set pursuant to UPPs are being followed. It publishes a quarterly *Retail Price Monitor* that facilitates this goal. ABB describes this publication as follows on its website: "[t]he ABB OPTICAL GROUP *Retail Price Monitor* provides [independent ECPs] with the retail pricing structure of brand name lenses charged by private practitioners and leading online retailers. . . . The *Retail Price Monitor* is a benefit to

ECPs looking to consolidate purchasing and maximize margins." As Alvarez stated in a press release issued in August of 2014, "[o]ur Q3 Retail Price Monitor that will be mailed with our Profit Advisor newsletter will show ECP's that they can continue to have a retail strategy by promoting annual supplies and staying within the limits of UPP."

129.    As one ECP put it, **"[o]ne of the biggest benefits to practitioners of UPP is that it instantly creates a perfectly level playing field; volume discounts for large practices and online retailers go away.**" (Emphases added). This same commentator also agreed that the Manufacturer Defendants "**also benefit from UPP because retail price erosion can be stopped**." (Emphases added).

130.    The 2014 third quarter issue of the ABB publication *Profit Advisor*, which was sent to independent ECPs across the country, stated that the UPPs were one of the first "business-focused shifts" in the industry. It went on to advise independent ECPs to charge more than the UPP:

> You know that competitors around the corner or the country cannot sell their contact lens for less than UPP. ECPs are staying in line, too, because the manufacturers are watching them. Sellers who choose to ignore UPP policy run the risk of being unable to purchase lenses from the manufacturer.
>
> **Remember that UPP specifies the lowest price at which a particular lens can be sold. Can you sell it for more? Indeed, yes, and I encourage you to do so.** Increase your price by several dollars--and continue using the best strategy of explaining to your patients and customers that although they may be paying a few dollars more per box, they are receiving the various benefits that you offer. See the *Soft Lens Retail Price Matrix* for a suggested retail pricing strategy on the UPP products.
>
> In fact, I encourage you to adopt a policy of saying that

you'll match any legitimate price on these contact lenses. You already know what the price is; it's the UPP price. It won't hurt your bottom line to match the UPP for annual supplies and for the very small percentage of customers who call on you to do so. And I expect that the vast majority of your customers will respond to your value proposition and pay your retail price. Most patients aren't looking for the absolute rock-bottom price.…

As a result of UPP, I believe that the prescribing practitioner will be able to obtain a higher percentage of patient revenue. (Emphases added),

131.    Alvarez repeated his advice that independent ECPs charge their customers more than the UPP in a September 13, 2014 broadcast of the "Power Hour" radio show hosted by Gerber, saying that ECPs should try to reach a gross profit margin of 48%-49%. Gerber concurred, saying that ECPs "should be charging more [than the UPP] because they can."

132.    Thus, ABB and its cohorts viewed the Manufacturer Defendants' UPPs as an occasion to gouge consumers even more for the price of contact lenses than would have been possible prior to the implementation of those agreements, with the hope that many consumers would not even realize they were paying a surcharge on the price mandated by UPPs that was duplicative of the service fees that they were already paying. And ABB collected data in its *Retail Price Matrix* that facilitated the ability of independent ECPs to engage in such systematic price-gouging.

### 3.   The Manufacturer Defendants Jointly Agreed to Implement UPPs.

133.    Collectively facing pressure from independent ECPs and ABB about competitive threats posed by the Discount Retailers, the Manufacturer Defendants agreed with one another and with ABB and the independent ECPs to impose UPPs on their most

advanced and most popular contact lens lines.

134.     There is substantial evidence that the Manufacturer Defendants agreed with ABB and ECPs to enter into UPPs. There is also substantial evidence that the Manufacturer Defendants agreed with one another to enter into UPPs. That evidence is described below.

135.     ***Industry Structure Conducive to Collusion***. The four Manufacturer Defendants control 97% of the market for contact lenses. As noted above, the contact lens industry is a mature one with high barriers to entry that involves a commoditized product. Likewise, ABB serves two-thirds of the independent ECPs who sell contact lenses to their patients.

136.     ***Opportunities to Conspire***. Some Manufacturer Defendants were members of the Contact Lens Manufacturers' Association ("CLMA") and were the ***only*** members of the Contact Lens Institute ("CLI"), the activities of which are described below. As members of the CLMA, the Manufacturer Defendants had regular opportunities to meet, exchange information, and signal their intentions to one another. The CLMA hosts an annual meeting, publishes bi-weekly presidential updates to its members, and regularly publishes a newsletter.

137.     ***Information Exchanges***. The exchange among competitors of competitively sensitive, non-public information can be indicative of a price-fixing conspiracy and this conduct itself can violate the antitrust laws. Such exchanges regularly occurred in the context of the CLI.

138.     According to the CLI's website, it was created to "represent[] the interests

of its members . . . ." CLI has no members other than the Manufacturer Defendants. Its

board of directors consists of one executive from each of the Manufacturer Defendants.

CLI's Chair is Angelini of JJVC. Its Vice-Chair is Andrew Sedgwick, Vice-President of

Global Commercial Strategy & Business Development for CV. Its Treasurer is Richard

Weisbarth, Vice-President of Professional Affairs for Alcon. Its Director is Joseph Barr,

Vice-President of Clinical and Medical Affairs for B&L.

139.    Contemporaneously with the Manufacturer Defendants' adoption of UPPs,

the CLI "newly created" a "Category Growth and Market Creation Committee" "to

develop a collaborative approach by the member companies to help inspire ECPs and

their staff to proactively pursue opportunities to fit CLs [contact lenses] and appropriately

follow up so that their patients and practice will benefit." The CLI's website further notes

that "[t]he members of the CLI, together with other participating companies participate in

a quarterly statistical program to track manufacturer shipment data of Contact Lens and

Lens Care products which is managed by Veris Consulting ['Veris']. The program's

objective is to provide participants with accurate and timely consolidated market data. . . .

. Each participating company in the CLI Statistical Program has a representative on the

CLI Global Statistical Task Force."

140.    According to Veris' website, the program established by it for the CLI

"track[s] sales at a detailed level worldwide" and "is more valuable than other sources of

market data because sales are reported directly from manufacturers". Veris states that its

work for the CLI "is the only program where the data is reviewed annually by Veris to

ensure accuracy. Veris implemented this internal review process to reassure participants

that they could be confident in the data." Indeed, Veris requests that "the finance department at each manufacturer's headquarters . . . . [pull sales information and revenue data] directly from their internal system at the model, or SKU level." The resulting low margin of error "*is extremely important to participants since they use this data for strategic planning*" (emphases added) and is reported to the Manufacturer Defendants on a quarterly and annual basis. According to its website, Karen Eftekari, the person at Veris who is the Senior Manager for this work, "also works with member companies [of CLI] such as Johnson & Johnson and Bausch & Lomb performing high-level data analysis and designing custom reporting tools and dashboards."

141.     Chris Holloway, Global Business Analytics Manager for CV, is quoted on Veris' website as saying that "Veris compiles and distributes consolidated reports of all the manufacturers' submissions with 5 year's history included, for both revenue and units….*These offer valuable insights in order to help us ga[u]ge where the market is heading and ultimately help with the possible strategic approaches we might make in the future*." (Emphases added). He noted further that "*Veris acts as a partner to ensure that all manufacturers are working together so that we can make the statistical programme as effective as possible.*" (Emphases added).

142.     The CLI functions as one of the vehicles through which the Manufacturer Defendants collude to enforce and monitor their respective UPPs. The CLI price monitoring program allows the Manufacturer Defendants to keep their fellow manufacturers in line and prevents cheating among the group.

143.     ***ABB's and Independent ECPs' Conduct***. The Manufacturer Defendants'

close relationships with independent ECPs and with a principal ECP representative, Defendant ABB, enabled them to collaborate with independent ECPs and ultimately with each other to develop the UPPs. As noted above, ABB has stated publicly that it "work[ed] closely with manufacturers to develop unilateral pricing policies." Similarly, the Manufacturer Defendants have admitted that they collaborated with ECPs to develop the policies. JJVC, for example, in its letter to ECPs announcing its UPPs, stated that it developed the policy in response to ECP "feedback," that ECPs were "instrumental" in formulating JJVC's policy, and that JJVC's implementation of that policy "further demonstrates our commitment to [ECPs]." As also noted above, CV has admitted that it decided to use a UPP on its Clariti line of contact lenses in direct response to feedback from independent ECPs, who viewed UPPs as an "important requirement"; in maintaining UPPs on the Clariti line, it was "responding" to the "voice of the independents." During this collaborative process, on information and belief, ABB, acting on behalf of its many thousands of ECP clients, and the ECPs communicated to each Manufacturer Defendant its competitors' position on UPPs.

144. ***Acts Contrary to Economic Self-Interest***. The acts of the Manufacturer Defendants in adopting UPPs were contrary to each one's independent economic self-interest. George Slover, President of the Consumers' Union, explained this fact at the Senate Hearing:

> In a competitive market, if one manufacturer tries to impose a rigid pricing policy like this, there's a natural temptation for another manufacturer to step in and take competitive advantage, and give consumers looking for a more affordable alternative what they want. Generally, a policy like this makes sense for a manufacture only if it can

> be confident that other manufacturers will be taking similar action, and won't be taking competitive advantage.
>
> So it's important not to just accept at face value a manufacturer's characterization that it is acting against its profit-making interest unilaterally – particularly where its competitors seem to be joining in, and where others in the marketing chain – the full-price retailers – are getting a clear benefit.

In short, it would be in the independent economic self-interest of each Defendant Manufacturer to lower its retail prices for contact lenses, thereby causing consumers to replace lenses more often and increase sales. UPPs were directly contrary to such a course of action.

145.    The fact that UPPs are against the individual economic self-interest of each Manufacturer Defendant has also been noted by some of the Manufacturer Defendants themselves. When CV announced a definitive agreement to acquire Sauflon on July 1, 2014, Robert Weiss ("Weiss"), President and CEO of Cooper Companies, Inc., noted that retailers were "somewhat troubled" by the adoption of UPPs by CV's competitors. Subsequently, in a candid analyst presentation made on September 11, 2014, CV admitted the "Potential Downsides/Challenges" of adopting UPPs included: (a) "Enforcement can be challenging"; (b) "Consumer activism may generate legislative backlash and negative public perceptions"; and (c) "May alienate larger customers who want greater pricing freedom and cross marketing." Yet only days later, it decided to continue the use of a UPP on its newly-acquired flagship Clariti line of contact lenses.

146.    The other Manufacturer Defendants faced similar adverse impacts, as reflected in the events of 2014 and early 2015, which included complaints to the FTC, the

Senate Hearing, a publicly-revealed investigation by the New York AG into Alcon's adoption of UPPs, negative consumer backlash, and proposed legislation in various state legislatures. And both JJVC and B&L knew full well the regulatory issues that could be created by the adoption of MRPM schemes, as reflected in their experiences with the FCO, JFTC, KFTC, and/or NDRC.

147.     The "legislative backlash" to which CV referred has also come to pass. Bills have been introduced in at least 14 state legislatures that would make it unlawful for contact lens manufacturers to enforce UPPs. The first such bill was enacted into law in Utah. The Utah legislature passed a law forbidding such conduct, which Governor Gary R. Herbert signed on March 27, 2015. Utah Code §58-16a-905.1. An attempt by certain of the Manufacturer Defendants to enjoin the enforcement of that law was rejected by a federal district court, which stated that "the people of Utah chose to enact section 905.1 to eliminate price fixing in favor of free competition." "Order," p. 18 (May 11, 2015) (Dkt. No. 60) in *Alcon Labs., Inc. v. Reyes*, No. 2:15cv252-DB (D. Utah). An appeal to the United States Court of Appeals for the Tenth Circuit is pending.

148.     Despite these economic reasons not to implement UPPs, all four Manufacturer Defendants proceeded to do so.

149.     Another consequence in 2014 of doing so was slower sales growth, which was certainly contrary to their individual economic self-interest. One industry analyst has noted that United States contact lens sales growth only increased sluggishly by 2% through the third quarter of 2014, a development that it attributed to the implementation of UPPs. JJVC's annual report for the year 2014 shows that sales by its contact lens

business declined from $2.937 billion in 2013 to $2.818 billion in 2014. In the first quarter of 2015, another industry analyst report was cited as saying that the present litigation "could actually resume the growth rate for the entire contact lens market…." And in a September 2015 analyst conference, Weiss, speaking on behalf of Cooper Companies, admitted candidly that the market is being "negatively impacted" by UPPs.

150.   Further demonstrating that the Manufacturer Defendants jointly implemented UPPs contrary to their individual economic self-interest, Dean Butler, the founder of LensCrafters, has stated that consumers purchase more eye care products--including contact lenses--when shopping online. Similarly, as noted above, ABB's Alvarez has said publicly that the Manufacturer Defendants are willing to lose business in order to enforce their UPPs, something that is not in their independent economic self-interest.

151.   It was thus contrary to the economic self-interest of any one of the Manufacturer Defendants to attempt to implement a UPP without assurance that its competitors would follow suit. The Discount Retailers referred to above collectively possessed sufficient buying power in the contact lens market that no Manufacturer Defendant would be willing to forego those sales or alienate those customers by acting alone. If only some of the Manufacturer Defendants had adopted UPPs, Discount Retailers such as Costco or Wal-Mart could have shifted market share to those manufacturers that did not dictate a minimum retail price. In fact, after all of the Manufacturer Defendants except for CV had implemented UPPs, Costco sent a letter to its customers informing them of the other Manufacturer Defendants' UPPs and urging

them to switch to CV, only to see CV soon thereafter implement a UPP on its flagship Clariti line.

152. ***Pretextual Reasons for UPPs***. The Manufacturer Defendants have tried to justify their conduct by claiming that the ocular health of consumers could be injured by buying contact lenses from shoddy retailers who provide low-quality service. That purported justification is pretextual--a fact that also supports an inference of conspiratorial conduct.

153. The pretextual nature of such claims was exposed as far back as the debates underlying the enactment of the FCLCA. In support of that legislation, the Chair of the Contact Lens Working Group of the National Association of Attorneys General Antitrust Task Force testified that such health claims have no evidentiary basis and do not justify restraining consumer choice:

> Sales by ECP competitors do not give rise to any eye health problems that AOA can support by valid, clinical or scientific data. Indeed, the AOA has not provided any evidence of consumer harm…Disposable contact lenses were introduced and alternative channels began selling them in the late 1980s. The States would expect that any consumer harm flowing from the sales of replacement contact lenses by alternative channels to have become manifest by now if there were such evidence.

154. Similarly, in the 2004 FTC Report, it was stated that "[t]he [FTC] workshop, the Commission's Rule review, the multidistrict litigation, and the Commission's staff's own consultations with industry experts have revealed no systematic evidence that sales through alternative channels, such as internet or mail order, pose any additional health risk as long as the retailer sells in accordance with a valid prescription."

155. The Manufacturer Defendants and their supporters have still not been able

to come up with credible health risks associated with sales of contact lenses by Discount Retailers. As a February 18, 2015 article in the *Salt Lake Tribune* noted, when the Chairman of the Utah Senate Business & Labor Committee questioned an industry lobbyist on this purported justification at a legislative hearing held on February 17 in connection with the aforementioned Utah bill, the latter "could not provide an example of that ever occurring." Indeed, Alexander stated during this hearing that she could not identify a single instance where a patient was harmed or placed at risk because he or she was able to buy contact lenses from a source other than optometrists. Alexander ***admitted*** that the adoption of UPPs by JJVC was ***not*** motivated by concerns about patient risk or harm. Similarly, Costco has explained that JJVC "asserts this change [adoption of UPPs] is for the benefit of patients—we totally disagree." The allegations of the complaint filed in the *Costco* Action further support this assertion. And these types of pretextual reasons for unlawful anticompetitive conduct formed a part of the evidence in MDL 1030.

156.    ***Motive to Conspire, Including Assurances That Competitors Will Also Act***. Each of the Manufacturer Defendants had a motive to maintain high retail prices for its contact lenses. They were concerned that low retail prices would put pressure on them to lower wholesale prices. In addition, in order to encourage independent ECPs to prescribe their contact lenses, the Manufacturer Defendants needed to keep the retail prices high. ABB, which (a) is the largest distributor of contact lenses in the United States, (b) sells the Manufacturer Defendants' contact lenses to two-thirds of ECPs, and (c) has stated publicly that it "worked with" the Manufacturer Defendants to develop and implement UPPs, was in a position to act as the "hub" in a "hub-and-spoke" conspiracy.

That is, ABB was in a position to communicate to each Manufacturer Defendant before it implemented a UPP that its competitors also intended to do so.

157.     ***Abrupt, Near-Contemporaneous and Fundamental Shift in Pricing Policies***. Before June of 2013, none of the Manufacturer Defendants restricted the minimum retail price of its contact lenses. After Alcon imposed the first UPP in June of 2013, all of its competitors followed suit within 15 months. As Alexander admitted, use of UPPs was a "significant change from traditional contact lens pricing strategies." Or, as Alvarez of ABB put it, UPPs represent a "fundamental shift" in the contact lens market. As noted above, contact lenses are the *only* prescription medical device sold in the United States pursuant to an MRPM policy.

158.     ***Past Conspiratorial Conduct***. The Manufacturer Defendants and independent ECPs have also demonstrated a past propensity to conspire against discounting retailers of contact lenses, as reflected in the discussion above of MDL 1030 and in the various foreign regulatory proceedings cited previously.

**4.   *The Manufacturer Defendants' UPPs Harm Competition.***

159.     Defendants' agreement to implement UPPs has harmed and continues to harm competition by increasing prices for the contact lenses made subject to them. Consumers ultimately pay the economic cost of this wrongful conduct in the form of higher prices for contact lenses affected by UPPs. The effect of the UPPs has been to limit consumer choice by depriving them of the ability to shop around for retail discounts on contact lenses.

160.     At the Senate Hearing, Zeidner presented the following graphic showing a

range of a 40% to 112% difference between the lowest internet price for JJVC's affected products and its UPP price.





161.    George Slover, Senior Policy Counsel for the Consumers' Union, and Atkinson gave similar testimony at the Senate Hearing.

162.    Zeidner noted that as of July of 2014, UPPs encompassed 40% of the market and predicted 80% coverage by the end of 2015, especially with ECPs writing prescriptions for contact lenses subject to the policy. As noted above, since his testimony at the Senate Hearing, CV adopted an MRPM policy on one of its contact lens lines.

163.    Similar testimony was given by Jay Magure ("Magure"), the Vice-President of Governmental Affairs for 1-800-Contacts, at the aforementioned February 17, 2015 hearing before the Utah Senate Business & Labor Committee. He noted that

because of JJVC's adoption of UPPs, 1-800-Contacts was compelled to eliminate rebates of between $15 and $100 on numerous JJVC ACUVUE® products. The result was that it effectively was forced to raise prices on the vast majority of the contact lenses it sells that are subject to UPPs. In a January 24, 2015 article, Oregonlive.com corroborated this point with a real-world example, noting how 1-800-Contacts sold a 90-lens box of JJVC ACUVUE® MOIST® contact lenses a year ago at a price as low as $57.49, but the same product is now sold by it for a low of $63.74. In his aforementioned testimony, Magure noted that a survey of 780 doctors conducted by 1-800-Contacts both before and after JJVC's implementation of UPPs confirmed that prices for JJVC contact lenses subject to such UPPs increased by 57% when compared to pre-UPP levels.

164.    Similarly, the website <stopupp.org> has published this comparison of JJVC's December 2013 contact lens prices (accounting for rebates and mail-in coupons) and its post-UPP prices:

| JJVC Product | Old Price | UPP Price | % Change |
|---|---|---|---|
| 1-Day ACUVUE® MOIST® (30 Lenses) | $13.80 | $33.00 | +139% |
| 1-Day ACUVUE® MOIST® (90 Lenses) | $36.49 | $63.50 | +74% |
| 1-DAY ACUVUE® MOIST® for ASTIGMATISM (30 Lenses) | $18.24 | $34.50 | +89% |
| 1-Day ACUVUE® TruEye® (90 Lenses) | $47.74 | $82.50 | +73% |
| ACUVUE® OASYS® with Hydraclear Plus (12 Lenses) | $22.68 | $67.50 | +198% |
| ACUVUE® OASYS® with Hydraclear Plus (24 Lenses) | $44.23 | $110.00 | +149% |
| ACUVUE® OASYS® for ASTIGMATISM (6 Lenses) | $21.74 | $40.00 | +84% |
| ACUVUE® OASYS® for PRESBYOPIA | $22.96 | $40.00 | +74% |

165.    The adverse economic effect of UPPs is reflected on the websites of internet retailers of contact lenses. In response to the questions about why it no longer beats the prices of others for contact lenses by 2% and why it charges the same as doctors, 1-800-Contacts' website states:

> We have always stood behind our commitment to beat any price by 2%. While we continue this practice on a large portion of our inventory, manufacturer mandated pricing policies have forced us to discontinue this pricing benefit. We aren't allowed to lower the price or offer any kind of discounts or rebates on products affected by UPP. . . . The [UPP] created by manufacturers sets the minimum price that contacts can be sold for, which restricts our ability to offer a lower price than doctors on those lenses.

166.     Similarly, the website of LensDiscounters.com has this to say about UPPs:

> UPP (Unilateral Pricing Policy) is a strategy used by
> certain contact lens manufacturers, requiring retailers such
> as ourselves to price their products at a manufacturer's
> specified minimum price. Retailers who do not comply will
> no longer be supplied by the manufacturer. . . . Under the
> guise of price equality, manufacturers want to give eye care
> practitioners incentive to prescribe their products vs. their
> competitor's products on the basis that the patient will be
> more likely to buy directly from the doctor if the prices for
> that contact lens are the same online or elsewhere. Initially,
> this might seem like a fair practice, but it prevents free
> market pricing -- and in the end, results in higher pricing to
> you, the end consumer. . . . .At LensDiscounters.com, we
> strive to provide a fair and transparent shopping experience
> to all of our customers and do not believe price controls are
> in the best interest of our customers. We will do what we
> can to fight these pricing policies and keep eyecare
> affordable for our customers. We will continue to keep you
> informed and will have more information about UPP soon.

167.     Meijer's website contains the following statements:

> The manufacturers state that they have instituted the UPP
> for their customers however, the adoption of the UPP
> essentially prevents marketplace competition. This
> eliminates your ability to shop around for the best price on
> these contact lens brands, as well as our ability to offer
> relief. . . . The manufacturers have created a "floor" or a
> "minimum" price that the lenses may not be priced below.
> Our prices had been lower than that "minimum" prior to
> this change in policy. The UPP has caused us to raise our
> prices on these contact lens brands in order to remain in
> compliance with this policy.

168.     Likewise, 1-800-GET-LENS told its customers that "Bausch & Lomb has

implemented a Unilateral Pricing Policy (UPP) on all retailers, both online and bricks and

mortar. The UPP prevents anyone from selling Bausch & Lomb products below a certain

price." A representative for Costco testified before the Washington Senate Health Care

Committee on February 16, 2015 that the Manufacturer Defendants' implementation of UPPs has caused it to raise prices on affected contact lenses by as much as 35%.

169.    In mid-2014, Costco conducted an analysis of its prices for Alcon's DAILIES TOTAL1 contact lenses before and after Alcon implemented a UPP. It concluded that the price for a 90-lens pack increased from $85.00 to $95.00. It also examined JJVC prices, and concluded that JJVC's UPPs required Costco to raise its prices an average of 26%. Costco makes similar allegations in the *Costco* Action.

170.    Gerber, in his article quoted above, also confirms that UPPs have the effect of elevating contact lens prices. Indeed, at a January 29, 2015 hearing before the Mississippi Senate Public Health & Welfare Committee, 1-800-Contacts presented econometric evidence that the use of UPPs going forward could cost contact lens consumers as much as an extra $2 billion annually. Defendants' conspiracy has thus caused Plaintiffs and members of the Class and Subclasses to pay supra-competitive prices for contact lenses and has substantially eliminated price competition in the market.

171.    Representative Brian Patrick Kennedy, Chairman of the Rhode Island House of Representatives' Committee on Corporations, Co-Chairman of the Permanent Joint Legislative Committee on Health Care Oversight and Dean of the Rhode Island House of Representatives, summed up the current state of affairs well in a letter he wrote on October 22, 2015 to the FTC in connection with the Commission's review of the Contact Lens Rule:

> As the Chairman of the House Committee on Corporations, I have witnessed many battles between competitors and business interests, *but none that had such an adverse impact to consumers as the unilateral pricing*

*policies implemented by the contact lens manufacturers*. This legislative battle brought forward many spurious claims that definitely deserve more attention, perhaps even during your review of the Contact Lens Rule.

*Quite frankly, some of the most spurious claims were made by individuals and organizations associated with the optometry profession. Indeed, the contact lens industry appears to be riddled with a variety of anti-consumer issues, such as prescribers selling eye care merchandise to patients because they have a beneficial and financial interest in moving product; prescribers failing or in most cases refusing to automatically release contact lens prescriptions; a history of collusion between contact lens manufacturers and optometrists and their associations; and most grievous are the false health claims being promulgated by the eye care providers and manufacturers, even after being directed by the courts to stop making such claims*.

(Emphases added).

## VII.   CAUSES OF ACTION.

### FIRST CAUSE OF ACTION
**Claim for Violation of 15 U.S.C. §§ 1 and 3 (*Per Se* Violation of the Sherman Act).**

172.   Plaintiffs incorporate by reference the allegations in paragraphs 1-171 as if fully set forth herein.

173.   Plaintiffs acknowledge that under the United States Supreme Court's precedent in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ("*Leegin*"), federal antitrust claims alleging the unlawfulness of vertical MRPM policies are typically examined under the Rule of Reason.

174.   However, in this case, Plaintiffs do not allege solely that the Manufacturer Defendants merely entered into vertical UPP agreements with retailers or their agents. Instead, Plaintiffs allege that the Manufacturer Defendants also conspired with each other

in a horizontal, *per se* illegal agreement in restraint of trade that ABB (acting as the agent for its ECP clients) helped to orchestrate. They also allege that these policies were the subject of agreements among the Manufacturer Defendants and independent ECPs, effectuated through ABB.

175.   The claims in this Complaint are therefore similar to those in *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015), where the United States Court of Appeals for the Second Circuit held that there is no confusion in the context of a hub-and-spoke conspiracy about the inapplicability of the Rule of Reason "where the vertical organizer has not only committed to vertical agreements, but has also agreed to participate in the horizontal conspiracy. In that situation, the court need not consider whether the vertical agreements restrained trade because all participants agreed to the horizontal restraint, which is and ought to be, *per se* unlawful." *Id.* at 325 (internal quotations omitted). Moreover, "[a] horizontal conspiracy can use vertical agreements to facilitate coordination without the other parties to those agreements knowing about, or agreeing to, the horizontal conspiracy's goals." *Id.* at 324. Similarly, the fact that setting identical retail price levels was not the goal of the conspiracy alleged in this Complaint does not make it any less objectionable. *Id.* at 327.

176.   Thus, this Complaint presents allegations of violations of the federal antitrust laws that are illegal *per se*. Where, as here, Defendants have engaged in a *per se* violation of Sections 1 and 3 of the Sherman Act, no allegations with respect to the relevant product market, geographic market, or market power are required.

177.   Beginning in June of 2013 and continuing to the present, Defendants have

engaged in a conspiracy and agreement in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). The Manufacturer Defendants implemented agreed-upon UPPs in concert with each other and with Independent ECPs, acting, in part, through Defendant ABB, which is complicit in their implementation. Non-ECP vendors of contact lenses are coerced into abiding by the UPPs or suffer the loss of the ability to sell the products covered by them. The Manufacturer Defendants agreed, at least tacitly, among themselves to start using agreed-upon UPPs, recognizing that the policies could be enforced only if all of them implemented agreed-upon UPPs. The Manufacturer Defendants also conspired with Defendant ABB and with Independent ECPs to implement agreed-upon UPPs. As noted above, the agreed-upon UPPs represented a drastic change in how contact lenses were sold in the United States.

178.    As a result of Defendants' unlawful conduct, prices for contact lenses subject to agreed-upon UPPs were raised, fixed, maintained and stabilized in the United States.

179.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses and property in that they have paid more for contact lenses than they otherwise would have paid in the absence of that conduct.

180.    With respect to their claim under the Sherman Act, Plaintiffs seek injunctive relief, treble damages and attorneys' fees and costs.

### SECOND CAUSE OF ACTION
**Claim for Violation of 15 U.S.C. §§ 1 and 3 (Rule of Reason Violations of the Sherman Act).**

181.    Plaintiffs incorporate by reference the allegations in paragraphs 1-171 as if

fully set forth herein.

182.     As an alternative to Plaintiffs' claims for *per se* violations of the Sherman Act, Plaintiffs also allege antitrust claims under the Rule of Reason.

183.     The relevant product market is the Retail Submarket of the overall market for disposable contact lenses, which, as noted above, can be further subdivided into distinct markets for each brand of contact lenses subject to a UPP. In denying the motion to dismiss the Costco Action, this Court recognized that a single contact lens manufacturer's brands can constitute a discrete product market for antitrust purposes. The relevant geographic market for purposes of this claim is the United States.

184.     Independent ECPs control approximately two-thirds of the Retail Submarket described above.

185.     The UPPs described herein impacted adversely both interbrand and intrabrand competition for disposable contact lenses. Up to the point where an ECP writes a prescription for a particular brand of contact lens, there is the potential for competition among brands that are clinically equivalent. As noted above, the effect of UPPs is that independent ECPs are incentivized to prescribe contact lenses subject to UPPs rather than those that are not. Likewise, within a particular Defendant Manufacturer's brands, UPPs stifle intrabrand competition by eliminating price competition from Discount Retailers.

186.     The Court in *Leegin* did not immunize vertical MRPM agreements from federal antitrust scrutiny. Rather, the Court identified three factors to be used in determining whether an RPM program is unreasonable: (a) whether several competing

manufacturers adopt MRPM programs; (b) whether retailers play a role in instigating MRPM programs; and (c) whether manufacturers or retailers have market power. 551 U.S. at 897-98. The Court made it clear that "the potential anticompetitive consequences of vertical price restraints must not be ignored or underestimated." *Id*. at 894.

187.    The first and third *Leegin* factors are satisfied here. Alcon, JJVC, CV, and B&L have all adopted UPPs. Collectively, the Manufacturer Defendants possess market power in the market for disposable contact lenses. Collectively, they control roughly 97% of that market, as well as the Wholesale Submarket therein. Independent ECPs also prescribe the vast majority of contact lenses sold in the United States.

188.    The second factor is also satisfied. Independent ECPs and ABB played a significant role in instigating and causing manufacturers to adopt UPPs. ABB worked with all four Manufacturer Defendants to impose the UPPs. As the dominant distributor in the market, ABB has the power to foreclose price competition. In addition, JJVC stated that it developed its UPP after listening to ECPs' "feedback" and they were "instrumental" in the creation of that policy. CV has also admitted as much. This is consistent with ECPs' other conduct aimed at keeping out low-cost competitors, including their campaign in the 1980s and 1990s to boycott mail-order contact lens suppliers, their public opposition to sales of contact lenses by non-traditional retailers (such as Costco), and their resistance to giving patients their prescriptions, as required by federal law.

189.    Nor do the UPPs have any procompetitive justification. These policies do not prevent free-riding because the ECP is compensated for his or her services (the eye

examination), even if the patient fills the prescription elsewhere. As noted above, concerns about harm to patients from buying contact lenses from other than ECPs are pretextual and do not justify the anticompetitive conduct claimed here. Furthermore, the Manufacturer Defendants' UPPs do not encourage ECPs to focus more on patient needs instead of contact lens costs. Instead, they do just the opposite; as several ECPs have said, a "savvy" ECP will always prescribe a contact lens subject to a UPP over another one, because the ECP will earn a greater profit.

190.    As a result of Defendants' unlawful conduct, prices for contact lenses subject to agreed-upon UPPs were raised, fixed, maintained and stabilized in the United States.

191.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses and property in that they have paid more for contact lenses than they otherwise would have paid in the absence of that conduct.

192.    With respect to their claim under the Sherman Act, Plaintiffs seek injunctive relief, treble damages and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### Claim for Violation of the California Cartwright Act.

193.    The California Plaintiffs incorporate by reference the allegations in paragraphs 1-171 as if fully set forth herein.

194.    Defendants' conduct has occurred in substantial part in the State of California and violates the Cartwright Act (Cal. Bus. & Prof. Code §§ 16720 *et seq.*), which prohibits combinations of two or more persons' capital, skill, or acts to restrict

trade or commerce. Unlike the vertical RPM schemes analyzed under federal antitrust law, such schemes as are alleged here are viewed as *per se* violations of the Cartwright Act. *Mailand v. Burckle*, 20 Cal. 3d 367 (1978). *See also Darush v. Revision LP*, 2013 U.S. Dist. LEXIS 60084, at \*16 (C.D. Cal. Apr. 10, 2013).

195.    The California Plaintiffs and the other members of the California Subclass paid supra-competitive, artificially inflated prices for contact lenses.

196.    As a direct and proximate result of Defendants' unlawful conduct, the California Plaintiffs and the members of the California Subclass have been injured in their business and property in that they paid more for contact lenses than they otherwise would have paid in the absence of that conduct.

197.    The agreed-upon UPPs instituted by the Manufacturer Defendants and the conduct of all Defendants in implementing them violate the Cartwright Act and should be enjoined accordingly.

198.    As a result of Defendants' violation of the Cartwright Act, the California Plaintiffs and the members of the California Subclass seek treble damages and the costs of suit, including reasonable attorneys' fees. *See* Cal. Bus. & Prof. Code § 16750(a).

**THIRD CAUSE OF ACTION**
**Claim for Violation of the Maryland Antitrust Act.**

199.    The Maryland Plaintiffs incorporate by reference the allegations in paragraphs 1-171 as if fully set forth herein.

200.    Defendants' conduct has occurred in substantial part in the State of Maryland.

201.    In 2009, the legislature of the State of Maryland overturned the decision in

*Leegin* by amending the Maryland Antitrust Act ("MAA") (Maryland Comm. Code §§ 11-204 *et seq.*). The newly-enacted language stated that "a contract, combination, or conspiracy that establishes a minimum price below which a retailer, wholesaler, or distributor may not sell a commodity or service is an unreasonable restraint of trade or commerce." *Id.*, § 11-204(b). The agreed-upon UPPs instituted by the Manufacturer Defendants and the conduct of all Defendants in implementing them effectively establish such a minimum price and are presumptively unlawful under Maryland law.

202.   The Maryland Plaintiffs and the members of the Maryland Subclass have been injured by the implementation of Defendants' agreed-upon UPPs and seek all remedies available to them under the MAA, including treble damages and attorneys' fees and costs. *See* Maryland Comm. Code § 11-209(b).

## SIXTH CAUSE OF ACTION
### Claim for Violation of the California Unfair Competition Law.

203.   The California Plaintiffs incorporate by reference the allegations in paragraphs 1-171 as if fully set forth herein.

204.   Defendants' conduct has occurred in substantial part in the State of California. California's Unfair Competition Law ("UCL") (Cal. Bus. and Prof. Code §§ 17200 *et seq.*) prohibits acts of unfair competition, which mean and include any "unfair . . . business practices."

205.   Defendants' conduct constitutes "unfair" business acts and practices because Defendants' practices have caused and are "likely to cause substantial injury" to the California Plaintiffs and the members of the California Subclass that is not "reasonably avoidable" by the California Plaintiffs and the members of the California

Subclass and is "not outweighed" by the practices' benefits to the California Plaintiffs and the members of the California Subclass.

206.    As more fully described above, the purpose and effect of Defendants' agreements to impose agreed-upon UPPs on leading contact lens lines was and is to eliminate the competition engendered by the FCLCA. Defendants' anticompetitive agreements constitute unfair business acts or practices within the meaning of the UCL in that the justification for Defendants' conduct is outweighed by the gravity of the consequences to the general public.

207.    The California Plaintiffs and the members of the California Subclass have been and are unable to avoid injury because ECPs, co-conspirators and beneficiaries of the agreed-upon UPPs are the ones who prescribe the contact lenses that the California Plaintiffs and members of the California Subclass are required to use, without substitution.

208.    Defendants' agreed-upon UPPs are contrary to public policy, immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.   Any purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of Defendants' conduct.

209.    Defendants' conduct is also "unfair" because it is contrary to numerous legislatively-declared policies.   Here, Defendants' conduct not only violates the letter of Sherman Act, the Cartwright Act, and the MAA, but it also contravenes the spirit and purpose of each of those statutes, as well as the spirit and purpose of the FCLCA and the FTC's Contact Lens Rule.   The conduct threatens an incipient violation of each of those

laws and has both an actual and a threatened impact on competition.

210.    Independently of prohibiting acts of "unfair" competition, the UCL also prohibits "unlawful" business acts or practices. The conduct alleged in this Complaint not only violates the Sherman Act and the antitrust laws of California and Maryland, but also is in direct contravention of the policy and spirit of the FCLCA and the FTC's Contact Lens Rule. This unlawful conduct has significantly harmed the California Plaintiffs and the members of the California Subclass.

211.    The California Plaintiffs and the members of the California Subclass have suffered injury in fact and have lost money as a result of Defendants' unfair competition and violations of law in that they paid more for contact lenses that they would have paid in the absence of the agreed-upon UPPs. They are therefore entitled to the relief available under the UCL as detailed herein.

**SEVENTH CAUSE OF ACTION**
**Claim for Violation of the Maryland Consumer Protection Act.**

212.    The Maryland Plaintiffs incorporate by reference the allegations in paragraphs 1-171 as if fully set forth herein.

213.    The Maryland Consumer Protection Act ("MCPA") was enacted to set certain minimum statewide standards for the protection of consumers across the State. Under the MCPA, a person may not engage in any unfair trade practice concerning the sale of any consumer good or service. Md. Com. Law §13-303(1).

214.    Under the MCPA, a trade practice is considered unfair when it results in a: (1) substantial injury; (2) that is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces; and (3) it must not be the type of

injury that a consumer could reasonably have avoided.

215.    Defendants have violated this prohibition by engaging in unfair practices concerning the implementation of agreed-upon UPPs, which have directly and proximately caused the Maryland Plaintiffs and the members of the Maryland Subclass to incur substantial additional actual damages in the form of increased prices paid for contact lenses at retail.

216.    Defendants' conduct also violates the purpose and intent of the FCLCA, which was enacted by Congress to foster price competition in the retail sale of contact lenses in light of previous anticompetitive conduct of Defendants and ECPs. The FCLCA was specifically enacted to "increase competition in the sale of contact lenses which will bring a substantial savings to America's contact lens wearers."

217.    Defendants' implementation of agreed-upon UPPs presents insurmountable obstacles to the Maryland Plaintiffs and the Maryland Subclass members' ability to obtain the lowest price for contact lenses, and thereby interferes with a well-functioning market for the sale of contact lenses.

218.    The Maryland Plaintiffs and the members of the Maryland Subclass have been and continue to be substantially injured as a result of Defendants' conduct.

219.    Defendants' conduct is not outweighed by any countervailing benefits to Maryland consumers or to competition. Specifically, the assertion by Defendants that their agreed-upon UPPs are designed to eliminate free rider problems created by mass merchandisers and online retail sellers of contact lenses is not a legitimate, pro-competitive reason for the introduction of agreed-upon UPPs. Independent ECPs are

74

doctors who have a duty to educate themselves on matters that affect the rendering of professional advice to their patients. The ECPs are compensated for their services through the payment of professional fees by their patients. As independent ECPs have themselves acknowledged, UPPs are a mechanism to simply increase their profits at the expense of their patients, and do not serve to enhance the medical benefits they receive. Independent ECPs have even acknowledged that the agreed-upon UPPs affect their medical judgment to the detriment of consumers, in that ECPs will prescribe contact lenses subject to the UPPs in order to increase their medical offices' profitability and to avoid retail price competition with mass merchandisers and the online channel.

220.    The Maryland Plaintiffs and the members of the Maryland Subclass have suffered injury and have lost money as a result of Defendants' actions and are therefore entitled to the relief available under the MCPA.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class and the California and Maryland Subclasses herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiffs as the designated Class representatives (and where appropriate, Subclass representatives) and their counsel as Class and Subclass Counsel;

B.    Defendants have engaged in a contract, combination, and conspiracy in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), the California Cartwright Act, the MAA, the UCL, and the MCPA, and that Plaintiffs and the members

of the Class (or where appropriate, Subclasses) have been injured in their business and property as a result of Defendants' violations;

C.      Plaintiffs and the members of the Class (or, where appropriate, Subclasses) recover damages sustained by them, as provided by the federal antitrust laws, the California Cartwright Act, the MAA, the UCL, and the MCPA, and that a judgment in favor of Plaintiffs and the Class and California and Maryland Subclasses be entered against Defendants in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

D.      Plaintiffs and the members of the Class (or, where appropriate, Subclasses) recover restitutionary relief to the extent such relief is afforded by any of the aforementioned laws;

E.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.      Plaintiffs and members of the Class (or, where appropriate, Subclasses) be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.      Plaintiffs and members of the Class (or, where appropriate, Subclasses) recover their costs of this suit, including reasonable attorneys' fees as provided by law;

and

H.      Plaintiffs and members of the Class (or, where appropriate, Subclasses)

receive such other or further relief as may be just and proper.

## IX.    JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by

jury of all of the claims asserted in this Complaint so triable.

Dated:  March 1, 2017.

Respectfully submitted,

*/s/ Robert C. Gilbert*
Robert C. Gilbert
Florida Bar No. 561861
Email: robert@gilbertpa.com
Email: gilbert@kolawyers.com
KOPLOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard
Suite 1100
Coral Gables, FL  33134
Telephone: (305) 384-7270
Facsimile: (954) 525-4300

*Plaintiffs' Liaison Counsel*

*/s/ John A. DeVault, III*
John A. DeVault, III
Florida Bar No. 103979
Email: jad@bedellfirm.com
Michael E. Lockamy
Florida Bar No. 103979
Email: mlockamy@bedellfirm.com
BEDELL, DITTMAR, DEVAULT,
PILLANS & COXE, P.A.
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
Telephone: (904) 353-0211
Facsimile: (904) 353-9307

*Plaintiffs' Local Counsel*

/s/ *Christopher M. Burke*
Christopher M. Burke
Walter W. Noss
John T. Jasnoch
Jennifer J. Scott
Kate Lv
SCOTT + SCOTT,
ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Tel.: (619) 233-4565
Fax: (619) 233-0508
Email: cburke@scott-scott.com

/s/ *Joseph P. Guglielmo*
Joseph P. Guglielmo
Thomas K. Boardman
SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174-4099
Tel.: (212) 223-6444
Fax: (212) 223-6334
Email: jguglielmo@scott-scott.com
Email: tboardman@scott-scott.com

*Interim Co-Lead Class Counsel*

/s/ *Michael P. Lehmann*
Michael P. Lehmann
Bonny E. Sweeney
Christopher L. Lebsock
HAUSFELD LLP
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1908
Facsimile: 415-217-6813
Email: mlehmann@hausfeld.com
Email: bsweeney@hausfeld.com
Email: clebsock@hausfeld.com

/s/ *Nathaniel C. Giddings*
Michael D. Hausfeld
James J. Pizzirusso
Nathaniel C. Giddings
HAUSFELD LLP
1700 K St. NW, Suite 650
Washington, DC 20006
Telephone: 202-540-7200
Facsimile: 202-540-7201
Email: mhausfeld@hausfeld.com
Email: jpizzirusso@hausfeld.com
Email: ngiddings@hausfeld.com

*Interim Co-Lead Class Counsel*

/s/ *Bernard Persky*
Hollis Salzman
Bernard Persky
Benjamin D. Steinberg
ROBINS KAPLAN LLP
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
Email: hsalzman@robinskaplan.com
Email: bpersky@robinskaplan.com
Email: bsteinberg@robinskaplan.com

*Interim Co-Lead Class Counsel*

/s/ *George W. Sampson*
George W. Sampson
Lucinda M. Dunlap
SAMPSON DUNLAP LLP
1001 4th Ave., Suite 3200
Seattle, WA 98154
Tel: (206) 414-8340
Email: george@sampsondunlap.com
Email: lucinda@sampsondunlap.com

*Plaintiffs' Trial Counsel*


/s/ *Dennis Stewart*
Dennis Stewart
HULETT HARPER STEWART LLP
225 Broadway, Suite 1350
San Diego, CA 92101
Telephone: 619-338-1133
Facsimile: 619-338-1169
Email: dennis@hulettharper.com

*Plaintiffs' Trial Counsel*


/s/ *Steven C. Marks*
Steven C. Marks
Robert C. Josefsberg
PODHURST ORSECK, P.A.
25 West Flagler Street, Suite 800
Miami, Florida 33130
Telephone: (305) 358-2800
Facsimile: (305) 358-2382
Email: smarks@podhurst.com
Email: rjosefsberg@podhurst.com

*Plaintiffs' Trial Counsel*

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

In Re:

**DISPOSABLE CONTACT LENS
ANTITRUST LITIGATION**

**Case No. 3:15-md-02626-HES-JRK**

**Judge Harvey E. Schlesinger**

**THIS DOCUMENT RELATES TO:**

**All Actions**

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants

.

> */s/ Robert C. Gilbert*
> Robert C. Gilbert
> Florida Bar No. 561861
> Email: robert@gilbertpa.com
> Email: gilbert@kolawyers.com
> KOPLOWITZ OSTROW FERGUSON
> WEISELBERG GILBERT
> 2800 Ponce de Leon Boulevard
> Suite 1100
> Coral Gables, FL  33134
> Telephone: (305) 384-7270
> Facsimile: (954) 525-4300
>
> *Plaintiffs' Liaison Counsel*

80