# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | |
|---|---|
| **IN RE:**<br><br>**DISPOSABLE CONTACT LENS ANTITRUST LITIGATION**<br><br>---<br><br>**THIS DOCUMENT RELATES TO:**<br><br>**All Class Actions** | **Case No. 3:15-md-02626-HES-JRK**<br><br>**Judge Harvey E. Schlesinger** |

# EXPERT REPORT OF DR. JOHN L. SOLOW

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................ 1

II.     OTHER EXPERT TESTIMONY ....................................................... 1

III.    COMPENSATION .............................................................................. 2

IV.     SUMMARY OF ASSIGNMENT AND CONCLUSIONS ................. 2

V.      INDUSTRY BACKGROUND ............................................................ 6

VI.     COMPETITION, MONOPOLY AND OLIGOPOLY ....................... 17

VII.    BASES FOR OPINIONS ................................................................... 20

      A.      The Same Economic Analysis and Evidence that Will Be Used as
            Proof of Plaintiffs' Antitrust Claims Will Also Be Proof of the Claims
            of the Other Members of the Proposed Classes ............................... 20

            1.      Common Structural Analysis of the Contact Lens Industry .............. 21

            2.      Market Definition................................................................... 22

VIII.   THE RETAIL MARKET FOR REPLACEMENT  DISPOSABLE CONTACT
      LENSES ............................................................................................. 24

      A.      Product Market.................................................................... 24

      B.      Geographic Market ............................................................. 27

IX.     THE WHOLESALE MARKET FOR REPLACEMENT  DISPOSABLE
      CONTACT LENSES ......................................................................... 27

      A.      Product Market.................................................................... 27

      B.      Geographic Market ............................................................. 29

      C.      Market Concentration ......................................................... 29

      D.      Barriers to Entry................................................................. 33

      E.      Summary of Structural Characteristics .............................. 35

X.      COMMON ANALYSIS OF CONDUCT IN THE CONTACT LENS
      INDUSTRY ....................................................................................... 36

A.      Alcon's Introduction of its Unilateral Pricing Policy ..................................... 36

B.      B&L's Adoption of UPPs In 2014. ............................................................... 45

C.      JJVC's Adoption of UPPs In 2014. ............................................................ 47

D.      CVI's Adoption of UPPs In 2014. .............................................................. 55

XI.     THE ROLES OF  ABB AND THE CONTACT LENS INSTITUTE ...................... 64

A.      The Role of ABB ........................................................................................ 64

B.      The Role of the Contact Lens Institute. ....................................................... 70

XII.    THERE IS NO "FREE-RIDING" PROBLEM IN THIS MARKET ........................ 73

XIII.   THREE OF THE FOUR MANUFACTURER DEFENDANTS HAVE
        ABANDONED UPPs .................................................................................... 77

XIV.    THE ECONOMIC IMPACT OF UPPs CAN BE ASCERTAINED
        THROUGH COMMON EVIDENCE ............................................................... 80

XV.     CONCLUSION ........................................................................................... 84

## I.  INTRODUCTION

1.      I am a Professor of Economics at the University of Iowa, where I have been employed since 1981.  I received my B.A. in Economics from Yale University, and my M.A. and Ph.D., both in Economics, from Stanford University.  At the University of Iowa, I have taught courses in industrial organization, microeconomics, and antitrust economics.  I have taught economics as a visiting professor at Stanford University and the University of Auckland in New Zealand, and have been a visiting scholar at Stanford University Law School.

2.      In addition to my teaching, I have published numerous articles on industrial organization, and co-authored (with the late Professor Philip Areeda and Professor Herbert Hovenkamp) three volumes in a leading antitrust treatise. I have refereed articles for over 20 economic journals and publications.  A list of all publications I have authored in the previous 10 years is included in my curriculum vitae, which is set forth in Exhibit 1.[1]

## II.  OTHER EXPERT TESTIMONY

3.      I have offered economic expert testimony and analysis on other occasions, involving industries such as high-fructose corn sweeteners, contact lenses, pharmaceuticals, photocopiers, waste hauling, and tobacco products, among others.  A list of all cases in which I have testified as an expert at trial or by deposition within the preceding four years is set forth in Exhibit 2. Among the cases in which I presented economic testimony was *In re Disposable Contact Lens Antitrust Litig.*, MDL No. 1030 (M.D. Fla.) ("MDL 1030").

---

[1] The exhibits referenced in this Expert Report are more fully identified in the Index attached as Exhibit A to the Declaration of Robert Gilbert in Support of Plaintiffs' Motion for Class Certification. A copy of each exhibit is attached to Mr. Gilbert's Declaration.

4.      In my previous work in connection with MDL 1030, I had occasion to familiarize myself with the contact lens industry and to study it from an economic perspective. The allegations in that case were that the major manufacturers and independent eyecare professionals ("ECPs") represented by their professional organization (the American Optometric Association ("AOA")) had colluded to restrict distribution by alternative channels (such as mail order and internet sellers), thereby raising the price of replacement contact lenses to consumers.   I offered my opinions to the Court in two reports and through testimony at a class certification hearing and at trial.   Much of the economic structure and many of the characteristics which I found to be relevant to my economic analysis in that case remain relevant to my examination of the issues in this case: the economic effects on contact lens customers of the adoption by the manufacturers, again with extensive support and involvement of ECPs, of unilateral pricing policies ("UPPs").   In broad terms, as will be evident from this report, I find the aims and the effects of the UPPs to be much the same as the restrictive policies I studied in MDL 1030, *i.e.*, the manufacturers and the independent ECPs restraining competition from retail price discounters in the interest of their own profits and to the detriment of the lens-purchasing consumer.

### III. COMPENSATION

5.      I am compensated at the rate of $700 per hour for deposition, trial testimony, and other case-related work.   My hourly rate is not contingent on my opinions in this matter.

### IV. SUMMARY OF ASSIGNMENT AND CONCLUSIONS

6.      I understand that Plaintiffs in this case have alleged that Defendants Alcon Laboratories, Inc. ("Alcon"), Johnson & Johnson Vision Care, Inc. ("JJVC", which operates

in the United States under the "Vistakon" trade name), Bausch & Lomb Inc. ("B&L"), and CooperVision, Inc. ("CVI") (collectively, "Manufacturer Defendants") conspired with ABB Concise Optical Group, LLC ("ABB") and independent ECPs to impose identical minimum resale price maintenance programs on certain disposable contact lenses.  Although the manufacturers each called these vertical restraints UPPs, Plaintiffs allege considerable evidence of pressure and advocacy from ECPs and ABB prior to and/or during the imposition of the UPPs.  Plaintiffs further allege that as a result of these policies, the price of disposable contact lenses was raised above competitive levels.

7.    Counsel for the Plaintiffs have asked me to analyze economic issues related to class certification for a proposed class defined as follows:

> All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by Alcon, JJVC, B&L, or CVI from June 1, 2013 to the present (the "Class Period") for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.[2]

This class encompasses subclasses of affected purchasers in the states of California and Maryland.

8.    Counsel for the Plaintiffs have also asked me in the alternative to analyze economic issues related to class certification for four proposed manufacturer-specific classes, defined as follows:

---

[2] Plaintiffs' Corrected Consolidated Class Action Complaint, ¶14.

**Alcon Class:** All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by Alcon from June 1, 2013 to the present (the "Class Period") for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

**B&L Class**: All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by B&L from June 1, 2013 to the present (the "Class Period") for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

**JJVC Class**: All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by JJVC from June 1, 2013 to the present (the "Class Period") for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

**CVI Class:** All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by CVI from June 1, 2013 to the present (the "Class Period") for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies,

subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

9.     With respect to these proposed classes, I have been asked to focus on whether the liability elements of Plaintiffs' claims are subject to common economic proof.  More specifically, my task is to investigate the structure, conduct and performance of the contact lens industry to determine:

a) whether common economic proof is available to establish the antitrust liability elements of Plaintiffs' claims on a class-wide basis; and

b) whether common economic proof is available to establish the causation elements of Plaintiffs' claims (also known as antitrust "impact") on a class-wide basis.

Dr. Michael Williams is providing a separate expert report on how damages to members of the proposed classes can be demonstrated on a class wide basis through common evidence.

10.     In the course of performing my analysis, I have reviewed various pleadings in this matter, including the Corrected Consolidated Amended Class Action Complaint filed by Plaintiffs; various business documents produced by the parties; publicly available information about the contact lens industry; and pricing and other statistical data.[3]

11.     In connection with the foregoing assignment, I have reached the following conclusions, which are discussed below in greater detail:

a)  Common economic evidence can be used to support Plaintiffs' allegations

---

[3] Because the opinions expressed in this report are focused on class certification issues and are based on the class certification discovery record, I reserve the right to incorporate additional information into my analysis as the case proceeds.

of collusive conduct by Defendants.  A number of economic factors are conducive to and consistent with the coordinated pricing policies that Plaintiffs have alleged.  This economic evidence is common to the proposed classes, that is, all members of the classes would present this type of evidence and benefit from it.

b)  Economic evidence shows that the alleged conspiracy would have been widely and generally successful, impacting all or nearly all members of the proposed classes in that all customers would have paid higher prices than they would have in the absence of the conduct.  In particular, the economic structure, conduct and performance of the industry was consistent with coordinated behavior having widespread impact on disposable contact lens prices paid by customers.  This evidence can be used by all class members as proof of the causation (or antitrust "impact") element of their claims.

## V.  INDUSTRY BACKGROUND

12.  Contact lenses are federally regulated medical devices and, as a result, consumers cannot purchase them without a prescription from an ophthalmologist or an optometrist.  21 C.F.R. §§886.5925 (b)(1), (b)(2). An ophthalmologist has an M.D. degree from a medical school.  An optometrist has an O.D. degree from an optometry school.  Opticians are not allowed to prescribe contact lenses, but may dispense them in some states.  Collectively, these three classes of individuals are what I mean when I refer to "ECPs".

13.     ECPs offer two relevant services to contact lens wearers: eye exams (including contact lens fittings), and retail sales of new or replacement contact lenses.  The first service involves providing an eye examination in which eye health and vision needs are assessed and contact lenses are prescribed as appropriate. The ECP charges a separate fee for this service.  The prescription typically includes not only the corrective parameters that apply to the specific patient, but also the brand of contact lens to be utilized by that patient.  ECPs also provide a retail service by selling replacement contact lenses to their patients.  Patients are not required to purchase their contact lenses from their ECP, but, at least since 2004, are able to take their prescription and shop elsewhere.

14.     By virtue of their sole ability to write the required prescription, ECPs have a great deal of influence over the brand and type of contact lenses that patients use.  ECPs are often referred to as a "gatekeeper" in the market, due to their required fitting and prescription function.

15.     Beginning in 1988 with the introduction of disposable contact lenses, the nature of the replacement lens market changed.  Today, disposable lenses comprise virtually

the entire market for contact lenses. They are typically categorized as either daily disposables, which are intended to be worn for one day and replaced, or frequent replacement lenses, which are typically replaced on a weekly or biweekly basis.

16. The introduction of disposable contact lenses means customers require distribution services for replacement lenses more frequently than they require eye examinations. Depending on the intended frequency of replacement, lenses are typically sold in packages of 6, 30, or 90 lenses, and since the customer's eyes may require different lenses, customers often buy two packages at a time. This inventory would last a typical customer from six weeks to three months, depending on the frequency of replacement.

17. The introduction of mass-produced disposable contact lenses also allowed for the separation of the eye exam and fitting activity from the retailing and distribution of replacement lenses. Since the purchase of replacement lenses became a relatively straightforward commercial transaction requiring no medical supervision, there arose other commercial establishments that specialize in this sort of transaction. These alternative channels of distribution offer distribution services that consumers prefer, such as convenient location, mail, telephone and internet ordering, and shipment of lenses directly to customers. They also typically sell lenses at a lower mark-up, so that the prices that consumers have to pay are lower. The alternative channels of distribution also extended the geographic market for replacement contact lenses to the entire nation. These alternative sources often advertise in national publications, and customers from many states are able to submit orders to a distant location, which are filled by mail or express delivery.

18.     The mass production of disposable replacement contact lenses also led to the growth of companies that provide distribution services to the manufacturers and ECPs, and in particular ABB, the largest provider of distribution services. ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████     In addition to distribution services to ECPs, ABB engages in extensive and detailed monitoring of prices and quantities for the main channels of distribution (ECPs, chain optical companies, mass marketers, and internet sellers).  These data are circulated to ABB's customers in the form of quarterly reports, known as the *Retail Price Monitor*, which includes suggested retail prices to ECPs.  ABB has a website (yourlens.com) which permits ECPs to sell replacement contact lenses to patients and have the products shipped directly to the patient. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

19.     ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███ ██ ███ ███ ██ ███ ████ ██ ██████ ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

20.     A 2005 report by the Federal Trade Commission ("FTC") entitled *The Strength of Competition In The Sale of Rx Contact Lenses: An FTC Study* (the "2005 FTC Report") presents data from both Ocular Services, Inc. ("OSI") (a company acquired by CVI in 2005) and 1-800-Contacts on the share of filled prescriptions and sales for contact lenses through these various retail channels. Ex. 10 at CONTACTPLTFS00000139. The OSI figures were as follows:



*Id.* The data presented by 1-800-Contacts were as follows:

10



*Id.*

21.     The FTC concluded that both sets of data indicated that "[m]anufacturers distribute the largest share of lenses through independent ECPs and the smallest through the online/mail-order channel." *Id.* at CONTACTPLTFS00000140. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

22.     The alternative channels of distribution also typically sell lenses at a lower mark-up, so that the prices that consumers have to pay are lower. Multiple studies conducted prior to implementation of the UPPs found that contact lenses were cheaper when purchased online or from big-box stores as opposed to independent ECPs.

23.     As noted in a 2004 FTC report entitled *Possible Anticompetitive Barriers To E-Commerce: Contact Lenses* (the "2004 FTC Report"), a 1998 study found that the average

11

price of a six-lens pack of contact lenses was roughly 19 percent more expensive when purchased from an independent ECP instead of from one of the other categories of retailers. Ex. 11 at CONTACTPLTFS00000118.

| Price Comparison by Channel by Product | | | |
|---|---|---|---|
| Retailing Channels | Focus Toric | FreshLook | Acuvue 2 |
| ECP | $ 70.3 | $ 45.1 | $ 24.3 |
| Independent Optometrists | $ 70.9 | $ 46.7 | $ 24.4 |
| Ophthalmologists | $ 73.2 | $ 46.5 | $ 25.7 |
| Optical Retail Chains | $ 66.7 | $ 42.1 | $ 22.9 |
| Non-ECP | $ 56.1 | $ 35.2 | $ 19.0 |
| 1-800 Contacts | $ 59.0 | $ 35.0 | $ 20.0 |
| Mass Merchandisers | $ 53.2 | $ 35.4 | $ 18.1 |
| Difference between ECP and Non ECP Retailers ($) | $ 14.2 | $ 9.9 | $ 5.3 |
| Difference between ECP and Non ECP Retailers (%) | 25% | 28% | 28% |

Source:   2004 FTC report "The Strength of Competition in the Sale of Rx Contact Lenses: An FTC Study."

24.     In the 2005 FTC Report, the FTC examined the prices of a six-month supply of ten different contact lenses from 20 online retailers (including four hybrid retailers, or retailers with both an online and offline presence) and from 14 offline retailers in Northern Virginia. Ex. 10 at CONTACTPLTFS00000168–70.  It found that contact lenses are, on average, "$15.48 less expensive online than offline" and that "[w]holesale clubs . . . [were] the least expensive channel overall, offering prices that averaged around $30 less than independent ECPs, around $9 less than all online outlets, and about $6 less than pure online retailers." *Id.* at CONTACTPLTFS00000170.  The results of this study are shown below.

| Channel | Average Price of All Lenses |
|---|---|
| **Non-ECPs** | |
| Pure Online Retailer | $87.77 |
| Hybrid Retailer | $106.38 |
| Wholesale Club | $83.18 |
| Mass Merchandiser | $108.38 |
| Non-ECP Average | $96.43 |
| **ECPs** | |
| Optical Chain | $109.20 |
| Independent ECP | $112.35 |
| ECP Average | $110.78 |
| | |
| *Price Difference* | *$14.34* |
| *% Difference* | *+14.9%* |

25.     Since their inception, these alternative channels of distribution have been perceived by ECPs as a competitive threat to their ability to sell replacement lenses. In MDL 1030, consumers and 32 state Attorneys General ("AGs") filed antitrust lawsuits against JJVC, B&L, CIBA, and the AOA.[4] These lawsuits alleged that the contact lens manufacturers and the AOA (the independent ECPs' trade association) "conspired among themselves . . . to restrict the supply of replacement contact lenses to alternative channels of distribution." Specifically, the Plaintiffs alleged a classic group boycott: that the manufacturers and the AOA restricted wholesale sales to "alternative suppliers" (*e.g*., mail order houses and pharmacies), and that but for this conspiracy, the Plaintiffs would have paid lower prices for

---

[4] *See In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996).

13

contact lenses.[5] As noted above, I served as an expert witness regarding class certification in that matter, and testified as an expert witness on damages during the trial.  Following several weeks of trial, the case settled. In addition to monetary damages, the contact lens manufacturers agreed to sell replacement contact lenses to the alternative distribution channels in a commercially reasonable and non-discriminatory way.

26.     In 2003, following concerns that ECPs were refusing to provide copies of prescriptions to patients and refusing to confirm their validity when requested by a retailer, Congress passed the Fairness to Contact Lens Consumers Act ("FCLCA") (15 U.S.C. §§ 7601 *et seq.*), which requires ECPs to provide patients copies of their contact lens prescriptions automatically so that they can purchase their contact lenses from a retailer other than their ECP. Section 4(f) of the FCLCA (15 U.S.C. § 7603(f)) also barred sellers from altering a contact lens prescription. The legislative history of the FCLCA made it clear that the legislation was intended to "promote [] competition, consumer choice, and lower prices by extending to contact lens wearers the same automatic right to copies of their own prescriptions and allows consumers to purchase contact lenses from the provider of their choice." Ex. 12 at 5. As Congressman Billy Tauzin stated in the debates preceding the enactment of the FCLCA:

> Back in the 1970s, the Federal Trade Commission enacted a rule that required eye care professionals to provide patients with a copy of their eyeglass prescription. That rule was necessary because doctors and optometrists would refuse to release prescriptions to consumers or would condition release on the purchase of eyeglasses. While the eyeglass rule radically changed the competitive landscape—today there is vibrant

---

[5] *In re Disposable Contact Lens Antitrust Litig.*, MDL No. 1030, 2001 WL 493244, at *1 (M.D. Fla. Feb. 8, 2001).

competition among eyeglass providers—contact lenses were not included in that rule. Today we see the same competitive problems festering in the contact lens marketplace as we saw in the eyeglasses market 25 years ago.[6]

27.     Similarly, Congressman James Sensenbrenner explained that the FCLCA "ensures that unscrupulous eye doctors will no longer be able to hold consumers' contact lens prescriptions hostage" and that, "[p]roviding consumers with an automatic right to their prescriptions will allow them to shop around for contact lenses based on price, service, and convenience."[7] He concluded by emphasizing the fundamental need for the FCLCA, explaining that "[c]ompetition among contact lens companies will result in lower prices, a greater choice of lens providers, and more convenient ways to fill contact lens prescriptions."

28.     In 2004, the FTC issued the Contact Lens Rule (16 C.F.R. Parts 315 and 456), which spells out the FCLCA's requirements. 60 Fed. Reg. 40502 (July 2, 2004). That rule reaffirms that ECPs must give a free copy of the contact lens prescription to the patient at the end of every contact lens fitting, even if the patient does not request it. It contains other requirements that are intended to make it easier for the patient to take his or her prescription to an alternative source in order to reap the benefits of competition. As the FTC has stated, the FCLCA "increases consumers' ability to shop around when buying contact lenses." Based in part on the study reported in the 2005 FTC Report, the FTC concluded that the

---

[6] *Fairness to Contact Lens Consumers Act* at 4, before the House of Representatives, Committee on Energy and Commerce, Subcommittee on Commerce, Trade and Consumer Protection, Subcommittee Meeting (Sept. 9, 2003) (statement of Rep. Billy Tauzin).

[7] Hon. F. James Sensenbrenner, Jr., Speech to House of Representatives on Fairness to Contact Lens Consumers Act, Congressional Record—Extension of Remarks, E2434, November 23, 2003, *available at* http://www.gpo.gov/fdsys/pkg/CREC-2003-11-23/pdf/CREC-2003-11-23-pt1-PgE2434.pdf.

FCLCA's provision requiring ECPs to provide the patient with a prescription that the patient can then use elsewhere to purchase contact lenses had increased competition and reduced contact lens prices across the country. Ex. 10 at CONTACTPLTFS00000178.

29. As a January 2015 article in *Contact Lens Spectrum* magazine noted, "[t]he FCLCA was of great concern because many believed that a great number of patients would start purchasing their contact lenses from alternative sources, affecting the profitability of contact lenses for practitioners." Ex. 13 at 4.

30. Many ECPs apparently have not followed the FCLCA and have not given contact lens subscriptions to patients so that they can choose which retail venue in which to have their prescription filled. In 2008, *Contact Lens Spectrum* magazine published a prescriber survey showing that prescription release in 2007 was well under 50%. Ex. 14 at 3. Likewise, in January 2017, 1-800 Contacts presented to the FTC a survey of 1000 contact lens wearers located across the country. Ex. 15 at Exhibit B. The survey indicated that 24% of those interviewed did not receive a copy of their prescription. An additional 5% were told, when they asked for a prescription, to either call back or visit the prescriber's office at a later time in order to obtain a copy. *Id.*

31. Beginning in June 2013, the major contact lens manufacturers, working in conjunction with independent ECPs and ABB, instituted minimum resale price maintenance ("RPM") policies that imposed a floor price, referred to in the industry as "UPPs." Under UPPs, a purchaser of a product for resale is required to charge no less than the minimum price specified in the policy. These policies had the effect of insulating independent ECPs' retail business from the competition provided by alternative channels of distribution. Having

failed to cut off the alternative channels' source of supply and being unable to prevent patients from taking their prescriptions to alternative retailers for fulfillment, the ECPs and manufacturers restricted the ability of the alternative channels to compete by removing their primary means of competition, low prices.

32.     An article on OptometryStudents.com described what happened in the United States when UPPs were introduced for contact lenses:

> In 2013, contact lens manufacturer Alcon (CIBA Vision) took action to end a pricing war that was pricing optometrists out of their own market. It enacted a minimum pricing policy called unilateral pricing policy (UPP) . . . . By setting minimum prices for its contact lenses, Alcon reset the bar for manufacturers to compete on value and service rather than solely on price. Since then, Bausch & Lomb, CooperVision and Vistakon have followed suit.
>
> In the past, discount and bulk merchandisers were able to cut the cost of premium contact lenses by selling a higher quantity at discounted rates, which allowed them to out price many small business and private practice optometrists. However, after the enactment of UPP, manufacturers can cut off companies who sell UPP protected products for less than the minimum retail price.

Ex. 16 at CONTACTPLTFS00000631.

## VI. COMPETITION, MONOPOLY AND OLIGOPOLY

33.     In a competitive market for a good or service, well-informed consumers are faced with a large number of alternative suppliers of that product, each making independent business decisions.  As a result, each supplier is forced, by the availability of alternatives, to offer the quality of good or service that consumers prefer, and to offer its output at the lowest price consistent with the cost of producing the desired quality of service.  Any supplier that offers a price/quality combination that is not desired by consumers will find itself losing

customers in large numbers to alternative suppliers. Firms in competitive markets are led by their own self-interest to serve customers well; to charge a price consistent with the incremental, or marginal, cost of producing an additional unit of output; and to sell any unit of output that increases their profit. An economy that consists of competitive markets will tend toward an equilibrium in which resources are allocated efficiently, in the sense that goods and services will be produced and sold at the least possible cost, which in turn maximizes consumer welfare as well as long-term economic growth.[8]

34.     In contrast, a firm with market power is able to raise the price, restrict the sales, and/or lower the quality of its product without losing so many of its customers as to make that conduct unprofitable.[9] Its ability to do so rests on the suppression of competition from other suppliers, whether because other sources of supply are not available to consumers, or because the suppliers as a group have explicitly or tacitly suppressed competition among themselves, or because the recognized dependence of each supplier's profits on the responses of rival suppliers' choices leads firms not to compete vigorously.

35.     When one firm controls all or the bulk of a product's output, and no other firm can enter the market, or expand output at comparable costs, a monopoly is said to exist. Such a monopolist has the power to raise prices above the competitive level by restricting its output or to reduce quality below the competitive level, because other firms are not available to provide customers with a more desirable alternative. Unlike a competitive market, a monopoly leads to an inefficient allocation of society's resources. The monopolist

---

[8]     *See* Phillip E. Areeda, Herbert Hovenkamp, and John L. Solow, IIB ANTITRUST LAW, ¶ 402 (3d ed. 2007).

[9]     *Id.* §5A, at 109-135.

maximizes its profit by selling less than the competitive output, and at a price that exceeds the marginal cost of production. Resources are diverted from the monopolized market to other markets in which their contribution to consumer welfare is less, and the monopolist is able to enrich himself at the expense of consumers.[10]

36. When relatively few sellers account for the bulk of output, perhaps accompanied by a "competitive fringe" of smaller sellers who behave competitively, an oligopoly is said to exist. Oligopoly differs from monopoly in that no single firm can determine the market output and price because each is faced with one or more rivals capable of having a significant effect on total output. It differs from competition in that each of the oligopolists recognizes that its price and output choices will affect the profitability of its rivals' decisions, and will engender responses from those rivals that must be taken into account when evaluating the profitability of alternative strategies, including pricing and output. While various assumptions as to what oligopolists believe those responses will be can lead to very different theories of output and pricing in an oligopoly, ranging from the competitive outcome to the monopoly outcome, both the theoretical and the empirical evidence clearly suggest that oligopoly pricing departs from the competitive outcome, often substantially.[11]

37. In economics, a group of firms that explicitly coordinates its pricing or output decisions is called a cartel; the act of explicitly coordinating economic decisions is called collusion. Collusion among cartel members to coordinate their pricing, output, or other

---

[10]  *Id.* ¶¶ 403a, 403b and 502.

[11]  *Id.* ¶¶ 404a and 404b.

strategies can allow them to approximate the monopoly outcome in the market. By restricting output directly, the cartel members cause the price of their product to rise as customers vie (through paying higher prices) for the limited amount of product that is available. Alternatively, cartel members may agree on a price to charge, and allocate the amount of the product demanded by consumers amongst the cartel members. As discussed below, a number of conditions make a market more conducive to cartelization, and make it more likely that collusion will be effective (*i.e.*, will increase the cartel members' profits by leading to the intended higher market prices and reduced output compared to competitive levels). When successful, collusive oligopoly also leads to an inefficient allocation of resources and a wealth transfer from consumers to producers in the same way that monopoly does.

## VII.    BASES FOR OPINIONS

### A.    The Same Economic Analysis and Evidence that Will Be Used as Proof of Plaintiffs' Antitrust Claims Will Also Be Proof of the Claims of the Other Members of the Proposed Classes

38.    As discussed above, I have been asked to determine whether any economic evidence used to establish Plaintiffs' claims would be common and equally applicable to the claims of the proposed Classes. As I explain below, extensive evidence shows that the structure, conduct, and performance of the contact lens industry is conducive to and consistent with the formation of a cartel and that any such cartel would have been successful in generally raising price to its customers. This common economic evidence can be used by all members of the proposed Classes as proof of the conspiracy and impact elements of their claims.

### 1.      Common Structural Analysis of the Contact Lens Industry

39.      Economic literature recognizes that a number of factors tend to make a market more favorable to effective collusion, that is, collusion having widespread impact on price.[12] A market that is structurally conducive to collusion both motivates firms to engage in collusive behavior in the first instance and facilitates the resultant cartel's ultimate success in terms of achieving and sustaining higher prices and profit margins.   Among the relevant structural factors are the number and relative market shares of the firms involved, the degree of standardization or homogeneity of the product, the availability of substitutes, the presence of barriers to entry, and the existence of trade associations or other industry organizations. These factors make a market more conducive to collusion for some of the following reasons:

(a) Having relatively few firms in the market reduces the amount of communication necessary to establish a cartel agreement, and makes it easier for the firms to monitor each other's pricing, output, and market shares and to identify those who cheat on the cartel agreement.

(b) Standardization of products simplifies the agreement that must be reached on prices or output, and minimizes the possibility of cheating on the cartel agreement (for example, by competing on product quality while maintaining the cartel agreement).

(c) A lack of significant possibilities to substitute alternative products for the products subject to collusion makes it is easier to raise or maintain prices without a significant loss of industry sales that would lessen the profitability of collusion.

---

[12]   *See generally* Don E. Waldman and Elizabeth J. Jensen, INDUSTRIAL ORGANIZATION: THEORY AND PRACTICE, at 246-248 (2nd ed. 2001); Dennis W. Carlton and Jeffrey M. Perloff, MODERN INDUSTRIAL ORGANIZATION, at 122-145 (3rd ed. 2000).

(d) Barriers to entry are necessary if a cartel is to be able to persistently profit from anticompetitive behavior, because such barriers insulate the cartel from new, competitive entrants who would be attracted by the high prices and margins.

(e) Trade associations and other industry groups provide an opportunity for firms to further collusive agreements, by providing opportunities for rivals to meet and communicate, deepening personal and business relationships among rivals, and lowering the cost of reaching and enforcing agreements.  Trade associations and other industry groups can also facilitate collusion by providing firms an opportunity to share information on prices, outputs, costs or other variables, thereby allowing cartel members to monitor each other's behavior.

40.     This standard economic framework and proof would be common and equally applicable to all members of the proposed Classes.

### 2.     Market Definition

41.     A given product in a given region is a market if an actual or hypothetical single seller controlling all the output of that product in that region could maximize its profits at prices significantly above the competitive level.  The ability of consumers to switch to other products or to the same product sold by producers at other locations, or the ability of other firms not currently selling that product to switch resources into the production of that product, are the factors that potentially limit the profitability of price increases by the hypothetical monopolist.  If those factors are sufficiently strong as to make supracompetitive pricing by the hypothetical monopolist unprofitable, then the particular product and location under consideration is not a market, but part of a larger market that includes the products to

which consumers would switch. To define a relevant market, then, is to identify those producers to whom customers of the firm could turn in response to a price increase above the competitive level or a quality decrease below the competitive level.[13]  Excluded are those producers whose products are either too different (the product aspect of the market) or too distant (the geographic aspect of the market) to be suitable alternatives to consumers, and those who are not likely to shift resources promptly to supply the firm's customers with a suitable alternative in both product and geographic terms.

42.    The standard methodology for defining a market,[14] which is reflected in the Joint United States Department of Justice ("DOJ") and FTC Horizontal Merger Guidelines ("Merger Guidelines"),[15] reflects these principles.  We begin by characterizing the product of the defendant firm or firms as a "provisional market," and ask whether a significant and non-transitory price increase by a hypothetical single seller of that product would be profitable.  If so, that product is a market.  If not, we assess the alternatives to which customers would switch, or the producers who would switch resources to the production of this product, and include the best of those in a revised provisional market.  We then repeat the analysis, adding additional alternative products until a hypothetical monopolist that controlled all of their sales could profit from a significant price increase.  The smallest such grouping of products constitutes a market.

---

[13]  *See* Areeda, *supra* note 8, ¶ 530a.

[14]  *Id.* §§5C, 5D and 5E, at 149-277.

[15]  Joint DOJ and FTC, *Horizontal Merger Guidelines*, §§ 2 and 4 ("Merger Guidelines") (Aug. 19, 2010).

43.     The underlying principles for establishing the geographical boundaries of a market are the same as those used to define the boundaries among alternative products.[16] We begin by characterizing as a provisional market those sales that occur at the location of the defendant firm or firms, and ask whether a hypothetical monopolist over those sales could profitably impose a non-transitory supracompetitive price increase.  If so, that area is a relevant geographic market.  If such a price increase would repel so many sales as to be unprofitable, either because consumers would make their purchases at other locations or because sellers located at other locations would ship their products to the provisional market location, we would add the location from which the best substitution came to the provisional market and repeat the question.  A relevant antitrust market would then be the smallest area for which a hypothetical monopolist could profitably impose a non-transitory supracompetitive price increase.

44.     The restraints that are the subject of this litigation consist of arrangements among manufacturers and some wholesale purchasers that restrain wholesale trade, with the purpose of restraining trade in the retail market.  It is thus necessary to consider in turn the wholesale and retail markets that are involved.

## VIII.   THE RETAIL MARKET FOR REPLACEMENT DISPOSABLE CONTACT LENSES

### A.      Product Market

45.     At the retail level in the contact lens industry, the consumers are individual patients, and the suppliers are the firms (independent ECPs, chain optical retailers, mass merchandisers and online retailers) that sell contact lenses to them.  Since several products

---

[16]   *See* Areeda, *supra* note 8, ¶551; Merger Guidelines, §1.2.

are offered, each has the potential to be a relevant market.  The economist inquires whether consumer substitution (consumers' willingness and ability to switch from one of these to another product or products) in response to a significant increase in the price imposed by a hypothetical single seller of the first product would limit the profitability of that price increase, or whether supplier substitution (suppliers' of another product or products willingness and ability to switch resources to the sale of the monopolized product) in response to the same price increase would similarly limit its profitability.

46.     Consumers' willingness and ability to switch among the different brands and modalities of soft contact lens use (daily disposable and frequent replacement) is severely limited by their lack of information regarding the products and the cost of getting a different prescription, which would typically involve incurring the cost of a second examination and fitting.  As a result, the ECP has great influence in choosing the brand and regime of lens use.

47.     One possible substitute for contact lenses is eyeglasses.  However, for patients who use contact lenses, eyeglasses have a number of disadvantages.  Due to the fact that there is a distance between the lenses and the eye, vision may be distorted and peripheral vision may be poor.  Some patients may be annoyed by the constant presence of their eyeglass frame and/or the edge of their eyeglass lens in their field of vision and the weight of their glasses on their ears and nose.  Eyeglass wearers can have problems with rain and snow, as well as possible reflections off the back of the lens; and glasses can fog up with changes in temperature.  Finally, some patients prefer contact lenses to eyeglasses for fashion or appearance reasons. Ex. 17 at 1.  Many, if not most, disposable contact lens wearers do have a pair of eyeglasses for use when they wish to remove their lenses.  This suggests that

eyeglasses are best thought of as a complement to, rather than a substitute for, disposable contact lenses.

48.     Another possible substitute for disposable contact lenses is rigid gas permeable ("RGP") contact lenses.  RGP lenses are hard contact lenses that are typically used for a year.  They are less comfortable for most patients initially, and require a longer period of adjustment for the patient, as well as the need for careful cleaning and maintenance to avoid eye infections and other complications. Ex. 18 at 2–4. RGP lenses are also custom-made for each patient, and are therefore more expensive than disposable contact lenses. Ex. 19 at 1–2. A contact lens patient facing a supracompetitive increase in the price of disposable contacts would need to have a new fitting for RGP lenses to determine whether he or she is a candidate for their use, to be custom-fit and to get through an uncomfortable adjustment period. ████████████████████████████████████████████

████████████████████████████████

49.     Another possible substitute is laser (LASIK or PRK) eye surgery.  This is an irreversible surgical procedure that is more expensive ($1,500 - $2,500 per eye), may not provide complete vision correction (requiring continued use of contact lenses after surgery), and may lead to undesirable complications, including glare, dry eyes, and vision loss. Ex. 20 at 2–3.  Not all patients are good candidates for laser eye surgery.  According to an industry publication, "[a]lternative vision corrections such as laser surgery don't seem to be as big a factor, now or for the future. According to Jobson Optical Research, the number of people pursuing laser vision correction will decline from roughly 675,000 in 2000 to a projected 560,000 for 2002." Ex. 21 at 5.

**B.      Geographic Market**

50.      In terms of geographic market definition, it is clear that the retail market for disposable contact lenses is national in scope.   While many buyers purchase from local sellers, the question in market definition is to determine what alternatives those customers would be able to turn to in the event of a hypothetical monopolistic price increase.   Product differences across locations or high shipping costs could make consumers unwilling to substitute products sold in distant locations, but contact lenses are standardized nationally, and have low shipping costs relative to their value.   There are already firms that can and do sell nationally; internet firms, in particular, advertise nationally and ship nationally.

## IX. THE WHOLESALE MARKET FOR REPLACEMENT DISPOSABLE CONTACT LENSES

**A.      Product Market**

51.      At the wholesale level, the producers are firms that manufacture contact lenses, and the consumers are the firms (independent ECPs, chain optical stores, mass merchandising companies and internet firms) that purchase contact lenses for resale. We need to ask whether consumer substitution (consumers' willingness and ability to switch from one of these to another product or products) in response to a significant increase in the price imposed by a hypothetical single seller of the first product would limit the profitability of that price increase, or whether supplier substitution (suppliers' of another product or products willingness and ability to switch resources to the sale of the monopolized product) in response to the same price increase would similarly limit its profitability.

52.      The wholesale market for contact lenses is driven largely by the retail market. Wholesale purchasers only purchase lenses because they can resell them to the end-user

patients.  ECPs have considerable influence over the brand and regime of soft contact lens purchased, and could be expected to shift their purchases and prescriptions to lower cost lenses if they felt that a price increase in one brand or replacement regime were negatively affecting their profits.  Other distribution channels, on the other hand, are unable to affect the choices of the patients that purchase from them, and must purchase the brands and types of lenses that their customers demand.  Moreover, the ability of all of the major manufacturers to produce lenses in a wide range of parameters and modalities means that supply side substitution prevents any one particular lens from being a separate market.  As a result, all brands and regimes of soft contact lenses must be considered as part of the same wholesale market.

53.     Again, eyeglasses, RGP lenses and laser eye surgery can be excluded from the relevant wholesale product market definition.  Since for all the reasons discussed above, these products are not substitutes for soft contact lenses at retail, wholesale purchasers will not be in a position to substitute purchases of these products in response to a hypothetical supracompetitive increase in the price of soft contact lenses.  Moreover, since the technologies for producing RGP lenses and eyeglasses are very different from that for producing soft contact lenses, producer substitution will not limit the exercise of market power in the wholesale soft contact lens market.

54.     Defendants' own statements support this product market definition. For example, Dr. Millicent Knight, Head of Professional Affairs for JJVC, testified at a hearing before the United States Senate Committee on the Judiciary's Subcommittee on Antitrust, Competition Policy and Consumer Rights on July 30, 2014 ("Senate Hearing") and

repeatedly referred to the "contact lens market." Ex. 22 at 1–5. 

## B.      Geographic Market

55.      The pattern of trade in the wholesale market for soft contact lenses clearly indicates that this market is national in scope. Again, the products are standardized nationally, and have low shipping costs relative to their value. Manufacturers can and do sell their products to ECPs and distributors located throughout the United States. One could consider the possibility that the geographic extent of the wholesale market is larger than the United States, and that in response to a supracompetitive price increase imposed by a hypothetical sole seller of soft contact lenses in the United States, wholesale purchasers could substitute lenses produced abroad. Since the same firms that dominate the United States market also dominate sales of soft contact lenses in the rest of the world, however, we cannot expect international wholesale trade to discipline such noncompetitive pricing. As a result, the possibility of a world market does not alter the results of the analysis.

## C.      Market Concentration

56.      Small numbers of firms and concentration of sales in an industry makes horizontal collusion easier, by making it easier for the colluding firms to reach an agreement,

to enforce the agreement, and to benefit from the agreement. This is well understood in standard economics.[17]

57.     There is empirical evidence to support this.  For example, a well-known empirical study that examined 50 known cartels found that 21 of them involved industries in which the four largest firms controlled more than 76 percent of the sales, while another 17 involved industries in which the four largest firms controlled between 51 and 75 percent of the sales.[18]

58.     Industry concentration is typically measured by the Herfindahl-Hirschman Index ("HHI"), which is calculated by summing the squared market shares of the sellers in the industry.[19]  The HHI gives a number between 0 and 10,000; an industry consisting of 100 firms, each with a market share of 1 percent would have an HHI of 100, while an industry consisting of two equal size firms (i.e., market shares of 50 percent) would have an HHI of 5,000.  The HHI decreases with the number of firms, and increases with rising inequality of market share among a given number of firms.  For the purposes of merger evaluation, the Antitrust Division of the DOJ has deemed a market to be highly concentrated if the HHI is greater than 2,500.[20]

---

[17] *See* Dennis W.Carlton and Jeffrey M. Perloff, MODERN INDUSTRIAL ORGANIZATION, at 121-150 (3d ed. 2000); Don E. Waldman and Elizabeth J. Jensen, INDUSTRIAL ORGANIZATION: THEORY AND PRACTICE, at 246-248 (2001); George Hay and Daniel Kelley, *An Empirical Survey of Price Fixing Conspiracies*, JOURNAL OF LAW AND ECONOMICS, at 13-38 (April 1974); Margaret C. Levenstein and Valerie Y. Suslow, *What Determines Cartel Success?* JOURNAL OF ECONOMIC LITERATURE, at 43-95 (March 2006).

[18] Hay and Kelley, *id*, n.9; *see also* Levenstein and Suslow, *id*., n.9.

[19] Carlton and Perloff, *supra* note 17, at 247; Waldman and Jensen, at 96-97.

[20] Merger Guidelines, §5.3.

59.     The retail market for disposable contact lenses is structurally unconcentrated. However, the special role of the ECP as gatekeeper, who is able via the required prescription to dictate the brand and selection of contact lens that the patient will purchase, has allowed ECPs to pressure the manufacturers to distort competition within the retail market. Absent those actions, the retail market was moving away from ECP retailing and towards the alternative distribution channels that are the low-cost suppliers.

60.  ████████████████████████████████

████████████████████████  ████████████

████████████████████████████████████

████████████████████████████████



████████████████████████████████████

61.    The conclusion that the wholesale market for contact lenses is highly concentrated is supported by other analyses.  According to testimony given by R. Joe Zeidner, the former General Counsel of 1-800-Contacts, at the Senate Hearing, the four Manufacturer Defendants collectively control 97% of the United States contact lens market (measured by revenue) as reflected in the following chart:



Exhibit 25 at 7.

**D.     Barriers to Entry**

62.     The economic feasibility of a cartel, as alleged here, depends, in part, on the extent to which new entrants are restricted from the market by barriers to entry. New entrants are firms that make substantial investments to bring new productive capacity to the market. If the profits arising from an effective agreement to raise price quickly attract new entrants (not subject to the cartel) with sufficient productive capacity to provide large numbers of purchasers with an alternative source of supply, then collusion can influence prices in the short run but cannot succeed in the long run. In contrast, a cartel in a market that is protected from entry can maintain elevated prices because no new firm can easily enter to drive prices down. This is well understood in standard economics.[21]

---

[21] *See* Carlton and Perloff, *supra*, note 17, at 74-80.

63. 

64.     The contact lens manufacturing industry has grown even more concentrated in recent years, as large pharmaceutical companies have acquired contact lens manufacturers. For example, on January 7, 2005, CVI finalized the acquisition of OSI. Ex. 26 at 1. Similarly, in 2011, Novartis AG ("Novartis") acquired Alcon for roughly \$12.9 billion. Ex. 27 at 1. Likewise, Valeant Pharmaceuticals International, Inc. entered this industry through its \$8.7 billion acquisition of B&L in August 2013. Ex. 28 at 1.  And in August 2014, CVI acquired Sauflon Pharmaceuticals Limited ("Sauflon").  Ex. 29 at 40–42.

65.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

66.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

**E.    Summary of Structural Characteristics**

67.    Based on the above and my knowledge of the contact lens industry, it is my opinion as an economist that the wholesale market for replacement disposable contact lenses was in the relevant time period conducive to cooperative behavior coordinated by one or more representatives of the ECPs, as occurred previously.  The wholesale market is highly concentrated with the defendants controlling a large share of production.  Disposable contact lenses are largely homogeneous across producers and there is little opportunity for consumers to substitute other products in response to higher prices for their contact lenses.  There are significant barriers to entry, meaning that successful collusion would not be undermined by lost sales to producers of other products or new entrants.  In sum, the conditions in these markets were favorable for successful collusion that, if imposed, would result in widespread supracompetitive pricing incurred by customers.

## X.  COMMON ANALYSIS OF CONDUCT IN THE CONTACT LENS INDUSTRY

68. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

### A.    Alcon's Introduction of its Unilateral Pricing Policy

69.    Alcon introduced UPPs as part of the introduction of its new DAILIES
TOTAL1® ("DT1") lenses. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

70. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

36

71. ███████████████████████████████████████

72. ███████████████████████████████████████



73.



74.

75.



76.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████

77.    ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

78.    ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

79.

80.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███

81.  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

82.  ████████████████████████████████████

██████████████████████    ██████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

83.   ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

84.   ████████████████████████████████

███████████████████████████████████████████

██████████████████████████



**B.**     **B&L's Adoption of UPPs In 2014.**

85.

86.

87.



88.

89.

C.    **JJVC's Adoption of UPPs In 2014.**

90.



22

91. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████

92. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████



93.



94.

95.



96.

97.

98.

99.   

100.

███████████████████████

101.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████

102.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

**D.**   **CVI's Adoption of UPPs In 2014.**

103. ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

104. ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

105. ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████



106.

107.

 Robert Atkinson, President of the Information

Technology and Innovation Foundation, likewise testified at length on the pressure placed on

CVI to join Alcon, B&L and JJVC at the Senate Hearing (footnotes omitted):

> But how do optometrists convey this desire to prescribe UPP lens to producers? . . . In the case of the eye care industry, the collusion may not be in a smoke-filled room, but it's (*sic*) collusion all the same. In this case, it's professional collusion through norms that is leading producers to adopt UPP policies.

> In the optometry profession these anticompetitive social norms are expressed in a variety of means, particularly in articles in professional journals and on social media channels that send a clear message to optometrists that they should prescribe doctors'-only lenses. For example, in an article in Review of Cornea and Contact Lens Gary Gerber, OD, writes:

> "One of the biggest benefits to practitioners of UPP is that it instantly creates a perfectly level playing field; volume discounts for large practices and online retailers go away. While this may create friction with buying groups, the benefits outweigh any ancillary issues. More importantly, however, it forces practices to focus on something other than price to keep prescriptions in their office—if all 'retailers' sell the lenses for the same price, the method and environment under which they are sold will be the factors that determine where a patient decides to purchase their lenses."

> He goes [on] to in essence to say, with UPP, optometrists will prescribe the UPP lens:

> "Manufacturers also benefit from UPP because retail price erosion can be stopped. With a 'race to the bottom' from aggressive price cutting eliminated, motivations to fit a particular lens increase; this has the ability to support and protect brand equity. . . . All things being clinically equal

(which of course they rarely are), savvy practitioners will give serious thought to prescribing UPP lenses. For example, if you have a patient with astigmatism and they can wear a UPP lens, and a non-UPP lens is clinically equivalent, a smart doctor will choose the UPP option."

Finally, he states what is obvious to everyone in the industry[:]

"Finally, the actual price mandated by UPP has so far been higher than lenses that do not have a UPP. This has afforded higher profit margins and created a new sense of excitement surrounding contact lenses." Likewise, in an article in Review of Optometric Business, Paul Karpecki, OD, FAAO writes in favor of UPP, stating "One other exciting development: Independent practice optometry becomes reinvigorated with contact lens prescribing as a profitable specialty and practice differentiator."

We see similar statements on optometrist social media sites. On the Facebook site "ODs on Facebook", a post from a person listed as Steve Silberberg (who lists himself as "ODwire.org supporting member") on the topic "JJVC goes to universal pricing" writes with regard to having to give "No more rebates etc. and 1-800 etc. goes away if they all follow B&L Alcon and now J & J. Cooper next." In other words he is saying with UPPs competitors like 1-800 Contacts that sell for less will go out of business. And he is not so subtly encouraging CooperVision to also use UPP pricing. Another ODwire.org supporting member listed as Stephen McDaniel writes in response to JJVC adopting UPP pricing, "Wow, great news. Now I might actually fit more of their lenses. Hopefully Cooper gets on board with this soon." In other words, he is saying that he prescribes lenses based on what level of profit he makes. And he is implying that if CooperVision doesn't also adopt UPP then he will not prescribe their lenses. Another member, listed as Joe DiGiorgio, OD, writes in response to a question of how to tell your patients that these prices of industry regulated lens: "I think I'll tell my patients that the onliner must have been selling counterfeit contacts. Why else would they suddenly raise their prices to what I'm selling them."

And they express this collective desire in meetings with industry representatives. For example, in the Facebook OD

site, a person listed as Kerry Kordet Giedd, writes, "At the Ultra launch last week with 300+ ODs from around the country present there was a Huge applause (honestly, it was quite an overwhelming response) when B&L (Bausch and Lomb) announced the UPP. Without a doubt they were largely pleasing their OD base when they followed Alcon's lead on the UPP. . . . I think B&L will gain far more than they lose in practitioner [*sic*] loyalty and support of this policy."

Ex. 110 at 4–6.

108.



Reputation for Cooper is huge, accounts feel that we sell those



111.    In announcing publicly CVI's adoption of a UPP on one of its product lines, Mr. Ferrigno said his company held twelve focus groups and met with 100 ECPs before acting. Ex. 117 at 1. He was also quoted in another article as follows: "[t]here was a strong voice that UPP is an important requirement for independent eyecare practitioners," he said. Ex. 118 at 2. "It was important that we understood the voice of the independents, and we're responding to it." *Id.* at 2.

112.



113. 

114.

115.

116.



## XI.    THE ROLES OF ABB AND THE CONTACT LENS INSTITUTE

### A.    The Role of ABB

117.    Another factor facilitating collusion is the frequency of inter-firm communications, either through intermediaries or directly through meetings.[23] For example, industry trade association events provide an opportunity for executives of rival firms to meet in person and communicate directly, often in private settings.  That such contacts facilitate collusion is well understood in standard economics.[24]

118.    ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

119.    ███████████████████████████████████████

████████████████████████████████████████████

---

[23] Adam Smith famously observed that, "[p]eople of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices." Adam Smith, AN INQUIRY INTO THE NATURE AND CAUSES OF THE WEALTH OF NATIONS, at 128 (New York: Modern Library ed. 1937).

[24] See Carlton and Perloff, supra note 12, at 135-136; Waldman and Jensen, supra note 12, at 577; see also Richard A. Posner, ANTITRUST LAW, at 170 (citing A. Fraas and W. Greer, Market Structure and Price Collusion: An Empirical Analysis, JOURNAL OF INDUSTRIAL ECONOMICS, at 21-44 (Sept. 1977)).  Professor Posner comments that the Fraas and Greer empirical study found that trade associations have been implicated in a "surprising number" of cartel cases.  Fraas and Greer (at 39) attribute their findings to the fact that "a trade association can serve as a vehicle for the coordination of a price fixing agreement, and it may also foster a social climate conducive to collusion"; see also Hay and Kelly, supra note 17.

120.



121.    When Alcon announced its UPPs, Mr. Alvarez stated publicly that 82% of ECPs supported the UPPs, because they helped ECPs raise profit margins. Ex. 128 at CONTACTPLTFS00000014 at 13:02-50 (audio recording).

122.



123.    Mr. Alvarez repeated his advice that independent ECPs charge their customers more than the UPP in a September 3, 2014 broadcast of the "Power Hour" radio show hosted by Dr. Gary Gerber, saying that ECPs should try to reach a gross profit margin of 48%-49%. Ex. 128 at CONTACTPLTFS00000014 at 23:45-55 (audio). Dr. Gerber concurred, saying that ECPs "should be charging more [than the UPP] because they can." *Id.* at 24:10-17.

124.    ████████████████████████████████████████████

████████████████████████████████████████████████████



125. ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

126. ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

127. ████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████

**B.    The Role of the Contact Lens Institute.**

128.    ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████   According to the CLI's

website, it was created to "represent[] the interests of its members . . . ." Ex. 145 at 1.  Its

board of directors consists of one executive from each of the four manufacturers. Ex. 146 at

1. During the relevant period, CLI's Chair was Ms. Angelini of JJVC. Its Vice-Chair was

Andrew Sedgwick, Vice-President of Global Commercial Strategy & Business Development

for CVI. Its Treasurer was Richard Weisbarth, Vice-President of Professional Affairs for

Alcon. Its Director was Joseph Barr, Vice-President of Clinical and Medical Affairs for

B&L. Ex. 147 at 1–2.

129.    The CLI's website notes that "[t]he members of the CLI, together with other

participating companies participate in a quarterly statistical program to track manufacturer

shipment data of Contact Lens and Lens Care products which is managed by Veris Consulting ['Veris']. The program's objective is to provide participants with accurate and timely consolidated market data. . . . . Each participating company in the CLI Statistical Program has a representative on the CLI Global Statistical Task Force." Ex. 148 at 2.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████

130.    According to the Veris website, the program established by it for the CLI "track[s] sales at a detailed level worldwide" and "is more valuable than other sources of market data because sales are reported directly from manufacturers . . . ." Ex. 149 at CONTACTPLTFS00000251.  Veris states that its work for the CLI "is the only program where the data is reviewed annually by Veris to ensure accuracy. Veris implemented this internal review process to reassure participants that they could be confident in the data." *Id.* Indeed, Veris requests that "the finance department at each manufacturer's headquarters . . . . [pull sales information and revenue data] directly from their internal system at the model, or SKU level." *Id.*  The resulting low margin of error "is extremely important to participants since they use this data for strategic planning" and is reported to the manufacturers on a quarterly and annual basis. Ex. 149 at CONTACTPLTFS00000252.  According to its website, Karen Taylor, the person at Veris who is the Senior Manager for this work, "also works with member companies [of CLI] such as Johnson & Johnson and Bausch & Lomb performing high-level data analysis and designing custom reporting tools and dashboards." Ex. 150 at 2.

131.   Chris Holloway, Global Business Analytics Manager for CVI, is quoted on Veris' website as saying that "Veris compiles and distributes consolidated reports of all the manufacturers' submissions with 5 year's history included, for both revenue and units. . . . These offer valuable insights in order to help us ga[u]ge where the market is heading and ultimately help with the possible strategic approaches we might make in the future."   Ex. 149 at CONTACTPLTFS00000252. He noted further that "Veris acts as a partner to ensure that all manufacturers are working together so that we can make the statistical programme as effective as possible." *Id.*

132.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

133.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

**XII.    THERE IS NO "FREE-RIDING" PROBLEM IN THIS MARKET**

134.    Economists recognize that there are circumstances under which minimum resale price maintenance can improve the way a market functions.  The most-often cited circumstance is what is known as the "free-riding" problem, in which a supplier of a product provides costly pre-sale services to a customer for which the provider is unable to charge. The customer has an incentive to avail themselves of those services, then purchase from a seller who doesn't provide the services and therefore has lower costs and is able to offer a

lower price.  For example, a customer interested in purchasing a high-end camera might go to their local photography store and have the highly-trained staff demonstrate the features and advantages and disadvantages of various cameras, then buy their camera from an internet seller or other discounter that does not provide (or incur the cost of) the highly-trained staff. As a result, photography store owners that invest in the training of their staff will not be able to recoup the costs or earn a return on that investment, and may ultimately choose not to provide them.  This is a loss to society if the value of the services outweigh their costs. Minimum RPM can alleviate this problem by preventing customers from free-riding on the free services provided by full-service sellers.  The full-service sellers recoup the cost of and earn a return on their investment in providing free services through the price of the camera without fear of losing sales to low-service sellers (although this injures customers who don't want the services but are forced to pay for them).

135.    This free-rider concern is not applicable here.  While it is true that ECPs must incur costs to learn their profession and (to the extent they choose) to stay informed about innovations in technique, diagnosis and contact lens technology so as to better serve their patients, they charge a price for providing those services in the form of eye examination and contact lens fitting fees.  These fees are payable by the patient whether or not he or she chooses to purchases replacement disposable contact lenses from a mass marketer or internet retailer.  Hence, there are no free services on which to free-ride.  Retailing of contact lenses is a commercial transaction that does not require medical supervision or specialized training; this is clear from the fact that mass marketers like Costco and Wal-Mart and internet companies like 1-800-Contacts provide those services with little difficulty.  Indeed, it is the

ability of the alternative channel distributors to provide those services to contact lens wearers at lower prices that led the ECPs to turn to the manufacturers to reduce the discounters' ability to compete.

136. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

137. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████



### XIII.   THREE OF THE FOUR MANUFACTURER DEFENDANTS HAVE ABANDONED UPPS

141.    Alcon, B&L, and JJVC no longer utilize UPPs on contact lenses. Alcon and JJVC discontinued them in 2016. Ex. 157 at 1; Ex. 158 at 1. B&L announced that it no longer would use UPPs in 2017. Ex. 159 at 1.

142.    Mr. Weiss of CVI also apparently continued to have doubts about UPPs. In a September 2015 analyst conference, he stated that the market is being "negatively impacted" by them. Ex. 170 at CONTACTPLTFS00001358. █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

143.    █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████





144.    On April 13, 2016, JJVC announced that it would cease using UPPs on contact lenses. Ex. 157 at 1. Dr. Bowling voiced his dismay about this development in *Optometry Times*: "[t]his is a blow to the private practice optometrist....UPP was exactly what we needed to level the playing field with big-box retailers. JJVC was a leader in UPP. Independent doctors can only hope that other contact lens manufacturers don't follow suit." Ex. 164 at 2.

145.



79

146.

147.    On December 23, 2016, Alcon discontinued its UPP, citing the United States

Court of Appeals for the Tenth Circuit's decision in *Johnson & Johnson Vision Care, Inc. v.*

*Reyes*, No. 15-4071, 2016 WL 7336568 (10th Cir. Dec. 16, 2016), that upheld a Utah law

prohibiting the enforcement of UPPs on contact lenses in that state. Ex. 158 at 1. On

February 10, 2017, B&L also dropped its UPPs, citing the Tenth Circuit's decision. Ex. 159

at 1.

## XIV.   THE ECONOMIC IMPACT OF UPPS CAN BE ASCERTAINED THROUGH COMMON EVIDENCE.

148.    Economic theory indicates that UPPs could be expected to adversely impact

consumers of contact lenses in three ways.  First, UPPs set at prices above the level of prices

charged by the low-price alternative channels directly impact customers who purchase their

replacement contact lenses from those channels.  We would expect to see customers who

purchase their replacement disposable contact lenses at mass merchandisers and from internet sellers to be paying higher prices for their lenses.

149.    Second, there are contact lens users who would in the absence of UPPs have purchased their replacement contact lenses at lower prices through the alternative channels but instead purchased from ECPs at higher prices as a result of the UPPs. Preventing patients from shopping for lower prices and allowing ECPs to capture more of the retail market was a central goal of the UPPs.  Customers who were deterred from searching because their ECP informed them that they would not be able to find a better price than the ECP's price, or who chose to purchase from their ECP after discovering from their own search that they could not find a lower price elsewhere, paid a higher price than they would have but for the imposition of UPPs.

150.    Third, UPPs insulated ECPs from the price and service competition provided by the alternative channels.  Since their entry into the retail contact lens market, internet firms and mass marketers have provided the convenience and low prices that customers preferred.  Before the imposition of UPPs, ECPs had to respond to lower-priced channels of distribution by lowering their prices and providing better service; one effect of the restraints would be to maintain ECP prices for replacement contact lenses above the prices that would have otherwise prevailed in the market.

151.    An examination of the evidence reveals that each of these effects has occurred. ECPs recognized the effect that the UPPs were having on alternative channels of distribution. ████████████████████████████████████████████

████████████████████████████████████████████████████



152.



153.

154.



155.

156.    In addition, the empirical analysis of Dr. Michael Williams that is presented in his separate report shows that, consistent with my analysis and conclusions, prices were maintained at a supracompetitive level during the relevant period, leading to higher prices incurred by all or a substantial majority of customers.  I have spoken with Dr. Williams on numerous occasions as he developed his methodology and performed his statistical analysis.  Dr. Williams' methodology is consistent with my own structural analysis of the industry, and with established economic theory.

## XV.    CONCLUSION

157.    Based on the foregoing, I believe from my analysis of industry structure, conduct, and performance that (i) the characteristics of the disposable contact lens market were conducive to collusion during the relevant period and (ii) there is sufficient evidence and methods from which Plaintiffs could show that the impact from Defendants' conduct was common and widespread to all, or virtually all, of the members of the proposed Classes.

Moreover, I believe that the analysis used to establish the foregoing could be applied uniformly to all of the members of the Classes.[26]

158.    To summarize, the following categories of economic analysis and opinion can be used to establish liability and damages in this litigation for all class members:  (i) market structure analysis of the contact lens industry; (ii) analysis explaining the basic economics of minimum resale price maintenance in general and its application in the contact lens industry in particular; and (iii) analysis of conduct and economic performance in the contact lens industry during the relevant period, including the nature, timing, and communications surrounding resale price maintenance, the corresponding trends in pricing over time, and econometric analysis showing widespread impact.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 3, 2017, at Iowa City, Iowa.


_____
Dr. John L. Solow

---

[26] It should be noted that since: (a) discovery is not complete and (b) my analysis to date has focused on class certification issues (that is, whether common economic proof is available regarding the elements of Plaintiffs' claims), my opinions may be supplemented or amended as discovery proceeds and as I conduct further analysis.

APPENDIX: DOCUMENTS CONSIDERED

**Documents Cited as Exhibits in the Expert Report**

*See* Index of Exhibits 1–170, Exhibit A to Declaration of Robert C. Gilbert in Support of Plaintiffs' Motion for Class Certification.

**Bates Numbered Documents**

ABB_00000782

ABB_00001075

ABB_00001083

ABB_00001126

ABB_00001998

ABB_00035504

ABB_00004288

ABB_00005882

ABB_00005989

ABB_00006332

ABB_00006801

ABB_00006802

ABB_00007058

ABB_00007182

ABB_00007209

ABB_00007216

ABB_00007220

ABB_00007288

ABB_00007488

ABB_00011062

ABB_00012508

ABB_00012509

ABB_00016042

ABB_00017088

ABB_00017166

ABB_00019805

ABB_00020071

ABB_00021321

ABB_00022217

ABB_00035422

ABB_00035422

ABB_00037794

ABB_00040190

ABB_00044437

ABB_MDL00019341

ABB_MDL00025611

ABB_MDL00025963

ABB_MDL00032394

ABB_MDL00032536

ABB_MDL00033072

ABB_MDL00038910

ABB_MDL00043524

ABB_MDL00066107

ABB_MDL00069829

ABB_MDL00070142

ABB_MDL00071523

ABB_MDL00098342

ALCONMDL0000529

ALCONMDL0005888

ALCONMDL0007835

ALCONMDL0008208

ALCONMDL0008208

ALCONMDL0009357

ALCONMDL0011482

ALCONMDL0013824

ALCONMDL0016178

ALCONMDL0016593

ALCONMDL0019329

ALCONMDL0020223

ALCONMDL0022742

ALCONMDL0026857

ALCONMDL0028995

ALCONMDL0040041

ALCONMDL0040322

ALCONMDL0041301

ALCONMDL0044296

ALCONMDL0050277

ALCONMDL0054100

ALCONMDL0054466

ALCONMDL0054488

ALCONMDL0059023

ALCONMDL0064686

ALCONMDL0078662

ALCONMDL0102174

ALCONMDL0108466

ALCONMDL0124376

ALCONMDL0150529

ALCONMDL0176115

ALCONMDL0176189

ALCONMDL0176212

ALCONMDL0176218

ALCONMDL0176272

ALCONMDL0210783

ALCONMDL0397990

AOA0000717

AOA0000820

AOA0001155

BLMDL00010297

BLMDL00011380

BLMDL00036569

BLMDL00106749

BLMDL00140568

BLMDL00143036

BLMDL00179453

BLMDL00187537

BLMDL00205218

BLMDL00213859

BLMDL00276202

CLI_0000000859

CLI_00000001914

CLI_00000002117

CostcoMDL0000019

CostcoMDL0000189

CostcoMDL0000201

CV00014679

CVI00002135

CVI00010523

CVI00013317

CVI00013381

CVI00013597

CVI00014126

CVI00014504

CVI00016201

CVI00016203

CVI00023083

CVI00025803

CVI00028683

CVI00043535

CVI00045917

CVI00046080

CVI00054413

CVI00074827

CVI00079162

CVI00079165

CVI00079363

CVI00080163

CVI00082721

CVI00082721

CVI00090195

CVI00090590

CVI00092519

CVI00096675

CVI00124672

CVI00124673

CVI00125992

CVI00185860

CVI00189638

CVI00196560

CVI00197745

CVI00199339

JJVC100091311

JJVCI_00139536

JJVCI_00139538

JJVCI_00139539

JJVCI_00139542

JJVCI_00139558

JJVCI_00163300

JJVCI_00166583

JJVCI_00191503

JJVCI_00209282

JJVCI_00210376

JJVCI_00210380

JJVCI_00217785

JJVCI_00220507

JJVCI_00232198

JJVCI_00232378

JJVCI_00232379

JJVCI_00232787

JJVCI_00232787

JJVCI_00232790

JJVCI_00232793

JJVCI_00232799

JJVCI_00232807

JJVCI_00232810

JJVCI_00232813

JJVCI_00232816

JJVCI_00232828

JJVCI_00232992

JJVCI_00249662

JJVCI_00249680

JJVCI_00249712

JJVCI_00249716

JJVCI_00249719

JJVCI_00249720

JJVCI_00249728

JJVCI_00249735

JJVCI_00249738

JJVCI_00290271

JJVCI_00290283

JJVCI_00290286

JJVCI_00318559

JJVCI_00320183

JJVCI00002233

JJVCI00008890

JJVCI00010649

JJVCI00016143

JJVCI00027726

JJVCI00027765

JJVCI00028496

JJVCI00029835

JJVCI00060531

JJVCI00062115

JJVCI00079369

JJVCI00089985

JJVCI00091872

JJVCI00092331

JJVCI000995031

JJVCI00113300

JJVCI00114185

JJVCI00114185

JJVCI00114185

JJVCI00115786

JJVCI00126315

JJVCI00133105

JJVCIOO117678

JJVCl_00086251

JJVCl_00139399

JJVCl_00177407

JJVCl_00225102

JJVCl_00246865

JJVCl00254935

JVCI00099010

**Academic Articles/Books**

Phillip E. Areeda, Herbert Hovenkamp, and John L. Solow, IIB ANTITRUST LAW (3d ed. 2007).

Don E. Waldman and Elizabeth J. Jensen, INDUSTRIAL ORGANIZATION: THEORY AND PRACTICE (2nd ed. 2001).

Dennis W. Carlton and Jeffrey M. Perloff, MODERN INDUSTRIAL ORGANIZATION (3rd ed. 2000).

George Hay and Daniel Kelley, *An Empirical Survey of Price Fixing Conspiracies*, JOURNAL OF LAW AND ECONOMICS (April 1974).

Margaret C. Levenstein and Valerie Y. Suslow, *What Determines Cartel Success?* JOURNAL OF ECONOMIC LITERATURE (March 2006).

**Pleadings, Submissions, Complaints, and Orders**

*In Re: Disposable Contact Lens Antitrust Litigation*, Plaintiffs' Corrected Consolidated Class Action Complaint, (November 23, 2015).

*In re Disposable Contact Lens Antitrust Litig*., 170 F.R.D. 524 (M.D. Fla. 1996).

*In re Disposable Contact Lens Antitrust Litig*., MDL No. 1030, 2001 WL 493244, at *1 (M.D. Fla. Feb. 8, 2001).

*State of Maryland v. Johnson & Johnson Vision Care, Inc*., Complaint (Baltimore Cty. Circuit Court).

Expert Report of Michael A. Williams, Ph.D., filed March 3, 2017.

**Other**

Caves, K., Holt, C. and Singer, H. (June 8, 2015), "Resale Price Maintenance in the Contact Lens Industry," 1-800-X-00000003-41

*Fairness to Contact Lens Consumers Act*, before the House of Representatives, Committee on Energy and Commerce, Subcommittee on Commerce, Trade and Consumer Protection, Subcommittee Meeting (Sept. 9, 2003) (statement of Rep. Billy Tauzin)

Hon. F. James Sensenbrenner, Jr., Speech to House of Representatives on Fairness to Contact Lens Consumers Act, Congressional Record—Extension of Remarks, E2434, November 23, 2003, *available at* http://www.gpo.gov/fdsys/pkg/CREC-2003-11-23/pdf/CREC-2003-11-23-pt1-PgE2434.pdf.

Joint DOJ and FTC, *Horizontal Merger Guidelines* ("Merger Guidelines") (Aug. 19, 2010).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 3, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

<u>s/John A. DeVault, III</u>
John A. DeVault, III
jad@bedellfirm.com
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
Telephone (904) 353-0211
Facsimile (904) 353-9307

*Plaintiffs' Local Counsel*