UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| **In Re:**<br><br>**DISPOSABLE CONTACT LENS ANTITRUST** | **Case No. 3:15-md-2626-J-20JRK**<br><br>**Judge Harvey E. Schlesinger** |
| **THIS DOCUMENT RELATES TO:**<br><br>**ALL ACTIONS** | |

## O R D E R

This multi-district litigation ("MDL") antitrust case involving the pricing of disposable contact

lenses is before the Court on the contact lens consumer Plaintiffs' Motion for Class Certification.

(Docs. 396; S-404) (collectively "Motion for Class Certification").[1]   The Defendants, contact lens

manufacturers, Alcon Laboratories, Inc. ("Alcon"), Johnson & Johnson Vision Care, Inc. ("JJVC"),

Bausch & Lomb Inc. ("B&L"), and CooperVision, Inc. ("CV") (collectively "Manufacturer

Defendants"), and distributor ABB Concise Optical Group, LLC ("ABB"), have filed a Memorandum

of Law in Opposition to Plaintiffs' Motion for Class Certification (Docs. 505; S-540).  With leave of

Court, Plaintiffs filed Plaintiffs' Reply Memorandum of Law in Support of Motion for Class

Certification (Docs. 611; S-649), and Defendants filed Defendants' Sur-Reply Memorandum of Law in

Further Opposition to Plaintiffs' Motion for Class Certification.  (Doc. 674; Doc. S-681).  A two-day

evidentiary hearing on Plaintiffs' Class Certification Motion was conducted in August of 2018.  (*See*

---

[1]   There are two versions of the motions, responses, and declarations and exhibits filed in support of thereof:
a redacted public version; and an unredacted version filed under seal with the Court's permission
because it contains confidential information.  If there are two docket numbers listed for a particular filing, the
docket number beginning with "S-" denotes the version filed under seal.

Doc. 866; Doc. 867). Plaintiffs have settled with CV. (Docs. 611 at 10; S-649 at 10; 781). In connection with the pending Motion for Class Certification, the Defendants have filed:

1) Defendants' Motion to Strike Portions of the Expert Report of Dr. John L. Solow and Preclude Testimony Regarding Purported Collusion Between the Defendants, Pursuant to Fed. R. Evid. 702 and *Daubert* (Docs. 500; S-531 ("Solow *Daubert* Motion")), to which Plaintiffs have filed a Plaintiffs' Opposition to Defendants' Motion to Strike Portions of the Expert Report of Dr. John Solow and Preclude Testimony Regarding Purported Collusion Between the Defendants Pursuant to Fed. R. Evid. 702 and *Daubert* (Docs. 549; S-558);

2) Defendants' Motion to Exclude or Strike the Expert Report of Dr. Michael A. Williams Under Fed. R. Evid. 702 and Fed. R. Civ. P. 37(c)(1), (Docs. 503; S-535 ("Williams *Daubert* Motion")), to which Plaintiffs have filed Plaintiffs' Opposition to Defendants' Motion to Exclude the Expert Report of Dr. Michael A. Williams. (Docs. 548; S-559); and

3) Defendants' Motion to Exclude the Supplemental Report of Dr. Michael A. Williams Under Fed. R. Evid. 702 and *Daubert* (Docs. 693; S- 720), and Plaintiffs' Opposition to Defendants' Motion to Exclude the Supplemental Report of Dr. Michael A. Williams. (Doc. 715; S-722).

Also before the Court is Plaintiffs' "Motion for Spoliation Sanctions Against Defendants Johnson & Johnson Vision Care, Inc. and Alcon Laboratories, Inc." (Doc. 854); Defendants' Responses to Plaintiffs' Spoliation Motion (Doc. 879; Doc. 881; Doc. 882; Doc. 886); Plaintiffs' Reply to Defendants' Responses (Doc. 901); and Defendants' Sur Replies (Doc. 913; Doc. 914).

The pending motions are ripe for the Court's consideration. The Court has considered the parties' papers and evidence submitted, as well as argument of counsel.

**I.   Background**

2

This multidistrict antitrust litigation was centralized before this Court on June 10, 2015, by order of the United States Judicial Panel on Multidistrict Litigation ("MDL Panel"). (Doc. 1; Transfer Order). It arises out of pricing policies adopted by contact lens manufacturers starting in June 2013 with regard to the distribution and sale of certain contact lens products. The operative complaint, Plaintiffs' Interlineation To Corrected Consolidated Class Action Complaint (Doc. 395; Complaint), filed on March 1, 2017, is a six-count Complaint brought by sixteen individual Plaintiffs suing on behalf of themselves, and on behalf of a class of Plaintiffs consisting of "all persons and entities in the United States who made a retail purchase . . . of disposable contact lenses ("contact lenses") manufactured by [the Manufacturer Defendants] . . . subject to one of the 'Unilateral Pricing Policies' ("UPPs") described herein from June 1, 2013 to the present." Complaint ¶ 1; see also id. ¶ 48. The individual Plaintiffs ("Plaintiffs") are Rachel Berg, Miriam Pardoll, Elyse Ulino, Jennifer Sineni, Susan Gordon, Cora Beth Smith, Brett Watson, Kathleen Schirf, Tamara O'Brien, John Machikawa, Amanda Cunha, Alexis Ito, Catherine Dingle, Sheryl Marean, Pamela Mazzarella, and Joe Felson. Complaint ¶¶ 1, 28-41.

A.    **The Complaint**

Plaintiffs contend that the Manufacturer Defendants' adoption, implementation and enforcement of UPPs as they apply to the market for disposable (soft) contact lenses ("contact lenses") violate antitrust law. Disposable contact lenses comprise 90% of the contact lenses sold in the United States. See Complaint ¶ 64.

Plaintiffs allege that

> the Manufacturer Defendants conspired with each other and with Defendant
> [ABB], a wholesaler, as well as independent eye care professionals
> ("ECPs") (e.g. optometrists and ophthalmologists who sell contact lenses

3

to consumers) and their trade association, the American Optometric Association ("AOA"), to impose minimum resale prices on certain contact lens lines by subjecting them to UPPs, thereby reducing or eliminating price competition on those products from "big box" stores. . . , buying clubs . . . , and internet-based retailers . . . (collectively, "Discount Retailers") by preventing them from discounting those products.

Complaint ¶ 2. Plaintiffs further allege that "the Manufacturer Defendants, working with ABB, conspired to eliminate discounting of contact lenses by ensuring that all retailers charged the same minimum price." Id. ¶ 3.

Plaintiffs allege a complex "interwoven" conspiracy in which

ABB worked with the Manufacturer Defendants to develop UPPs for several of the most advanced and/or most popular lines of contact lenses sold by the Manufacturer Defendants. Over the course of 15 months commencing in June of 2013, each Manufacturer Defendant implemented this strategy in the form of a [UPP] . . . [promulgating] a minimum retail price for its affected product(s) and threaten[ing] to curtail the supply of some of its contact lens lines to retailers who sell below the mandated price.

Complaint ¶ 9. "The Manufacturer Defendants agreed to limit retail price competition only after extensive consultation with independent ECPs and their agent ABB." Id. ¶ 11.

Plaintiffs allege that "the Manufacturer Defendants . . . conspired with each other in a horizontal, *per se* illegal agreement in restraint of trade that ABB (acting as the agent for its ECP clients) helped to orchestrate," and that "these policies were the subject of agreements among the Manufacturer Defendants and independent ECPs, effectuated through ABB." Complaint ¶ 174. They contend that the Manufacturer Defendants, "facing pressure from independent ECPs and ABB about competitive threats posed by the Discount Retailers, . . . agreed with one another and with ABB and the independent ECPs to impose UPPs on their most advanced and most popular contact lens lines." Complaint ¶ 133; see also id. ¶¶ 135-158 (citing "plus factors" such as of "Industry Structure",

4

"Opportunities to Conspire," "Information Exchanges," "ABB's and Independent ECPs' Conduct," "Acts Contrary to Economic Self Interest," "Pretextual Reasons for UPPs," "Motive to Conspire, Including Assurances That Competitors Will Also Act," "Abrupt, Near Contemporaneous and Fundamental Shift in Pricing Policies," and "Past Conspiratorial Conduct.").

Plaintiffs also contend that Defendants engaged in a "vertical conspiracy," subdividing the relevant market for disposable contact lenses into distinct markets for each brand of contact lenses subject to a UPP. Complaint ¶ 183. They alleged that the Manufacturer Defendants, ABB, and the independent ECPs "all share an interest in not reducing the retail price of contact lenses and limiting competition from Discount Retailers," id. ¶ 4, and that ECPs, ABB, and the Manufacturer Defendants communicated up and down the distribution chain regarding the enactment, implementation and enforcement of UPPs. Id. ¶¶ 102, 103, 106, 107, 111, 114, 115, 117-32.

Plaintiffs allege that the UPPs harm competition by increasing prices for contact lenses subject to the UPPs, and depriving consumers of the ability to shop around for retail discounts on contact lenses. Id. ¶ 159.

Plaintiffs bring the following claims (the claims are mis-numbered in the Complaint):

| | |
|---|---|
| First Cause of Action: | Claim of Violation of 15 U.S.C. §§ 1 and 3 (*Per Se* Violation of the Sherman Act) ["Count 1"] |
| Second Cause of Action: | Claim for Violation of 15 U.S.C. §§ 1 and 3 (Rule of Reason Violations of the Sherman Act) ["Count 2"] |
| Third Cause of Action: | Claim for Violation of the California Cartwright Act ["Count 3"] |
| Third Cause of Action: | Claim for Violation of the Maryland Antitrust Act ["Count 4"] |
| Sixth Cause of Action: | Claim for Violation of the California Unfair Competition Law ["Count 5"] |

Seventh Cause of Action:    Claim for Violation of the Maryland Consumer Protection Act.
["Count 6"]

**B.    The UPPs**

Defendants adopted UPPs as follows (see Doc. S-537 at 131-144 (Cremieux Report Exs. 10-13) (dates that UPPs were adopted))):

Alcon adopted UPPs for its products as follows: Dailies Total I (June 2013 concurrent with the product's release); Dailies Aquacomfort Plus Multifocal (January 2014 concurrent with the product's release); Dailies Aquacomfort Plus Toric (January 2014 concurrent with the product's release); Air Optix Colors (April 2014 concurrent with the product's release); and Dailies Total 1 Multifocal (July 2016 concurrent with the product's release). (Doc. S-537 at 131-32 (Cremieux Report Ex. 10)). Alcon discontinued the UPPs in December 2016. Id.

B&L adopted UPPs for its products as follows: Ultra (February 2014); BioTrue ONEday for Presbyopia (June 2014 and December 2016 for different package sizes); and Ultra for Presbyopia (March 2016 concurrent with the product's release). (Doc. S-537 at 134-35 (Cremieux Report Ex. 11)). B&L discontinued the UPPs in February 2017. Id.

CV (and predecessor Sauflon Pharmaceuticals Limited ("Sauflon")) adopted UPPs for its products as follows: Clariti 1 Day (January 2014 (by Sauflon)); Clariti 1 Day Multifocal (January 2014 (by Sauflon)); Clariti 1 Day Toric (January 2014 (by Sauflon)). The Sauflon UPPs were subsequently adopted by CV in August 2014. CV adopted UPPs for its products: MyDay (June 2015 concurrent with the product's release); Biofinity XR Toric (January 2016 concurrent with the product's introduction); and Biofinity Energys (July 2016 concurrent with the product's introduction). (Doc. S-537 at 136-37 ( ((Cremieux Report Ex. 12)). CV discontinued the UPPs for five of the products

6

(Biofinity XR Toric, Clariti 1 Day, Clariti 1 Day Multifocal, Clariti 1 Day Toric, and MyDay) in March 2017. Id.

JJVC adopted UPPs for its products as follows: Acuvue Oasys with Hydraclear (July 2014 with follow up UPPs for different package sizes in August and October 2014 and June 2015); 1-Day Acuvue Moist (August 2014); 1-Day Acuvue Moist for Astigmatism (August 2014); 1-Day Acuvue TruEye (August 2014); Acuvue Oasys for Astigmatism (August 2014); Acuvue Oasys for Presbyopia (August 2014); 1-Day Acuvue Define (March 2015); 1-Day Acuvue Moist Multifocal (May 2015 concurrent with the product's release); Acuvue Oasys with Hydraluxe (August 2015 concurrent with the product's release). (Doc. S-537 at 140 ((Cremieux Report Ex. 13)). JJVC discontinued all UPPs in April 2016. Id.

Defendants' expert Dr. Cremieux detailed the specifics about the UPPS regarding price and modality (package size). (Doc. S-537 at 131-144 (Cremieux Report Exs. 10-13)

### C.    Applicable Antitrust Law

"Section 1 of the Sherman Act broadly prohibits 'every contract, combination . . . or conspiracy, in restraint of trade or commerce[.]'" Aquatherm Indus., Inc. v. Fla. Power & Light Co., 145 F.3d 1258, 1262 (11th Cir. 1998); see also United States v. Colgate & Co., 250 U.S. 300, 307 (1919) ("The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade of commere. . . ."). A manufacturer, however, "generally has a right to deal, or refuse to deal, which whomever it likes, as long as it does so independently." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 760 (1984) (citing Colgate, 250 U.S. at 307)). Thus, a manufacturer is permitted to "announce its resale prices in advance and refuse to deal with those who fail to comply.

7

And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination." Id. at 761. The elements of a conspiracy to restrain trade in violation of § 1 of the Act, are: "(1) an agreement to enter a conspiracy (2) designed to achieve an unlawful objective . . . [and] (3) actual unlawful effects or facts which radiate a potential for future harm to competition." U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 1001 (11th Cir. 1993) (internal citation and quotation omitted). See also Aquatherm Indus., Inc., 145 F.3d at 1262 (citing U.S. Anchor Mfg., Inc.).

Antitrust law differentiates between vertical and horizontal price restraints. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 730 (1988) (footnote omitted). With limited exceptions, horizontal agreements are *per se* unlawful, whereas vertical restraints are unlawful only if an assessment of market effects, known as the "rule of reason" analysis, reveals that the vertical agreements unreasonably restrain trade. See Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885-86, 907 (2007). Under the "rule of reason," "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Id. at 885 (citation omitted). Vertical and horizontal price arrangements may intersect. See United States v. Apple, Inc., 791 F.3d 290, 314 (2d Cir. 2015), cert. denied, 136 S. Ct. 1376 (2016).

"It is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators, and from other circumstantial evidence (economic and otherwise), such as barriers to entry and other market conditions." Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1299-1300 (11th Cir.

8

2003) (internal quotations and citations omitted);  see also Apple, 791 F.3d at 315; In re Text

Messaging Antitrust Litig., 630 F.3d 622, 629 (7th Cir. 2010) ("Circumstantial evidence can establish

an antitrust conspiracy." (citing cases)); DeLong Equip. Co. v. Washington Mills Abrasive Co., 887

F.2d 1499, 1515 (11th Cir. 1989) ("Conspiracies are rarely evidenced by explicit agreements, and must

almost always be proven by inferences that may be fairly drawn from the behavior of the alleged

conspirators.").

To prevail on their claims under Section 1 of the Sherman Act, Plaintiffs must prove "(1) the

existence of a contract, combination or conspiracy in restraint of trade (liability); (2) injury-in-fact

(antitrust injury); and (3) the extent of injury (damages)." In re Terazosin Hydrochloride Antitrust

Litig., 220 F.R.D. 672, 695 (S.D. Fla. 2004) (citing J. Truett Payne Co. v. Chrysler Motors Corp., 451

U.S. 557, 562 (1981)); see also State of Ala. v. Blue Bird Body Co., 573 F.2d 309, 317 (5th Cir. 1978)

(observing that "a prerequisite to recovery was a showing by the plaintiff of a violation of the antitrust

laws, the fact of damage, and some indication of the amount of damage.").[2] In this case, the claims of

the proposed state classes arise out of the same alleged illegal conduct by Defendants and are based on

the same related antitrust theories as the federal claims.

**D.      Plaintiffs' Motion for Class Certification**

Plaintiffs filed their Motion for Class Certification on March 3, 2017, citing Rule 23, Federal

Rules of Civil Procedure ("Rule(s)").  Plaintiffs seek class certification

> pursuant to the horizontal conspiracy theory, [of] a nationwide class of
> persons who purchased disposable contact lenses made by the
> [Manufacturer Defendants] and two subclasses comprised of class

---

[2]  In Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

9

members residing in Maryland and California. Alternatively, if the Court declines to certify the Horizontal Class, Plaintiffs seek certification of four Vertical Classes, one for purchasers of each [Manufacturer Defendants'] lenses.

(Docs. 396 at 17-18; S-404 at 17-18). Plaintiffs initially sought certification of the following classes:

CLASS AND SUBCLASSES DEFINITIONS

Horizontal Class

All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by Alcon, JJVC, B&L, or [CV] from June 1, 2013 to the present (the "Class Period") for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

The proposed Horizontal Class Consists of the following subclasses:

(1)     The Maryland Subclass:

All persons and entities residing in Maryland who made retail purchases of disposable contact lenses manufactured by Alcon, JJVC, B&L, or CV from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, all governmental entities, and any judges, justices, or jurors assigned to hear any aspect of this action.

(2)     The California Subclass:

All persons and entities residing in California who made retail purchases of disposable contact lenses manufactured by Alcon, JJVC, B&L, or CV from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were set

10

pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, all governmental entities, and any judges, justices, or jurors assigned to hear any aspect of this action.

Vertical Classes:

(1)   The JJVC Class

All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by JJVC from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, all governmental entities, and any judges, justices, or jurors assigned to hear any aspect of this action.

(2)   The Alcon Class

All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by Alcon from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, all governmental entities, and any judges, justices, or jurors assigned to hear any aspect of this action.

(3)   The B&L Class

All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by B&L from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, all governmental entities, and any judges, justices, or jurors assigned to hear any aspect of this action.

(4)     The CV Class

> All persons and entities residing in the United States who made retail
> purchases of disposable contact lenses manufactured by CV from June 1,
> 2013 to the date the Court certifies the Class for their own use and not for
> resale, where the prices for such contact lenses were set pursuant to a
> "Unilateral Pricing Policy" and the purchase occurred during the period
> when the Unilateral Pricing Policy was in effect. Excluded from the Class
> are Defendants, their parent companies, subsidiaries, and affiliates, any co-
> conspirators, all governmental entities, and any judges, justices, or jurors
> assigned to hear any aspect of this action.

(Docs. 396 at 40-41; S-404 at 40-41).

In recognition of Plaintiffs' settlement with CooperVision; the discontinuation of the UPPs by

the remaining Manufacturer Defendants; and additional findings and opinions by Plaintiffs' expert Dr.

Michael A. Williams based upon new data being made available, Plaintiffs, on September 8, 2017,

amended their proposed Class and Subclasses Definitions as follows:

Horizontal Class:

> All persons and entities residing in the United States who made retail
> purchases of disposable contact lenses manufactured by Alcon, JJVC, or
> B&L from June 1, 2013 to the present (the "Class Period") for their own
> use and not for resale, where the prices for such contact lenses were set
> pursuant to a "Unilateral Pricing Policy" and the purchase occurred during
> the period when the Unilateral Pricing Policy was in effect. Excluded from
> the Class are any purchases from 1-800 Contacts of disposable contact
> lenses subject to B&L's Unilateral Pricing Policy,
> where the purchase occurred on or after July 1, 2015. Also excluded from
> the Class are Defendants, their parent companies, subsidiaries and
> affiliates, any coconspirators, all governmental entities, and any judges or
> justices assigned to hear any aspect of this action.

The proposed Horizontal Class consists of the following subclasses:

(1) Maryland Subclass:

> All persons and entities residing in Maryland who made retail purchases of
> disposable contact lenses manufactured by Alcon, JJVC, or B&L from

12

June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are any purchases from 1-800 Contacts of
disposable contact lenses subject to B&L's Unilateral Pricing Policy, where the purchase occurred on or after July 1, 2015. Also excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any coconspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

(2) California Subclass:

All persons and entities residing in California who made retail purchases of disposable contact lenses manufactured by Alcon, JJVC, or B&L from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are any purchases from 1-800 Contacts of disposable contact lenses subject to B&L's Unilateral Pricing Policy, where the purchase occurred on or after July 1, 2015. Also excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any coconspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

Vertical Classes:

(1) The JJVC Class

All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by JJVC from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, all governmental entities, and any judges, justices, or jurors assigned to hear any aspect of this action.

(2) The Alcon Class:

All persons and entities residing in the United States who made retail

purchases of disposable contact lenses manufactured by Alcon from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, all governmental entities, and any judges, justices, or jurors assigned to hear any aspect of this action.

(3) The B&L Class:

All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by B&L from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are any purchases from 1-800 Contacts of disposable contact lenses subject to B&L's Unilateral Pricing Policy, where the purchase occurred on or after July 1, 2015. Also excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co- conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

(Docs. 611 at 34; S-649-1). Plaintiffs offer an alternative to the "*'pursuant to*' a UPP" language,

which they "view . . . as another way of saying that a contact lens price was *subject to* a UPP." (Docs.

715 at 11; S-722 at 11) (emphasis added).

## II.    Class Certification Standard

To maintain a case as a class action, the party seeking class certification must satisfy each of the

prerequisites of Rule 23(a) and at least one of the alternative provisions of Rule 23(b). Allapattah

Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003); Rutstein v. Avis Rent-A-Car Sys.,

Inc., 211 F.3d 1228, 1233 (11th Cir. 2000)). Rule 23(a) provides that a class representative may sue on

behalf of its members only if:

(1) the class is so numerous that joinder of all members is impracticable;

14

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); see Carriuolo v. Gen. Motors Co., 823 F.3d 977, 984 (11th Cir. 2016). These prerequisites are commonly referred to as: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Cooper v. Southern Co., 390 F.3d 695, 711 n.6 (11th Cir. 2004), overruled in part on other grounds by Ash v. Tyson Foods, Inc., 546 U.S. 454, 457-58 (2006). Failure to establish any one of the four factors precludes certification.

In addition, under Rule 23(b), the individual plaintiffs must convince the Court that: (1) prosecuting separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications or prejudice to those members of the class not parties to the subject litigation; (2) the party opposing the class has refused to act on grounds that apply generally to the class, necessitating final injunctive or declaratory relief; or (3) questions of law or fact common to the members of the class "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for [fair and efficient adjudication of] the controversy." Fed. R. Civ. P. 23(b). The party seeking class certification bears the burden of proving that these requirements are satisfied. See Carriuolo, 823 F.3d at 981; Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181, 1187 (11th Cir. 2003). The decision to grant or deny class certification lies within the sound discretion of the district court. Klay v. Humana, Inc., 382 F.3d 1241, 1251 (11th Cir. 2004), abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008); Armstrong v. Martin Marietta Corp., 138 F.3d 1374, 1386 (11th Cir. 1998) (en banc).

15

When considering the propriety of class certification, the Court should not conduct a detailed evaluation of the merits of the suit. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974). Nevertheless, the Court must perform a "rigorous analysis" of the particular facts and arguments asserted in support of class certification. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982); Gilchrist v. Bolger, 733 F.2d 1551, 1555 (11th Cir. 1984). That "rigorous analysis" may entail some overlap with the merits of the plaintiff's underlying claim. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351-52 (2011).

"[T]he Supreme Court has repeatedly 'emphasized that it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.'" Carriuolo, 823 F.3d at 981 (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (internal quotation marks omitted)); see also Landeros v. Pinnacle Recovery, Inc., 692 F. App'x 608, 611 (11th Cir. 2017).[3] The determination of class certification "will frequently entail overlap with the merits of the plaintiff's underlying claim." Comcast, 569 U.S. at 33-34 (citation omitted). This is because "'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" Dukes, 564 U.S. at 351 (quoting Falcon, 457 U.S. at 160). The Plaintiffs, as the moving parties seeking class certification, have the "burden of *proof*, not the burden of pleading," and "if a question of fact or law *is* relevant to that determination, then the district court has a duty to actually decide it and not accept it as true or construe it in anyone's favor." Brown v. Electrolux Home Prods., Inc., 817 F.3d 1225, 1234 (11th Cir. 2016) (emphasis in original).

However, "the district court can consider the merits 'only' to the extent 'they are relevant to

---

[3] "Although an unpublished opinion is not binding . . ., it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000). See generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

determining whether the Rule 23 prerequisites for class certification are satisfied.'" Brown, 817 F.3d at 1234 (quoting Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013)). "[I]f a question of fact or law *is* relevant to that determination, then the district court has a duty to actually decide it and not accept it as true or construe it in anyone's favor. Id. (emphasis in original) (citing Comcast, 569 U.S. at 33-34). The Supreme Court admonishes:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011) (internal quotation marks omitted), Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent - but only to the extent - that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. See id., at 351 n. 6 (a district court has no "'authority to conduct a preliminary inquiry into the merits of a suit'" at class certification unless it is necessary "to determine the propriety of certification" (quoting Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974)); Advisory Committee's 2003 Note on subd. (c)(1) of Fed. Rule Civ. Proc. 23, 28 U.S.C.App., p. 144 ("[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision.").

Amgen, 568 U.S. at 465-66.

Plaintiffs argue that their motion for Class Certification mirrors their motion filed in a previous antitrust class action brought by customers against the Defendant Manufacturers and two trade organizations for ECPs alleging a conspiracy to restrict the supply of replacement contact lenses to drive up prices. They contend that like that earlier class action, their Motion for Class Certification should be granted and a nationwide class certified. (Docs. 396 at 10; S-404 at 10 (citing In re Disposable Contact Lens Antitrust Litig., 170 F.R.D. 524 (M.D. Fla. 1996) ("MDL 1030 ")).

Plaintiffs cite to the testimony of two experts in support of their Motion for Class Certification, Dr. John L. Solow ("Dr. Solow") and Dr. Michael A. Williams ("Dr. Williams"). Noting that Dr.

17

Solow offered expert testimony in MDL 1030, Plaintiffs state that based on his review of documents and data both publically available and produced by Defendants, Dr. Solow offers testimony describing "[t]he features of the contact lens industry that made it conducive to an illegal [minimum resale price maintenance] scheme.'" (Docs. 396 at 15; S-404 at 15). Dr. Solow concludes that "[e]conomic theory and the facts of this case . . . present a predominant common issue." Id. at 16. Plaintiffs offer Dr. Williams' testimony for purposes of conducting an economic analysis, using the "standard statistical methodology of multiple regression analysis to demonstrate that Plaintiffs paid a higher price for their contact lenses" because of the Defendants' conduct. (Doc. S-404 at 16). Plaintiffs describe Dr. Williams' analysis as using "the well-accepted 'before-during' method to estimate overcharges related to the horizontal and vertical theories," relying on data from third-party distributors in order to estimate overcharges. Id.

Defendants argue that the issues presented by the instant case are "very different" from those presented in MDL 1030, which they argue involved an alleged conspiracy between three manufacturers and two trade associations to "boycott sales of the manufacturers' soft contact lenses to any business that sought to compete with independent [ECPs]." (Docs. 505 at 11; S-540 at 11). They contend that this case is not appropriate for class certification because the evidence establishes that:

> (1) each of the Manufacturer Defendants came up with a different UPP, on different products, at different times and with different effects; (2) ECPs and retailers charged widely varying prices for contact lenses covered by a UPP and often determined their prices without regard to any UPP; and (3) consumers often paid less and sometimes paid nothing for contact lenses subject to a UPP due to rebates, discounts and insurance.

Id. at 11-12 (emphasis in original). Defendants argue that whether a contact lens purchaser was impacted by a UPP depends on an individualized inquiry of each individual class plaintiff into whether

18

the person:

> • bought a contact lens subject to a UPP at a time when the UPP was in effect;
>
> • purchased a contact lens from an ECP/retailer that was part of an alleged conspiracy;
>
> • acquired a contact lens from an ECP/retailer that determined his or her price pursuant to a UPP price;
>
> • would have bought the same contact lens in the absence of a UPP;
>
> • would have paid any less for the same contact lens in the absence of a UPP; and
>
> • was insulated from any potential impact due to rebates, discounts and insurance reimbursements.

Id. at 12. Additionally, Defendants argue that to establish a vertical conspiracy, each Plaintiff must establish that he or she purchased contact lenses from a retailer who actually conspired with Defendants by agreeing to adhere to one or all of the differing UPPs, creating yet another individualized inquiry into whether the Plaintiff was impacted by the alleged conspiracy between Defendants. Id. at 12.

Defendants argue that since the MDL 1030 Order approving class certification in 1996, the Supreme Court has heightened the requirements for class certification with its decisions in Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011) and Comcast, 569 U.S. at 33. (Docs. 505 at 13; S-540 at 13). They contend that Plaintiffs' Motion for Class Certification is "devoid of *any* evidence related to the experiences of the named Plaintiffs and the ECPs who treated them," id. (emphasis in original), and that it fails to survive the "rigorous analysis" now required. Id. at 17. (citing Brown, 817 F.3d at 1234). Defendants assert that the "Court . . . cannot certify a class on less than a finding that Plaintiffs' proposed expert proof of common impact and damages is a reliable method of fully adjudicating injury and damages claims for all class members." Id. at 31; see also id. at 34 (arguing that Plaintiffs'

19

reliance on expert testimony to demonstrate how that antitrust impact can be proven on a classwide basis should be rejected because Plaintiffs' expert testimony is inadmissible under Daubert.).

## III.   Discussion

### A.   *Daubert* Motions

In support of their Motion for Class Certification, the Plaintiffs rely on the expert testimony of Drs. Solow and Williams.   The Defendants have filed *Daubert* motions challenging the admissibility of both Drs. Williams' and Solow's opinions.  Defendants have proffered the reports of two experts, Dr. Edward A. Snyder ("Snyder") and Dr. Pierre-Yves Cremieux ("Cremieux"), in support of their *Daubert* motions.  Plaintiffs do not seek to exclude the testimony of Drs. Snyder and Cremieux. Because Plaintiffs' "expert testimony is both challenged and critical to class certification, the Court cannot grant certification without first engaging in the analysis required by Federal Rule of Evidence 702 ("Evidence Rule(s)") and Daubert v. Merrell Dow Pharms., Inc, 509 U.S. 579 (1993)." In re Delta/AirTran Baggage Fee Antitrust Litigation, 317 F.R.D. 675, 683 (N.D. Ga. 2016) (citing Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp., 762 F.3d 1248, 1258 n.7 (11th Cir. 2014)); see also Sher v. Raytheon Co., 419 F. App'x 887, 890 (11th Cir. 2011) ("[W]hen an expert's report or testimony is critical to class certification, . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." (citation omitted)); PB Prop. Mgmt., Inc. v. Goodman Mfg. Co., L.P., No. 3:12-cv-1366-HES-JBT, 2016 WL 7666179, at *9 (M.D. Fla. May 12, 2016).

Defendants assert that the Court is obliged at this juncture to resolve the "battle of the experts" and accept the opinions of their experts over those of Plaintiffs' experts.  (See Docs. 674 at 18, 20; S-

681 at 18, 20 (citing Sher, 419 F. App'x at 890).

In Sher, the Eleventh Circuit required the Court to "resolve.any challenge to the reliability of information" presented in an expert's report which is being offered in support of a motion for class certification. Sher, 419 F. App'x·at 890-91 (citation omitted). The Eleventh Circuit held that the district court erred as a matter of law "by not sufficiently evaluating and weighing conflicting expert testimony on class certification," and that it was "error for the district court to decline to declare a proverbial, yet tentative winner." Id. at 890. The court concluded that where an expert opinion necessary to class certification is challenged, such as in this case, the Court must perform a full *Daubert* analysis.

Under *Daubert*, this Court serves a gatekeeper role in evaluating the admissibility of expert evidence and testimony. In Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999), the Court explained "*Daubert's* general holding-setting forth the trial judge's general 'gatekeeping' obligation-applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Id. Federal Rule of Evidence 702, governing the admissibility of expert evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

21

>    (d) the expert has reliably applied the principles and methods to the
>    facts of the case.

Fed. R. Evid. 702; see also Daubert, 509 U.S. at 589-90.  The Eleventh Circuit has adopted a three part

analysis for determining whether expert testimony is admissible under *Daubert* and Federal Rule of

Evidence 702.  Under this analysis, expert evidence is admissible if the court finds: (1) the expert is

competent and qualified to testify regarding the matters that he intends to address; (2) the methodology

by which the expert reaches his conclusions is sufficiently reliable; and (3) the expert, through

scientific, technical or specialized expertise, provides testimony that will assist the trier of fact to

understand the evidence or determine a fact in issue.  See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK

Ltd., 326 F.3d 1333, 1340-41 (11th Cir.2003) (citing City of Tuscaloosa v. Harcros Chems., Inc., 158

F.3d 548, 562 (11th Cir.1998) (citing Daubert, 509 U.S. at 589)); Maiz v. Virani, 253 F.3d 641, 665

(11th Cir.2001).  In ruling on the admissibility of expert testimony, "[t]he focus must be 'solely' on the

expert's 'principles and methodology, not on the conclusions that they generate.'"  KW Plastics v.

United States Can Co., 131 F. Supp. 2d 1289, 1292 (M.D. Ala. 2001) (quoting Daubert, 509 U.S. at

594-95).  If the expert predicates his testimony on an assumption that is belied by the evidence, the

expert's testimony is properly excluded.  Ferguson v. Bombardier Servs. Corp., 244 Fed App'x. 944,

949 (11th Cir. 2007).

>    In the end, although rulings on admissibility under *Daubert* inherently require
>    the trial court to conduct an exacting analysis of the proffered expert's
>    methodology, . . . it is not the role of the district court to make ultimate
>    conclusions as to the persuasiveness of the proffered evidence. . . . [A] district
>    court's gatekeeper role under *Daubert* is not intended to supplant the
>    adversary system or the role of the jury. . . . . Quite the contrary, vigorous
>    cross-examination, presentation of contrary evidence, and careful instruction
>    on the burden of proof are the traditional and appropriate means of attacking
>    shaky but admissible evidence. . . . By attempting to evaluate the credibility
>    of opposing experts and the persuasiveness of competing scientific studies,

the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder.

Quiet Tech., 326 F.3d at 1341-42 (internal quotation marks and citations omitted).  The party offering the expert's testimony has the burden of proving that it is admissible by a preponderance of the evidence.  Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

### 1.    Dr. Solow

Dr. Solow has submitted an Expert Report, dated March 3, 2017, in support of Plaintiffs' Motion for Class Certification.  (Docs. 397; S-405) ("Solow Report").  In the Solow *Daubert* Motion, Defendants request that the Court strike Sections X and XI of the Solow Report "and preclude Dr. Solow from offering testimony regarding alleged collusion relating to any of the Manufacturer Defendants' unilateral proving policies ('UPPs')."  (Docs. 500 at 6; S-531 at 6).  Defendants characterize Sections X and XI as purporting "to conduct a 'common analysis of conduct' regarding the adoption of UPPs by the various Manufacturer Defendants in this suit, concluding that 'the manufacturers worked cooperatively with influential ECPs and/or ABB to design, promote, and enforce the policies,' including communications supposedly facilitated by Defendant ABB and the third-party Contact Lens Institute (""CLI")."  (Doc. S-531 at 6 (citing Doc. S-405 at 39, 67-68, 73 (Solow Report ¶¶ 68, 119, 128)).

Defendants contend that Dr. Solow's opinions regarding alleged collusion are speculative and contrary to the evidence in the record inasmuch as there is "no evidence of direct communications between the Manufacturer Defendants regarding the supposed conspiracy," or indirect communications among the Manufacturer Defendant through ABB and CLI.  (Docs 500 at 7; S-531 at 7).  Defendants

23

criticize Dr. Solow's methodology as unreliable, saying he relied upon a small number of documents handpicked by Plaintiffs' counsel, taking documents out of context, and failing to consider alternative explanations. Id. Defendants argue that Dr. Solow's opinion as "'conspiracy' advocate" would be of no assistance to the Court, because it does nothing more than review documents that the Court is capable of reviewing. Id. at 7-8. Defendants argue that Dr. Solow has no experience in the contact lens industry. Id. at 8.

### a.    The Solow Report

Dr. Solow is a professor of economics at the University of Iowa where he has been employed since 1981. He has taught courses in industrial organization, micro economics, and antitrust economics. (Docs. 397 at 4; S-405 at 4 (Solow Report ¶ 1)). He has been a visiting professor at Stanford University and the University of Auckland in New Zealand, has published numerous articles, and co-authored three volumes in a leading antitrust treatise. Id. ¶¶ 1, 2; (Doc. 399-2 ). He has offered economic expert testimony in antitrust litigation, including the MDL 1030 case. (Docs. 397 at 4-5; S-405 at 4-5); (Doc. 399-3). Dr. Solow states that he received the following directive from Plaintiffs' counsel:

> 9.    With respect to these proposed classes, I have been asked to focus on whether the liability elements of Plaintiffs' claims are subject to common economic proof. More specifically, my task is to investigate the structure, conduct and performance of the contact lens industry to determine: a) whether common economic proof is available to establish the antitrust liability elements of Plaintiffs' claims on a class-wide basis; and b) whether common economic proof is available to establish the causation elements of Plaintiffs' claims (also known as antitrust "impact") on a classwide basis.
>
> Dr. Michael Williams is providing a separate expert report on how damages to members of the proposed classes can be demonstrated on a class wide basis through common evidence.

(Docs. 397 at 8; S-405 at 8 (Solow Report ¶ 9)). In preparing his Report, Dr. Solow reviewed

pleadings filed, including Plaintiffs' Complaint; business documents produced by the parties;

publically available information about the contact lens industry; trade publications; Federal Trade

Commission reports regarding the contact lens industry; federal statutes and regulations regulating the

contact lens industry; and pricing and other statistical data. Id. at 6-10 (Solow Report ¶¶ 10, 12-32).

Based upon his review, Dr. Solow concludes:

> a)      Common economic evidence can be used to support Plaintiffs'
> allegations of collusive conduct by Defendants. A number of economic
> factors are conducive to and consistent with the coordinated pricing policies
> that Plaintiffs have alleged. This economic evidence is common to the
> proposed classes, that is, all members of the classes would present this type
> of evidence and benefit from it.
>
> b)      Economic evidence shows that the alleged conspiracy would have
> been widely and generally successful, impacting all or nearly all members of
> the proposed classes in that all customers would have paid higher prices than
> they would have in the absence of the conduct. In particular, the economic
> structure, conduct and performance of the industry was consistent with
> coordinated behavior having widespread impact on disposable contact lens
> prices paid by customers. This evidence can be used by all class members as
> proof of the causation (or antitrust "impact") element of their claims.

Id. ¶ 11; see also id. ¶ 67 (Based upon his review of the materials listed, and his "knowledge of the

contact industry, it is my opinion as an economist that the wholesale market for replacement

disposable contact lenses was in the relevant time period conducive to cooperative behavior

coordinated by one or more representatives of the ECPs, as occurred previously."). Dr. Solow further

opined:

> 157.    Based on the foregoing, I believe from my analysis of industry
> structure, conduct, and performance that (I) the characteristics of the
> disposable contact lens market were conducive to collusion during the
> relevant period and (ii) there is sufficient evidence and methods from which

25

> Plaintiffs could show that the impact from Defendants' conduct was common and widespread to all, or virtually all, of the members of the proposed Classes. Moreover, I believe that the analysis used to establish the foregoing could be applied uniformly to all of the members of the Classes [footnote omitted].
>
> 158.   To summarize, the following categories of economic analysis and opinion can be used to establish liability and damages in this litigation for all class members: (I) market structure analysis of the contact lens industry; (ii) analysis explaining the basic economics of minimum resale price maintenance in general and its application in the contact lens industry in particular; and (iii) analysis of conduct and economic performance in the contact lens industry during the relevant period, including the nature, timing, and communications surrounding resale price maintenance, the corresponding trends in pricing over time, and econometric analysis showing widespread impact.

(Docs. 397 at 87-88; S-405 at 87-88 (Solow Report ¶¶ 157, 158)).  Dr. Solow added the following:

> It should be noted that since (a) discovery is not complete and (b) my analysis to date has focused on class certification issues (that is, whether common economic proof is available regarding the elements of Plaintiffs' claims), my opinions may be supplemented or amended as discovery proceeds and as I conduct further analysis.

Id.  Dr. Solow offers no opinion on the legality of Defendants' alleged conduct.  (Doc. S-405 at 40, 42, 45, 65-66 (Solow Report ¶¶ 71, 75, 80, 116)).  At the evidentiary hearing, Dr. Solow provided an overview of his findings, supported by citation to evidence in the record.

Concerning the genesis of Defendants' UPPs, Dr. Solow testified that the implementation of the UPPs came about as a response to ECPs' concerns about the difficulties in competing with alternative contact lens distributors who sold contact lenses at lower margins.  (Doc. 866 at 65–66).  He testified that, at least three years before Alcon announced the first UPP, influential ECPs— "ones who had the ear of the manufacturers"—lobbied Defendants to set minimum retail prices for their products.  Id.  The

idea, according to Dr. Solow, was that if the ECPs could successfully convince one manufacturer to adopt a minimum retail price, it could be leveraged by the ECPs against the remaining manufacturers, who would be pressured to adopt a minimum retail price themselves, or risk losing the ECPs' business. Id. at 67, 70. Dr. Solow supported these assertions with reference to evidence in the record; specifically the emails of Dr. Barry Eiden, an influential ECP and member of Alcon's Global Professional Affairs Advisory Board. In the emails, Dr. Eiden takes some credit for Alcon's decision to implement a UPP, and thought that the other manufacturers would be forced to follow suit or risk losing business. (Id. at 69–70).

Regarding the market impact of the UPPs, Dr. Solow testified that Defendants' adoption of minimum retail prices eased the competitive pressures ECPs were facing from low-cost competitors. Id. at 73–74. He stated that whether or not individual ECPs knew about (or chose to comply with ) the UPPs was irrelevant in evaluating the market impact of the policy; that lower-priced sellers of contact lenses were required to raise their prices allowed individual ECPs to also raise their prices without the risk of losing a substantial amount of customers. Id. at 74.

Dr. Solow also testified regarding whether any competitive justifications existed for Defendants' implementation of UPPs. Dr. Sollow suggested that while UPPs might be pro-competitive in certain contexts, those considerations were absent in this case:

> [T]he impetus for this policy was to restrain competition between Internet sellers and the big box sellers on the one hand, and independent ECPs on the other who felt that they could not -- they couldn't make any money at those prices.
>
> And in a competitive market, if you can't make money against your competitors, then you probably shouldn't be in that business. But here, [the ECPs] reached out to the manufacturers and said: Handicap those people for us. Make -- level the playing field. Make it so that they can't out-compete us, and then we can make

27

money.

Id. at 81.

Defendants, in their *Daubert* motion, seek to exclude Sections X and XI of the Solow Report, which examine the circumstances of each Manufacturer's adoption of a UPP and the roles of ABB and the CLI in the alleged antitrust conspiracy.

### 1)    Section X

Section X of Dr. Solow's Report is entitled "Common Analysis of Conduct in the Contact Lens Industry." (Doc. 397 at 39); (Doc. S-405 at 39). Dr. Solow recounts how the four Manufacturer Defendants adopted UPPs seriatim, starting on June 1, 2013, with Alcon, followed in February 2014 by B&L, June 2014 by JJVC, and September 2014 by CV. (Doc. S-405 at 39 (Solow Report ¶ 68 (citing Doc. S-410-8, S-410-9, S-410-10, 410-11))). He opines that "the manufacturers worked cooperatively with influential ECPs and/or ABB to design, promote, and enforce the policies," and that ABB advocated for the adoption of minimum resale price maintenance to B&L, JJVC, and CV following Alcon's introduction of its UPP. Id. (Solow Report ¶ 68). Dr. Solow starts with a discussion of Alcon's introduction of a UPP in 2013, in the face of "'flat to minimum growth.'" (Doc. S-397 at 39 (Solow Report ¶ 69 (quoting Doc. S-410-6 at 2))). Dr. Solow cites to evidence that Alcon was being pressured by ECPs prior to the introduction of UPPs in June 2013. (Doc. S-650 at 18-20 (Solow Supp. Report ¶¶ 37-42 (citing Docs. S-661-86, S-661-87, S-661-88, S-661-89, S-661-90, S-661-91, S-661-92))). Alcon introduced UPPs as part of the introduction of its new DAILIES TOTAL1® ("DTI") lenses on June 1, 2013. (See Doc. S-405 at 39 (Solow Report ¶ 69)). Alcon's General Manager Jim Murphy, in an April 12, 2013 presentation, announced that the UPP "is designed

28

to alleviate focus on price and allow for features and benefits to become the focus," which will "lead

the contact lens market back to more of a medical market model where the doctor and manufacturer

share the responsibility for care, education and patient liability." (Doc. S-410-6 at 17); (See also Doc.

S-405 at 39-40 (Solow Report ¶ 70)).  Alcon recognized the need to have "'legal footing'" for its UPP,

and that merely "suggesting" a price would "'not get followed.'"  (Doc. S-405 at 40 (Solow Report ¶

71 (quoting Docs. S-410-12 at 1, S-410-13, and 410-14 at 1))).   Dr. Solow reviewed communications

between Alcon representatives and ECPs regarding pricing and ECPs, including the creation of an

ECP advisory board for the planning and introduction of a "minimum retail price." Id. at 40-44

(Solow Report ¶¶ 72-77  (citing Docs. S-410-15 at 1-2, S-410-16 , S-410-17 at 1, Doc. S-410-18, Doc.

S-410-19)).  He cites to documentation that ECPs signed UPP pricing agreements with Alcon. Id. at

45-46 (Solow Report ¶ 80 (citing Docs. S-410-24, S-410-25 at 2, S-410-26, S-410-27 at 3, S-410-28 at

1)).  Alcon also sought to elicit the support of ABB in its communication with ECPs regarding the sale

of contact lenses on a monthly payment plan. Id. at 46 (Solow Report ¶ 81 (citing Doc. S-410-29)).

For example, after receiving a complaint from an ECP that a discount retailer was selling an Alcon

lens at less that the UPP price, Alcon "responded by telling ABB not to sell to [the discount retailer]."

Id. at 46-47 (Solow Report ¶ 82 (citing Docs. S-410-30; S-410-31; S-410-32)).  ABB also notified

Alcon about retailers selling Alcon lenses below the UPP price. Id. at 47 (Solow Report ¶ 83 (citing

Doc. S-410-33)). Subsequently, Alcon extended UPPs to DAILIES® Aqua Comfort Plus® Multifocal

and DAILIES® Aqua Comfort Plus® Toric contact lenses. Id. at 45 (Solow Report ¶ 79 (citing Doc.

410-22 at 2)).  In April 2014, Alcon adopted UPPs for AIR OPTIX® COLORS contact lenses, and

"raised wholesale prices by 10% on its older non-UPP products in order to 'encourage migration' to

the UPP products" which was the new technology. Id. (Solow Report ¶ 79 (quoting Doc. 410-23 at

9)).

B&L implemented a UPP in February, 2014, for its ULTRA ™ line of contact lenses.  (Doc. S-405 at 48 (Solow Report ¶ 85 (citing Doc. S-410-9))).  B&L received feedback from ECPs in support of UPPS.  Id. at 48-49 (Solow Report ¶ 87 (citing Docs. S-410-36; S-410-37)).  In adopting its UPP, B&L communicated with ECPs:

> Eliminating Internet: No longer have to compete on pricing without Uniform Pricing Policy.  Ultra Lens will not be priced below $60. . . .

Id. at 49 (Solow Report ¶ 88 (quoting Doc. S-410-38)).  ECPs communicated with B&L about violations of UPPs, and B&L took action; "we need to be relentless in addressing these [complaints] when they come up."  (Doc. S-410-124); (see also Doc. S-405 at 50 (Solow Report ¶ 89 (citing Docs. S-410-124; S-410-40 at 5-6; S-410-41))).

Still in Section X of his Report, Dr. Solow then provides an overview of JJVC's adoption of UPPs for its products in June 2014, at the same time that it discontinued contact lens lines that would not be subject to a UPP.  (Doc. S-405 at 50-57 (Solow Report ¶¶ 90-102 (citing Doc. S-410-10))).  JJVC adopted UPPs for the following contact lines: 1-Day ACUVUE® MOIST®, 1-Day ACUVUE® MOIST® for ASTIGMATISM, 1-Day ACUVUE® TruEye®, ACUVUE® OASYS® with HRDRACLEAR®, ACUVUE® OASYS®for ASTIGMATISM, and ACUVUE® OASYS® for PRESBYOPIA.  Id. at 50 (Solow Report ¶ 90 (citing Doc. S-410-42)).  Leading up to the implementation of UPPs in the summer of 2014, JJVC received its private consultant's Vision Care Pricing Strategy Assessment dated July 22, 2013, which included an assessment of "competitive pricing strategies" and "pricing philosophies."  (Doc. S-410-44 at 1, 4); (see also Doc. S-405 at 51

30

(Solow Report ¶ 91)). JJVC considered creating an ECP advisory board in August 2013, (Doc. S-405

at 51 (Solow Report ¶ 91 (citing Doc. S-410-43))), and created a presentation with ABB, dated March

19, 2014, entitled "Partnership for Category Growth," which included a page listing a UPP price

increase for ACUVUE® OASYS®. Id. at 51 (Solow Report ¶ 92 (citing Doc. S-410-45 at 1, 13)).

Dr. Carol Alexander, Director of Professional Affairs at JJVC met with ECPs on April 11, 2014. and

reported on the positive response of practitioners to Alcon's UPP, stating:

> 1.      Overwhelmingly positive response by practitioners in
> private practices and schools as it "levels the playing field,
> and CL [contact lens] conversations can now center on the
> care and the product - not the price. We no longer have to
> justify what we charge for lenses or compete to keep the
> patient by lowering our prices."

Id. at 47 (Solow Report ¶ 84 (quoting Doc. S-410-34 at 1-2)). An April 16, 2014 JJVC presentation

stated that the "Benefits of UPP" included:

> Removes patient incentive to shop online or with big box
> retailers
> Brings patient sale back to prescribing ECP's office
> Returns revenue back to appreciative ECPs
> Enables manufacturers to regain control of product pricing

The presentation also discussed the "significant risk of NOT enforcing violations promptly." (Doc. S-

410-46 at 4, 10); (see also Doc. S-405 at 51-52 (Solow Report ¶ 92)). In May, 2014, a JJVC

presentation recounted that

> Today, many of [JJVC'S] OASYS contracts and pricing are
> inconsistent. JJVC has long been interested in standardizing
> its pricing across the brand and recent introductions of
> Unilateral Pricing Policies (UPP) by competitors have
> increased pressure to make this change sooner rather than

31

later.

(Doc. S-405 at 52 (Solow Report ¶ 92 (quoting Doc. S-410-47 at 3))).  JJVC studied Alcon's UPP

pricing strategy.  Id. at 52 (Solow Report ¶ 92 (citing Doc. S-410-48 at 1-2)).  Dr. Solow observes that

"[a]s it was considering adoption of UPPs, [JJVC] hired DDP, a third-party, to conduct detailed

interviews of personnel who were formerly employed at Alcon and B&L, and who had knowledge

about how those respective companies implemented UPPs."  Id. at 45, 49 (Solow Report ¶¶ 80, 88)

(citing Doc. S-410-24)).  In June, 2014, Laura Angelini, former President of JJVC, wrote in a letter to

ECPs, that JJVC had six months earlier had asked for ECPs' feedback on pricing strategy, and that

JJVC, in response, implemented the changes the ECPs said were needed.  Angelini wrote that to

"'further demonstrate [JJVC's] commitment to prescribers,'" JJVC was announcing the

implementation of its new pricing strategy in the United States, including a UPP.  Id. at 52-53 (Solow

Report ¶ 93 (quoting Doc. S-410-49 at 2-4)); (see also Doc. S-410-50 at 8 (December 14, 2014

Angelini letter confirming that JJVC had asked for ECP feedback "one year ago")).  JJVC received a

positive response to the UPPs from the ECPs.  (Doc. S-405 at 53-54 (Solow Report ¶¶ 95, 96 (citing

Docs. S-410-51 at 2; S-410-52, S-410-53)).

JJVC also worked with ABB in connection with JJVC's implementation of the UPPs.  On June

19, 2014, Michael Dari, Vice President of sales for ABB, wrote in an email that he "just got [JJVC] to

commit to provide us ALL of their communications so we will be sending it to the field by tomorrow."

(Doc. S-410-54 at 1); (see also Doc. S-405 at 54 (Solow Report ¶ 97)).  Jack Jenkins, director of

strategic accounts at ABB wrote to Dari that he had spoken with "the [JJVC] management team" on

June 19, 2014, regarding JJVC's new pricing policy and transitioning to UPP covered products, and

that "ABB cover half targets and [JJVC] the other half."  (Doc. S-410-54 at 1-2); (see also Doc. S-410-

55 at 1 (Dari with ABB on June 3, 2014: "We are working through plans with VK [JJVC] now.");

Doc. S-410-39 (Dari with ABB on June 4, 2014: "I am working with VK to come up with a plan.");

Doc. S-410-56 at 1-2 (June 11, 2014 e-mail chain conversation between Dari with ABB and Angel

Alvarez, Chief Executive Officer of ABB, regarding ABB's efforts to boost JJVC sales and the

"Significant decline in overall pricing/margin of VK [JJVC] products," by focusing on Oasys  24-pack

pricing and selling annual supplies, noting that the "UPP should keep the patient from shopping BUT

this completely removes them from the market." Alvarez responded that Dari "please align with

Vistakon [JJVC] sales management."); (Doc. S-410-57 (June 20, 2014 email recounting meeting notes

and key points of a meeting between JJVC and ABB representatives, including JJVC providing ABB

"more detailed information for [ABB] to communicate to the sales team on UPP pricing" and JJVC

"will be conducting third party monitoring on the UPP pricing program."). Dr. Solow states that

"[t]here is also evidence that [JJVC] and ABB acted co- operatively to enforce UPPs, citing to JJVC's

use of ABB's publication Retail Price Monitor, and ABB reports about retailers selling below the UPP

price as a "violation of detection tool[s]." (Doc. S-405 at 57 (Solow Report ¶ 102 (citing Docs. S-410-

57, S-410-70, S-410-71, S-410-72, S-410-73, S-410-74, S-410-76, S-410-77, S-410-78, S-410-123)).

He notes that JJVC "shared 'Do Not Sell' customer lists with ABB for such violations." Id. at 57

(Solow Report ¶ 102 (citing S-410-78 at 3)).

JJVC adjusted and modified its UPPs several times during the summer of 2014 in response to

concerns from customers and retailers. (Doc. S-405 at 55 (Solow·Report ¶ 98). For example, Dr.

Solow recounts that in response to concerns by discount club retailer reseller Costco Wholesale

Corporation ("Costco"), JJVC, working with Costco, announced on October 5, 2014, a "Club Channel

Exception" to the UPPs that permitted a 10% discount at club stores which could be used on products

other than contact lenses. Id. at 56 (Solow Report ¶ 99 (citing Docs. S-410-60, S-410-65, S-410-66, S-410-89)).

JJVC eventually discontinued the UPP in April 2016. In the run-up to announcing the UPP "retirement," JJVC director of professional communications Dr. Carol Alexander wrote to her colleagues at JJVC regarding who to announce the shift:

> In our advocacy efforts the story that we use around [JJVC] embraced the UPP as a good one, i.e. because we realized our prices were too high in the market place and we reset wholesale prices, and implemented UPP to draw retail prices down. It worked. The tough part is that in 1:1 sales meetings we may have sold the UPP in to customers as a "gift to the IECP". And it is those customers that are going to feel distrustful.

> [W]e know that retail price differences were at times 40% lower at Costco than the independent channel. Even with UPP we unsettled trust a bit when we allowed Costco to offer additional deals within the warehouse further incenting [sic] patients to buy in that channel.

(Doc. S-410-68 at 1); (see also Doc. S-661-53 at 3 (referring to JJVC "ECP [Wholesale] Reset Required Given New Market Reality" expected to "Breakeven" in 2.3 years")).

In September 2014, CooperVision, Inc. ("CV") made the decision to maintain a UPP for its Clariti contact lens line which it acquired through its August 2014 purchase of Sauflon, another contact lens manufacturer that had instituted a UPP on the Clariti lenses. (Doc. S-405 at 58 (Solow Report ¶ 103 (citing Doc. S-410-11)). Despite initial reservations about the wisdom of enacting a UPP, CV elected to continue with the UPP on Clariti. (Doc. S-405 at 59 (Solow Report ¶¶ 106, 107). Dr. Solow cites to evidence that CV consulted with ECPs regarding the implementation of UPPs on its

34

contact lens lines, and that ECPs "pressured" CV to adopt UPPs. Id. at 59-65 (Solow Report ¶¶ 107-113 (citing Docs. S-410-84 (September 25, 2013 internal CV email exchange about ECPs wanting CV to consider adopting a UPP and that "some ECPs are embracing this policy"), S-410- 85 (April 28, 2014 internal CV e-mail reporting that ECPs were in "unanimous agreement that UPP provides a very positive benefit to their practices," and that they "strongly urge [CV] to adopt this policy as we release new products."), 399-111 (CV President Robert Atkinson testifying before a Congressional subcommittee on July 31, 2014 regarding optometrists' "professional collusion" in conveying their "desire to prescribe UPP lens"), S-410-86 (June 25, 2014 email from the president of United Eye Care Providers to CV's president of North America operations, regarding an informal survey of Chicago area ECPs who "have mentioned they are forming 'closer ties' to the companies embracing UPP, and even two have used the word 'boycott' of companies that are not actively *moving* in that direction."), S-410-87 (notes regarding a September 2014 conversation with owner of internet retailer lens.com that "a group of ECP's are threatening [CV] with the possibility of not prescribing [CV] products unless [CV] adopts a UPP approach."), S-410-88 (July 30, 2014 email in which CV's Dennis Murphy wrote to ABB that "ECPs are starting to view UPP vendors as champions of the cause," and of CV's "need to let some pressure out of the UPP issue."), S-410-90 (September 2014 CV internal memo reporting on CV's consultation with ECPs regarding UPPs, finding that ECPs are "favorable or somewhat favorable on UPP," and while "not negative" on CV, they "question [CV's] reluctance" to adopt a UPP), S-410-91 (September 21, 2014 internal CV memo discussing loss of sales and damage to reputation among "accounts"), 399-118 (September 19, 2014 CV announcement of UPP for Clariti contact lens line announcing CV "'held 12 focus groups and spoke with 100 ECPs, who felt UPP was consistent with helping them maintain their relationships with their patients'"), 399-119 at 2 (CV President stating in a

35

September 19, 2014 article that "'[t]here was a strong voice that UPP is an important requirement for independent eyecare practitioners. . . . It was important that we understood the voice of the independents, and we're responding to it.'"), S-410-93 (October 2014 survey finding "most" ECPs view UPP in a positive light.")). Dr. Solow cites to a post-UPP March 2015 CV analysis of UPPs concluding that the "Anticipated Benefits" from the UPP were:

- Seen as Protecting the ECP's Price Point from substantial internet or Mass Merchandisers as it relates to retail sell price

- Seen as eliminating the threat from "Mom and Pop" internet retailers.

- Demonstrates [contact lens] Share Leaders are dedicated to the ECP in the States.

- Encompasses the Distributor Channel.

- Protects margins for the Contact Lens company - Alcon one price for all with Total 1.

(Doc. S-405 at 65-66 (Solow Report ¶ 115 (citing Doc. S-410-95 at 2). The same analysis listed the "Potential Downsides" of the UPP:

- Does not control the Gray Market which is the biggest source of downward pressure on ECP price management. Internet sites will still be an issue in under cutting retail prices.

- Competitive Pressures for ECP's and retailers will be significant with today's consumer.

- Enforcement will be complex and challenging on a

36

global scale

- Consumer activism may generate government review and potential legal action

- Ensuring the local representations does not resolve or address breaches in the UPP

- Applying UPP's to [contact lenses] already in the market with various price points.

- Global price coordination.

Id. at 3.

### 2)   Section XI

Defendants seek to exclude Section XI of Dr. Solow's Report, which is entitled "The Roles of ABB and the Contact Lens Institute." In this Section, Dr. Solow opines that ABB "facilitat[ed] collusion" through "inter-firm communications, either through intermediaries or directly through meetings." (Docs. 397 at 67; S-405 at 67). ABB is "America's leading authorized distributer of all major soft contact lens manufactured permeable contact lenses," serving "nearly two-thirds of eye care practitioners nationwide." (Doc. S-399-7 at 1 (ABB promotional material)). The Third Quarter 2014 issue of ABB's publication "The Profit Advisor, Business Strategies for ABB Optical Group Customers," reports that "UPP Brings a Fundamental Shift to the Industry," that "can level the playing field," and that "Most ABB Optical Group Accounts Say They Welcome UPP." (Doc. S-410-20 at 3-4). Dr. Solow quotes the "Profit Advisor" article as recommending that ECPs price their contact lenses above the UPP price by "several dollars" and promise to match any legitimate price on the contact lens because "'You already know what the price is; it's the UPP price,'" and the competition is

37

bound by the UPP price or "run the risk of being unable to purchase lenses from that manufacturer. . . . As a result of UPP, . . . the prescribing practitioner will be able to retain a higher percentage of patient revenue.'" (Doc. S-405 at 69-70 (Solow Report ¶ 122 (citing Doc. S-410-20 at 3)).

Dr. Solow opines that the evidence suggests "that ABB coordinated the adoption of UPPs by the four manufacturers." (Docs. S-405 at 70-71 (Solow Report ¶ 124 (citing Docs. 410-105 (a June 19, 2014 e-mail in which Angel Alvarez, chief executive officer of ABB states that "'[w]e have worked hard with manufacturers to develop Universal Product Pricing, UPP, that will not allow any group, including managed care, to under sell the prescribing practitioner.'"), S-410-106 (September 22, 2014 e-mail from ABB director of marketing Aaron See to Alvarez asking for approval of a proposed quote: "ABB has been working closely with manufacturers to develop Unilateral Pricing Policies, which we believe enables a better overall patient experience, by supporting competitiveness of prescribing practitioners," which was apparently approved and was published in October 2014.)))). (See also Doc. 399-136 at 3)); (Doc. S-397 (Solow Report ¶ 119 (citing Doc. S-410-1 at 3 (In a July 2015 analysis Alcon set as a goal to "'[c]ollaberate externally' and '[s]upport ABB and other distributors in their service and support of ECP sales growth.'"))).

Dr. Solow also opines that "ABB also apparently played a central role in the implementation of UPPs." (Doc. S-405 at 71 (Solow Report ¶ 124 (citing Doc. 410-107 at 2 (a July 18, 2014 email in which ABB shares with JJVC its strategy to advise ECPs regarding suggested retail pricing with the "UPP as the lowest price and use it as needed.")))). On June 24, 2014, Angel Alvarez with ABB wrote:

> Concerning UPP...it's a classic brand protection move by the
> manufacturers to protect their products from becoming a low

38

> cost commodity. The bottom line is that there is real time and
> effort (cost) in fitting contact lenses and this move is to
> protect the industry by making sure that the prescribing
> practitioners keep engaged in the effort. No reason to fit
> contacts if you cannot make any money . . . I'm a huge fan and
> have been lobbying for years for UPP!!

(Doc. S-661-64 at 4). On June 19, 2014, Mr. Alvarez wrote: "We have worked hard with the

manufacturers to develop Universal Product Pricing, UPP, that will not allow any group, including

managed care, to under sell the prescribing practitioner." (Doc. S-661-156 at 2). On September 22,

2014, Mr. Alvarez approved a statement for an optometry trade publication that "'ABB has been

working closely with manufacturers to develop Unilateral Pricing Policies, which we believe enables a

better overall patient experience, by supporting competitiveness of prescribing practitioners.'" (Doc. S-

661-157 at 2); (see also Docs. S-661-162 at 3; S-661-147 at 4). Dr. Solow cites to evidence in which

ABB and the Manufacturer Defendants refer to each other as "partners" and had a "cooperative

relationship." (Doc. S-405 at 72-73 (Solow Report ¶¶ 126, 127 (citing Docs. 410-109 at 1 (September

16, 2013 email from B&L to ABB thanking ABB for hosting B&L's team and "providing an overview

of ABB's business and the partnership with B&L"), S-410-110 at 1 (September 18, 2013 email in

which B&L executive said "I have calls into ABB to understand how our competitors tackle this one,"

referring to locking in large customers who do not buy inventory), S-410-111 at 2 (January 22, 2015

B&L internal e-mail regarding ABB giving B&L confidential market share data and the need to keep

the ABB source of the material confidential as being from a "third party," in accordance with "the

contract with ABB"), S-410-45 (JJVC presentation dated March 19, 2014 titled "Partnership for

Category Growth" between JJVC and ABB), S-410-113 (April 7, 2014 JJVC powerpoint presentation

about Oasys in which JJVC states that it is "[p]artnering with external supplier to monitor compliance

with pricing policy"), S-410-114 at 1-2 (July 17, 2014 email regrading the "CooperVision/ABB Visit, July 15, 2014," in which ABB's head of sales Mike Dari states to CV that "[o]ur sales team looks forward to partnering with Cooper in new ways," and that"[w]e will continue to elevate our communication to the sales team so we see the right level of mutual partnership" to which CV replied "it [is] great to see so much mutual opportunity."))).

Dr. Solow opines that in addition to ABB, the Manufacturer Defendants used the CLI (Contact Lens Institute) "to coordinate their activity." (Doc. S-405 at 73 (Solow Report ¶ 128)). CLI "'represent[s] the interests of its members,'" (Docs. 397 at 73; S-405 at 73 (Solow Report ¶ 128 (quoting Doc. 399-146))), and its board of directors consists of one executive from each of the four Defendant Manufacturers. Id. (Solow Report ¶ 128 (citing Doc. 399-147)). Dr. Solow cites to the CLI website which discusses CLI's quarterly statistical program to provide participants with consolidated market data including "manufacturer shipment data of Contact Lens . . . products," id. at 73-74 (Solow Report ¶ 129 (citing Doc. 399-149 at 2)). He states that "'the CLI Board encourages members of the CLI committees and board from each company to communicate with each other.'" (Doc. S-405 at 74 (Solow Report ¶ 129 (quoting Doc. 410-64 at 3 (CLI Meeting Minutes dated March 27, 2013)))). In 2014, CLI created a new "'Category Growth and Market Creation Committee,'" with the objective to develop "'a plan to help improve trend/growth in the overall market for contact lenses.'" Id. at 75 (Solow Report ¶ 133 (quoting Doc. S-410-115 at 1 (April 10, 2014 (CLI conference call minutes)))). Among the strategies discussed was focusing on ECPs, "so a united CLI approach could look very good to that audience." (Doc. S-410-115 at 2) (see also Doc. S-405 at 75 (Solow Report ¶ 133)). In June, 2014, the Committee discussed the ECP campaign as being positive; "'[s]uch a campaign was also felt to provide a positive message for ECPs that CLI members are working together to have an

impact on the overall market.'" (Doc. S-405 at 76 (Solow Report ¶ 133 (quoting Doc. S-410-104 at 3

(June 3, 2014 conference call minutes)))). The Committee members circulated notes regarding the

"ECP campaign" with the "objective" of a "'united front of four major manufacturers to inspire ECPs

to proactively pursue opportunities to fit [contact lenses] so that their patients and practice will

benefit.'" Id. (Solow Report ¶ 133 (quoting Doc. S-410-117 at 8)).

### b.   Defendants' Arguments

Defendants contend that aside from citing to a "hodgepodge" of documents, Dr. Solow does not

support his testimony with record evidence. They argue that Dr. Solow rendered his opinion prior to

reading any deposition testimony, or speaking with any ECPs or the named class members. (Doc. S-

531 at 9 (citing Doc. 532-1 at 19-20, 33-34 (Solow Dep. at 18-19, 32-33))). Citing to Dr. Solow's

deposition testimony, Defendants state that Dr. Solow "admits" that he has seen no direct evidence that

any communications among any of the Manufacturer Defendants took place - whether facilitated by

third parties through ABB and ECPs or not. Id. at 9, 25-26 (citing Doc. 532-1 at 35-36, 40, 42, 44-45,

49-50, 60-61, 66 (Solow Dep. at 92-93, 95-97,  99, 101-102, 106-107, 114-116,  123-125, 139, 153-

154, 192, 217 )). They argue that the Solow Report is not based on reliable methodology. (Docs. 500

at 11; S-531 at 11-12), and that he "misrepresents the record" and cites evidence out of context

regarding the Manufacturer Defendants' adoption of UPPs and communications between the

Manufacturer Defendants. (Doc. S-531 at 17-27). Defendants also contend that in rendering his

opinions, Dr. Solow ignored the "broader story" found in the record of the Manufacturer Defendants

"myriad" of legitimate reasons for adopting UPPs, including support of new contact lens technology,

simplifying price structure by eliminating rebates to increase "transparency." (See Doc. S-531 at 21,

23) (citing Docs. S-532-10 (fact sheet regarding B&L UPP), S-532-5 at 10-16 (Donley Dep. at 305-

309, 319-20), S-532-11 at 5-6 (Sommer Dep. at 72-73), S-532-14 at 4-5 (Miura Dep. at 296-297), S-532-15 at 5-7 (Helms Dep. at 51-52, 60), S-532-16 at 9 (JJVC presentation))).

Defendants argue that Dr. Solow's opinions are not based upon "reliable or scientifically valid methodology," because he relied upon only "a small subset of documents - most of which were pre-selected for him by Plaintiffs' counsel," and he "ignores the vast majority of the record evidence." (Doc. S-531 at 12). They cite to Dr. Solow's deposition testimony that he reviewed 380 documents out of 600,000 documents produced, and that he has spoken only with Plaintiffs' counsel and with Dr. Williams. (Doc. S-531 at 13-14 (citing Doc. S-532-1 at 19-20 (Solow Dep. at 18-19) and Doc. S-405 at 89 (Solow Dep. Appendix)). Defendants also criticize Dr. Solow's Report as being "rife with errors and factual misinterpretations of the evidence," and devoid of citation to any evidence providing any details of the alleged antitrust conspiracy. (Doc. S-531 at 12, 16). Defendants argue that Dr. Solow is nothing more than "Plaintiffs' 'conspiracy' advocate." (Docs. 500 at 7; S-531 at 7).

### c.     Plaintiff's Response

Plaintiffs respond that the purpose of Dr. Solow's Report and opinion at this stage of the litigation is "only to determine 'whether the liability elements of Plaintiffs' claims are subject to common economic proof.'" (Docs. 549 at 13; S-558 at 13 (citing Docs 397 at 8; S-405 at 8 (Solow Report ¶ 9)). Plaintiffs contend that Dr. Solow's opinion is not due to be stricken as inadmissinble under Daubert because Dr. Solow did not view all 600,000 documents in the record at the time of the Report. (Docs. 549 at 15; S-558 at 15). Additionally, Plaintiffs cite to Dr. Solow's deposition testimony in which he stated that he reviewed documents not only pointed out by Plaintiffs' attorneys, but also documents he located on the case database as well as from a search for documents on his own.

42

(Doc. S-558 at 16 (citing Doc. 532-1 at 20 (Solow Dep. at 19)).

### d. Discussion

#### 1) Competence

The Eleventh Circuit observes that "experts may be qualified in various ways." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004). "While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." Id at 1260-61 ("expert status may be based on 'knowledge, skill, experience, training, or education.'" (quoting Fed. R. Civ. P. 702 (emphasis omitted))). The "'proposed expert testimony must be supported by appropriate validation - i.e., "good grounds," based on what is known.'" Id. at 1261 (quoting Daubert, 509 U.S. at 590). "Determining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." Feliciano v. City of Miami Beach, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012) (internal quotation marks and citation omitted).

Dr. Solow satisfies the qualification requirement. Based on his training and experience, Dr. Solow is qualified as an expert to testify regarding whether common economic proof is available to establish antitrust liability and causation of economic damages to a class of Plaintiffs. (See Docs. 397 at 7; S-405 at 7 (Solow Report ¶ 9)). He has extensive education, and teaching and writing experience in the fields of industrial organization, microeconomics, and antitrust economics. He has been qualified as an expert and has offered economic expert testimony in antitrust litigation, including the MDL 1030 case. Defendants' do not mount a serious challenge to Dr. Solow's qualifications.

#### 2) Reliability (Methodology)

43

When an expert's proposed testimony is scientific in nature, "the trial judge must assess 'whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts at issue.'" Frazier, 387 F.3d at 1261-62 (quoting Daubert, 509 U.S. at 592-93).  The Eleventh Circuit considers the following non-exhaustive factors when evaluating the reliability of scientific expert opinion:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

Frazier, 387 F.3d at Id. at 1262 (citation omitted).  "The Frazier Court went on to explain that "'[s]ometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful.'" PB Prop. Mgmt., 2016 WL 7666179, at *8 (quoting Frazier, 387 F.3d at 1262).

> "Scientific evidence encompasses so-called hard sciences (such as physics, chemistry, mathematics and biology) as well as soft sciences (such as economics, psychology, and sociology), and it may be offered by persons with scientific, technical, or other specialized knowledge whose skill, experience, training, or education may assist the trier of fact in understanding the evidence or determining a fact in issue."

Frazier, 387 F.3d at 1261 n.14 (quoting William W. Schwarzer & Joe S. Cecil, "Management of Expert Evidence," Reference Manual on Scientific Evidence 39 (Federal Judicial Center, 2d ed. 2000)).  "The trial judge has 'considerable leeway' in deciding the reliability of expert testimony, but importantly, 'what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial' in every case." PB Prop. Mgmt., 2016 WL 7666179,

at *8 (quoting Frazier, 387 F.3d at 1262).

Defendants argue that Dr. Solow's citation to the record is inaccurate. For example, Defendants argue that Alcon adopted a UPP to support its innovative new contact lens and bring back "drop out" consumers to the contact lens market. (Doc. S-531 at 18 (citing Doc. S-410-6 at 4)). Defendants fail to address the UPP portion of that same Alcon slide show report in which Alcon's general manager Jim Murphy states that Alcon's UPP "is designed to alleviate focus on price and allow for features and benefits to become the focus," which will "lead the contact lens market back to more of a medical market model where the doctor and manufacturer share the responsibility for care, education and patient liability." (Doc. S-410-6 at 17). The latter slide tends to support Dr. Solow's conclusion that Alcon adopted UPPs to "incentivize ECPs to prescribe its new lenses." (Doc. S-405 at 39 (Solow Report ¶ 70)).   To be sure, Dr. Solow appears to overstate that an e-mail chain between Alcon, ABB and an influential ECP was directed at "implementing and enforcing UPPS." (See Doc. S-405 at 46 (Solow Report ¶ 81 (citing Doc. S-410-29))).   However, the interchange was concerning monthly payment plans for ECPs, and illustrates that Alcon, ABB and ECPs collaborated regarding pricing options.

Defendants criticize Dr. Solow's deposition testimony in which he observes that B&L's announcement of its UPP policy "virtually plagiarizes Alcon's policy . . . . [T]hey use the exact, almost virtually identical language. . . . [C]ertainly they were aware of what was being done to the point where they actually just copied it." (Doc. S-532-1 at 43 (Solow Dep. at 100)); (see Doc. S-531 at 19). Defendants contend that Dr. Solow could cite to no communications between B&L and Alcon, and that there were differences between Alcon's and B&L's UPPs regarding advertising based on the availability of a manufacturer's rebate. (Doc S-531 at 18-19 (citing Doc. S-532-5 at 17-18 (Donley

45

Dep. at 354-55)). Defendants fail to cite the Court to the nearly identical UPP announcements to which Dr. Solow was referring. (Compare Doc. S-410-8 (Alcon announcement) with Doc. S-410-9 (B&L announcement)). Dr. Solow's citation to an ECP e-mail to B&L supports his statement that B&L had consulted with ECPs leading up to the adoption of its UPP, (see Doc. S-405 at 48 (Solow Report ¶ 87)), and was not cited to "concoct a relationship between B&L and Alcon" as Defendants suggest. (Doc. S-531 at 19). Dr. Solow's citation to references that B&L and ABB had a "cooperative relationship" and referred to themselves as "partners" (Doc. S-405 at 72 (Solow Report ¶ 126)), is characterized by Defendants as being "nothing more than a business relationship." (Doc. S-531 at 20). The two characterizations are not irreconcilable and their import is left to the trier of fact.

As to JJVC, Defendants criticize Dr. Solow for citing to a JJVC Power Point presentation, dated March 19, 2014 for the proposition that JJVC solicited feedback on other manufacturers' UPPs from ABB and ECPs. JJVC created a presentation called "Partnership for Category Growth" with ABB. Defendants argue that the presentation had on its face been created after the JJVC July 2014 implementation of a UPP. (Doc. S-531 at 21-22 (citing Docs. S-405 at 51, 72 (Solow Report ¶¶ 92, 127), S-410-45 at 1, 4, and S-532-1 at 63-66 (Solow Dep. at 136-39))). The JJVC power point presentation embracing a "partnership" between JJVC and ABB and explaining that the UPP "enables [ECPs] to feel confident that Eye Health and patient experience will be at the center of your dialogue with patients, not cost," (see Doc. S-410-45 at 1, 4), is relevant to Plaintiffs' allegations of conspiracy and Defendants' motivations, notwithstanding that the presentation was created after JJVC's UPP launch.

Defendants also take issue with Dr. Solow's references to JJVC's interviews of personnel who were formerly employed at Alcon and B&L regarding those companies' adoptions of UPPs. (Doc. S-

531 at 22 (citing Docs. S-405 at 45, 49, 51 (Solow Report ¶¶ 80, 88, 91)). Nothing in Dr. Solow's

deposition testimony cited by Defendants dispels the relevance of Dr. Solow's reference to the third

party interviews. (See Doc. S-531 at 22 (citing Doc. 532-1 at 58-59 (Solow Dep. at 121-22 ("I think

under some circumstances, it could be [competitive intelligence]. I think under some circumstances, it

could be anticompetitive."))).

Finally, as to CooperVision, by recounting how CV acquired the Clariti line of contact lenses

from a prior owner Sauflon, which had implemented a UPP, Defendants contend that Dr. Solow

"concedes" that CV unilaterally adopted a UPP on September 2014, rather than in collusion with the

other Defendant Manufacturers. (Doc. S-531 at 23 (citing S-405 at 58 (Solow Report ¶ 103))).

Defendants argue that Dr. Solow has no information on how or why Sauflon adopted the UPP on the

Clariti line.  Id. at 24 (citing Doc. S-532-1 at 67-68 (Solow Dep. at 140-41)).  Defendants also contend

that Dr. Solow mischaracterized the evidence as supporting his opinion that CV was pressured by

ECPs to implement UPPs on its contact lens lines, citing to ECP complaints about other CV lines of

contact lenses which did not have a UPP.  Id. at 24.  The evidence cited by Dr. Solow (see Doc. S-405

at 63, 66 (Solow Report ¶¶ 107, 110 (citing Docs. S-410-84, S-410-91, S-410-95, S-410-98))

demonstrates ECPs' desire that CV maintain UPPs on its products including a communication from an

ECP regarding CVs lack of a UPP on another line of contact lenses, Biofinity, and is not contrary to

Dr. Solow's opinion that CV was being pressured by ECPs regarding pricing and UPPs.  On this point,

Dr. Solow testified that CV's decision to maintain the Sauflon UPP on the Clariti contact lens line "is

still a decision . . . It chose to do that once it took over [Sauflon]. . . . And then extended that to . . . the

MyDay line." (Doc. S-532-1 at 79-80 (Solow Dep. at 195-96)).  Dr. Solow testified that CV was

"under pressure from ECPs generally.  They met with a dozen focus groups and a hundred ECPs, and

they heard from Dr. Eiden." Id. at 80 (Solow Dep. at 196).

Defendants also take issue with Dr. Solow's statement that "[e]conomic theory indicates that UPPs could be expected to adversely impact consumers," (see Docs. 397 at 83; S-405 at 83 (Solow Report ¶ 148)) because Defendants contend that Dr. Solow fails to recognize CV provided rebates on three contact lens lines that were subject to UPPs, dropping the actual price for consumers below the UPP price. (Doc. S-531 at 24-25 (citing Doc. 501-18)). And they assert that Dr. Solow was unable to testify regarding any CLI communications at a CLI meeting regarding UPPs, or that there is any evidence that the CLI was "'used in an anticompetitive fashion.'" Id. at 26 (citing Doc. S-532-1 at 74-75 (Solow Dep. at 169-170)). Dr. Solow did respond, however, that he "think[s] the sharing of information among rivals, in an oligoplastic industry, . . . is something that can be anticompetitive, but need not be anticompetitive." (Doc. S-532-1 at 75 (Solow Dep. at 170)).

In In re Urethane Antitrust Litig., 768 F.3d 1245, 1255 (10th Cir. 2014), Dr. Solow testified at trial regarding the existence of a manufacturer defendant's conspiracy to fix prices for polyutethane products, observing "four types of collusive conduct": 1) a series of "'lockstep price increase announcements'" within weeks of each other; 2) "'a widespread pattern of communication'" among the top executives of the defendant companies held in secret and close to the time of the price increases; 3) a "'price over volume strategy,'" where the companies would stick to their list prices "'even if it meant walking away from opportunities to earn business or make sales at lower, but still profitable, prices'"; and 4) the defendant companies monitored one another to prevent cheating and to discipline any supplier that was found cheating. In re Urethane Antitrust Litig., 768 F.3d 1264-65 (citing trial testimony). Dr. Solow also testified in In re Urethane Antitrust Litig. that the "the polyurethane industry was 'ripe for collusion' based on six features," many of which are present here:

48

1) "sales of polyurethane products were 'concentrated in the hands of only a handful of firms' during the conspiracy period"; 2) "the market had high barriers to entry"; 3) polyurethane products are homogenous; 4) "there were no close product substitutes available to customers"; 5) there was excess capacity and 6) "the industry has several trade associations, which provided 'an opportunity to engage in price fixing behavior.'" Id. at 1265. The court affirmed the jury verdict in favor of Plaintiffs, finding the evidence was sufficient to support finding that a price fixing agreement was implemented. Id. at 1264-66. While Dr. Solow acknowledges that he had found no direct evidence of communications between the executives of the Manufacturer Defendants as he did in In re Urethane, he asserts that "there was communication between ABB and the executives of the companies." (Doc. S-532-1 at 27 (Solow Dep. at 26)). Defendants' criticisms and attempts to distinguish In re Urethane, (see Doc. S-531 at 27), are properly the subject of cross examination and argument for the eventual trier of fact to consider, and do not amount to a basis to not consider Dr. Solow's Report in conjunction with Plaintiffs' Motion for Class Certification.

"Courts in this circuit and others regularly admit expert testimony that certain conduct or evidence is 'consistent with a finding that Defendants engaged in a conspiracy to fix prices.'" In re Delta/Airtran Baggage Fee Antitrust Litig., 245 F. Supp. 3d 1343, 1359 (N.D. Ga. 2017) (quoting In re Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348, 1355 (N.D. Ga. 2000) and citing City of Tuscaloosa, 158 F.3d at 565 (holding that expert testimony is admissible so long as it "constitute[s] one piece of the puzzle that the plaintiffs endeavor to assemble before the jury"), aff'd 714 F. App'x 986 (11th Cir. 2018); see also In re Urethane Antitrust Litig., 152 F. Supp.3d 357, 359-61 (D.N.J. 2016) (admitting expert economic testimony that certain evidence was "not consistent with the existence of a price-fixing conspiracy"); In re Processed Egg Prods. Antitrust Litig., 81 F. Supp. 3d

412, 424 (E.D. Pa. 2015) ("An economic expert may permissibly testify as to whether certain conduct is consistent with collusion or an entity or individual's self-interest."); U.S. Info. Sys., Inc. v. IBEW Local Union No. 3, 313 F. Supp. 2d 213, 240 (S.D.N.Y. 2004) ("Economists often explain whether conduct is indicative of collusion."). Expert testimony that certain conduct or evidence is "consistent with a finding that Defendants engaged in a conspiracy to fix prices," has been held to be admissible in antitrust cases. Polypropylene Carpet, 93 F. Supp. 2d at 1355. There is no evidence that Dr. Solow formed his opinion prior to reviewing the record evidence, that he relied on one-sided data, or that he ignored certain evidence in the record. Compare PODS Enters., Inc. v. U-Haul Int'l, Inc., No. 8:12-cv-1479-T-27MAP, 2014 WL 12628664, at *4 (M.D. Fla. June 27, 2014). Dr. Solow conducted an independent investigation of the record evidence available at the time his Report was due to support his conclusions, and does not simply parrot the allegations of Plaintiffs' Complaint, as Defendants suggest. If Defendants believe that the basis for Dr. Solow's opinions is insufficient, they can explore that with Dr. Solow on cross examination and argument for the benefit of the trier of fact; "'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" United States v. Ala. Power Co., 730 F.3d 1278, 1282 (11th Cir. 2013) (quoting Allison, 184 F.3d at 1311-12 and citing Daubert, 509 U.S. at 596). This Court determines that Dr. Solow's opinion is sufficiently reliable under Daubert to support Plaintiffs' Motion for Class Certification.

### 3)     Assist the Trier of Fact

Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262. To satisfy the helpfulness requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the

understanding and experience of the average citizen." <u>United States v. Rouco</u>, 765 F.2d 983, 995

(11th Cir. 1985). "Proffered expert testimony generally will not help the trier of fact when it offers

nothing more than what lawyers for the parties can argue in closing arguments." <u>Frazier</u>, 387 F.3d at

1262-63.  Defendants argue that Dr. Solow's report "merely provides his interpretations of business

documents and weaves a factual narrative designed to supplement Plaintiffs' Motion for Class

Certification based on these documents." They contend that the Court "is more than capable of

reading and interpreting these materials without Dr. Solow offering his own gloss," (Doc. S-531 at 28),

and that testimony by fact witnesses involved in creating the documents relied on by Dr. Solow would

better assist the trier of fact in determining the documents' meaning. (Docs. 500 at 29; S-531 at 29)

An expert's testimony in an antitrust case

> need not show a successful conspiracy to be admitted under [Evidence]
> Rule 702 as circumstantial evidence of a conspiracy.  As expert evidence,
> the testimony need only *assist* the trier of fact, through the application of
> scientific, technical, or specialized expertise, to understand the evidence or
> to determine a fact in issue.  As circumstantial evidence, [the expert's]
> testimony need not prove the plaintiffs' case by [itself], [it] must merely
> constitute one piece of the puzzle that the plaintiffs endeavor to assemble
> before the jury.

<u>City of Tuscaloosa</u>, 158 F.3d at 564-65 (emphasis in original) (internal quotations and citation

omitted) (testimony by statistician characterizing certain bids as "signals" to co-conspirators was

outside his expertise, and the trier of fact was capable of drawing such conclusions without technical

assistance from experts).  But Courts may rely upon expert testimony regarding whether defendants

behavior "is consistent with anticompetitive coordination," which is the focus of Dr. Solow's Report.

<u>See</u> <u>In re Delta/Airtran</u>, 245 F. Supp. 3d at 1358-59; <u>see also</u> <u>Polypropylene Carpet</u>, 93 F. Supp. 2d at

1353 (finding that expert's testimony that "the climate of the polypropylene market during the relevant

time period was consistent with a finding that Defendants engaged in a conspiracy to fix prices" as a general matter "may be helpful to the trier of fact").

If, as Defendants contend, Dr. Solow has based his opinions on misconstrued, misrepresented or overstated facts, provided by a biased source, i.e. Plaintiffs' counsel, Defendants can bring this to the attention of the trier of fact through cross-examination. An expert is permitted "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." Daubert, 509 U.S. at 592. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. The potential weaknesses in his testimony only go to the weight of the opinions—not their admissibility—and are thus not grounds for exclusion under Daubert of Dr. Solow's opinion in support of Plaintiffs Motion for Class Certification. See Viterbo v. Dow Chem. Co., 826 F.2d 420, 422 (5th Cir. 1987) ("[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."); PODS Enters., 2014 WL 12628664, at *2 (finding that expert's "methodology and conclusions are sufficiently reliable to be admissible, notwithstanding that virtually all of the materials he examined were provided to him by . . . counsel. While that may be fruitful cross examination bearing on the weight of his opinions, it does not render his methodology of usage and context unreliable."). Defendants' criticisms of the factual foundations for Dr. Solow's opinions bear more on the weight of the evidence than its admissibility. Dr. Solow identified documents produced that he considered to support his opinions. Evidence Rule 702 recognizes that "it might also be important in some cases for an expert to educate the factfinder about general principles," and to apply these principals to the facts of the case." Fed. R. Evid. 702 (2000 Amendments advisory committee notes). "For this kind of generalized testimony, [Evidence] Rule 702 simply requires that:

(1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case." Id.

One function of an expert in a case such as this, where tens of thousands of documents have been exchanged through discovery, is to review the documentation and highlight and interpret those pieces of evidence by applying their specialized knowledge and skill, that are relevant to the respective theories in the case. To the extent Dr. Solow relied upon documentary exhibits found in the record, and the fact that he did not review deposition testimony —assuming that testimony was in existence at the time he prepared his March 3, 2017 Report—does not negate his analysis of the documents reviewed. See generally United States v. U.S. Gypsum Co., 333 U.S. 364, 396 (1948).

### 2. Dr. Williams

Defendants seek to strike the Report of Plaintiffs' economic expert Dr. Williams, proffered by Plaintiffs in support of their Motion for Class Certification. Dr. Williams' Report is relevant to the predominance requirement of Rule 23. Dr. Williams, through his Report, seeks to demonstrate that antitrust impact and damages can be shown as to all members of the proposed classes through common proof.

Defendants contend that Dr. Williams' analytical model regarding impact and damages allegedly caused by the Defendants' UPPs "has nothing to say about whether any consumer suffered any actual injury—it merely *assumes* that all consumers within a given retail channel suffered an identical injury." (Docs. 503 at 7; S-535 at 7 (emphasis in original) (citing Doc. S-534 at 215 (Williams Dep. at 214 ("[M]y regression doesn't say anything about persons. My regression says that the average effect in the different channels is statistically significant, different than zero.")))); see also

id. at 11, 18.  As a result, Defendants argue that Dr. Williams' Report is not reliable and should be

excluded because it does not account for that the fact, for example, that "consumers bought contact

lenses from 1-800-Contacts for far less than Dr. Williams' claimed 'average effect' and other

consumers paid *nothing* for contact lenses due to rebates, discounts, and insurance."  (Doc. S-535 at 7-

8 (emphasis is original)).

        a.      **The Williams Report**

      Dr Williams is Director of the consulting company Competition Economics, LLC.  He

specializes in analyses involving antitrust, industrial organization and regulation.  (Docs. 398 at 3; S-

406 at 3 (Williams Report ¶ 1)).  He has produced extensive publications and has testified as an expert

in numerous court cases.  Id. at 3, 19-26 (Williams Report ¶¶ 1, 2 and Appendix I)).  Dr. Williams

concluded that Defendants' alleged horizontal and vertical agreements resulting in the UPPs applicable

to certain contact lens lines resulted in "statistically significant price increase[s]" for those particular

contact lens lines.  (Doc. S-406 at 12-16 (Williams Report ¶¶ 21-35)).  This is reflected in his Report,

dated March 3, 2017.  (Docs. 398; S-406).

      In compiling his Report, Dr. Williams relied upon numerous documents in the record.  (Docs.

396 at 4; 28-33; S-406 at 4, 28-33 (Williams Report ¶ 3 and Appendix II)).  Dr. Williams states that

Plaintiffs' counsel requested that he assume Defendants "will be found liable on: (1) Plaintiffs' First

Cause of Action ('horizontal agreement' claim) and (2) Plaintiffs' Second Cause of Action ('vertical

agreements' claim)," and "to determine whether economic methodologies exist and are supported by

sufficient data that can be used to reasonably estimate class-wide damages for both of Plaintiffs'

causes of action."  Id. at 6 (Williams Report ¶ 6).  Dr. Williams says that he focuses his "econometric

analysis . . . to determine whether and, if so, to what extent Defendants' illegal actions caused

Plaintiffs to pay higher contact lens prices than they would have paid but for the alleged actions," using

what he calls a "standard and widely accepted statistical methodology - multiple regression analysis."

(Doc. S-406 at 6 (Williams Report ¶ 7). Dr. Williams concludes that his analysis "demonstrates that

Plaintiffs paid higher contact lens prices for products subject to Defendants' 'unilateral pricing

policies' ('UPPs '), than they would have paid but for Defendants' alleged illegal actions." Id. At the

evidentiary hearing, Dr. Williams testified that his analysis follows the computational methodology set

forth by the American Bar Association. (Doc. 866 at 187).

   Dr. Williams describes his multiple regression analysis, which he cites as commonly used in

antitrust cases, as follows:

> The determination of overcharges, if any, attributable to alleged illegal
> conduct typically involves the comparison of (1) actual prices during the
> period affected by the alleged illegal conduct (the "damages period") to (2)
> estimated but-for prices in the absence of the alleged illegal conduct in that
> period.   Multiple regression analysis is, in my experience, the most
> common statistical methodology for performing damages analysis.
> [Footnote omitted]. When used to estimate overcharges in antitrust cases,
> multiple regression analysis entails the specification of a model - that is, an
> equation - that relates price (or a function of price) to factors that may affect
> price when the alleged illegal conduct does not occur. The model analyzes
> prices during damages and "benchmark" (i.e., non-damages) periods to
> calculate "but for" prices, i.e., prices that Plaintiffs would have paid but for
> the alleged illegal conduct. The comparison of actual prices to but-for
> prices quantifies the overcharge and provides a reasonable basis for
> calculating the amount of damages attributable to the alleged illegal
> conduct.

(Doc. S-406 at 6-7 (Williams Report ¶ 8)). He designated the "damages period" as the period of time

in which a given contact lens product was subject to a UPP. Id. at 7 (Williams Report ¶ 9). He did

"not assume there were damages during that period for the given UPP product." Id.

Dr. Williams first applies the regression model to estimate overcharges, if any, which resulted from Defendants' "alleged horizontal agreement," Plaintiff's First Cause of Action. "Because the objective is to compare prices between the benchmark and damages periods, price is specified as the dependent variable in the model." (Doc. S-406 at 7 (Williams Report ¶ 10)). Dr. Williams uses "retail prices from various transactional and survey datasets over the 2008-2016 period" in his analysis, and "estimate[s] the price effect of Defendants' alleged horizontal agreement using a benchmark of two groups: (1) Defendants' pre-UPP-period prices for products that later had a UPP, and (2) Defendants' pre-UPP-period prices for products that never had a UPP." Id. at 8 (Williams Report ¶ 10)). He calls this the "Horizontal Agreement Model." Id.

As to the alleged Vertical Agreements, Dr. Williams states that he "estimate[s] the price effect of each Manufacturer Defendant's alleged illegal vertical agreement using a benchmark of two groups: (1) each Manufacturer Defendant's pre-UPP-period prices for products that later had a UPP and (2) each Defendants' pre-UPP-period prices for products that never had a UPP." (Doc. S-406 at 8 (Williams Report ¶ 11)). In each of the four regressions, Dr. Williams uses "only a given Manufacturer Defendant's data." Id. He calls this the "Vertical Agreement Model." Id.

In conducting his multiple regression analysis, Dr. Williams considers the following variables which could affect price:

> (1)   Product Characteristics ("The regression models allow contact lens prices to differ if the products are (1) in different categories (i.e., sphere, toric, or multifocal); (2) produced by different manufacturers; (3) in different package sizes; or (4) color lenses or not," and
>
> (2)   UPP and Post-UPP Indicators, measuring observed prices during the damages period compared to prices in the same period "but for the UPP."

(Doc. S-406 at 8-9 (Williams Report ¶¶ 12, 13)); (Doc. S-561-1 at 98 (Williams Dep. at 97)). This latter variable included observations of (1) non-UPP products during the damages period; (2) UPP products in post-UPP periods; and (3) non-UPP products in post-UPP periods. Id. at 9 (Williams Report ¶ 13).

In his initial Report, Dr. Williams used the following data sets: the retailer 1-800-Contacts Survey, which consists of compilations of competitor gross retail prices collected by 1-800-Contacts between January 6, 2011 through November 30, 2016; retailer Costco transactional datasets, regarding Costco sales, costs, discounts and rebates by time period, manufacturer and product to determine Costco net prices from September 2013 through November 30, 2016; retailer National Vision datasets of transactions made on its websites, including prices, discounts, and quantities sold by date and product, for the period October 24, 2008 through November 30, 2016; retailer Walgreens monthly transactional datasets on orders shipped, including sales, quantities sold, and retail prices by month, and by manufacturer and product, from January 2013 through December 2016; and retailer 1-800-Contacts transactional data through its website, including data on sales, quantities sold, discounts, rebates, and shipping revenues by date and product to determine 1-800-Contact's net prices, covering September 16, 2008 through June 4, 2016. (Doc. S-406 at 9-11 (Williams Report ¶¶ 14-18)). He eliminated "outlier" sales and prices from his observations, such as prices charged when the products were sold as a "'trial.'" Id. at 11 (Williams Report ¶ 19)). According to Dr. Williams, the 1-800-Survey data "contain the most reliable data with respect to sales through the Retail and ECP channels." Id. (Williams Report ¶ 20); (see also Doc. S-541-34 at 35 (Williams Dep. at 133 ("[T]he ECP data in my report came from . . . 1-800 Contacts survey data, and those are gross prices."))).

Under various interpolations, using "Quantity-weighted regressions," "Revenue-weighted

regressions," and "Unweighted regressions," Dr. Williams' Horizontal Agreement Model reflects a "statistically significant price increase" or "price effect" under each dataset. (Doc. S-406 at 12-13, 35-37 (Williams Report ¶¶ 21-23; Appendix III Tables 1-3)). Likewise, Dr. Williams' Vertical Agreement Model, under each interpolation and utilizing each data base, results in "statistically significant price increase[s]" for each of the four Manufacturer Defendants. (Doc. S-406 at 13-16, 35-49 (Williams Report ¶¶ 24-35; Appendix III Tables 4-15)).

Dr. Williams then estimated "overcharges and the associated Manufacturer Defendants' respective revenues for UPP products sold during the damages periods . . . [to] estimate the resulting dollar value of damages," by first calculating "the average percentage overcharge for each of the four channels," referring to retailers by Internet, "Club," Retail, and ECP channels. (Doc. S-406 at 16 (Williams Report ¶ 36)). "The damages are calculated as the associated Manufacturer Defendants' respective revenues for UPP products sold during the damages periods, multiplied by the average percentage overcharges, and then divided by one plus the average percentage overcharges." Id. He "estimated overcharges by the various retail channels purportedly affected by each alleged conspiracy, with the estimated overcharges ranging from 3.4 percent to 89.2 percent." (Doc. S-535 at 10-11 (citing Doc. S-406 (Williams Report at 35-49))). Dr. Williams estimates separate damages for the Horizontal Agreement Model, and for the Vertical Agreement Model as to each Manufacturer Defendant, using the "Quantity Weighted Method" and the "Revenue Weighted Method." (Doc. S-406 at 16-17, 50 (Williams Report ¶¶ 36-41, Appendix III Tables 16, 17)).

In his initial Report, Dr. Williams estimates overcharges resulting from Defendants' alleged horizontal agreement, using the "Quantity Weighted Method" to be $392 million.. (Doc. S-406 at 16, 50 (Williams Report ¶ 37, Appendix Table 16). Using the "Quantity Weighted Method," Dr. Williams

estimates the overcharges resulting from the alleged vertical agreements as follows: $120 million for the JJCV channel; $144 million for the Alcon channel; $8 million for the CV channel; and $24 million for the B&L channel. Id. at 17, 60 (Williams Report ¶ 38-41, Appendix Table 16).[4]

###    b.    Defendants' Argument

Defendants contend that "Dr. Williams' regressions do not reflect a legitimate economic approach, but instead reflect exactly the sort of outcome-driven approach for litigation that *Daubert* forbids." (Docs. 503 at 8; S-535 at 8). Defendants argue that Dr. Williams' analysis is flawed in the following ways:

> (1)    it produces "false positives," attributing damages where none exist, finding a "purported 'overcharge' attributable to a UPP where no UPP existed," (Docs. 503 at 16;  S-535 at 8, 16-17; S-681 at 18);

> (2)    it implies that prices on certain lenses have increased when "in fact" prices for four out of eight JJVC contact lens "high volume" lines decreased, (Doc. S-535 at 8, 23 (citing (Doc. S-538 at 44-45 (Snyder Report ¶¶ 92-94));

> (3)    it fails to control for new technologies which could have caused an increase in retail price, modality (frequency of replacement of a contact lens), and the wholesale price of contact lenses, (Docs. 503 at 20; S-535 at 8, 13, 20-21);

---

[4]  In his Supplemental Declaration, dated September 8, 2017, Dr. Williams revised his overcharge estimates for Defendants JJVC, Alcon and B&L, taking into consideration additional data that had become available through discovery since his March 3, 2017 initial Report.  In these revised estimates, Dr. Williams calculated the percentage change in "Price Effects of the UPP" using data from various sales channels. for both the Horizontal Agreement Model and the Vertical Agreement Model. (See Doc. S-651 at 74-85, 124-41 (Williams Supp. Decl. ¶¶ 135-57, Appendix Tables 2-19). However, because he was continuing to review data and "performing additional economic analysis, [he had] not performed new damages calculations for this report." Id. at 85 (Williams Supp. Decl. ¶ 157)). On December 4, 2017, Dr. Williams reported that "[d]ollar values of estimated damages are updated based on new data and information, and they confirm the core conclusion in both of my reports that UPPs caused price increases for all or nearly all class members." (Doc. S-723 at 50 (Williams 2d Supp. Decl. ¶ 40)).

(4)     it uses unreliable survey data rather than available transactional data, referring to Dr. Williams' reliance on retailer 1-800-Contacts' telephone survey, contending that he does not know the details of the survey methodology, whereas "actual transactional data for sales by ECPs leads to negative overcharges for most contact lens lines," and takes into consideration the effect of discounts, rebates and other price reductions which can vary with each consumer, (Docs. 503 at 23-24; S-535 at 8-9, 14, 23-24 (citing Doc. S-538 at 53-56 (Snyder Report ¶¶ 109-116) and Doc. S-534 at 38, 137-43, 151-53, 156-160 (Williams Dep. at 37, 136-42, 150-52, 155-159); Doc. S-681 at 18); and

(5)     it was not supported by any standard statistical testing by Dr. Williams to "prove the reliability of his model." (Docs. 503 at 9, 14, 25; S-535 at 9, 14, 25-27 (citing Doc. S-534 at 199-215, 229-30 (Williams Dep. at 198-214, 228-29))

Specifically, Defendants contend that Dr. Williams' "regression model does not control for all major factors that likely will affect the retail price of contact lenses, such as whether the contact lenses contained new technologies or materials, higher wholesale prices, or consumer preferences for certain modalities," and thus improperly attributes any difference in retail prices to a UPP, where the price differences "were likely caused by other explanatory factors." (Doc. S-535 at 21-22). Defendants cite to the fact that Dr. Williams did not interview any witnesses, including the named Plaintiffs or review the named Plaintiffs' purchases; did not review any deposition transcripts; and "did not consider manufacturer rebates, ECP discounts, and insurance payments in his regressions." Id. at 14, 17, 19 (citing Doc. S-534 at 26, 28, 129-30, 134-35 (Williams Dep. at 25, 27, 128-29, 133-134)).

Defendants argue that:

[b]ecause Dr. Williams' regression results speak only to "averages," as opposed to measures of impact on individual persons, any overcharge that the model detects is *assumed* to apply to the entire class, but the model does not test or address whether any individual member of the class actually paid an overcharge.

(Docs. 503 at 11; S-535 at 11) (emphasis in original). As a result, contend Defendants, "Dr. Williams'

model detects injury even in situations where an individual consumer paid far less than the UPP price

for a particular lens, as Dr. Williams admitted in his deposition." (Doc. S-535 at 11-12 (citing Doc. S-

534 at 129, 134, 181-83 (Williams Dep. at 128, 133, 180-82))). They assert that "if Dr. Williams'

'average' overcharge approach were followed, consumers who paid 40% or more less than the UPP

price at 1-800-Contacts would be permitted to recover claimed damages resulting from a UPP of 3.8%-

5% and consumers who paid *nothing* for their contact lenses because of manufacturer rebates, ECP and

retailer discounts, and insurance would be able to recover because they supposedly paid 'too much.'"

Id. at 17 (emphasis in original)); (see also id. at 18, 19 (citing Doc. S-534 at 182-83 (Williams Dep. at

181-82)). (See generally id. at 18 (citing Doc. S-538 at 48-51 (Snyder Report ¶¶ 100-105))).

Defendants assert that "[t]he fact that Dr. Williams' model cannot determine whether any individual

member of the class was, in fact, injured by the alleged conduct and simply assumes that an average

overcharge will apply to all members of the class is enough to exclude his conclusions as irrelevant

under Rule 702 and *Daubert* for failing to advance any material aspect of the Plaintiffs' claims." Id. at

19.

　　　Additionally, Defendants argue that Dr. Williams' lack of control for higher cost modalities

and new technologies results in his failing to compare "apples to apples." (Doc. S-535 at 22.). For

example, relying on their expert Dr. Snyder's own regression analysis of JJVC UPP-products, using

Dr. Williams' data, Defendants argue the more precise product analysis "shows that the retail prices on

four out of eight JJVC contact lens lines declined after the UPP went into effect." Id. at 23 (citing

Doc. S-538 at 44-45 (Snyder Report ¶¶ 92-94)).

　　　Defendants criticize the disparity in Dr. Williams estimated damages for the alleged horizontal

conspiracy, which is $100 million more than the total damages for all four alleged vertical

conspiracies. (Doc. S-535 at 11 (citing $392 million and $297 million respectively)).

At the evidentiary hearing, Defendants' expert, Dr. Snyder, reiterated his criticism of Dr.

Williams methodology; specifically, Dr. Williams' assumption that his average overcharge applies to

all individuals in the proposed classes. (Doc. 867 at 22). Dr. Snyder noted that, when individual

customers are taken into account, around 40 percent of those customers paid less for their contact

lenses while the UPPs were in effect than they did when the UPPs were discontinued. (Id. at 23–24).

Defendants also ask the Court to exclude Dr. Williams opinion pursuant to Rule 37(c)(1),

because he "failed to disclose all of the facts and data he considered in forming his opinions as

required by Rule 26(a)(2)(B)." (Docs. 503 at 9-10, 15; S-535 at 9-10, 15 (citing Doc. S-534 at 18-31,

70-76, 99-101, 229-30 (Williams Dep. at 17-30, 69-75, 98-100, 228-29)); (see also Docs. 503 at 27-29;

S-535 at 27-29). Defendants contend that Dr. Williams testified in his deposition that he relied upon a

"'large number' of documents that were produced," but that were not disclosed in his Report,

precluding Defendants from cross examining him about the supportive documents. Id. Defendants

contend that Dr. Williams' determination of which contact lens features to control for in his regression

models "were based on the undisclosed discovery documents." (Doc. S-535 at 28-29).

### c.   **Plaintiffs' Response**

### 1)   **Plaintiffs' Argument**

Plaintiffs respond that Dr. Williams use of a multiple regression analysis is appropriate

"because it is the standard tool economists use to isolate the effect of a single variable (here, the

conspiracy) on the price of a good or service." (Docs. 548 at 6, 15; S-559 at 6, 8, 15 (citing Doc. S-

406 at 6-7 (Williams Report ¶¶ 7, 9, 10))). They contend that the "use of averages is appropriate"

because the contact lens market "is a national market without significant price discrimination (*i.e.*,

different consumers generally pay the same price for the [contact lens])", and that Dr. Williams relied

upon the best data available, controlling for the relevant variables as Defendants defined them in the

ordinary course of business.   (Docs 548 at 6-7; S-559 at 6-7).  Plaintiffs noted at the evidentiary

hearing that Defendants' experts acknowledged that an individual's antitrust injury is determined by

comparing the actual price with the "but for" price, and that Dr. Snyder did not perform a regression

analysis. Plaintiffs argue that controlling for the specified product characteristic variables "allowed Dr.

Williams to isolate changes in price attributable to the UPPs," showing "'but-for' prices that Plaintiffs

and class members would have paid in the absence of UPPs." (Doc. S-559 at 9).  Regarding

Defendants' request that the Court exclude Dr. Williams' Report as a sanction for not listing all

documents relied upon, Plaintiffs' respond that Dr. Williams "identified all documents on which he

relied when building and analyzing his regressions, and that he did not list some background

documents he reviewed, all but one of which Defendants produced by themselves (the exception is a

publicly- available government report)" and as such, sanctions are not warranted. (Docs. 548 at 7; S-

559 at 7) (emphasis omitted).

## 2)     Dr. Williams' Supplemental Declaration

In response to Defendant's Williams *Daubert* Motion, Plaintiffs submit a Declaration of

Michael A. Williams, Ph.D. in Support of Plaintiffs' Opposition to Exclude his Expert Report, dated

July 10, 2017. (Docs. 550; S-560; Williams Decl.).  In the Declaration, Dr. Williams asserts that

notwithstanding Defendants' citation to testimony of named Plaintiffs who said they paid less for

contact lenses during the UPP period, based on Dr. Solow's opinion that the Manufacturer Defendants

imposed UPPs on contact lenses brands in a non-discriminatory manner and retail sellers did not price

discriminate, the Williams model "correctly takes the absence of price discrimination into account and

estimates the common impact of UPPs on retail prices paid by proposed class members." (Docs. 550

at 6; S-560 at 6 (Williams Decl. ¶ 8)).  He reiterates his conclusion that "all or almost all proposed

class members did suffer actual injury, i.e., antitrust impact." Id. at 6; S-560 at 6 (Williams Decl. ¶ 9).

He states that:

> In particular, all 50 regressions in my Opening Report show the UPPs
> caused substantial increases in retail prices paid by proposed class
> members, and these price increases are all statistically significant at the one
> percent level. [Footnote omitted.]  These findings provide evidence that
> customer-specific factors are unlikely to be important determinants of
> overcharges.

(Doc. S-560 at 6-7 (Williams Decl. ¶ 9)).  Moreover, as "Plaintiffs have not asserted that discounts,

rebates, or insurance payments are 'harmful acts' [by Defendants], . . . discounts, rebates, and

insurance payments are [considered the to be] the same in the but-for world as they are in the actual

world." Id. at 15 (Williams Decl. ¶ 23); see also id. at 30 (Williams Decl. ¶ 47 ("[T]he but-for world

holds all other factors except one - the alleged conduct - the same in order to measure what prices

would have been but for the alleged conduct.")).  Thus, Dr. Williams' regression analysis applies the

same discount, rebate and insurance payment to the "but-for" price as with the actual price paid during

the UPP damages period. Id. at 16 (Williams Decl. ¶ 24).  He used "net pricing" data, which included

rebates and discounts, where it was available, specifically in the Costco transactional datasets, and the

1-800-Contacts transactional datasets.  (Doc. S-406 at 10-11 (Williams Report ¶¶ 15, 18)).

Dr. Williams asserts that his regression model cannot be "tested" or disproved by information

from a single Plaintiff.  (Doc. S-560 at 8-9 (Williams Decl. ¶¶ 12-14)).  In response to Defendants'

citation to his testimony that his regression model does not say anything about "persons," Dr. Williams cites to the remainder of the relevant passage in his deposition where he testified that his "'regression says that the average affect in the different channels is statistically significant. Different than zero.'" Id. at 8 (Williams Decl. ¶ 11 (citing Doc. S-543 at 215 (Williams Dep. at 214)).   Dr. Williams maintains that the actual price paid by each class member should be compared to the "but for" price he or she would have paid in the absence of the UPP.  (Doc. S-560 at 9 (Williams Decl. ¶ 14)); see also id. at 26-32 (Williams Decl. ¶¶ 42-52)).

In response to Defendants' contention that the Williams regression model produces "false positives," because Dr. Williams' model finds that the non-UPP contact lens prices also increased as a result of the UPPs, Dr. Williams states that this phenomenon is attributable to the so-called "umbrella effect," which results when all the price of all comparable competitive lenses in the same categories increases because of the UPPs.  (Doc. S-560 at 9-12 (Williams Decl. ¶¶ 15-18)).  Dr. Williams states that his regression model "evaluates the effect of UPPs on retail contact lens pricing using groups of comparable, competitive products" with identifiable characteristics and variables, as set forth in his Report. Id. at 10-11 (Williams Decl. ¶¶ 16, 17). Dr. Williams explained, "[C]ontrolling for these factors, non-UPP and UPP lenses are comparable and competitive, i.e., they are substitutes.  Basic economics teaches that when the price of one product increases, the price of a substitute product will also increase." Id. at 11 (Williams Decl. ¶ 17; (see also Doc. 534 at 204 (Williams Dep. at 203)); (Doc. S-649 at 21).

Dr. Williams addresses Plaintiffs' argument that his regression models failed to control for variables such as new technology.  (Doc. S-560 at 17-24 (Williams Decl. ¶¶ 26-37)). Dr. Williams' initial multiple regression model controls for four variables which might impact price: categories (such

as spherical, toric or multifocal); manufacturer; package size; and color - selected as supported by Dr.

Solow's description of the market, publically available websites, and Defendants' marketing material.

Id. at 17 (Williams Decl. ¶¶ 26, 27).  He rejects Plaintiffs' argument that he should have considered

wholesale retail prices because to do so would lead to "statistical error."  Id. at 22 (Williams Decl. ¶

33).  This is because

> Wholesale prices are affected by the alleged conduct because a
> Manufacturer Defendant's profit-maximizing wholesale price depends on
> the retail price.  Since retail prices were affected by the alleged conduct, so
> too were wholesale prices.  Thus, including wholesale prices in the
> regression would incorrectly hold constant factors that changed because of
> the alleged conduct.

Id.  As to "modality," (how often a customer must change a lens), Dr. Williams asserts that modality is

accounted for by his consideration of the "package size" variable.  Id. at 24 (Williams Decl. ¶ 34)).  In

response to Dr. Snyder's opinion that Dr. Williams did not compare "apples to apples" by estimating

overcharges for all JJVC UPP-products as opposed to product by product, Dr. Williams responds that

the focus on smaller subgroups of products magnifies the effects of outliers and is less precise:

> [T]he fact that Dr. Snyder found positive overcharges for some products
> and negative overcharges for other products *in the same category* reveals
> that his product-specific regressions suffer from product-specific, random
> price variation that masks the true overcharges. [Footnote omitted.].
> Product-specific random price variation tends to cancel out when the
> regressions are correctly performed, combining observations across
> comparable, competitive products subject to the same alleged conduct."

Id. at 21 (Williams Decl. ¶ 32 (emphasis in original)); (see also Doc. S-559 at 19-20; Docs. 715 at 17-

18; S-722 at 17-18 ("Dr. Snyder's product-specific approach is flawed" because it "wrongly assumes

separate markets for individual products.")).  Dr. Williams testified that he considered categories of

JJVC products, grouped in accordance with the variables considered, rather than a product by product

comparison of before benchmark prices with UPP prices, based upon JJVC's internal marketing documents.  (Doc. S-534 at 68-72 (Williams Dep. at 67-71)).

Dr. Williams also defends his reliance upon 1-800-Contacts survey data and other sources, noting that his regression model uses "millions of observations of transaction data" from various sources, including the survey data.  (Doc. S-560 at 24 (Williams Decl. ¶ 38)).  He contends that the survey data is reliable because 1-800-Contacts is a profit-maximizing firm that relies on its own surveys which were gathered in the regular course of business for its own business purposes, providing an indicia of reliability to the data, and argues that Defendants have provided no evidentiary or empirical support for their dismissing the use of the survey data.  Id. at 25 (Williams Decl. ¶ 39-40); (Doc. S-534 at 152 (Williams Dep. at 151)).  "The survey data includes a database of 56,208 ECPs, and it reflects data acquired by making 100 calls on average per week to each retailer group."  (Doc. S-559 at 11 (citing S-534 at 151-54 (Williams Dep. at 150-53 (referring to an industry article))).  "The survey also includes data from the internet channel and club retailers, like Sam's Club and Costco."  Id. (citing Doc. S-543 at 157-59 (Williams Dep. at 156-58 (referring to an industry article))).  In response to Defendants' criticism that Dr. Williams has no knowledge regarding the methodology used by 1-800-Contacts in conducting its survey, Dr. Williams testified that he reviewed an industry article which set forth the survey methodology.  (Doc. S-534 at 151-53, 159-60 (Williams Dep. at 150-52, 158-59)).

Dr. Williams asserts that because Manufacturer Defendants and sellers did not "price discriminate," by charging "different prices paid by individual customers for the same product," and "UPPs did not vary by retailer, geographic region, or the identity of any given retail customer," "differences in prices paid by individual consumers will not affect the estimated overcharges" as

determined by the multiple regression model. (Doc. S-560 at 25-26 (Williams Decl. ¶ 40))

Finally, Dr. Williams responds to Defendants' criticism that his analysis is unreliable because the damages impact estimated for the alleged horizontal conspiracy is greater than the sum of the estimated impact of the four alleged vertical conspiracies. He states that the $97 million (or 24%) difference is supported by "elementary economics" because "[a] horizontal conspiracy by construction has more market power than a combination of four vertical conspiracies." (Doc. S-560 at 30 (Williams Decl. ¶¶ 48, 49)). Price overcharges varied by channel from 3.4% to 89.2% because "[o]vercharges in club and internet channels [discounters] are generally higher than overcharges in retail and ECP channels," and are consistent with Defendants' "goal" that UPPs "insulate retail and ECP sellers from competition provided by club and internet sellers." Id. at 31 (Williams Decl. ¶ 51). Additionally, in his deposition, Dr. Williams testified that there are two reasons for the variance. First, the single average impact variable in the horizontal model is averaged across four manufacturers; if the horizontal model were broken down to each of the four manufacturers, the results for the horizontal model would be closer to the vertical model results. Second, Dr. Williams refers to the so-called "Johnson & Johnson effect." Because JJVC accounts for approximately 75 percent of the revenues of all UPP products in the damages period, and JJVC generally has lower prices than the other Manufacturer Defendants, it produces a larger effect in the horizontal model than in the sum of the vertical models, making the damages calculation lower for the vertical conspiracies as opposed to a horizontal conspiracy. (Doc. S-534 at 205-07 (Williams Dep. at 204-206)); (Doc. S-649 at 22).

      **d.**    <u>**Discussion**</u>

                **1)**    <u>**Dr. Williams' Reliance on Documents Not Listed in His Report**</u>

Defendants contend that Dr. Williams' "failure to disclose a 'large number' of documents that he considered" deprived Defendants of the "opportunity to fully cross-examine him at his deposition about his methodology, assumptions and conclusions." (Docs. 503 at 30; S-535 at 30). Defendants contend that they did not learn about Dr. Williams "non-disclosures" until seven days before their response to Plaintiffs' Motion for Class Certification was due, and that Dr. Williams admitted in his deposition that he does not have a list of documents that were not disclosed. Id. They argue that "Dr. Williams' non-disclosure cannot be cured through supplementation of Dr. Williams' expert report," and that the only appropriate remedy is exclusion of Dr. Williams' opinions pursuant to Rule 37((c)(1). Id.

Dr. Williams responds that he relied on facts set forth in the Complaint, Dr. Solow's Report, and marketing information from publically available websites that describes contact lens features as categorized by the industry. (Doc. S-560 at 33 (Williams Decl. ¶ 53 (citing Doc. S-534 at 71 (Williams Dep. at 70))). Dr. Williams states that "[a]lthough these documents were not listed in Appendix 2 of my Opening Report, they were provided to Defendants as part of the backup materials for my Opening Report," affording Defendants with the opportunity to cross examine him on these aspects of his regression analysis. Id. (Williams Decl. ¶ 54); (see also Doc. S-559 at 23). Plaintiffs contend that Dr. Williams' failure to list the background documents was both "substantially justified" and "harmless," and that exclusion of his testimony is a "drastic sanction" that is not warranted in these circumstances. (Docs. 548 at 23; S-559 at 23). They state that "Dr. Williams listed or produced all of the documents he considered or relied on to build his regression model," and that the only three documents not listed or produced were "three marketing documents Dr. Williams received *after* his report was served." (Doc. S-559 at 24) (emphasis in original).

69

Under Federal Rule of Civil Procedure 26(a), a party must provide an expert witness report for an expert witness who is retained or specially employed to give expert testimony and who the party may use at trial. Fed. R. Civ. P. 26(a)(2). The report must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them . . . .

Fed. R. Civ. P. 26(a)(2)(B)(I)-(iii). The disclosures must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). The disclosure requirements are "intended to provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." Reese v. Herbert, 527 F.3d 1253, 1265 (11th Cir. 2008) (internal quotation marks omitted).

"Under Rule 37(c), if a party fails to make or supplement required disclosures or discovery responses, 'the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.'" United States v. McCarthy Improvement Co., No. 3:14-cv-919-J-PDB, 2017 WL 443486, at *5 (M.D. Fla. Feb. 1, 2017) (citing Fed. R. Civ. P. 37(c)(1)). "Substantial justification is 'justification to a degree that could easily satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.'" Poole v. Gee, No. 8:07-CV- 912 -EAJ, 2008 WL 2397603, at *2 (M.D. Fla. June 10, 2008) (quoting Chapple v. Ala,, 174 F.R.D. 689, 701 (M.D. Ala.1997)). "Failure to disclose is 'harmless' where there is no substantial prejudice to the party entitled to receive the

70

disclosure." Id. (citing Chapple, 174 F.R.D. at 689).  The non-disclosing party bears the burden of establishing that the failure to disclose was substantially justified or harmless. See Prieto v. Malgor, 361 F.3d 1313, 1318 (11th Cir. 2004).

"[U]nder Rule 37, the Court has discretion to sanction a party who fails to provide information required by Rule 26." Collins v. United States, No. 3:08-cv-923-J-32JRK, 2010 WL 4643279, at *4 (M.D. Fla. Nov. 9, 2010) (citing Parrish v. Freightliner, LLC, 471 F. Supp. 2d 1262, 1268 (M.D. Fla. 2006)).  "The main purpose underlying the sanctions in Rule 37(c)(1) is to prevent surprise and prejudice to the opposing party." Whetstone Candy Co. v. Nestlé USA, Inc., No. 3:01-cv-415-J-25HTS, 2003 WL 25686830, at *3 (M.D. Fla. June 2, 2003) (internal quotation and citation omitted).

> Excluding otherwise admissible evidence probative of a core issue is inappropriate if it permits a party "to construct, to maintain, and to proffer to the jury a 'fiction.'" United States v. CMC II LLC, No. 8:11-cv-1303-T-23TBM, 2016 WL 7665764, at * 1 (M.D. Fla. Dec. 1, 2016) (unpublished).  Such a sanction "is warranted, if ever, only in an instance of the most egregious, purposeful, calculated, and otherwise irremediable enormity by a litigant or by counsel or by both and, even then, only if the evidence establishing the enormity and the malevolence that created the enormity is nothing less than distinct and unmistakable." Id.  Other sanctions, including a "steep fine against counsel or against the party or against both and disciplinary action against counsel," are preferable. Id.

McCarthy, 2017 WL 443486, at *6.  Excluding expert testimony is a "drastic" sanction requiring careful consideration. See Brooks v. United States, 837 F.2d 958, 961 (11th Cir. 1988).

> Whether failure to make sufficient expert disclosures is substantially justified or harmless depends on many factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC, 845 F. Supp. 2d 1241, 1250-51 (M.D. Fla. 2012).  Sanctions may be warranted if a delayed

disclosure deprives a party of the ability to disclose a rebuttal expert, impairs its ability to effectively cross examine the expert at his deposition, changes the scope of the claims, or is part of a pattern of "last minute filings and disclosures" that "have greatly affected the orderly handling of th[e] case." See id. at 1251-52.

McCarthy, 2017 WL 443486, at *6. "A failure to timely make required disclosures might be harmless if substantially similar evidence has already been produced." Id. at *7 (citing inter alia, Miele v. Certain Underwriters at Lloyd's of London, 559 Fed. App'x. 858, 861-62 (11th Cir. 2014)).

Dr Williams testified that he "used, reviewed, informed [himself] with a large number of documents that are not listed here. . . . [T]hey're important documents to . . . help me understand the industry, help me form my opinion. . . . They weren't specifically relied on to prepare the regressions, to run the regressions. They weren't specifically listed in footnotes. But they were certainly important to me in understanding the industry." (Doc. S-534 at 19-20 (Williams Dep. at 18-19)). The publically available GAO Report and Defendants' SEC filings were not directly relevant to Dr. Williams multiple regression analyses but rather assisted in providing Dr. Williams with an overview of the industry. Dr. Williams' reason for not "disclosing" the documents were that they were utilized more for background information and context about the contact lens industry, about which Defendants as participants in the contact lens industry, are well aware. These documents were tangential to his opinions that resulted from his regression models, and were all within Defendants' possession, either belonging to Defendants, or in the public sphere. Additionally, it is undisputed that Defendants were accorded the opportunity to depose Dr. Williams a second time in connection with his Supplemental Declaration (Doc. 612), and to submit additional briefing, curing any alleged prejudice from surprise. (Docs. 668; S-682-10). Dr. Williams' failure to list these documents has not disrupted the trial of this case in any way, and Defendants have been afforded ample opportunity to address all issues raised by their

72

Williams *Daubert* Motion. and Plaintiffs' Motion for Class Certification, pending before the Court. The sanction of excluding Dr. Williams' Report would seriously impair Plaintiffs' ability to support their Motion for Class Certification, particularly on the pinnacle issue of predominance. Moreover, Defendants have not established how Dr. Williams' incomplete disclosure has in anyway impaired their ability to test his regression models or challenge his opinions. The Court determines that Dr. Williams' failure to list all background documents in his Expert Report was harmless in the context of this case, and declines Defendants' request to exclude Dr. Williams' testimony. Defendants have not proposed any lesser appropriate sanction, and the Court does not see the need to sua sponte craft one. See Whetstone Candy, 2003 WL 25686830, at *3. To the extent that Defendants request the Court to exclude the Expert Report of Dr. Michael A. Williams, Ph.D. (Docs. 398; S-406), for failing to disclose documents he considered in forming his opinion, see (Doc. 505 at 45); (Doc. S-540 at 45), that request is due to be **DENIED**. Defendants have the materials in their possession, and have been given the opportunity to cross-examine Dr. Williams prior to filing their Reply Memorandum.

### 2)      Competence

Defendants do not challenge Dr. Williams' competence to testify as an expert economist and statistician. "While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." Frazier, 387 F.3d at 1260-61. Dr. Williams has extensive knowledge and experience in his specialty analyzing antitrust, industrial organization and regulation, and has testified in numerous court cases. (See Doc. 398 at 3, 19-26; S-406 at 3, 19-26 (Williams Report ¶¶ 1, 2 and Appendix 1)). He has never been excluded from testifying under *Daubert*. (Doc. S-534 at 33 (Williams Dep. at 32)). The Court finds that Plaintiffs have satisfied their burden with respect to Dr. Williams' qualification to testify as an expert witness on the issues

presented by Plaintiffs' Motion for Class Certification.  See In re Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d at 1353.

### 3)    Reliability (Methodology)

Defendants contend that Dr. Williams' report is unreliable, challenging the sufficiency of both the methodology and the underlying data.  The method in question is Dr. Williams' use of a multiple regression analysis.

"[W]hen expert 'testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'"  In re Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d at 1352 (quoting Kumho Tire, 526 U.S. at 149).  "[T]he Court's inquiry focuses not on whether the expert is correct, but whether the proponent of expert testimony has established by a preponderance of the evidence that the testimony is reliable in the context of the methodologies or techniques applied within the appropriate field."  Id. at 1352-53 (citing Allison, 184 F.3d at 1312).  "The Court's evaluation of the reliability of expert testimony . . . does not depend upon a rigid checklist of factors designed to test the foundation of that testimony.  Rather, the gatekeeping inquiry must be tailored to the facts of the case and the type of expert testimony at issue."  Id. at 1353 (citing Kumho Tire, 526 U.S. at 150 and City of Tuscaloosa, 158 F.3d at 566 n. 25 (discussing reliability of testimony by economic and statistical experts)).

A regression analysis has been described as follows:

> A regression analysis is a mathematical device which estimates the relationships between variables.  See, e.g., In re Flat Glass Antitrust Litig., 191 F.R.D. 472, 486 (W.D. Pa. 1999).  More specifically, a regression

74

> analyzes the relationship between a dependent variable (response variable) and one or more independent variables (explanatory variables), and aims to parse out which independent variables have an effect on the value of the dependent variable. See Franklin M. Fisher, Multiple Regression in Legal Proceedings, 80 Colum. L. Rev. 702, 704 (1980). When a regression includes more than one explanatory variable, it is referred to as a multiple regression. Id.
>
> To perform a multiple regression analysis, an economist first considers which major explanatory variables are likely to have an effect on a particular dependent variable of interest. Id. at 705. After collecting a dataset that will allow measurement of those effects, the economist then inputs his or her set of data into a statistical program. The statistical program will then output a "model" which shows the effects of each explanatory variable on the dependent variable, holding the others constant. Id. at 706.

In re Domestic Drywall Antitrust Litig., 322 F.R.D. 188, 212 (E.D. Pa. 2017).

> A regression is a statistical tool designed to express the relationship between one variable, such as price, and explanatory variables that may affect the first variable. Regression analysis can be used to isolate the effect of an alleged conspiracy on price, taking into consideration other factors that might also influence price, like costs and demand.

In re High-Tech Employee Antitrust Litig., 985 F. Supp. 2d 1167, 1208 n.15 (N.D. Cal. 2013) (quoting

In re Aftermarket Auto. Lighting Prods. Antitrust Litig., 276 F.R.D. 364, 371 (C.D .Cal. 2011)).

> A regression model is an equation that seeks to account for the major independent influences on the dependant variable - the variable that is estimated or forecast by the model - in order to arrive at a reliable prediction of the dependant variable.
>
> Inclusion of irrelevant variables or omission of relevant variables is to be avoided.

In re Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d at 1359-60 (citations omitted).  A multiple regression model includes more than one explanatory variable on one side of the equation. (See Doc. S-538 at 24 (Snyder Report ¶ 45)).

The Court determines that Dr. Williams's selection of variables in his initial Report which could affect price; (1) in different categories (i.e., sphere, toric, or multifocal); (2) produced by different manufacturers; (3) in different package sizes; or (4) color lenses or not—is valid, given the constraints on data available at the time. Notably, in subsequent declarations, after having had the opportunity to review later - produced data of customer-based transactions, Dr. Williams re-ran his regression models by product, and the results were consistent. Williams states that he based his initial selection of variables upon the Manufacturer Defendants' own marketing information that describes contact lens features as categorized by the industry. (Doc. S-534 at 71-72 (Williams Dep. at 70-71)). While Defendants contend that Dr. Williams omitted key variables such as technological advances which they argue also affect price, Dr. Williams disputes Defendants' assertion and provides his own reasoning for not adding that as a variable. Dr. Williams' multiple regression analysis is a sufficient and reliable means of proving impact on a classwide basis, even if arguably imperfect. Kleen Prods. LLC v. Int'l Paper, 306 F.R.D. 585, 605 (N.D. Ill. 2015) (finding that defendants' criticism of expert's selection of variables for multiple regression analysis "is a merits question that the Court does not need to resolve in order to decide whether to certify the class."), aff'd, 831 F.3d 919 (7th Cir. 2016), cert. denied, 137 S. Ct. 1582 (2017). .

"Regression analyses are admissible even where they omit important variables so long as they account for the 'major variables' affecting a given analysis. . . . But it is the 'proponent who must establish that the major factors have been accounted for in a regression analysis.'" Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc., 49 F. Supp. 3d 385, 403 (S.D.N.Y. 2014) (quoting Bazemore v. Friday, 478 U.S. 385, 400 (1986); Freeland v. AT & T Corp., 238 F.R.D. 130, 145 (S.D.N.Y.2006)) aff'd, 638 F. App'x 43 (2d Cir. 2016).

> Unless the party challenging a regression model proffers evidence that an omitted variable "is correlated with the dependant variable and is likely to affect the result of the regression analysis," the Court will not find that omission of the variable implicates the reliability of the model. Estate of Bud Hill v. ConAgra Poultry Co., No. 94-CV-0198, 1997 WL 538887, at *8 (N.D. Ga. Aug. 25, 1997). Merely pointing to economic conditions that may affect the dependant variable is not enough to call into question the reliability of an econometric model.  See id. at *7; In re Industrial Silicon Antitrust Litig., Nos. 95-2104, 95-1131, 96-2003, 96-2111, 96-338, 1998 WL 1031507, at *3 (W.D. Pa. Oct.13, 1998).

In re Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d at 1365; see also Estate of Hill v. ConAgra Poultry Co., No. CIV.A.4:94CV0198-HLM, 1997 WL 538887, at *8 (N.D. Ga. Aug. 25, 1997). "While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors must be considered unacceptable evidence of discrimination." Bazemore, 478 U.S. at 400 (internal quotations omitted) (finding multiple regression analysis admissible to prove pattern or practice of racial discrimination).

Defendants also challenge the data underlying Dr. Williams' initial analysis. Dr. Williams' reliance on aggregate data, found in the 1-800-Contacts survey results, and supplemented by aggregate club channel and retailer data, does not in and of itself render his Report unreliable and inadmissible under Daubert for consideration in conjunction with Plaintiff's Motion for Class Certification. While Dr. Williams did not conduct the surveys or data collection first-hand, he was sufficiently familiar with the methodology employed, through industry materials, to support his reliance upon the massive survey results. Mr. Williams used what data was available, and indeed later supplemented his analysis with actual transactional data as that became available. The 1-800-Contacts survey data was vast in scope, and Defendants have not presented any evidence that it was flawed.  Unlike the expert in In re

<u>Photochromic Lens Antitrust Litig.</u>, No. 8:10-CV-00984-T-27EA, 2014 WL 1338605, at *24-25 (M.D. Fla. Apr. 3, 2014) cited by Defendants, Dr. Williams establishes the correlation between the survey data and the transactional data, and by using the survey data, Dr. Williams was able to expand his analysis to a larger sampling.  Additionally, this is not a case where the prices were widely negotiated by consumers rather than based on list prices, distinguishing Dr. Williams' analysis from that excluded in <u>Photochromic Lens</u>, 2014 WL 1338605, at *25.  Rather, the starting point for prices for contact lenses to which UPPs applied was the UPP itself.  Moreover, it appears that Defendants' expert Dr. Snyder also cites to the 1-800-Contacts survey as a source of data for his own analysis of Dr. Williams' Report.  (<u>See</u> Doc. S-538 at 92).

Dr. Williams takes discounts, rebates, insurance payments and other price reductions into account as part of his average results, holding those reductions as a constant in his regression analysis.  The UPPs were applied nondiscriminatorily across the board, and Defendants have made no showing that these price reductions were in any way tied to the UPPs. Plaintiffs, at the evidentiary hearing, established that rebates were paid on a very small number of products.

"[E]ven if there is considerable individual variety in pricing because of individual price negotiations, class plaintiffs may succeed in proving classwide impact by showing that the minimum baseline for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised (or slowed in its descent) by the collusive actions of the defendants." <u>In re Commercial Tissue Prods.</u>, 183 F.R.D. 589, 595 (N.D. Fla. 1998) (citing cases).  Plaintiffs contend that any individualized price adjustments through rebates, or discounts began from the UPP floor prices which Plaintiffs allege were artificially and unlawfully inflated by the conspiracy.  <u>See id.</u> Additionally, where available, as with the Costco and the 1-800-Contacts transactional "net pricing"

data, Dr. Williams folds in actual rebates and discounts into his analysis. Despite some citation to

testimony by Defendant manufacturers that the implementation of UPPs was a part of a bigger plan to

address prices for consumers, Defendants have not established that the cited price reductions in the

forms of rebates, discounts and insurance payments was in any way connected to Defendants' setting

UPPs. See In re Nexium Antitrust Litig., 777 F.3d 9, 27 (1st Cir. 2015) ("[A]ntitrust injury occurs the

moment the purchaser incurs an overcharge, whether or not that injury is later offset. . . . [I]f a class

member is overcharged, there is an injury, even if that class member suffers no damages."); see also

Delta/AirTran Baggage Fee, 317 F.R.D. at 683 ("[A] person suffers a cognizable injury and is

impacted by a price-fixing conspiracy at the moment he pays an antitrust overcharge, even if the

anticompetitive conduct at issue also results in offsetting benefits such as base-fare reductions or a

reduced second-bag fee."). The Court finds no error in Dr. Williams' consideration of the price

reductions as a constant in both his "but for" and UPP calculations.

Defendants have forcefully attacked Dr. Williams' conclusion, with the support of their own

experts. Defendants' expert, Dr. Snyder re-ran Dr. Williams regressions by substituting an indicator

variable for new products never subject to a UPP for products subject to a UPP to demonstrate "false

positives." (See Doc. S-538 at 46-47, 93-94 (Snyder Report ¶¶ 96-98 and Exs 9 and 10)). Dr.

Williams takes issue with Dr. Snyder's assumptions, specifically his variable for "new" products, as

containing "'spurious correlations'" which fail to recognize the "umbrella effect" of the UPPs lifting

prices of all comparable and competitive lenses, including those not subject to a UPP. Plaintiffs

contend that "the 'false positives' that Defendants purport to identify are based on Dr. Snyder's

identification of increases in prices of non-UPP products." (Doc. S-722 at 20 (citing Doc. S-651 at 39-

50 (Williams Supp. Decl. ¶¶ 56-77)). "[R]ather than correctly evaluating the effect of UPPs on retail

contact lens prices using groups of comparable, competitive products that correspond to 'practical indicia as industry or public recognition,' Dr. Snyder's regression model corresponds to a non-existent marketplace in which the price of each specific type of contact lens can be evaluated in isolation of comparable, competitive contact lenses." (Doc. S-560 at 19-20 (Williams Decl. ¶¶ 29, 31)); See also id. at 28-29 (Williams Decl. ¶ 46) (noting that Dr. Snyder's product-specific regressions "suffer from product-specific, random price variation that masks the true overcharges" and that citing that application of regression models to smaller subgroups of data causes "[t]he effects of potential outliers on regression estimates [to] increase as the number of observations available to estimate each separate coefficient decreases." (citation omitted)). Though Defendants urge the Court to resolve this difference of opinion and to reject Dr. Williams' Report based upon Dr. Snyder's different opinion, this difference of opinion does not preclude admission or consideration of Dr. Williams' Report; it merely goes to its weight.

Defendants also criticize Dr. Williams' failure to "test" his results by analyzing millions of individual contact lens consumer transactions, which they argue renders the Williams opinion "unreliable" under *Daubert*. But, as noted by the Eleventh Circuit, the "testing" requirement of *Daubert* is not necessarily applicable to a statistical analysis of alleged antitrust conduct:

> Economic or statistical analysis of markets alleged to be collusive, for instance, cannot readily be repeatedly tested, because each such case is widely different from other such cases and because such cases cannot be made the subject of repeated experiments. The proper inquiry regarding the reliability of the methodologies implemented by economic and statistical experts in this context is not whether other experts, faced with substantially similar facts, have repeatedly reached the same conclusions (because there will be few or no cases that have presented substantially similar facts). Instead, the proper inquiry is whether the techniques utilized by the experts are reliable in light of the factors (other than testability) identified in *Daubert* and in light of other factors bearing on the reliability of the

methodologies.

City of Tuscaloosa, 158 F.3d at 566 n.25. The parties have addressed the reliability of Dr. Williams'

methodology and the Court has conducted a rigorous analysis of the subject. Defendants' argument

that Dr. Williams' opinions are not reliable because he failed to "test" them is a "straw man"

argument, in light of the Eleventh Circuit's observation in City of Tuscaloosa.

"Courts frequently recognize that regression analysis can be used to isolate the effect of an

alleged conspiracy on price, taking into consideration other factors that might also influence price, like

cost and demand." In re: Processed Egg Prods. Antitrust Litig., 312 F.R.D. 171, 193 (E.D. Pa. 2015)

(internal quotations and citations omitted); see also In re Urethane Antitrust Litig., 768 F.3d at 1251-52

(expert testimony in antitrust case based up on multiple-regression analysis to develop models

predicting prices that would have existed in a competitive market, compared to the actual prices during

the conspiracy period to estimate overcharges was admissible, concluding that Defendant's challenges

to the expert's methodology affected the weight of the testimony rather than its admissibility); City of

Tuscaloosa, 158 F.3d at 566 (finding that methodologies used by statistician in the preparation of his

statistics and his testimony were sufficiently reliable to make his expert testimony admissible in

antitrust action brought against chemical distributors where statistician generated the statistics

underlying his testimony through simple compilation of data, and his conclusions were the products of

simple arithmetic and algebra and of multiple regression analysis); Domestic Drywall, 322 F.R.D. at

213 ("Regression analysis has become increasingly common in antitrust litigation as well - specifically

it has been used to show antitrust impact and as a method of determining damages." (citing cases));

Processed Egg Prods., 81 F. Supp. 3d at 430, 436 (finding that the case law endorses the admissibility

of plaintiff's expert's regression model in direct purchasers' overcharge antitrust case, and that

expert's model is reliable for *Daubert* purposes); <u>In re: Cathode Ray Tube (CRT) Antitrust Litig.</u>, 308

F.R.D. 606, 629 (N.D. Cal. 2015) (finding that expert's "use of regression and correlation analysis is

well established as a means of providing classwide proof of antitrust injury and damages"); <u>United</u>

<u>States v. Am. Exp. Co.</u>, No. 10-CV-4496 (NGG) (RER), 2014 WL 2879811, at *4 (E.D.N.Y. June 24,

2014) (observing that the multiple regression analysis is "a well-established and reliable econometric

methodology frequently relied upon by federal courts under Rule 702." (citing cases)); <u>Allapattah</u>

<u>Servs., Inc. v. Exxon Corp.</u>, 61 F. Supp. 2d 1335, 1347 (S.D. Fla. 1999) ("Generally, econometric and

regression analyses are considered reliable disciplines."), <u>aff'd</u>, 333 F.3d 1248 (11th Cir. 2003), <u>aff'd</u>

<u>sub nom.</u> <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. 546 (2005); <u>Polypropylene Carpet</u>,

93 F. Supp. 2d at 1359-70 (finding that expert testimony based on multiple regression model designed

to estimate what competitive prices would have been during relevant period was admissible on issue of

damages in price fixing suit against carpet manufacturers; model reasonably accounted for variables,

reasonably defined benchmark period, reasonably used logarithms, and reasonably selected data.).

> In industries involving varying products and complex pricing structures, antitrust plaintiffs have in recent years trended toward presenting an econometric formula or other statistical analysis to show class-wide impact. The idea is to account for differences from transaction to transaction by assigning variables to certain conditions relating to the transaction (*e.g.*, product features or type of purchaser) or by establishing some type of correlation between product lines or purchasers.

<u>In re Graphics Processing Units Antitrust Litig.</u>, 253 F.R.D. 478, 491 (N.D. Cal. 2008) (citing <u>In re</u>

<u>Dynamic Random Access Memory Antitrust Litig.</u>, No. M 02-1486 PJH, 2006 WL 1530166 at *9

(N.D. Cal. June 5, 2006) and <u>In re Linerboard Antitrust Litig.</u>, 203 F.R.D. 197, 218 (E.D. Pa. 2001)).

> The reliability of an expert's multiple regression analysis depends on the choices the expert makes in choosing variables and setting up the model.

> *See,* Daniel L. Rubinfeld, Reference Guide on Multiple Regression 311-17.
> In determining whether a model is set up correctly, courts consider several
> questions: has the expert correctly identified the dependent variable; has he
> or she chosen the correct explanatory variable that is relevant to the
> question at issue; are the additional variables chosen all correct or are some
> missing [or] irrelevant; is the form of the analysis correct?

Kleen Prods., 306 F.R.D. at 602 (citations omitted).  Where such methods are reliable, they should be

allowed as a means of common proof.  Graphics Processing Units, 253 F.R.D. at 491.  "To rule

otherwise would allow antitrust violators a free pass in many industries."  Id.; see also Tuscaloosa, 158

F.3d at 566 (reversing exclusion of expert testimony in antitrust action against chemical distributors

based statistics generated through simple compilation of data and estimated damages that were "the

products of simple arithmetic and algebra and of multiple regression analysis, a methodology that is

well-established and reliable."); In re Static Random Access Memory (SRAM) Antitrust Litig., 264

F.R.D. 603, 616 (N.D. Cal. 2009) ("Although each side presents myriad valid challenges to the other's

expert, the Court concludes that these challenges are of the type that go to the weight of the evidence,

not the admissibility.  The economic principles and regression models relied upon by [indirect

purchasers] Plaintiffs' experts . . . are solidly grounded in the academic literature, [and] [t]hey cite

extensive facts and data from this case that they reviewed and relied upon in rendering their

opinions.").

"Normally, failure to include variables will affect the analysis' probativeness, not its

admissibility."  Bazemore, 478 U.S. at 400.  Only when the "regression[ ] is so incomplete as to be

inadmissible as irrelevant" should the Court exclude it.  Id. at 400 n.10.  Instead, "[v]igorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at

596.

> The damages arising from the antitrust injury must, as the Supreme Court has said in dicta, be demonstrated by a "common methodology" applicable to the class as a whole. Comcast, 133 S. Ct. at 1430. Even so, it is also clear . . . that "[t]he use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself."

In re Nexium (Esomeprazole) Antitrust Litig., 297 F.R.D. 168, 182 (D. Mass. 2013) (quoting In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 197 (1st Cir.2009) (citing 3 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 10.5, at 483–86 (4th ed. 2002) ("Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages . . . ."), aff'd sub nom., In re Nexium Antitrust Litig., 777 F.3d 9 (1st Cir. 2015).

Dr. Williams does not purport to provide a precise calculation of the exact dollar amount each plaintiff was overcharged. Rather he seeks to provide a reasonable estimate of each plaintiff's likely overcharge. The use of averages to prove common impact to a putative class is accepted. See Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1047-49 (2016) (holding that representative proof from a sample, based on an expert witness's estimation of average time that employees spent donning and doffing protective gear, could be used to show predominance of common questions of law or fact in employment class action ). "[A]ttacking averaged data is a standard defense tactic in antitrust cases, so it is unsurprising that courts have often evaluated and approved the appropriate use of averages." Cathode Ray Tube (CRT), 308 F.R.D. at 628. Indeed, "in a complicated antitrust case such as this, where the theory of harm is that the entire market price of a product was inflated as a result of a conspiracy, 'plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages.'" Kleen Prods., 306 F.R.D. at 605 (quoting Loeb Indus., Inc. v.

84

Sumitomo Corp., 306 F.3d 469, 493 (7th Cir.2002)). "[T]he use of aggregate data in regression

analysis is often appropriate 'where [a] small sample size may distort the statistical analysis and may

render any findings not statistically probative.' . . . In such a case, the use of 'aggregate numbers' may

'allow for a [more] robust analysis and yield more reliable and more meaningful statistical results.'"

Cathode Ray Tube (CRT), 308 F.R.D. at 628 (quoting Paige v. California, 291 F.3d 1141, 1148 (9th

Cir.2002) (amended) and Ellis v. Costco Wholesale Corp., 285 F.R.D. 492, 523 (N.D. Cal.2012)).  In

short, Dr. Williams regression models present a scatter gram, plotting an average line of prices

between numerous data points plotted by variables.  Some price points are above the average line and

some price points are below the average line.  The averages plotted are necessarily not about individual

persons, but rather show trends statistically attributable to a given factor—the UPPs, while controlling

for other factors.  By using averages, Dr. Williams presents a model that he argues follows and

demonstrates the general market, averaging out the idiosyncratic outliers both high and low which tend

to obscure the average trend of the market price. Dr. Williams' methodology identifies classwide

impact that is the result of the wrong alleged.  See Comcast, 569 U.S. at 33-37.

The Court finds that Dr. Williams' Report presents a sufficiently reliable functioning model

tailored to the facts of this case, using available aggregate data as opposed to overly minute sub-data

that would have produced statistically unreliable and meaningless results.  See In re Cathode Ray Tube

(CRT), 308 F.R.D. at 628.  Dr. Williams' multiple regression analysis is a sufficiently reliable means

of demonstrating that nearly all consumers who purchased contact lenses paid more than they would

have in the absence of the alleged conspiracy, and of measuring those overcharges.  See In re Blood

Reagents Antitrust Litig., No. 09-2081, 2015 WL 6123211, at *19 (E.D. Pa. Oct. 19, 2015).

Defendants' objections to the specifics of Dr. Williams' methodology raise debatable issues for cross

examination and ultimate determination by the trier of fact.  But the objections are not dispositive in terms of striking Dr. Williams' the opinions, and do not affect whether Plaintiffs have offered a reasonable method for determining impact on a class-wide basis.

The Defendants both criticize Dr. Williams' professional methodology employed in conducting his regression analysis, specifically his failure to control for variables they deem to be major factors affecting price, and question the relevance of his conclusion under the regression analysis which necessarily involves averaging, as opposed to individual consumer experiences.  For these reasons. Defendants assert that the analysis is not probative of on the issue of impact.  That is a merits debate for the factfinder, and not a reason to strike the testimony under *Daubert* from consideration on of the Rule 23(b)(3) predominance requirement as to whether antitrust impact is "capable of proof by evidence common to the class" in consideration of Plaintiffs' Motion for Class Certification.  E.g. In re Scrap Metal Antitrust Litig., 527 F.3d 517, 531 (6th Cir. 2008) (concluding that the question of whether an expert's opinion is accurate in light of his use of certain data "goes to the weight of the evidence, not to its admissibility.").  Rejecting Dr. Williams' regression analyses, which appear to follow accepted regression methodology, is inappropriate at this juncture.  See Domestic Drywall, 322 F.R.D. at 1262.

The issues raised by Defendants' experts regarding specific aspects and merits of Dr. Williams' analysis are open to debate and bear on the weight of Dr. Williams' opinions.  See Urethane Antitrust Litig., 768 F.3d at 1262 (finding that the district court had the discretion to accept the expert's explanation for omitting variables addressing domestic demand in his regression analysis).  In conducting a *Daubert* analysis, a court may not "evaluate the credibility of opposing experts" or the persuasiveness of their conclusions, Quiet Tech., 326 F.3d at 1341; instead, a court's duty is limited to

86

"ensur[ing] that the fact-finder weighs only sound and reliable evidence." Frazier, 387 F.3d at 1272; see also Navelski v. Int'l Paper Co., 244 F. Supp. 3d 1275, 1287 (N.D. Fla.). See generally Kumho Tire, 526 U.S. at 153 (stating that if an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to "decide among the conflicting views of different experts"); Rink v. Cheminova, Inc., 400 F.3d 1286, 1293 n.7 (11th Cir. 2005) (observing that "a district court may not exclude an expert because it believes one expert is more persuasive than another expert"); see generally Sher, 419 F. App'x at 891; Navelski v. Int'l Paper Co., 261 F. Supp.3d 1212, 1217 (N.D. Fla. 2017).

### 4)      Assist the Trier of Fact

An expert witnesses may only testify when the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. This prong is geared towards ensuring that the expert testimony is relevant, in addition to being reliable. See Kumho Tire, 526 U.S. at 152. To satisfy this *Daubert* requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." United States v. Rouco, 765 F.2d at 995. Plaintiffs have carried their burden of showing, by a preponderance of the evidence, that Dr. Williams' testimony is relevant and will assist the trier of fact in determining whether Defendants' alleged conduct resulted in classwide impact. This conclusion does not necessarily mean that the finder of fact has to accept Plaintiffs' theory, but only that Plaintiffs have satisfied the requisites of *Daubert*. See Domestic Drywall, 322 F.R.D. at 231-32.

### B.      Defendants' Motion to Exclude Dr. Williams' Supplemental Declaration

1.    **Dr. Williams' Supplemental Declaration**

In conjunction with Plaintiffs' filing of their Reply Memorandum of Law in Support of Motion

for Class Certification (Doc. 611; Doc. S-649), Plaintiffs on September 8, 2017 submitted the

Supplemental Declaration of Dr. Michael A. Williams, Ph.D. (Docs. 612; S-651 (Williams Supp.

Decl.)). In the Supplemental Declaration, Dr. Williams further rebuts the criticisms made by

Defendants' experts Drs. Snyder and Cremieux. Id. at 7-11 (Williams Supp. Decl. ¶ 7). He responds

to Drs. Snyder and Cremieux as follows:

> 1)    Dr. Williams "confirmed that the UPPs caused statistically
> significant increases in retail prices." Dr. Williams takes issue with Dr.
> Snyder's use of one regression modification to dispute all 50 of Dr.
> Williams' regressions. He notes that since the date of his opening Report,
> he has received additional data from Defendants and third parties, including
> post-UPP pricing to allow for additional comparisons, all of which support
> his opinion. (Doc. S-651 at 8-9 (Williams Supp. Decl. ¶ 7.1)).

> 2)    Dr. Williams "confirmed that UPPs cause price increases for nearly
> all class members," and had a common impact. In response to Dr. Snyder's
> opinion that Dr. Williams' regressions are not capable of proving common
> impact, Dr. Williams criticizes Dr. Snyder's "product specific" regression
> models that reveal "random price variation" as opposed to market
> variations.    Additional data analyzed by Dr. Williams, using ABB
> Yourlens.com and the 1-800-Contacts transaction data "empirical results"
> establish the common impact of the UPPs. (Doc. S-651 at 9 (Williams
> Supp. Decl. ¶ 7.2)).

> 3)    Dr. Williams' "damages model does not generate 'false positives.'"
> Dr. Williams cites to evidence that Alcon raised its wholesale prices by
> 10% on older non-UPP lenses to "'encourage migration' to UPP products."
> Dr. Williams calls this the "'umbrella effect,' which empirically exists in
> the present case." (Doc. S-651 at 10 (Williams Supp. Decl. ¶ 7.3)).

> 4)    Dr. Williams "appropriately used aggregate data." Dr. Williams
> asserts that later available transactional data confirms that his "use of the
> aggregated data is supported by the fact that the regression results using

such data lead to the same conclusion as regression results using transactions data." Specifically, using the later available ABB Yourlens.com transactional data for the ECP channel, Dr. Williams re-asserts that his opinion is that "all or virtually all" class members were affected by Defendants' UPPs. (Doc. S-651 at 10-11 (Williams Supp. Decl. ¶ 7.4)).

5)      The "1-800-Contacts survey data are reliable and representative of manufacturers' sales." Dr. Williams cites to his deposition testimony regarding why he considers the survey data reliable, and asserts that Dr. Snyder fails to rebut the survey's reliability. (Doc. S-651 at 11 (Williams Supp. Decl. ¶ 7.5)).

6)      Dr. Cremieux is incorrect "that individualized inquiry is necessary to determine whether consumers paid higher prices as a result of the alleged conduct," because it is based on the "mistaken and unstated assumption that actual insurance payments, rebates and discounts would have been different in the but-for world." (Doc. S-651 at 11 (Williams Supp. Decl. ¶ 7.6))

(See Doc. S-651 at 8-11 (Williams Supp. Decl. ¶ 7)).

The three remaining Manufacturer Defendants all discontinued their implementation of UPP's in 2016 and 2017. In his Supplemental Declaration, Dr. Williams analyzed "before-during" UPP data for JJVC, and "during-after" UPP data for Alcon and B&L, noting that Alcon and B&L introduced their UPPs on new products so that there is no "before" data for Alcon and B&L UPP products. (Doc. S-651 at 65 (Williams Supp. Decl. ¶¶ 113, 114)). According to Dr. Williams, the "after" UPP comparisons "render Dr. Snyder's argument that estimated overcharges in [Dr. Williams'] Opening Report are explained by 'advanced features' of new lenses invalid [s]ince the ["after"] analyses determine estimated overcharges based on prices of the same lenses," accounting for the "advanced features" of new lenses. Id. ¶ 114. Dr. Williams has produced updated damages estimates based upon his supplemental analysis. (See Doc. S-684 at 36-37 (Snyder Sur-Reply Report ¶¶ 81-84)).

## 2.     Defendants' Argument

Defendants argue that Dr. Williams' Supplemental Declaration should be excluded because of "(1) the fundamental methodological flaws that plagued his original report remain and (2) his latest report introduces additional problems as well." (Docs. 693 at 5; S-720 at 5). They criticize Dr. Williams' reliance on "average 'overcharges' that do nothing to answer whether contact lens purchasers really were impacted on a class-wide basis that can be accurately determined using common proof." (Docs. 693 at 5; S-720 at 5, 14). Defendants reiterate that the terms of each consumer's individual transaction must be examined "one by one." Id. at 6. Defendants cite as an example, deposition testimony that B&L offered a rebate to consumers to encourage them to be refit into the "newest technology," presumably covered by a UPP. (Doc. S-720 at 13 (citing (Doc. S-721-2 at 5-6 (Guglielmino Dep. at 58, 326)).)

Defendants' expert Dr. Snyder responds that Dr. Williams' "simplistic framework" does not reflect that implementation of a UPP "might not lead to common impact" because the UPP may not be strictly enforced, retailers did not increase prices that were already above the UPP level, or retailers lowered their prices in response to the implementation of a UPP. (Doc. S-684 at 16 (Snyder Sur-Reply Report ¶ 30)). Thus, according to Dr. Snyder, "higher prices alone - which is all that Dr. Williams purports to show - would not constitute proof of common injury." Id. Dr. Snyder recounts detailed exceptions: 1) Wal Mart prices for JJVC Acuvue Oasys (6 pack) were at prices below the UPP; 2) US Vision prices for JJVC Acuvue Oasys (24 pack) ranged from $110 to $138 before the UPP, whereas during the UPP most sold for the UPP price of $110 and for no more than $120; 3) one-third of the sales of JJVC's 1-Day Acuvue Moist for Astigmatism (30-pack) before the implementation of the UPP was "close" to the $34.50 UPP level according to National Vision retail data, and after the

implementation of the UPP, 70% of the sales were at the same or similar level; 4) National Vision data shows that "[s]ome during-period prices" of the JJVC Acuvue Oasys (24-pack) are below the $110 UPP price and "many" are at the price, with the average price being "within 1.5 percent of the UPP" and "prices charged to consumers range from 30 percent below the UPP to 20 percent above." Id. at 18-19 (Snyder Sur-Reply Report ¶¶ 34, 36, 38, 39); (see Doc. S-720 at 14).  Dr. Snyder also states that "[t]he overcharge estimates generated by Dr. Williams's regressions vary greatly depending on the data set used," so, for example, Dr. Williams' overcharge estimates for Alcon products range from 1.5% based on 1-800-Contacts data to 18.2 percent based upon National Vision data.  (Doc. S-684 at 20 (Snyder Sur-Reply Report ¶ 41).  Dr. Snyder re-ran the regressions by product, which resulted in a different perspective.  Defendants assert,

> in order to better understand Dr. Williams's alleged 3.7% overcharge for all nine JJVCI products sold through ABB Yourlens.com, Dr. Snyder further broke down the regressions by product.  After running the regressions separately for each product, he found that the overcharges actually ranged from -7.5% to 5.9%.

(Doc. S-720 at 14 (citing Doc. S-684 at 20-21 (Snyder Sur-Reply Report ¶ 42)).  Similarly, Dr. Snyder counters Dr. Williams' conclusion that five Alcon lenses sold through retailer US Vision averaged an overcharge of 2.6% during the UPP period, with a product by product finding that the estimated overcharges ranged from -6.1% to 6.2%.  Id. at 15.

As to the second criticism, Defendants argue that Dr. Williams "manipulates both his regression models and the underlying data."  (Docs. 693 at 6, 16; S-720 at 6, 16).  Defendants target three aspects of Dr. Williams' Supplemental Declaration.  First, they criticize Dr. Williams' redefinition of the proposed class of B&L consumers based on "a cursory and untested observation of

1-800-Contacts data," after July 1, 2015, while failing to make the same adjustment to the definition of the proposed Alcon class of consumers. Defendants charge that Dr. Williams made the adjustment to avoid a finding of "negative overcharges" for purchases of B&L lenses through 1-800-Contacts upon the introduction of the UPPs. (Docs 693 at 6, 17; S-720 at 6, 17-19 (citing Doc. S-684 at 10-11 (Snyder Supp. Sur-Reply Report ¶ 18, 19)). Additionally, Defendants argue that while Dr. Williams now controls for "'product fixed effects' when measuring overcharges for Alcon and B&L lenses, "he fails to apply that same approach when analyzing JJVC lenses." Id. at 6. Finally, the Defendants question Dr. Williams' inclusion of JJVC wholesale pricing as an independent variable in his updated regressions, "contradict[ing] the very position he took during his deposition concerning his original reports." Id. at 7, 19. Defendants contend that "[b]ecause wholesale prices are usually lower than retail prices, their inclusion in a regression analysis could artificially lower the average pre-UPP prices, thereby increasing overcharges under Dr. Williams' model," and that "[e]xclusion of the wholesale prices, therefore, would be necessary if they were enacted in coordination with the UPP." (Docs. 693 at 19; S-720 at 19). Defendants argue that JJVC changed its wholesale prices as part of "an overall change in pricing policy'" (Doc. S-720 at 20-21 (quoting Doc. S-721-3 at 11 (Angelini Dep. at 140) and citing Doc. S-541-5 at 3-4 (Miura Decl. ¶¶ 5-8) (discussing JJVC's "business strategy" which included lowering wholesale prices, eliminating consumer rebates, and implementing UPPs) and citing (Doc. S-684 at 12-14 (Snyder Sur-Reply Report ¶¶ 21-23) (stating that inclusion of wholesale prices as a variable increases Dr. Williams' finding of JJVC overcharges)).

Defendants argue that Dr. Williams use of additional data to run "before-during" and "during-after" models "result[s] in substantial changes," including a finding that "his new overcharges are significantly lower than those originally calculated for Alcon and B&L." (Docs. 693 at 8; S-720 at 8)

(citing Williams Report Tables); see also id. at 22 (citing Doc. S-684 at 7 (Snyder Sur-Reply Report ¶ 11 & Exs. 1A-1C)). Dr. Williams' consideration of post-UPP prices for Alcon and B&L allowed him to consider "product fixed effects." (Doc. 693 at 22; S-720 at 22). However, Defendants contend that "Dr. Williams's decision to ignore product fixed effects in his [JJVC] before-during regressions causes a higher overcharge in all eleven of the regressions; in fact, for some of his [JJVC] before-during regressions, Dr. Williams's reported overcharge is double what it would have been had he accounted for product fixed effects," increasing Dr. Williams' JJVC damage estimate by $30 million. (Doc. S-720 at 23 (citing Doc. S-684 at 9 (Snyder Sur-Reply Report ¶ 16 (stating that Dr. Williams' use of three broad product categories instead of fixed product effects for JJVC increases his estimated overcharges; "Dr. Williams's decision to cast aside the fixed product effects method used for all of his other analyses in the Supplemental Report arbitrarily increases estimated overcharges . . . . ")))); (Doc. S-721-1 at 85 (Williams Supp. Dep. at 84)).

Defendants also attack Dr. Williams' Supplemental Declaration in their Sur-Reply regarding Plaintiffs' Motion for Class Certification. Citing to their own experts' supplemental reports generated in response, Defendants argue that Dr. Williams' Supplemental Declaration is flawed because it relies on averages "that mask significant numbers of unharmed consumers, generate wildly fluctuating results, and cherrypick transactions counted." (Docs. S- 681 at 20 (citing Doc. S-684 at 4, 6 (Cremieux Sur-Reply Report ¶¶ 6, 9-10) and S-684 at 4-5, 10-11, 22-26 (Snyder Sur-Reply Report ¶¶ 5(iii), 18, 47-51 (arguing that Dr. Williams inconsistently adjusted the proposed B&L class definition regarding sales through 1-800-Contact after July 2015 but not for Alcon, leading to his reporting "higher estimated overcharges for B&L.")))).

Defendants argue that instead of rehabilitating Dr. Williams' opinions, Plaintiffs tender an

"entirely new model" from Dr. Williams, in which Dr. Williams revised his horizontal agreement damages model. (Doc. S-681 at 19 (citing (Doc. S-682-10 at 3-4 (Williams 10/17 Dep. at 21-22 (applying the same regression methodology to a different model)))). Defendants argue that Dr. Williams' revised regression models are equally flawed because he fails to address evidence that consumers purchased contact lenses from ECPs who did not participate in the alleged conspiracy; purchased contact lenses at prices that were not set "'pursuant to a UPP'"; and paid no more for contact lenses covered by a UPP than they would have if not covered by a UPP. (Doc. S-681 at 19).

### 3. Plaintiffs' Response

Plaintiffs respond that Dr. Williams' Supplemental Declaration was compiled to address Defendants' criticisms of his initial Report, and to "update his estimated overcharges and damages with previously unavailable data." (Docs. 715 at 8; S-722 at 8); (see also Docs. 611 at 16; S-649 at 16) (stating that Dr. Williams "analyzed additional data sets only made available to him after he issued his Opening Report," and that "[h]is analysis of that data confirms his additional findings, and rebuts Defendants' experts."). Plaintiffs defend Dr. Williams' use of his multiple regression methodology as offering "the *only* scientific method[ ] for determining what the prices would have been in the 'but-for' world, the hypothetical world in which Defendants' UPPs were not imposed." (Docs. 715 at 8; S-722 at 8) (emphasis in original).

At the time of Dr. Williams' initial Report, Defendants had not produced any data reflecting transactions after December 2016, which did not capture Alcon's, B&L's, and CV's discontinuance of the UPPs. (Docs. 715 at 9; S-722 at 9). In his Supplemental Declaration, Dr. Williams applied a "during-after" UPP analysis for Alcon and B&L to compare the same products using "product fixed

effects" rather than categorical variables, which he was unable to do in his initial Report, (eliminating

a criticism of Defendants), and a "before-during" analysis for JJVC "rather than the 'before-during-

after' approach because the latter is affected by the lingering effects of JJVC's UPP restraint even after

its abandonment." (Docs. S-722 at 10).  Plaintiffs contend that "while the during-after models provide

a more complete (albeit conservative) damages estimate for Alcon and B&L, because JJVC applied its

UPP to older products, the before-during model is the most econometrically appropriate model as to

JJVC." Id. at 21.  Plaintiffs note that by the time Dr. Williams filed his Supplemental Declaration on

September 8, 2017, the following new data sets had become available: 1) customer-level transactions

for ECPs (ABB Yourlens.com); 2) customer-level transactions for internet sales (1-800-Contacts), and

3) additional data from the retailer and club channels.  (Docs. 715 at 10; S-722 at 10).  This newly

produced data permitted Dr. Williams to conduct "customer-specific" regressions (adding 300,000

customer specific variables from the ABB Yourlens.com data, and 5.7 million customers in the 1-800

Contacts transaction data set, addressing a criticism leveled by Defendants, and ultimately bolstering

his findings. (Doc. S-722 at 15 (citing Doc. S-651 at 86-89, 90-93 (Williams Supp. Decl. ¶¶ 159-166

and Figures 7-10)).  He concluded that "93-100% of customers in the ABB data set and 96-100% of

those in the 1-800-Contacts data set had at least one overcharge during the damages period." Id. at 16

(citing Doc. S-651 at 88-89 (Williams Supp. Decl. ¶¶ 164-65)).  In his Second Supplemental

Declaration, dated December 4, 2017,  Dr. Williams reports using the "before-during approach for

JJVC customers," and finding that "96-100% of customers in *both* datasets had at least one overcharge

during the damages periods." (Doc. S-722 at 16 (citing Doc. S-723 at 13 (Williams 2d Supp. Decl.

n.33) (emphasis in original)).  Then, in his Second Supplemental Declaration, Dr. Williams reports

that running his same regressions with the newly produced customer level indicator variables from

National Vision (internet channel) and US Vision (retail channel), he found that "99-100% of customers in *both* of these datasets had at least one overcharge transaction during the damages period." (Doc. S-722 at 16 (citing Doc. S-723 at 18 (Williams 2d Supp. Decl. ¶¶ 22-24) (emphasis added))).

Plaintiffs also sight to a subsequent declaration prepared by Dr. Williams, dated December 4, 2017, in which he further "refined his overcharge estimates," considering additional data from National Vision - Internet Channel, and US Vision. (Doc. S-722 at 11); (see Doc. S-723 at 18 (Williams 2d Supp. Decl. ¶ 22)). Plaintiffs represent that Dr. Williams also excluded "clearly anomalous transactions from the ABB Yourlens.com database" in compiling this Second Supplemental Declaration. (Doc. S- 722 at 11). According to Plaintiffs, "[u]sing the same standard methodology as before, but with the new data, Dr. Williams finds that more than 96% of class members suffered an antitrust injury when they purchased a disposable contact lens subject to a UPP." Id. at 11. Dr. Williams reached similar results using Dr. Snyder's product-by-product regressions, which he opined "when done properly show that the UPPs injured all or nearly all class members," updating data using net rather than gross prices, using a "before-during" approach for JJVC UPP lenses, and removing non-ECP sales by ABB Yourlens.com to two discount retailers from the analysis. (Doc. S-722 at 19-20 (citing S-723 at 27-45 (Williams 2d Supp. Decl. ¶¶ 31-32, Tables 1-11, Figures 9-13) ).

Plaintiffs assert that "[b]ecause JJVC imposed UPPs on its legacy products, Dr. Williams compared the same products in the 'before' and 'during' periods. For the other Manufacturer Defendants, Dr. Williams employed standard industry groupings of lens types for comparable non-UPP lenses to calculate 'before' prices in the benchmark period." (Docs. 715 at 10; S-722 at 10). Dr. Williams criticizes Dr. Snyder's use of the "before-during-after" approach to comparing JJVC's prices

because "after JJVC removed its UPPs, it attempted to maintain the retail prices of its contact lenses at levels similar to those in the damages period." (Doc. S-723 at 25 (Williams 2d Supp. Decl. ¶ 29); (Doc. S-651 at 74 (Williams Supp. Decl. ¶ 136 (citing Doc. S-661-62 (JJVC sales call notes)))).

Plaintiffs contend that "[t]he JJVC wholesale prices were lowered not because of UPPs but because JJVC separately recognized its lack of new products and excessively high wholesale prices." (Doc. S-722 at 9, 25-27 (citing inter alia Doc. S-723 at 54 (Williams 2d Supp. Decl. ¶¶ 45-51)). Dr. Williams states that he decided to include JJVC's wholesale prices as a variable in his regression analysis because they were implemented independent of the UPPs, based not just on Laura Angelini's testimony, but also on opinions set forth in Dr. Solow's unchallenged Supplemental Report. (Doc. S-723 at 54 (Williams 2d Supp. Decl. ¶ 46 (citing Doc. S-650 at 13 (Solow Supp. Report ¶ 24))); (see also Doc. S-661-128 at 3-4, 8 (Angelini Dep. at 57-58, 140 ("These [wholesale prices and UPPs] were two separate work streams in our pricing strategy." . . . "[F]irst we changed the selling price, and then we implemented the UPP. . . [I]t was done over the course of a short period of time, and these were two separate actions."))). Additionally, to the extent that JJVC's wholesale prices are "connected" and "exogenous" to the UPPs as opposed to "dependent" on JJVC's UPPs, they may still be properly included as a variable in the regression analysis. (Doc. S-723 at 55 (Williams 2d Supp. Decl. ¶ 47)). According to Plaintiffs, even assuming that wholesale prices were not endogenous and should not be included as an independent variable in determining JJVC's regressions, "whether one includes or excludes wholesale prices, the before-during regressions analyses demonstrate that all or nearly all class members suffered antitrust impact and damages." (Doc. S-722 at 27 (citing Doc. S-723 at 57, 105-106 (Williams 2d Supp. Decl. ¶¶ 51-52 and Tables A31 and A32)).

Plaintiffs respond that Dr. Williams' decision to shorten the damages period for class members

who purchased B&L lenses through 1-800-Contacts, was a result of the ruling by the United States

Court of Appeals for the Tenth Circuit Court upholding the State of Utah's statutory prohibition of

UPP enforcement, which took effect in June 2015. Inasmuch as 1-800-Contacts is headquartered in

Utah, the company responded to the court ruling by lowering prices, and "as to sales by 1-800-

Contacts, the B&L UPP effectively ended by July 1, 2015." (Doc. S-722 at 22-24 (citing Doc. S-651

at 77 (Williams Supp. Decl. ¶ 140 n.251)). Dr. Williams states that he did not see similar price

reductions to UPP lenses manufactured by JJVC and Alcon. (Doc. S-651 at 77 (Williams Supp. Decl.

¶ 140 n.251)).

Plaintiffs repeat their argument that Dr. Williams' use of averages is appropriate because each

contact lens product had a single minimum price under Defendants' UPPs, and contend that Dr.

Williams in his two supplemental declarations, "confirms his findings that all or almost all Class

members are impacted using both customer-specific regressions and even Dr. Snyder's product

specific overcharge regressions." (Docs. 715 at 13-14; S-722 at 13-14). Dr. Williams disputes

Defendants' anecdotally based assertion that three named Plaintiffs did not suffer antitrust injury,

noting that the anecdotal examples represent 6 out of 3,880,525 transactions for UPP products, and

includes transactions with settled CV and transactions outside of the damages period. (Doc. S-723 at 9

(Williams 2d Supp. Decl. ¶ 11)). He also counters that the named Plaintiffs would have received the

same manufacturer rebate in a "but for" world; would have paid the higher prices on UPP products for

remaining transactions or non-ECP purchases made during the damages period; or would have paid

even less for UPP contact lenses after insurance reimbursement in the "but for" world. Id. at 9-11

(Williams 2d Supp. Decl. ¶¶ 11-16). Countering Defendants experts Drs. Snyder and Cremieux, Dr.

Williams states:

> In sum, comparing, in isolation from other products in the same market and
> without controlling for other factors that may affect prices: (1) the actual
> price paid (by any specific class member) on a product that was at the time
> of purchase subject to a UPP to (2) the actual price paid (by the same class
> member) on the same product when the product was not subject to a UPP
> provides no useful information regarding that individual class member's
> overcharges. Neither does that comparison provide a valid test for whether
> my regression analysis (which uses the well-known and widely accepted
> dummy variable regression methodology) [footnote omitted] demonstrates
> common impact.

(Doc. S-723 at 8-9 (Williams 2d Supp. Decl. ¶ 10)). Dr. Williams contends that Dr. Snyder's

comparisons, in isolation from other customers and other products in the same market is not supported

by science or peer-reviewed literature. Id. at 12 (Williams 2d Supp. Decl. ¶ 16); see also id. at 23-24

(Williams 2d Supp. Decl ¶¶ 26-28 (criticizing Dr. Snyder's "product- specific overcharge

regressions")). He also disputes Defendants' assertion that he failed to consider the effect of

discounts, and responds that he took discounts into account in 23,466,264 (or 99.8 %) observations,

comprising 97.2% of total sales in his datasets. Id. at 46 (Williams 2d Supp. Report ¶ 34)).

### 4. **Discussion**

Rebuttal or reply expert reports are "intended solely to contradict or rebut evidence on the same

subject matter identified by another party . . . ." Fed. R. Civ. P. 26(a)(2)(D)(ii). "Rebuttal expert

reports are proper if they contradict or rebut the subject matter of the affirmative expert report." Leaks

v. Target Corp., No. CV414-106, 2015 WL 4092450, at *3 (S.D. Ga. July 6, 2015). "The test under

Rule 26(a)(2)(D)(ii) is not whether a rebuttal report contains new information, but whether it is

'intended solely to contradict or rebut evidence on the same subject matter' of an opponent's expert

report." Teledyne Instruments, Inc. v. Cairns, No. 6:12-cv-854-Orl-28TBS, 2013 WL 5781274, at *17

(M.D. Fla. Oct. 25, 2013). "[R]ebuttal and reply reports 'may cite new evidence and data so long as

the new evidence and data is offered to directly contradict or rebut the opposing party's expert.'"

Withrow v. Spears, 967 F. Supp. 2d 982, 1002 (D. Del. 2013) (quoting Glass Dimensions, Inc. ex rel.

Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State St. Bank & Trust Co., 290 F.R.D. 11, 16

(D. Mass. 2013)).

Defendants have not challenged Dr. Williams' Supplemental Declarations as untimely or

procedurally improper. Moreover, Defendants had an adequate opportunity to respond to Dr.

Williams' Supplemental Declaration, (see Docs. 674, S-681), and to depose Dr. Williams' regarding

his Supplemental Declaration . (See Docs. 668; S-682-10). The Court finds that the Supplemental

Declarations are proper rebuttal, and discovery is ongoing. (See, e.g. Docs. 361, 749, 815).

Defendants do challenge the admissibility of Dr. Williams' Supplemental Declaration under *Daubert*.

The crux of Defendants' argument that Dr. Williams' opinions should be discounted and not

considered in support of Plaintiffs' Motion for lass Certification is that

> there is no class-wide method for determining whether someone was
> impacted by the existence of UPPs and averages cannot *accurately* answer
> that question for any member of the putative class given different types of
> contact lenses sold under different pricing strategies by a multitude of
> different retailers, compounded by different insurance policies, rebate
> offerings, and discounts that can impact the out-of-pocket cost to any
> individual consumer."

(Docs. 693 at 5; S-720 at 5) (emphasis added); see also id. at 9. At the evidentiary hearing, Dr. Snyder

testified that it was inappropriate to apply a regression model to the circumstances of this case.

The Court recognizes that courts are split regarding the viability and reliability of regression

models to prove classwide impact; Plaintiffs and Defendants cite to numerous cases supporting their

respective positions. But addressing the specific facts of this case, as set forth in the evidence

100

proffered by Plaintiffs' through their experts Drs. Williams and Solow, the Court concludes that in this case, a multiple regression analysis is a sufficiently reliable and appropriate means to establish class wide impact of alleged illegal antitrust conduct setting minimum consumer prices. By their very nature, multiple regression models illustrating the average effect on price will necessarily have some individuals paying more after implementation of the UPP and some paying less. That individuals may not establish that they indeed paid more for their contact lenses during the UPP-period goes to individual damages, not predominance. What Dr. Williams' Report and subsequent declarations demonstrate is the "impact" of UPPs on retail prices of contact lenses for which UPPs were implemented. The impact can indeed be demonstrated with different permutations, for instance, by product or by manufacturer, as discussed by Defendants' expert Dr. Snyder. But the detailed observations of individual products sold by individual retailers is a question for the determination of damages for class members, and does not derail Plaintiffs' proffered evidence and expert opinion that impact can be demonstrated on a classwide basis.

While Defendants' experts have identified possible flaws and weaknesses in Plaintiffs' experts' reports, their critiques do not disqualify Plaintiffs' experts from proffering evidence and opinions in support of Plaintiffs' Motions for Class Certification. After conducting a full and rigorous *Daubert* review of Plaintiffs' experts' reports, and evaluating and weighing Defendants' conflicting experts' reports, the Court determines that Plaintiffs' experts opinions and reports are sufficiently reliable and persuasive, and are admissible for the Court's consideration of Plaintiff's Motion for Class Certification.

C.    **Plaintiffs' Motion for Class Certification**

Having denied Defendants' *Daubert* Motions to exclude Plaintiffs' experts Drs. Solow and Williams, the Court turns to Plaintiffs' Motion for Class Certification, evaluating each statutory requirement in turn.

### 1. Standing

Article III of the United States Constitution permits the court to hear only "Cases" and "Controversies." U.S. Const. art. III, § 2; see Warth v. Seldin, 422 U.S. 490, 498 (1975). Article III standing has three elements: (1) injury in fact to "'a legally protected interest'" that is "'(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;'" (2) "'a causal connection between the injury and the conduct complained of'" that is fairly traceable to the defendant's action; and (3) a likelihood that the injury will be redressed by a favorable decision. Fla. Family Policy Council v. Freeman, 561 F.3d 1246, 1253 (11th Cir. 2009) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)).

Prior to the certification of a class, "the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279-80 (11th Cir. 2000). "[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." Id. at 1280 (citation omitted). "[T]he Court need not decide whether all putative class members must have standing as the Court is empowered to amend an over-inclusive class definition; an over-inclusive class may be remedied "'by refining the class definition rather than by flatly denying class certification on that basis.'" A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co., 321 F.R.D. 688, 695-96 (S.D. Fla. 2017) (quoting Messner v. Northshore Univ. Health Sys., 669 F.3d 802, 825 (7th Cir.

2012)).

While the question of standing appears to relate more to the Rule 23 "typicality" analysis, see Piazza v. Ebsco Indus., Inc., 273 F.3d 1341, 1346 (11th Cir. 2001) ("Typicality also encompasses the question of the named plaintiff's standing, for without individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class." (internal quotation marks and citation omitted)), Defendants raise the question of Plaintiffs' standing in the context of their predominance argument by contending that Plaintiffs cannot establish standing through common evidence on a classwide basis.

Antitrust standing "involves more than the 'case or controversy' requirement that drives constitutional standing." Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1448 (11th Cir. 1991) It requires "an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws. . . . Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws." Id. (citations omitted); see also Omni Healthcare, Inc. v. Health First, Inc., No. 6:13-cv-1509-Orl-37DAB, 2015 WL 275806, at *7 (M.D. Fla. Jan. 22, 2015). The Eleventh Circuit employs a two-pronged test to determine whether a plaintiff has antitrust standing. See Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp., 604 F.3d 1291, 1299 (11th Cir. 2010). "[F]irst, the plaintiff must have alleged an antitrust injury." Id. An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Second, "the plaintiff must be an efficient enforcer of the antitrust laws." Palmyra, 604 F.3d at 1299. The "efficient enforcer" requirement ensures that a "particular plaintiff will efficiently vindicate the goals of the

antitrust laws." <u>Todorov</u>, 921 F.2d at 1452; <u>see also</u> <u>Omni Healthcare, Inc.</u> 2015 WL 275806, at *7.

Antitrust standing "can be established by showing that consumers paid higher prices for a product due

to anticompetitive actions of a defendant, such as a horizontal market allocation scheme." <u>In re Online</u>

<u>DVD-Rental Antitrust Litig.</u>, 779 F.3d 914, 922 (9th Cir. 2015).

Related to Defendants' argument regarding individualized impact, Defendants assert that

Plaintiffs cannot show injury and standing on a class-wide basis using common evidence. (Docs. 505

at 12, 15, 23, 52; S-540 at 12, 15, 23, 52). "'[I]mpact' (or 'injury-in-fact') and 'damages' are two

distinct elements of an antitrust claim - injury-in-fact is *whether* the plaintiffs were harmed and

damages quantify *by how much*." <u>In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.</u>,

256 F.R.D. 82, 88 (D. Conn. 2009) (emphasis in original).  To establish standing, Defendants contend

that Plaintiffs must prove that the specific retailer from which he or she purchased contact lenses

conspired with Defendants regarding the UPP price. (Docs. 505 at 12, 15; S-540 at 12, 15). "[T]he

only way to determine whether a putative class member purchased contact lenses from an iECP who

participated in the alleged conspiracy is to inquire into the iECP's dealings with the manufacturer or

distributor from whom s/he purchased lenses." <u>Id.</u> at 52-53.  Defendants contend that ECPs of the

proposed class representatives provided unrebutted testimony that they did not participate in the

alleged conspiracy.  <u>Id.</u> at 53 (citing declarations and deposition testimony of ECP's).

As noted by the District Court for the Southern District of Florida, there is no "binding

precedent requiring that a district court speculatively determine whether every putative class member

has Article III standing." <u>A & M Gerber Chiropractic</u>, 321 F.R.D. at 695.  The Eleventh Circuit holds

that the district court must, at a minimum, be satisfied that at least one named plaintiff has Article III

standing.  <u>Prado–Steiman</u>, 221 F.3d at 1279) (Prior to the certification of a class and before

undertaking any analysis under Rule 23, the Court "must determine that at least one named class representative has Article III standing to raise each class subclaim."); see also A&M Gerber Chiropractic, 321 F.R.D. at 695-96; Veal v. Crown Auto Dealerships, Inc., 236 F.R.D. 572, 577 (M.D. Fla. 2006).

Plaintiffs may prove the existence of an antitrust agreement by circumstantial evidence.  In this context, they may through evidence establish the alleged conspiracy to set and enforce minimum prices on consumers circumstantially, as opposed to with direct evidence.  Plaintiffs also contend that large retailers' prices were also implicated by Defendants' alleged antitrust conduct.  Thus, testimony that ECPs did not "participate" in the alleged conspiracy may be countered by circumstantial evidence that they too were subject to and required to charge at least the UPP minimum price for the covered conduct lens products, or risk losing access to them.  To the extent that ECP conspiracy participation is required, Defendants' concern that the proposed class definitions may include putative class members who did not purchase from an ECP who participated in the alleged conspiracy, and therefor lacked standing, can be remedied by narrowing the scope of the class.  See A & M Gerber Chiropractic, 321 F.R.D. at 696; see also Bouton v. Ocean Properties, Ltd, 322 F.R.D. 683, 693 (S.D. Fla. 2017) ("[A] plaintiff may seek to certify a class definition *narrower* than the one proposed in the operative pleading." (emphasis in original)).

Defendants argue that as indirect purchasers of contact lenses, Plaintiffs lack standing to assert their antitrust claims because their alleged injuries are too remote and speculative.  (See Docs. 674 at 21; S-681 at 21).  They argue that "Plaintiffs cannot show standing without looking at each consumer, each ECP, and each transaction one by one."  Id.  (citing Illinois Brick Co. v. Illinois, 431 U.S. 720, 729-36 (1977)); (see also Docs. 505 at 12, 13, 23-24, 52-54; S-540 at 12, 13, 23-24, 52-54).

Defendants contend that Plaintiffs are unable to establish with common evidence, and that the

evidence belies, that ECPs participated in the alleged conspiracy or even paid heed to the UPPs.

(Docs. 674 at 21-22; S-681 at 21-22).

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or

property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover

threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15

U.S.C. § 15(a). As set forth above, antitrust injury is

> injury of the type the antitrust laws were intended to prevent and that flows
> from that which makes defendants' acts unlawful. The injury should reflect
> the anticompetitive effect either of the violation or of anticompetitive acts
> made possible by the violation. It should, in short, be "the type of loss that
> the claimed violations . . . would be likely to cause."

Brunswick, 429 U.S. at 489 (quoting Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 125

(1969)). "The antitrust injury requirement ensures that the plaintiff, although motivated by private

interests, is seeking to vindicate the type of injury to the public that the antitrust laws were designed to

prevent." Palmyra, 604 F.3d at 1299.

In Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977) the Supreme Court narrowly interpreted

Section 4, and held that under Section 4, indirect purchasers of price-fixed products—that is, persons

who pay an overcharge only after it has been passed on to them through middlemen—suffer no

antitrust injury and thus lack standing to sue. The Court held that an indirect purchaser of a product

cannot sue a distant manufacturer for alleged antitrust violations under a "pass-on" theory—meaning a

theory that the intermediary passed on the unlawful overcharges through the distribution channel to

them. Illinois Brick, 431 U.S. at 729-36; see also Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392

U.S. 481, 488-94, (1968) (prohibiting a manufacturer from asserting a pass-on defense against the direct purchaser of its product); Glynn-Brunswick Hosp. Auth. v. Becton Dickinson and Co., 159 F. Supp. 3d 1361, 1369-70 (S.D. Ga. 2016) (citing Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 208-12 (1990) (holding that only a customer who purchases goods directly from an alleged antitrust violator has standing to bring claims under Section 4, even if the direct purchaser passes on the entirety of the unlawful overcharges to its downstream customers)). The Supreme Court recognized several rationales for the direct purchaser rule of Illinois Brick: (1) it eliminates the complication of apportioning overcharges among purchasers in the chain of distribution; (2) it eliminates a pass-on defense for manufacturers, which would reduce the effectiveness of Clayton Act actions by diminishing the recovery available to plaintiffs; and (3) it eliminates the risk of multiple or duplicative recoveries by direct and indirect purchasers. Kansas v. Utilicorp United, Inc., 497 U.S. at 206-207; see Illinois Brick, 431 U.S. at 730-31, 745-47.

> The Supreme Court, however, has recognized that the rationales underlying the direct purchaser rule "will not apply with equal force in all cases." UtiliCorp, 497 U.S. at 216. Accordingly, the Supreme Court has enumerated two exceptions to the rule, which provide for indirect purchaser standing "where there is a preexisting cost-plus contract or where the direct purchaser is owned or controlled by its customer." Lowell v. Am. Cyanamid Co., 177 F.3d 1228, 1229 n. 2 (11th Cir. 1999) (citing Illinois Brick, 431 U.S. at 735-36 & n. 16). . . . Nevertheless, the Eleventh Circuit Court of Appeals has determined that the direct purchaser standing rule simply does not apply in the case of a vertical conspiracy, with no allegations of pass on, "where the plaintiff has purchased directly from a conspiring party in the chain of distribution." Lowell, 177 F.3d at 1230, 1232.

Glynn-Brunswick Hosp. Auth., 159 F. Supp. 3d at 1370-71. "[F]or the indirect purchaser to merit standing under this exception, the conspiracy must fix the price paid by the plaintiffs." In re ATM Fee

Antitrust Litig., 686 F.3d 741, 749 (9th Cir. 2012).

Illinois Brick does not preclude automatically an antitrust claim by the Plaintiffs as indirect

purchasers:

> Illinois Brick does not limit suits by consumers against a manufacturer who
> illegally contracted with its dealers to set the latter's resale price. The
> consumer plaintiff is a direct purchaser from the dealer who, by hypothesis,
> has conspired illegally with the manufacturer with respect to the very price
> paid by the consumer. There is no problem of duplication or apportionment
> because the consumer is the only party who has paid any overcharge.
> Although the manufacturer did not sell directly to the consumer, he is a
> fellow conspirator with the direct-selling dealer and therefore jointly and
> severally liable with the dealer for the consumer's injury.

Lowell, 177 F.3d at 1230 (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law 264 (rev.

ed.1995)). In Lowell, the plaintiffs sued an upstream supplier for conspiring with middlemen

distributors to set a "minimum resale price"—the price at which the distributors would sell the

supplier's products to the plaintiffs and other customers - in violation of Section 1 of the Sherman

Act, 15 U.S.C. § 1. Id. at 1228-29. The Eleventh Circuit held that the plaintiffs had standing to sue

the supplier, because the direct purchaser rule is inapplicable "where the plaintiff has purchased

directly from a conspiring party in the chain of distribution." Id. at 1232. The Court reasoned that the

rationales for the direct purchaser rule do not apply "to the very different case of vertical conspiracy

with no allegations of passing on." Id. at 1230. The Eleventh Circuit recognized that vertical price-

fixing involved conspiracies between retailers, distributors and manufacturers to maintain artificially

high resale prices, and found that there were no problems of double recovery because only one illegal

act (the vertical conspiracy) was present and only one set of potential plaintiffs existed. Id. Plaintiff

purchasers were permitted to proceed against the manufacturer alone, not including the middlemen

distributors, "for the full cost of the conspiracy with the dealers." 177 F.3d 1230.  In short, the

Eleventh Circuit has determined that "the direct purchaser rule does not apply in the case of a vertical

conspiracy." Glynn-Brunswick Hosp. Auth., 159 F. Supp. 3d at 1374.

Though in another context, Plaintiffs' counsel has argued that the decision to name the

Defendant Manufacturers and ABB as defendants, and to not include retailers and ECPs as defendants

does not defeat their standing under Illinois Brick.  This is because

> [U]nlike the typical horizontal cartel case, there is no overcharge to be
> passed down a distribution chain from manufacturer to wholesaler to
> retailer to consumer.  Rather, there is a *single* overcharge paid *only* by the
> class of consumers who purchased lenses subject to a UPP, regardless of
> which retailer or ECP sold the lens.  In other words, the UPPs do not
> require Costco, for example, to *pay* an artificially increased price for the
> lenses.  They only require Costco to *sell* the lenses at a supra-competitive
> price.  Accordingly, there is only one class of consumer plaintiffs in this
> case - and they are all direct purchasers.

(Doc 150 at 7-8) (citing to Lowell, 177 F.3d at 1230, Plaintiffs contend that all purchasers are "direct

purchasers" in both the alleged horizontal and a vertical conspiracies to fix minimum resale prices.

Id. at 8-9.

Plaintiffs allege, and present evidence through the testimony and opinion of Dr. Solow, that the

distributors either agreed to the UPPs or were forced to implement the UPPs under threat from the

Manufacturer Defendants of losing their ability to sell the product, making the so-called middle

distributors part of the vertical conspiracy chain, contemplated by the Supreme Court's UtiliCorp and

the Eleventh Circuit's Lowell exception.  Plaintiffs allege a conspiracy with one goal - to fix the price

paid by Plaintiff consumers.  They do not allege a "pass on" of the higher price.  Under these facts,

Plaintiffs have purchased contact lenses "directly" from a "conspiring party," satisfying the exception

set forth in <u>Lowell</u>.  Plaintiffs cite to evidence that the Manufacturer Defendants set the retail price to be paid by the Plaintiffs as consumers, and that the Defendant Manufacturers threatened all middle retailers in the vertical chain, be they ECPs or discount retailers, that they would stop distributing the UPP to any retailer who sold the product for less than the UPP.

Defendants' concern that the proposed class definitions may include putative class members who did not purchase from an ECP who participated in the alleged conspiracy, and therefor lacked standing, can be remedied by narrowing the scope of the class.  See <u>A & M Gerber Chiropractic</u>, 321 F.R.D. at 396; <u>see also</u> <u>Bouton</u>, 322 F.R.D. at 693 ("[A] plaintiff may seek to certify a class definition *narrower* than the one proposed in the operative pleading." (emphasis in original)).

Turning to Plaintiffs' standing to assert a horizontal conspiracy between Defendants, Plaintiffs' allege that the Plaintiffs who purchased contact lenses manufactured by the Manufacturer Defendants that were subject to a UPP during the Class Period paid a higher price for the product as a result of the UPPs.  They present evidence to this effect through Drs. Solow and Williams.  Plaintiffs assert, through Dr. Solow, that Defendants engaged in a "hub-and-spoke" antitrust conspiracy, involving a horizontal agreement between the Manufacturer Defendants.  Where a plaintiff alleges antitrust injury from its purchases of a product at prices inflated by a horizontal conspiracy, the standing analysis is also subject to the "direct purchaser" rule.  See <u>Animal Sci. Prod., Inc. v. China Minmetals Corp.</u>, 34 F. Supp. 3d 465, 491 (D.N.J. 2014).

Plaintiffs allege and through Dr. Solow present evidence of a multi-level "hub-and-spoke" conspiracy involving a  horizontal conspiracy between the Manufacturer Defendants to enact the UPPs, with vertical "spokes" facilitated by ABB and the ECPs, resulting in increased prices reaching the

consumer Plaintiffs through vertical means.  In this context, <u>Lowell's</u> co-conspirator exception to

<u>Illinois Brick</u> is applicable, and Plaintiffs have standing to assert their horizontal conspiracy claim.  In

<u>State of Ariz. v. Shamrock Foods Co.</u>, 729 F.2d 1208, 1211 (9th Cir. 1984), plaintiffs alleged that

dairy producers engaged in horizontal conspiracy to raise prices, and that retail intermediates, the

grocery stores, were co-conspirators with the dairy producers to fix the price of dairy products at the

retail level.  The court determined that <u>Illinois Brick</u> did not apply and that the plaintiff consumers had

standing to sue the dairy producers because they alleged that the "retail price was the one fixed," and

that their theory of recovery did not depend on pass-on of damages.  <u>Shamrock Foods</u>, 729 F.2d at

1211; <u>see generally</u> <u>Glynn-Brunswick Hosp. Auth.</u>, 159 F. Supp. 3d at 1374 & n. 8.

      As in <u>Shamrock Foods</u>, Plaintiffs limit their claims to alleged retail overcharges, and are not

alleging pass-through damages from a wholesale price through a distribution chain of the type barred

by <u>Illinois Brick</u>.  <u>See</u> Complaint ¶ 48 (Plaintiffs are persons "who made a retail purchase or purchases

of disposable contact lenses.");   ¶ 78 ("The disposable contact lens market also encompasses a Retail

Submarket in which Plaintiffs are consumers.").  In the context of this case, Plaintiffs are not the

typical "indirect purchasers" through a distribution chain from a horizontal conspiracy.  They allege,

and the testimony of Dr. Solow at this juncture sufficiently establishes that Defendants agreed to set

minimum <u>consumer</u> prices.  For this reason, Plaintiffs are more properly considered as "direct

purchasers" from the alleged horizontal conspiracy.  (<u>See</u> Doc. 50 at 7-8).  By limiting their claims to

retail prices, Plaintiffs eliminate the risk of duplicative recovery by intermediate direct purchaser

distributors of the type sought to be avoided by the <u>Illinois Brick</u> doctrine.  National optical chains,

mass merchandisers, and club stores' claims against the Defendants necessarily would involve

damages caused by wholesale prices and restrictions on the price they could set to sell UPP-restricted

lenses, which are not duplicative of Plaintiffs' alleged injury of paying higher retail prices as a result of the Defendants' alleged horizontal and vertical conspiracies to enact and enforce the UPPs. See Shamrock Foods Co., 729 F.2d at 1213-14. Plaintiffs have antitrust standing to challenge Defendants' alleged conspiracy because their injury, paying higher prices for contact lens products subject to a UPP is "inextricably intertwined with the injury the conspirators sought to inflict on . . . the. . . . market." Blue Shield of Va. v. McCready, 457 U.S. 465, 479, 484 (1982) (holding that group health plan subscriber had antitrust standing because she was injured as a direct result of the anticompetitive scheme to deny reimbursement to patients who were treated by psychologists instead of medical doctors, implemented to accomplish the exclusion of psychologists; the injury suffered by the Plaintiff was not too remote from the antitrust violation because the plaintiff's injury was not only foreseeable, but was a "necessary step in effecting the ends of the alleged illegal conspiracy."). Their alleged injury is not remote, but rather is precisely the sort that the Defendants intended, that is, paying a set anticompetitive minimum price to protect the prescription-writing ECPs' interest in charging sufficient prices for contact lenses to ensure their profit margins. This is exactly the type of injury that the antitrust laws were intended to prevent.

Dr. Solow opines that the direct prescribing ECPs, which comprise up to 64% of the sales of contact lens to consumers, lent "extensive support and involvement" in the implementation of the UPPs. (E.g. Doc. S-405 at 5, 15, 19, 38, 40-42, 48-49, 52-54, 63 (Solow Report ¶¶ 4, 20, 31, 67, 72, 73, 87, 93-96, 110)). Additionally, Dr. Williams opines that UPPs caused prices charged by ECPs and national optical chains, mass merchandisers, wholesale clubs and online retailers, which traditionally charge charged less for contact lenses than ECPs, (see Doc. S-405 at 14-16 (Solow Report ¶¶ 22-24)), to increase, under threat of loss of the brand. Putative class members are not remote purchasers

through a long distribution chain; they are the target of the alleged horizontal and vertical interlocking conspiracies. Plaintiffs through Drs. Solow's and Williams' opinions, have provided a reasonable method for determining on a class-wide basis whether and to what extent that alleged retail overcharge created by the UPPs was maintained and imposed directly on each putative plaintiff. The Court determines that Plaintiffs' have standing to assert both their horizontal and vertical antitrust claims.

The California subclass is not affected by Illinois Brick standing concerns, to the extent it is proceeding under the California Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 et); and the California Unfair Competition Law ("UCL") (Cal. Bus. and Prof. Code §§ 17200 et seq.)). See Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 991 (9th Cir. 2000) (regarding the Cartwright Act); Clayworth v. Pfizer, Inc., 233 P.3d 1066 (Cal. 2010) (finding that indirect-purchaser pharmacies had standing to bring suit under that Cartwright Act and the UCL). However, the parties did not cite, and the Court could not locate authority supporting that the Maryland Antitrust Act, Md. Code Ann., Com. Law § 11-201 et seq. ("MATA") is not subject to Illinois Brick standing limitations for indirect purchasers. See Davidson v. Microsoft Corp., 143 Md. App. 43, 56, 792 A.2d 336, 344 (Md. Ct. Spec. App. 2002) ("In summary, Illinois Brick controls the issue of whether a purchaser has sustained an injury under MATA, meaning that only direct purchasers may bring suit to recover an alleged illegal overcharge."). However, for the reasons set forth above, both the California and Maryland putative class has standing.

## 2. Ascertainability

"Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly

ascertainable." Little v. T-Mobile USA, Inc., 691 F.3d 1302, 1304 (11th Cir. 2012) (citation omitted).

"An identifiable class exists if its members can be ascertained by reference to objective criteria," and

that identification is "administratively feasible," meaning "that identifying class members is a

manageable process that does not require much, if any, individual·inquiry." Bussey v. Macon Cty.

Greyhound Park, Inc., 562 F. App'x 782, 787.(11th Cir. 2014) (citations omitted). "Class members

need not actually be ascertained prior to certification, but each individual's class membership must be

ascertainable at some stage in the proceeding." Bush v. Calloway Consol. Grp. River City, Inc., No.

3:10-cv-841-J-37MCR, 2012 WL 1016871, at *4 (M.D. Fla. Mar.·26, 2012) (citation omitted).

Plaintiffs argue in their Motion for Class Certification that the "[c]lass members are easily

identifiable because they purchased specific contact lenses manufactured by one of the [Manufacturer

Defendants] in the United States (or California or Maryland) during the period UPPs were in effect

pursuant to ECP prescriptions." (See also Docs. 396 at 19; S-404 at 19); (Docs. 611 at 24-25; S-649 at

24-25).

Defendants respond that the proposed classes are "overbroad because they include consumers

who purchased from retailers of all kinds, even though Plaintiffs allege only that [independent] ECPs

conspired with Defendants." (Docs. 505 at 17; S-540 at 17); (see also Docs. 674 at 25; S-681 at 25).

They argue Plaintiffs' proposed class definitions include consumers who purchased from not just

ECPs, but from "all ECPs and retailers," which can include those ECPs and retailers who were not part

of the alleged conspiracy." Id. at 60. As a result, "[a]lmost half of the putative class members may

have purchased from retailers not alleged to be part of the conspiracy - e.g., national, regional and

online retailers, and bigbox stores." (Docs. 674 at 26; S-684 at 26 (citing Doc. S-537 at 116

(Cremieux Report Ex. 4A))); Doc. 395 at 26-27 (Complaint ¶¶ 79-80)). They contend that the only

way to identify who is a co-conspirator ECP "is to conduct an individualized analysis of who supposedly conspired with whom, and which putative class members bought contact lenses from those who conspired." (Docs. 505 at 17; S-540 at 17); (see also Docs. 674 at 26; S-681 at 26).  In addition to overbreadth, Defendants argue that putative class members cannot be identified absent individualized inquiry into whether the putative class member actually purchased UPP-covered contact lenses from an ECP who participated in the alleged conspiracy.  Id. at 61-62; (see also Docs. 674 at 27; S-681 at 27 (arguing that the evidence establishes that consumers purchased contact lenses for which there was a UPP price in place, but that the actual price for the lens was not set "pursuant to a UPP.").  Defendants also question Plaintiffs' class definition that includes putative class members who made retail purchases "where the prices for such contact lenses were set pursuant to a 'Unilateral Pricing Policy,'" contending that retailers 1-800-Contacts, Luxottica, and "most of the named Plaintiffs' own ECPs did not price 'pursuant to UPP.'" (Doc. S-540 at 62 (citing Doc. S-537 at 166-172 (Cremieux Report Exhibits comparing 1-800-Contacts prices for selected lenses); Doc. S-541-1 at 2 (Chang Decl. ¶ 7); Doc. S-541-3 at 3 (Huynh Decl. ¶ 5); Doc. S-541-6 at 3 (Prange Decl. ¶¶ 11, 14)); Doc. S-541-7 at 3 (Ruder Decl. ¶ 7)); Doc. S-541-9 at 3-4 (Takeda Decl. ¶ 13)); Doc. S-541-11 at 3-4 (Sudarsky Decl. ¶¶ 6, 11)); Doc. S-541-13 at 4 (Wessels Decl. ¶¶ 9-10 ) (discussing Luxottica Retail North America, Inc. pricing above UPP prices))); Doc. S-541-14 at 3 (Williams Decl. ¶ 6)).  Additionally, Defendants argue that membership in the class requires individual inquiry.

"[A]scertainability at the class certification stage does not require that a plaintiff *actually* identify all class members, but rather, it only requires a plaintiff to demonstrate that class members *can* be identified in reference to objective criteria." PB Prop. Mgmt. 2016 WL 7666179, at *19 (citing Bush 2012 WL 1016871, at *4).  Plaintiffs' claims allege that the contact lens *market* prices were

inflated as a result of the UPPs, affecting all consumers who meet the putative class definitions, regardless of from whom they purchased the UPP-controlled contact lens, and regardless of whether rebates, discounts or insurance payments subsequently reduced the price of the lens. Plaintiffs' contend that "all Class members who bought UPP contact lenses during the period of UPPs were harmed even if they purchased from Discount Retailers." (Docs. 611 at 26; S-649 at 26). Plaintiffs' proposed class definitions are not overbroad, amorphous or vague. The Court finds that the proposed classes can be ascertained by reference to objective criteria. The proposed horizontal class requires that a class member be (a) a resident of the United States, who (b) made a consumer retail purchase of disposable contact lenses manufactured by Alcon, JJVC, or B&L from June 1, 2013 to the present for their own use and not for resale, (c) "where the prices for such contact lenses were set pursuant to a 'Unilateral Pricing Policy' and the purchase occurred during the period when the Unilateral Pricing Policy was in effect," (d) excluding "any purchases from 1-800 Contacts of disposable contact lenses subject to B&L's Unilateral Pricing Policy after July 1, 2015." (Doc. S-649-1). The horizontal subclasses for Maryland and California residents, and the vertical classes by manufacturer, incorporate similar defining language. Id. The Court believes that substituting "subject to a UPP" for "pursuant to a UPP" better describes the putative Plaintiffs' posture.

### 3.   Rule 23(a) Requirements

#### a.   Numerosity

Federal Rule of Civil Procedure 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While "mere allegations of numerosity are insufficient," Rule 23(a)(1) imposes a "generally low hurdle, and a plaintiff need not show the precise

number of members in the class." Manno v. Healthcare Revenue Recovery Grp., LLC, 289 F.R.D.

674, 684 (S.D. Fla. 2013) (citations omitted); see Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1267

(11th Cir. 2009); Evans v. U.S. Pipe & Foundry Co., 696 F.2d 925, 930 (11th Cir. 1983) (stating that

the class representative is not required to establish the exact number in the proposed class).

"'Nevertheless, a plaintiff still bears the burden of making *some* showing, affording the district court

the means to make a supported factual finding that the class actually certified meets the numerosity

requirement.'" Manno, 289 F.R.D. at 684 (emphasis added) (quoting Vega, 564 F.3d at 1267). The

numerosity requirement is met when it would be inconvenient or difficult to join all of the class

members. Terazosin Hydrochloride, 220 F.R.D. at 684-85. Courts may also take into account other

factors under Rule 23(a)(1), "including 'the geographic diversity of the class members, the nature of

the action, the size of each plaintiff's claim, judicial economy and the inconvenience of trying

individual lawsuits, and the ability of the individual class members to institute individual lawsuits.'"

Id. at 685 (citing Walco Inv., Inc., v. Thenen, 168 F.R.D. 315, 324 (S.D. Fla. 1996)).

Plaintiffs estimate that the proposed class will "number in the tens of millions," based upon

Dr. Solow's observation that 41 million Americans wear disposable contact lenses. (Docs. 396 at 20;

S-404 at 20 (citing Doc. S-405 at 12 (Solow Report ¶ 19 (citing contact lens industry publication)))).

Noting that the Court in MDL 1030 observed that "[n]umerosity does not appear to be an issue in this

case," see In re Disposable Contact Lens Litig., 170 F.R.D. at 529, Plaintiffs argue that joinder of

millions of proposed class members would be "impracticable." (Docs. 396 at 20; S-404 at 20).

Defendants do not dispute that Plaintiffs have met the Rule 23 numerosity requirement.

Considering the number of putative class members, their geographic diversity, the relatively

small size of their individual claims, the inconvenience of trying individual lawsuits, and the ability of

individual class members to institute individual lawsuits, the Court finds that Plaintiffs have met their burden in establishing that the proposed classes are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

> **b.   Commonality**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality pertains to the characteristics of the group or class as a whole, unlike typicality which refers to the individual characteristics of the class representative as compared to those of the class members. Piazza, 273 F.3d at 1346 (citing Prado-Steiman, 221 F.3d at 1279). Commonality "does not require complete identity of legal claims." Johnson v. Am. Credit Co. of Ga., 581 F. 2d 526, 532 (5th Cir.1978). In fact, commonality can be satisfied even with some factual variations among class members. Armstead v. Pingree, 629 F. Supp. 273, 280 (M.D. Fla.1986). In Wal-Mart Stores, Inc. v. Dukes, supra, the Supreme Court clarified the commonality requirement for class certification by specifically rejecting the use of generalized questions to establish commonality. Noting that "any competently crafted class complaint literally raises common questions," 564 U.S. at 349 (citation omitted), the Court focused the required discussion as follows:

> What matters to class certification . . . is not the raising of common "questions" - even in droves - but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Id. at 350 (citation omitted). The Court explained that the "common contention" underpinning a finding of Rule 23(a) (2) commonality "must be of such a nature that it is capable of classwide resolution - which means that determination of its truth or falsity will resolve an issue that is central to

the validity of each one of the claims in one stroke." Id. "Commonality requires the plaintiff to

demonstrate that the class members 'have suffered the same injury.'" Id. at 350 (quoting Falcon, 457

U.S. at 157).

> [Plaintiffs'] claims must depend upon a common contention . . . . That
> common contention, moreover, must be of such a nature that it is
> capable of classwide resolution - which means that determination of its
> truth or falsity will resolve an issue that is central to the validity of each
> one of the claims in one stroke.

Id. "'[F]or purposes of Rule 23(a)(2) even a single common question will do.'" Carriuolo, 823 F.3d at

984 (quoting Dukes, 564 U.S. at 359) (quotations omitted). "Commonality requires that there be at

least one issue whose resolution will affect all or a significant number of the putative class members."

Williams v. Mohawk Indus., Inc., 568 F. 3d 1350, 1355 (11th Cir. 2009) (internal quotation marks and

citation omitted). The "commonality" requirement carries a "light burden," demanding "only that

there be 'questions of law or fact common to the class.' . . . This part of the rule 'does not require that

all the questions of law and fact raised by the dispute be common,' . . . or that the common questions

of law or fact 'predominate' over individual issues." Vega, 564 F.3d at 1268 (citations omitted); see

also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624 (1997) (observing that the "commonality

requirement" is less demanding that the "predominance" requirement).

Plaintiffs allege that the individual Class Representatives purchased contact lenses

manufactured by one of the four Manufacturer Defendants all subject to a UPP. The Individual Class

Representatives (and their location and product purchased) are:

119

| Name | State | Defendant-Lens |
|---|---|---|
| Rachel Berg | WI | Alcon Air Optix Colors |
| Alexis Ito | CA | Alcon Dailies Total 1 |
| Miriam Pardoll | FL | Bausch & Lomb Ultra |
| Jennifer Sineni | MO | Bausch & Lomb Ultra |
| Pamela Mazzarella | CA | Bausch & Lomb Ultra |
| Joseph Felson | CA | CooperVision Clariti Multifocal |
| Tamara O'Brien | CA | JJVC 1-Day Acuvue Moist |
| Susan Gordon | PA | JJVC 1-Day Acuvue Moist |
| Catherine Dingle | VT | JJVC 1-Day Acuvue Moist |
| Elyse Ulino | FL | JJVC 1-Day Acuvue Moist |
| Amanda Cunha | CA | JJVC Acuvue Oasys |
| Sheryl Marean | ME | JJVC Acuvue Oasys 12 Pack |
| Brett Watson | MD | JJVC Acuvue Oasys for Astigmatism |
| Kathleen Schirf | MD | JJVC Acuvue Oasys for Astigmatism |
| Cora Beth Smith | TN | JJVC Acuvue Oasys with Hydraclear |
| John Machikawa | CA | JJVC Acuvue TrueEye |

Complaint ¶¶ 1, 28-41; (Docs. 396 at 45; S-404 at 45).  Plaintiffs argue that the putative Plaintiffs'

common contention that "Defendants entered into agreements to develop, implement and enforce

UPPs operating as unreasonable restraint of trade" "is capable of classwide resolution." (Docs. 396 at

21; S-404 at 21). Plaintiffs contend that the "commonality" requirement is satisfied because the

following questions of law and fact are common to all claims:

> (1) whether the [Manufacturer Defendants] engaged in a contract, combination, and conspiracy among themselves and with ABB and ECPs to fix, raise, maintain, or stabilize prices of contact lenses in violation of section one of the Sherman Act; (2) whether the UPPs operated as unreasonable restraints of trade; (3) whether Defendants' conduct caused the prices of contact lenses to be sold at artificially high and supra-competitive levels; (4) whether the Defendants' conduct injured Class members, and, if so, the appropriate class-wide measure of damages; and (5) the scope of any injunctive relief available to Class members.

(Docs. 396 at 21-22; S-404 at 21-22) (citing Doc. S-405 at 83-87 (Solow Report ¶¶ 148-156))).

Defendants did not specifically address the commonality requirement of Rule 23(a)(2).

Where a complaint alleges that the Defendants have engaged in a standardized course of

conduct that affects all class members, the commonality requirement will generally be met. See

Williams, 568 F. 3d at 1355. Specifically in the antitrust context, courts in the Eleventh Circuit have

consistently held that allegations of price-fixing, monopolization, and conspiracy by their very nature

involve common questions of law or fact. In re Carbon Dioxide Antitrust Litig., 149 F.R.D. 229, 232

(M.D. Fla.1993); see also Terazosin Hydrochloride, 220 F.R.D. at 685-86 (S.D. Fla. 2004); In re Infant

Formula Antitrust Litig., No. MDL-878, 1992 WL 503465, at *4 (N.D. Fla. Jan.13, 1992).

Plaintiffs cite a number of common questions of law and fact, including whether, under

common principles of antitrust law, Defendants conspired or agreed to set and enforce minimum

consumer prices for their contact lens products; the identity of each member of the alleged conspiracy

and the facts surrounding how it was carried out; and the time period during which the alleged

conspiracy existed.  Because of the many common questions of law and fact applicable to the claims of

all class members, the Court finds that the requirements of Rule 23(a)(2) have been satisfied.  Accord

In re Fla. Cement & Concrete Antitrust Litig., 278 F.R.D. 674, 679 (S.D. Fla.2012) ("[C]ourts have

consistently held that the nature of the antitrust conspiracy action compels a finding that common

questions of fact and law exist.").  The proposed class action could "generate common answers apt to

drive the resolution of the litigation," satisfying the commonality requirement.  See Dukes, 564 U.S. at

350.

        c.    **Typicality**

      Class certification also requires that the claims of the class representatives be typical of those

of the class .  See Fed. R. Civ. P. 23(a)(3).  In order to establish typicality, "there must be a nexus

between the class representative's claims or defenses and the common questions of fact or law which

unite the class."  Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir. 1984).  "A

sufficient nexus is established if the claims or defenses of the class and the class representative arise

from the same event or pattern or practice and are based on the same legal theory."  Id.; see also

Williams, 568 F.3d at 1357; see Falcon, 457 U.S. at 156 ("[A] class representative must be part of the

class and possess the same interest and suffer the same injury as the class members." (citation

omitted)).  When the class representative's injury is different from that of the rest of the class, his

claim is not typical and he cannot serve as the class representative.  See Murray v. Auslander, 244 F.3d

807, 811 (11th Cir. 2001).  Moreover, when proof of the class representative's claim would not

necessarily prove the claims of the proposed class members, the class representative does not satisfy

the typicality requirement.  Brooks v. S. Bell Tel. & Tel. Co., 133 F.R.D. 54, 58 (S.D. Fla.1990).

Thus, commonality traditionally refers to characteristics of the class as a whole, while typicality "refers

to the individual characteristics of the named plaintiff in relation to the class." Prado-Steinman, 221 F.3d at 1279. "Typicality, however, does not require identical claims or defenses." Kornberg, 741 F.2d at 1337. "A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." Id.; see also Appleyard v. Wallace, 754 F.2d 955, 958 (11th Cir. 1985) ("[T]he typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." (citation omitted)), disapproved on other grounds sub nom., Green v. Mansour, 474 U.S. 64 (1985).

Plaintiffs argue that the "typicality" requirement is met because "the Proposed Classes' and Subclasses' claims arise from the same alleged practices of Defendants: their conspiracy to restrict *prices*, which resulted in each Plaintiff paying more for their lenses." (Doc. 396 at 22-23; Doc. S-404 at 22-23) (emphasis in original). They argue that they have met the typicality requirement because all members of the proposed classes have been subjected to increased prices for their contact lenses because of the Defendants' unlawful conduct in connection with the implementation of UPPs. Plaintiffs allege that the same unlawful conduct affected both the class representatives and the class itself.

Defendants assert that the named class representatives are not "typical" of the putative class they purport to represent, arguing that based upon discovery thus far,

> [T]he UPPs either had no effect on the named Plaintiffs or affected them in highly variable and individual ways. For example, many named Plaintiffs were not impacted by any UPP as they paid retail prices far below the UPP price, received manufacturer rebates that reduced their out of pocket cost dramatically (in some cases to $0), obtained ECP/retailer discounts that took the purchase price well below the relevant UPP price,

and/or benefitted from insurance payments that covered all (or almost all)
of their acquisition costs for their contact lenses.

(Doc. 505 at 25); (Doc. S-540 at 25).

"[O]nce the party advancing the class establishes that the same unlawful conduct was directed

at or affected both the class representatives and the class itself, then 'the typicality requirement is

usually met irrespective of varying fact patterns which underlie the individual claims." Terazosin

Hydrochloride, 220 F.R.D. at 687 (quotation and citation omitted) (finding the claims of the consumer

class representative were "not only typical of the claims of all class members, they were virtually

identical in nature, notwithstanding variations in the amount of damages."). The factual distinctions

between some of the named Plaintiffs and the putative class do not negate the shared interest of the

Plaintiffs in proving Defendants' alleged anticompetitive conduct, which they allege caused antitrust

injury. The Court determines that the named class representatives are "typical" of the putative class,

under Rule 23(a)(3).

### d.     Adequacy of Representation

The final requirement for class certification under Rule 23(a) is adequate representation. See

Fed. R. Civ. P. 23(a)(4). A plaintiff can meet this requirement by showing that the class representative

has common interests with the class members and by demonstrating that the class representative will

vigorously prosecute the interests of the class through qualified counsel. Piazza, 273 F.3d at 1346.

The adequacy of representation analysis involves two inquiries: "(1) whether any substantial conflicts

of interest exist between the representatives and the class; and (2) whether the representatives will

adequately prosecute the action." Valley Drug Co., 350 F.3d at 1189 (citation omitted); see also

Amchem Prods., 521 U.S. at 625 ("The adequacy inquiry under Rule 23(a)(4) serves to uncover

124

conflicts of interest between named parties and the class they seek to represent."). "It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent." Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir.2000) (quotation and citation omitted). "[T]he existence of minor conflicts alone will not defeat a party's claim to class certification." Valley Drug, 350 F.3d at 1189. Rather, "the conflict must be a fundamental one going to the specific issues in controversy." Id. "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class" and "the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members." Id. at 1189-90. "The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" Amchem Prods., 521 U.S. at 626 n. 20 (quoting Falcon, 457 U.S. at 157, n. 13).

Plaintiffs contend that "[e]ach named Plaintiff has a common interest in representing all class members, as the alleged conspiracy involves a nationwide plan to eliminat[e] competition." (Docs. 396 at 23; S-404 at 23) (quoting In re Disposable Contact Lens Antitrust Litig., 170 F.R.D. at 532)). They assert:

> There are no conflicts among the Plaintiffs; they are a cohesive group seeking damages from Defendants, share the same cause, raise the same liability questions, and will have their claims decided by the same answers deciding Defendants' misconduct. It is "of no moment" that some Plaintiffs purchased their lenses from one Manufacturer Defendant while others made their purchases from different ones. Plaintiffs allege that all [Manufacturer Defendants] were either a part of one horizontal conspiracy

or entered into identical, anticompetitive vertical agreements.

(Docs. 396 at 23; Doc. S-404 at 23). They point out that Defendants do not argue, and the evidence does not support that any class member actually benefitted from the implementation of the UPPs, which could give rise to a conflict. (Docs. 611 at 27; S-649 at 27). As to class counsel, Plaintiffs assert that class counsel has experience litigating antitrust class actions, and have to resources to commit to the prosecution of Plaintiffs' claims. Plaintiffs' argue that the Court has already determined that class counsel meets the requirements of Rule 23(g)(1)(A)(I)-(iv), and request that the Court make that same finding and appoint Hausfeld LLP, Robins Kaplan LLP, and Scott + Scott LLP as Class Counsel. (Docs. 396 at 24; S-404 at 24).

Defendants contend that "[s]ubstantial conflicts of interest preclude the proposed class representatives from adequately representing all putative class members, including those consumers who paid less for contact lenses that were subject to a UPP, than they paid before." (Docs. 505 at 16; S-540 at 16). Defendants argue that, for example, a purchaser of at least two of JJVC's products experienced a decrease in price after JJVC implemented its UPP. (Doc. S-540 at 58 (citing (Doc. S-541-13 at 7 (Wessels Decl. ¶ 11(a)-(b)). Defendants assert that "several of the named Plaintiffs have interests that directly conflict with those of the putative class because the price they paid actually decreased upon the introduction of UPPs, and thus the class itself would include people of diverging and conflicting economic interests." (Docs. 674 at 24; S-681 at 24). Defendants contend that those consumers who paid less for contact lenses after the implementation of UPPs did benefit from the UPPs. (Docs. 647 at 24-25; S-681 at 24-25); (Docs. 505 at 16; S-540 at 16, 58-59).

Defendants do not dispute the adequacy of class counsel, and the Court independently

determines that Plaintiffs' counsel are skilled and adequate in all respects.

The Court finds that Plaintiffs are adequate class representatives who have vigorously

represented the putative class in this action, and are capable of continuing to do so.

> "A conflict is not fundamental when . . . all class members share common
> objectives and the same factual and legal positions and have the same
> interest in establishing the liability of defendants." Ward v. Dixie Nat'l
> Life Ins. Co., 595 F.3d 164, 180 (4th Cir.2010) (internal punctuation
> omitted); Telecomm Tech. Servs., Inc. v. Siemens Rolm Commc'ns, Inc.,
> 172 F.R.D. 532, 544 (N.D. Ga.1997) (Adequacy requirement looks to
> "[a]ntagonistic interests" among class members creating risk that "one
> party's interest may be sacrificed for another's.").
>
>      "Moreover, a conflict will not defeat the adequacy requirement if
> it is 'merely speculative or hypothetical.'" Ward, 595 F.3d at 180 (internal
> punctuation omitted). "Potential" conflicts of interest are likewise
> insufficient to defeat certification; instead, a district court should continue
> to monitor the matter going forward and may "revisit the issue and de-
> certify the class if a true conflict ever manifested." In re Vitamin C
> Antitrust Litig., 279 F.R.D. 90, 113 (E.D.N.Y.2012); see also Fed. R. Civ.
> P. 23(c)(1) (Class certification order "may be altered or amended before
> final judgment.").

Delta/AirTran Baggage Fee, 317 F.R.D. at 680-81, 695 (finding representation adequate even though

some passengers may have benefitted from defendants' conduct where such benefit was "de minimis"

and "incidental to the antitrust overcharge."). Plaintiffs' expert Dr. Williams submits that his

regression analysis demonstrates that nearly all putative Plaintiffs paid higher contact lens prices for

products subject to Defendants' UPPs, than they would have paid but for Defendants' alleged illegal

actions, whether or not the final price was reduced by discounts, rebates or insurance payments. Dr.

Williams reviews one-by-one those Named Plaintiffs who Defendants contend paid less for their

contact lenses while the UPPs were in effect, (Doc. S-723 at 9-11 (Williams 2d Supp. Decl. ¶¶ 11-15)).

Dr. Williams states that under his analysis, the insurance payments and rebates which impacted the

Named Plaintiffs' purchases during the UPP period are equally applied in the "but for" calculation, and thus the overall impact of the UPP still increased the price to the Named Plaintiff. He also found that Defendants did not necessarily consider all purchased made by the Named Plaintiffs during the UPP period, and that indeed the prices they paid on these other purchases were also impacted by the UPP in place. Id.

Defendants have not established that any Plaintiffs actually or potentially realized a "net economic benefit" as a result of Defendants' alleged anticompetitive conduct, or that they were subjectively aware that they received a price reduction through rebates, discounts or insurance payments as a result of a UPP. Compare Photochromic Lens, 2014 WL 1338605, at *13-14. Rather, the alleged decrease in prices cited by Defendants was occasioned by rebates, discounts and insurance payments, not by the Defendants' alleged agreement to enact UPPs. The potential for individualized damages does not suffice as a fundamental conflict, and is not sufficient to defeat class certification. Carriuolo, 823 F.3d at 990. This is because "[e]ach class member is connected by the common predominate inquiry." Id.

### 4.    Rule 23(b) Requirements

In addition to satisfying the requirements of Rule 23(a), a plaintiff seeking class certification must satisfy at least one of the alternative requirements of Rule 23(b). In their Motion for Class Certification, Plaintiffs seeks certification under Fed. R. Civ. P. 23(b)(2) and (3).

### a.    Rule 23(b)(2): Injunctive or Declaratory Relief

Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is

128

appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  "A hybrid Rule 23(b)(2) class

action is one in which class members seek individual monetary relief . . . in addition to class-wide

injunctive or declaratory relief." Cox v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1554 (11th Cir.

1986).  A hybrid or Rule 23(b)(2) class action is not available where "'the appropriate relief relates

exclusively or predominantly to monetary damages.'" Holmes v. Cont'l Can Co., 706 F.2d 1144, 1155

(11th Cir. 1983) (quoting Fed. R. Civ. P. 23(b)(2) Advisory Committee Notes (1966 Amendment)).  If

the declaratory relief is merely incidental to the monetary damages, then a Rule 23(b)(2) hybrid class

action is inappropriate. Agan v. Katzman & Korr, P.A., 222 F.R.D. 692, 701-02 (S.D. Fla.2004);

Swanson v. Mid Am. Inc., 186 F.R.D. 665, 668-69 (M.D. Fla.1999); see also Dukes, 564 U.S. at 363-

65.

 Plaintiffs argue that the fact that the three remaining Manufacturer Defendants recently

discontinued their UPPs does not foreclose Plaintiffs' ability to seek injunctive relief, as it not

"absolutely clear" that the Defendants will not revive their UPPs in the future. (Docs. 396 at 34; S-404

at 34); (see also Docs. 611 at 29; S-649 at 29) ("There is no guarantee that Defendants' unlawful

conduct will not recur, unless the Court issues an injunction.").  Plaintiffs seek a "mandatory"

injunction, not a voluntary cessation of UPPs.  (Docs. 396 at 34; Doc. S-404 at 34)

 Defendants respond that the complained-of conduct has ceased, mooting Plaintiffs' claim for

injunctive relief.  (See Docs. 505 at 16, 57; S-540 at 16, 57); (see also Doc. S-681 at 24 ("[T]he only

UPP . . . remaining concern[s] a product of [CV], with whom Plaintiffs have settled.").  Moreover,

Defendants argue that Plaintiffs primarily seek monetary damages, making the need for Rule 23(b)(2)

certification inapplicable. (Docs. 505 at 16, 56-57; S-540 at 16, 56 -57 (noting that Plaintiffs seek

statutory, treble and restitution damages); (Docs 674 at 24; S-681 at 24).

Plaintiffs do not meet the criteria for certification under Rule 23(b)(2). Their claims are ones primarily seeking money damages. The complained-of conduct has ceased, and Plaintiffs have presented no evidence that the Defendants will revive the UPPs.

**b.**     <u>**Rule 23(b)(3)**</u>

**1)**     <u>**Predominance**</u>

To satisfy the predominance requirement, "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." <u>Kerr v. City of W. Palm Beach</u>, 875 F.2d 1546, 1558 (11th Cir. 1989) (internal citations omitted). "The predominance inquiry requires an examination of 'the claims, defenses, relevant facts, and applicable substantive law,' . . . to assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant." <u>Babineau v. Fed. Express Corp.</u>, 576 F.3d 1183, 1191 (11th Cir. 2009) (quoting <u>Klay</u>, 382 F.3d at 1254). "The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" <u>Tyson Foods</u>, 136 S. Ct. at 1045 (quoting <u>Amchem Prods.</u>, 521 U.S. at 623). "Rule 23(b)(3) . . . does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. . . . What the rule does require is that common questions '*predominate* over any questions affecting only individual [class] members.'" <u>Amgen Inc.</u>, 568 U.S. at 469 (emphasis in original) (quoting Fed. Rule Civ. Proc. 23(b)(3) (emphasis added)).

Under Rule 23(b)(3), "[i]t is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions." <u>Klay</u>, 382

130

F.3d at 1254 (citation omitted).  "Whether an issue predominates can only be determined after

considering what value the resolution of the class-wide issue will have in each class member's

underlying cause of action.  Id. at 1255 (citation omitted).  Common issues of fact and law

predominate if they have a direct impact on every class member's effort to establish liability and on

every class member's entitlement to . . . relief."  Id. at 1255 (citations omitted).

> The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. . . . When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

Tyson Foods, 136 S. Ct. at 1045 (internal quotations and citations omitted).

> Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.  On the other hand, common issues will not predominate over individual questions if, as a practical matter, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues.

Carriuolo, 823 F.3d at 985 (quoting Babineau, 576 F.3d at 1191).  The predominance requirement in

Rule 23(b)(3) is "'far more demanding'" than the commonality requirement.  Id. (quoting Alchem

Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997)).  "'Common issues can predominate *only* if they

have a 'direct impact on every class member's effort to establish liability that is more substantial than

the impact of individualized issues in resolving the claim or claims of each class member.'"  Id.

(quoting Vega, 564 F.3d at 1270).

    The Court's analysis of predominance "begins, of course, with the elements of the underlying

cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011).

> In conducting the predominance inquiry, courts must take into account the claims, defenses, relevant facts, and applicable substantive law to assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant. If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable. Although individual treatment of the *essential* elements of a case precludes certification, it is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions.

Photochromic Lens, 2014 WL 1338605, at *17 (internal quotation marks and citations omitted) (emphasis in original); see Amgen, 468 U.S. at 469 ("Rule 23(b)(3) . . . does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." (citation omitted)).  On the other hand, "'[i]f the effect of class certification is to bring in thousands of possible claimants whose presence will in actuality require a multitude of mini-trials (a procedure which will be tremendously time consuming and costly), then the justification for class certification is absent.'" Cardiovascular Care of Sarasota, P.A. v. Cardinal Health, Inc., No. 8:08-cv-1931-T-30TBM, 2009 WL 928321, at *5 (M.D. Fla. Apr. 3, 2009) (quoting Blue Bird Body Co., Inc., 573 F.2d at 328).

### (a)    Predominance: Agreement or Conspiracy

Plaintiffs argue that "[c]ommon questions of liability predominate over individual issues because all Class and Subclass members, regardless of their number of contact lens purchases or what state they reside in, will rely on the same evidence at trial to prove the single, overwhelmingly predominant issue of whether Defendants conspired on a horizontal or vertical basis to eliminate competition in the nationwide contact lens market." (Docs. 396 at 25; S-404 at 25).  Plaintiffs contend that they have made a "'threshold showing that the proof they intend to offer at trial of the alleged

132

conspiracy will be sufficiently generalized in nature to warrant a certification of the class.'" Id. at 26

(quoting In re Disposable Contact Lens Antitrust Litig., 170 F.R.D. at 531). Citing to Dr. Solow's

Report, Plaintiffs argue that the direct and circumstantial evidentiary "plus factors," which are

susceptible to common, class-wide evidence because Plaintiffs all bought contact lenses subject to the

UPPs, establish a horizontal and vertical antitrust conspiracy. (Doc. S-404 at 26-27 (citing Doc. S-

405 at 11-76 (Solow Report ¶¶ 17-133)). Plaintiffs rely upon Dr. Solow's Report in which Dr. Solow,

citing to evidence produced during the ongoing discovery in this case, recounts the history and

structure of the contact lens market in which ECPs both prescribe and sell contact lenses; the

Defendant Manufacturers' implementation of UPPs starting in 2013; communications between ECPs

and ABB; communications between ECPs and the Manufacturer Defendants; communications between

ABB and the Manufacturer Defendants; statements and analyses made by representatives of the

Manufacture Defendants; and the pivotal role of distributor ABB in the contact lens market with

regards to contact lens pricing, demonstrated, in part, by various communications by Manufacturer

Defendants, ABB, and the Contact Lens Institute. See Solow Report ¶¶ 17-133.

Defendants argue that each individual Manufacturer Defendant's response to Plaintiffs' claims

is different, inasmuch as their respective contact lens products "incorporate different materials, employ

different technologies, and offer different modalities (i.e. daily, weekly, monthly)," and "utilize unique

proprietary technologies." (Docs. 505 at 20; S-540 at 20 (citing (Doc. S-537 at 26-33 (Cremieux

Report ¶¶ 51-61))). Defendants assert that "[e]ach UPP is a different marketing strategy representing

a manufacturer's independent judgment," implemented at a different time and for different marketing

reasons. (Docs 505 at 20; S-540 at 20-21 (citing Doc. S-537 at 131-144, 147, 161-65 (Cremieux

Report Exs. 10-13, 15, 23-25); Doc. S-541-18 at 25 (Alcon bullet-point presentation "Why We Need

133

to Implement MPP/UPP"); Doc. S-541-19 at 33 (Helms Dep at 122); Doc. S-541-20 at 26 (Miura Dep. at 95 ); Doc. S-537 at 55-57, 59 (Cremieux Report ¶¶ 107, 109, 110, 112, 117, 118))). Defendants state that the UPP set by each Manufacturer Defendant for their respective products, was set at a different price. Id. at 22 (citing(Doc. S-537 at 52-53, 65 (Cremieux Report ¶¶ 102, 135); Doc. S-537 at 119-121, 145, 148, 149, 154 (Cremieux Report Exs. 6A-C, 14, 16, 17, 20)). Though Defendant JJVC eliminated rebates with the implementation of the UPPs, "Alcon, B&L and CVI . . . actively issued manufacturer rebates for products subject to a UPP, which had the effect of bringing the purchase price well below the UPP price if redeemed." (Doc. S-540 at 29 (citing Doc. S-537 at 60, 74-75 (Cremieux Report ¶¶ 119, 165, 167); Doc. S-541-8 at 8 (Seshadri Decl. ¶¶11-13))).

Citing to evidence in the record, Dr. Solow states that the four Manufacturer Defendants collectively control 97% of the United States contact lens market (measured by revenue), that "[m]anufacturers distribute the largest share of lenses through independent ECPs and the smallest though the online/mail-order channel," and that the price of a package of contact lenses was roughly 19 percent more expensive when purchased from an independent ECP.   (Docs. 397 at 14-15, 35; S-405 at 14-15, 35 (Solow Report ¶¶ 21, 23, 61; see also id. ¶ 24)). One Manufacturer Defendant, Alcon, observed that ABB "'is a dominant player providing turn-key business solutions to private ECP practices and networks, and large regional players.'" (Doc. S-405 at 68-69 (Solow Report ¶ 120)). By 2017, online retail of contact lenses garnered an estimated 9.2% share of industry revenue, and was projected to continue to increase "'as consumers will continue to view online purchases as a quick and relatively less expensive method to purchase contact lenses.'" (Doc. S-405 at 34 (Solow Report ¶ 59). Dr. Solow states that:

> extensive evidence shows that the structure, conduct, and performance of

134

the contact lens industry is conducive to and consistent with the formation of a cartel and that any such cartel would have been successful in generally raising price to its customers. This common economic evidence can be used by all members of the proposed Classes as proof of the conspiracy and impact elements of their claims.

Id. at 23 (Solow Report ¶ 38).

Plaintiffs contend that the scope of the alleged vertical agreements may be established on a class-wide basis for each Vertical Class, through common centralized evidence establishing that the Manufacturer Defendants, ABB and independent ECPs shared an interest in maintaining prices and limiting competition from the Discount Retailers; ABB's and the ECPs' role in encouraging the implementation of UPPs; and the ECPs' support of the UPPs. (Doc. 396 at 27); (Doc. S-404 at 27) (citing Doc. S-405 at 59, 63, 65, 67-73 (Solow Report ¶¶ 107, 109, 110, 113, 117-127)).

In this case, the claims of the proposed putative class members all arise out of the same alleged illegal conduct by Defendants, based upon related antitrust theories of conspiracy in restraint of trade. Likewise, the claims of the proposed state classes arise out of the same alleged illegal conduct by Defendants and are based on the same related antitrust theories of.conspiracy in restraint of trade. Although each proposed subclass is proceeding under its own state law of Maryland and California, class certification pursuant to Rule 23(b)(3) is nonetheless appropriate where there is a commonality of substantive law applicable to all class members.

In general, a federal or state claim based upon a theory of antitrust conspiracy raises three ultimate issues to be proven at trial: (1) the existence of a contract, combination or conspiracy in restraint of trade (liability); (2) injury-in-fact (antitrust injury); and (3) the extent of injury (damages). See J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562 (1981). As demonstrated by . . . Plaintiffs, all proof relative to Defendants' alleged conspiracy to restrain trade is common to the members [in all classes]. In fact, "courts repeatedly have held that the existence of

135

> a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant individual issues are present."  In re NASDAQ Mkt.-Makers Antitrust Litig., 169 F.R.D. 493, 518 (S.D.N.Y. 1996); see also In re Potash Antitrust Litig., 159 F.R.D. 682 (D. Minn. 1995).

In re Terazosin Hydrochloride, 220 F.R.D. at 695.  Plaintiffs have met their burden of showing that the

issue of the existence of an agreement or conspiracy among the Defendants is subject to common

issues of fact and law, and may be established by generalized proof, applicable to the class as a whole.

### (b)   Predominance: Impact and Damages

### i.   Plaintiffs' Argument

Plaintiffs argue that "Defendants' supra-competitive prices caused by Defendants' UPPs are

susceptible to common proof on a class-wide basis." (Docs. 611 at 10; S-649 at 10).  Plaintiffs

compare the prices paid by consumers in the "actual world" of UPPs with the alleged antitrust conduct

to the prices that would have been paid by consumers in a "but for" world (but for or absent the alleged

antitrust conduct).  They note that Defendants' expert recognizes that this "but for" analysis establishes

whether an individual purchaser suffers antitrust injury.  (Doc. S-649 at 11 (citing Doc. S-538 at 10

(Snyder Report ¶ 16)).  Plaintiffs assert that "[e]vidence that customers paid artificially high prices as a

result of Defendants' restraint on trade is susceptible to class-wide proof," (Doc. 396 at 29); (Doc. S-

404 at 29) (citing Doc. S-405 at 23-25 (Solow Report at ¶¶ 38-40) and Doc. S-406 at 12-16 (Williams

Report ¶¶ 21-23, 24-35)), and that and that "'Plaintiffs have demonstrated at least a "colorable

method" of proving impact at trial.'"  (Docs. 396 at 29; S-404 at 29 (quoting In re Disposable Contact

Lens Litig., 170 F.R.D. at 531)).  Specifically, Plaintiffs argue that after applying a regression analysis

to both the contact lenses produced by all four Manufacturer Defendants to analyze the alleged

horizontal conspiracy, and to lenses produced by each Manufacturer Defendant individually to establish the impact of the alleged vertical conspiracies, Dr. Williams concludes that "Plaintiffs paid higher contact lens prices for products subject to Defendants' UPPs than they would have paid in the absence of Defendants' illegal actions." (Doc. S-404 at 29-30). Plaintiffs assert that while damages may differ for each individual class member based on the number and type of contact lenses purchases, that determination does not foreclose class certification, particularly when the overreaching antitrust liability questions are so common to each Class and Subclass member. (Docs. 396 at 32; S-404 at 32 (citing Carriuolo 823 F.3d at 988)). Plaintiffs also contend that the same facts and evidence as set forth above can be used to support the Maryland and California state law claims. Id. at 30-32.

ii.     **Defendants' Argument**

Defendants argue that "at least two of the essential elements of Plaintiffs' claims - antitrust injury and standing - cannot be proved on a classwide basis with a common body of evidence." (Docs. 505 at 32; S-540 at 32); see also id. at 14. Defendants focus particularly on the impact element of Plaintiffs' antitrust claims, arguing that "the UPPs at issue did not have the uniform effect that Plaintiffs assert." (Docs. 505 at 43; S-540 at 43). Rather, they argue that "the undisputed evidence shows that the UPPs either had no impact at all (*e.g.*, some class members paid *nothing* or far less than the UPP price for contact lenses) or had a highly variable impact that could never be shown with a common body of evidence." Id. (emphasis in original).

Among the differing factors cited by Defendants applicable to each individual class Plaintiff are: whether the ECP/retailer who sold the lens to the plaintiff was part of an alleged conspiracy; whether the ECP/retailer determined his or her price pursuant to the relevant UPP price; whether the consumer would

have purchased the same lens in the absence of a UPP; whether the price paid by the consumer was higher than it would have been in the absence of the alleged conspiracy; and whether the price paid by the consumer was reduced by rebates or discounts offered by the manufacturer or retailer, or by reimbursement by a third party insurer. (Docs. 505 at 14-15; S-540 at 14-15). They argue that Plaintiffs cannot prove classwide impact with common proof, "because evaluating whether any UPP affected a contact lens purchaser at all requires looking individually at each transaction to compare what the person actually paid against what s/he would have paid (including based on changes in the price of the lens, the amount of any vision care benefits, and rebates and discounts." (Docs. 674 at 11; S-681 at 11). Additionally, Defendants argue that Dr. Williams' use of a "'but for' impact" analysis embraces an incorrect definition of impact that is "disconnected" from the impact requirement of Rule 23, which requires evaluating "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'". (Doc. S-681 at 20) (quoting Brunswick, 429 U.S. at 489). Defendants cite to testimony of putative Plaintiffs and to ECPs and retailers in support of their arguments. They contend that:

> 1)       "Plaintiffs cannot show [through common proof] that any meaningful number of putative class members purchased from a participant in the alleged conspiracy" because retailers set prices independently. (Docs. 505 at 26, 35; S-540 at 26, 35; see also Docs. 674 at 10; S-681 at 10 (citing Plaintiff Class Representative and ECP testimony: (Doc. S-541-9 at 4 (Takeda Decl. ¶¶ 13-15); Doc. S-541-11 at 3-4 (Sudarsky Decl. ¶¶ 6, 7, 11); Doc. S-541-7 at 3 (Ruder Decl. ¶¶ 5-7); Doc. 541-1 at 4 (Chang Decl. ¶¶ 8-9); Doc. S-541-4 at 2 (Mann Decl. ¶¶ 7-8); Doc. 541-3 at 3 (Huynh Decl. ¶¶ 5, 7-8); Doc. S-541-36 at 17 (Kikunaga Dep. at 62-64); Doc. 541-17 at 19 (Mason Dep. At 70-73); Doc. S-541-10 at 3 (Sorkin Decl. ¶¶ 6, 7); Doc. S-541-2 at 3-4 (Gray Decl.  ¶¶12-14); Doc. S-541-12 at 3-4 (Wally Decl. ¶ 10); Doc. S-541-6 at 2-3 (Prange Decl. ¶¶ 7-9, 13, 15); Doc. S-541-23 at 18 (Goldberg Dep. at 67-68); Doc. 510-17 at 3 (Weisband Decl. ¶¶ 6, 7))); (Docs. 674 at 34-40; S-681-1 and S-681-2 (same citations and adding (Doc. 677-2 at 3 (Torres Decl. ¶ 7); (Doc. 510-1 at 2 (Bennett Decl. ¶¶ 5, 7)); (Doc. 682-6 at 3 (Bennett Dep. at 62)); (Doc. 510-9 at 2 (Sakamoto Decl. ¶¶ 5, 7)); (Doc. S-682-5 at 3 (Sheldon Dep. at 114-18)); (Doc. 682-4

at 3 (Uzick Dep. at 95)); (Doc. 510-15 at 2 (Uzick Decl. ¶ 7))).

2)      "Plaintiffs cannot show that putative class members paid more for contact lenses subject to a UPP than they had previously." (Docs. 505 at 27-28; S-540 at 27-28 (citing Doc. S-541-25 at 15 , 20 (Felson Dep. at 54-55, 73 (plaintiff citing to "an insurance reimbursement" and agreeing that he paid less for the same JJVC lenses in 2015 as compared to 2013 and stating that an ECP offered him a discount)); Doc. S-541-15 at 31-33, 38, 46-47 (Schirf Dep. at 117-18, 121-22, 127-28, 146-47, 179-81 (plaintiff comparing the price she paid for JJVC lenses through the years, including while a UPP was in place with no appreciable change)); Doc. S-541-26 at 13 (Machikawa Dep. at 46-47 (plaintiff testifying he was charged the same for contact lenses in 2013 and 2014 and that insurance paid all but $14 in 2014)); Doc. S-537 at 50-51, 74 (Cremieux Report ¶¶ 97, 164, 166 (noting that one Vision Source ECP provided discounts for a particular lens and passed along manufacturer rebates to consumers, and some other retailers offer discounts) and discussing insurance reimbursements for contact lenses)); Doc. S-541-24 at (Mazzarella Dep. at 105-06 (plaintiff testifying about rebate on Bausch & Lomb lenses)); Doc. S-541-17 at 14 (Mason Dep. at 50 (ECP testifying that some patients use insurance to pay for contact lenses)); Doc. S-541-36 at 13 (Kikunaga Dep. at 45 (ECP testifying that majority of patients use insurance to pay for contact lenses)); (Doc. S-537 at 48 (Cremieux Report ¶ 93 (stating that one survey shows that 57 percent of contact lens wearers had vision insurance, 33 percent of which had plans that covered some of the cost of contact lenses for one year.)); Doc. S-541-27 (invoice showing insurance reimbursement to class representative plaintiff Felson showing that as a result of an insurance reimbursement and an ECP professional discount, he paid nothing for contact lenses subject to a UPP)).

3)      "Many putative plaintiff class members paid prices that varied significantly from the UPP price of a given lens." (Docs. 505 at 38; S-540 at 38 (citing Doc. S-541-25 at 20-21(Felson Dep. at 76-77 (class representative Felson paid $122 for two boxes of CooperVision lenses when the UPP price was $178 due to a "courtesy write-off" or "professional discount")).

4)      "Plaintiffs cannot show that all putative class members paid more for contact lenses as a result of the introduction of the UPPs." (Docs. 505 at 39; S-540 at 39 (citing Doc. S-541-5 at 3, 5 (Miura Decl. ¶¶ 4-5, 9 ( JJVC reduced wholesale prices for some products in July 2014, and UPP

decreased wholesale prices for 66% consumers)); Doc. S-537 at 183 (Cremieux Report Exs. 32-34 (data charts based upon National Vision, Inc. Data illustrating median price per month of three JJVC lenses showing fluctuations in prices in relation to UPPs); (Doc. S-537 at 153 (Cremieux Report Ex. 19 (chart using Luxottica Data showing retail price drop when UPP implemented for JJVC Acuvue Oasys with Hydraclear (24-pack)); Doc. S-541-25 at 15, 20 (Felson Dep. at 54-55, 73 (class representative plaintiff paid $48 less for JJVC Acuvue lenses in 2015 than in 2013, noting an insurance reimbursement and that ECP offered him a discount)). In this regard, Defendants assert that in some instances, "manufacturer rebates brought the price paid below the UPP price for the product purchased." (Doc. S-540 at 41 (citing Doc. S-541-24 at 28 (Mazzarella Dep. at 105-06 (plaintiff testifying about a $100 rebate on Bausch & Lomb lenses that covered out of pocket costs); (Doc. S-537 at 31 (Cremieux Report ¶ 57 (discussing CooperVision rebates on products subject to a UPP covering more than 60,000 purchases of two conduct lens products subject to a UPP)); (Doc. 541-8 at 8 (Seshadri Decl. ¶ 13 (discussing CooperVision rebates on UPP products)); (Docs. S-541-29 at 3-4, S-541-30, S-541-32 and 541-33 (Alcon rebate information for customers)). Retailers and ECPs also offered rebates and discounts on UPP-covered contact lens products. (Doc. S-540 at 42 (citing Doc. S-537 at 74 (Cremieux Report ¶ 166 (reporting that Target offered a $10 discount on the purchase of JJVC 1-Day Acuvue TruEye (90 Pack) which would have resulted in a price of $81.74 per box, below the UPP price of $82.50)); Doc. S-537 at 75-76 (Cremieux Report ¶ 168 (reporting that 1-800 Contacts offered new customers discounts of $20 for $150 in contact lens purchases, and $45 for $200 worth of purchases)).

Defendants cite to the high number of retailers and ECPs involved as a reason why they

contend that Plaintiffs are unable to establish impact on a classwide basis.

> The Manufacturer Defendants design and make contact lenses. Dozens of distributors of contact lenses buy contact lenses from manufacturers and sell to ECP/retailers. More than 50,000 ECPs (of whom approximately 35,000 are in independent practice ("iECPs")), prescribe contact lenses and, together with retailers, sell contact lenses to more than 40 million consumers.

(Docs. 505 at 19; S-540 at 19) (citing (Doc. S-537 at 15, 37 (Cremieux Report ¶¶ 31, 70-71)).

Defendants contend that each ECP and retailer set its own prices, independently and regardless of the

140

UPPs. As support, Defendants cite to retailers who sold various models of contact lenses at prices below the UPP. (Docs. 505 at 26-27; S-540 at 26-27 (citing Doc. S-537 at 149, 166-71 (Cremieux Report Exs. 17, 27A, 27B, 27C))); (see also Doc S-540 at 36-37 (citing testimony of ECPs)).

Defendants assert that Plaintiffs' experts fail to establish common impact on a classwide basis, and that their reports do not satisfy the "rigorous standards of *Daubert*" that apply to Plaintiffs' Motion for Class Certification. (Docs. 505 at 44; S-541 at 44). (See Docs. 505 at 45-51; S-540 at 45-51 (Defendants' criticisms of Dr. Williams' regression analysis); (Docs. 505 at 51-52; S-540 at 51-52 (characterizing Dr. Solow as "merely a human 'highlighter,'" providing "a voice to describe documents produced in this litigation," which is insufficient to make an evidentiary showing that impact can be proven on a classwide basis using a common body of evidence)).

Defendants argue that:

> Williams purports to compare actual prices to hypothetical prices that he estimates using a "before-during" method for both the alleged horizontal and vertical agreements. . . . On the basis of that analysis, Williams concludes that prices in various channels were higher for products subject to a UPP than they would have been in a hypothetical "but-for" world without the UPPs.

(Doc. S-540 at 44 (citing Doc. S-406 (Williams Report ¶¶ 7-8, 10-11, 21-41))). They argue that Dr. Williams undermines Plaintiffs' Motion for Class Certification because he "relies primarily on non-transactional data as opposed to actual prices paid by the majority of contact lens purchasers; and employs a regression that uses false comparisons, adopts misleading and impermissible averaging techniques and produces false positives and internally inconsistent results." (Docs. 505 at 18; S-540 at 18); (see also Doc. S-540 at 45-46 (citing Doc. S-541-34 at 47, 55 (Williams Dep. at 181-82, 214); Doc. S-406 at 46 (Williams Table 12) (focusing on his conclusion that a consumer who paid less than

the UPP price for a contact lens through 1-800-Contacts was nevertheless injured, testifying that "the impact of the UPP policy was to cause the prices sold by 1-800-Contacts to be . . . 5 percent to 3.4 percent higher than they otherwise would have been.")); (Doc. S-540 at 46 (citing Doc. S-538 at 14, 19, 46 (Snyder Report ¶¶ 25, 35, 97)).  Defendants also criticize Dr. Williams' price comparisons, arguing that the Alcon, B&L and CV UPPs were all placed on new products where there were no "before" prices to compare the post-UPP price to, and that Dr. Williams compared the new products with the UPPs to older dissimilar products, without taking into account differences and improvements in the newer products with the UPPS which were expected to sell at a premium to reflect their increase in value.  (Doc. S-540 at 47).  Both of Defendants' experts, Drs. Snyder and Cremieux, testified that impact and damages cannot be established by common proof.

### iii.    Plaintiffs' Reply

Plaintiffs respond that class members "need not buy identical products at identical prices on identical terms in order to prevail in an antitrust class case."  (Docs. 611 at 10; S-649 at 10 (citing Delta/AirTran Baggage Fee, 317 F.R.D. at 682)).  They argue that the evidence establishes that UPPs increased contact lens base prices.  (Doc. S-649 at 11 (citing Doc. S-661-145 at 3 (Chavez Dep. at 10 (testifying Manufacturer Defendants would "indicate to us [Costco] what we had to sell the merchandise for"); Doc. S-661-128 at 5 (Angelini Dep. at 86 (JJVC had the expectation that more than 50 percent of the prices "would tend to gravitate around the UPP price"); Doc. S-661-134 at 3 (McKenna Dep. at 62 ("I believe that all the customers understood that there was a UPP in place and that they could not charge - if they wanted to keep supply they would not charge below $60 on retail basis.")).

Notwithstanding individual ECP testimony that they did not "conspire" with the Manufacturer

Defendants to set prices at the UPP level, Plaintiffs argue that ECP's testified "they were all aware of

UPPs and, regardless of whether they specifically admit UPP pricing, the UPP affected their contact

lens prices," demonstrating the "pervasive effect of UPPs." (Doc. S-649 at 13 (citing (Doc. S-649-2

at 2-3 (Appendix B summarizing the testimony of 12 ECP's as follows: (Doc. S-541-1 at 3 (Chang

Decl. ¶ 7 (set retail prices based on a number of factors including "the wholesale cost of contact lenses,

and competitor's' retail pricing.  UPP plays a role in my determination as to how to price contact

lenses because if the minimum UPP price is not met, then my account with the manufacturer would

terminate.")); Doc. S-541-2 at 3 (Gray Decl. ¶ 12 (since 2013, the policy was "to price contact lenses

competitively by reference to the prices charged by 1-800-Contacts.")); Doc. S-661-142 at 3 (Huynh

Dep. at 29 (set price "close to being the same" as the ABB Profit Advisor suggested price for private

practitioners)); Doc. 541-36 at 11 (Kikunaga Dep. at 37 (discussed with patients that under the UPPs,

"the contact lenses are X price per box and that they are pretty much standardized amongst all -

anywhere you buy them")); Doc, S-661-139 at 3-5 (Mason Dep. at 43, 49, 162 (decides prices by

matching the "1-800 list price," and that it was his understanding that "1-800-Contacts couldn't lower

their price for a UPP product lower than was listed in the UPP" and the patient would pay the same

price "no matter where they went.")); Doc. S-661-140 at 3 (Prange Dep. at 86 (agrees that after UPP

was implemented, his pricing was "based off what the UPP price was.")); Doc. S-541-7 at 3 (Ruder

Decl. ¶ 7 (stating that prices at clinic were "based on a number of factors, including the wholesale cost

of the contact lenses and competitors' retail pricing.")); Doc. 510-12 at (Sheldon Decl. ¶ 7 (stating that

while UPP was in effect on Alcon lenses, he "priced at the minimum retail price because I believed it

was a fair price for the lenses and because I wanted to be competitive in my pricing.")); Doc. 541-10 at

3 (Sorkin Decl. ¶ 6 (while UPP's "did not play a role in determining the prices that [he] set," he "set

the price of contact lenses by taking a markup over the wholesale price, as well as by observing

competitive prices.")); Doc. 541-11 at 3 (Sudarsky Decl. ¶¶ 6-7 (retail prices were "based on a number

of factors, including the online price of comparable lenses and my acquisition costs.")); Doc. 661-141

at 3, 5 (Takeda Dep. at 55, 57 (factoring in rebates she tries to be "competitive" with the chain stores,

and would "look online to see what companies are charging.")); Doc. 541-14 at 3 (Williams Decl. ¶ 6

(group set prices "based on its wholesale costs for the lenses and evaluating the prices charged by its

competitors."))).

### iv.    Defendants' Sur-Reply

In their Sur-reply, Defendants argue that Plaintiffs' experts, Drs. Solow and Williams, failed to

review the deposition testimony of the named Plaintiffs and their ECPs, to rebut Defendants' evidence

of individualized impact. (Docs. 674 at 12; S-681 at 12) (citing Doc. 682-9 (Solow Supplemental

Dep. testimony); Doc. S-682-10 (Williams Supplemental Dep. testimony)). They contend that the fact

that "even some of the named Plaintiffs paid nothing for their contact lenses underscores why a class

based on an 'average' overcharge regression model would include scores of people who were not

impacted and therefore have no cause of action." (Docs. 674 at 13; S-681 at 13). Defendants' also

criticize Plaintiffs' experts' opinions that rebates, discounts and insurance payments "would have

remained the same" with or without the UPPs, without any evidentiary support. (Doc. S-681 at 16

(citing competing supplemental expert reports by Defendants' experts); (Doc. S-685 at 18-19 (Supp.

Cremieux Report ¶¶ 33-35 ("[T]here are many reasons why insurance, rebates and discounts would be

different in the but for world . . . [as] supported by economic theory, documents and testimony,"

noting that JJVC "introduced UPPs around the same time it lowered wholesale prices . . . [and] to

144

make their products more attractive both to consumers and ECPs, they also simplified their sales practices, eliminating some of the rebates and discounts."). As to Plaintiffs' citation to retailers' testimony that they set prices based upon wholesale prices, competitors' prices, and profit markups, Defendants argue that following competitors' prices is not actionable under antitrust laws. "That ECPs may have conformed to a UPP does not suffice to show the 'conscious commitment to a common scheme designed to achieve an unlawful objective' required" for violation of antitrust laws. (Docs. 674 at 14; S-681 at 14) (citing Monsanto, 465 U.S. at 764).

### v.    Discussion

In order to prevail on a Section 1 antitrust claim, a plaintiff must establish a "cognizable" or "actual" injury "attributable to an antitrust violation," along with "some approximation of damage." J. Truett Payne, 451 U.S. at 561-62. The "fact of injury" is also known as "antitrust impact." See Blue Bird Body Co., 573 F.2d at 320. Establishing antitrust impact requires proof that "there is a causal relation between the alleged antitrust violation and an injury" to the plaintiff. Constr. Aggregate Transp., Inc. v. Florida Rock Indus., Inc., 710 F.2d 752, 782 (11th Cir. 1983). "Antitrust impact is established in this type of case if Defendants' activities had the effect of stabilizing prices above competitive levels." In re Polypropylene Carpet Antitrust Litig., 996 F. Supp. 18, 22 (N.D. Ga. 1997).

"In an overcharge case, impact is shown through proof that: (1) Defendants charged more than they would have but-for their antitrust violation; and (2) class members made some purchases at the illegally inflated or stabilized price." Terazosin Hydrochloride, 220 F.R.D. at 696 (citing Hanover Shoe, 392 U.S. at 489 and Blue Bird Body Co., 573 F.2d at 324). "[O]ne way of demonstrating predominance is to show that there is a common method for proving that the class plaintiffs paid

higher actual prices than in the but-for world, such as using an econometric regression model incorporating a variety of factors to demonstrate that a conspiracy variable was at work during the class period, raising prices above the 'but-for' level for all plaintiffs." Ethylene Propylene Diene Monomer (EPDM), 256 F.R.D. at 88.

Rebates, discounts and insurance payments do not defeat predominance as to impact. Dr. Solow opines that:

> A properly defined "but for" world is one in which all aspects of the actual world remain unchanged except for the effects *caused* by the restraint of trade at issue. Defendants' experts misapprehend the correct definition of the 'but for world, which leads them to focus mistakenly on insurance reimbursements, rebates and discounts, all of which would have remained unchanged in the 'but for' world." . . . [T]here is no evidence that UPPs *caused* changes in the discounting practices of individual ECPs or internet retailers.

(Doc. S-650 at 4, 12 (Solow Supp. Report ¶¶ 4(b), 21)); (see also Docs. S-651 at 57 (Williams Supp. Report ¶ 98 ("Plaintiffs have not asserted that insurance payments, rebates, or discounts are 'harmful acts.' Thus, insurance payments, rebates, and discounts are the same in the but-for world as they are in the actual world."))). Defendants' contention that discounts, rebates and insurance reimbursements defeat Plaintiffs' ability to prove antitrust impact with evidence common to all putative class members is not supported by the evidence. Defendants cite to no evidence that the discounts, rebates and in insurance payments were in anyway related to Defendants' conduct giving rise to the UPPs, or that UPPs caused changes in insurance reimbursements, or the discounting practices of the Manufacturer Defendants, individual ECPs, or internet retailers. Thus, Dr. Williams' treatment of these discounts, rebates and insurance payments as remaining constant in the "but for" world absent Defendants' conduct is not disproven. That JJVC enacted UPPs and then discontinued its discounts in an effort to

146

"simplify" pricing does not put the reductions in pricing into the mix to negate the impact of the alleged illegal conduct complained about by Plaintiffs.

Whether in some circumstances, a putative Plaintiff's contact lens purchase resulted in no out-of-pocket economic loss while UPPs were in place, —be it from rebates, discounts, insurance payments, or a retailer who affirmatively did overruled the UPP requirement and priced below it - does not defeat class certification. In this circumstance, Defendants' classwide practice of allegedly conspiring to adopt UPPs to artificially constrain certain contact lens prices, if proven, is a common question of fact that predominates over the exact circumstances of each putative plaintiff's individual purchase. A rebate, discount or insurance payment does not necessarily negate the impact of the alleged conspiracy. See Delta/AirTran Baggage Fee, 317 F.R.D. at 687 ("Whether any class members were reimbursed for any part of a baggage fee—i.e., whether they were able to pass on some portion of the alleged antitrust overcharge—is legally irrelevant and therefore will not lead to a situation in which individual questions of antitrust injury will dominate over common ones.").

Defendants' expert also contends that Plaintiffs cannot establish classwide impact because "[t]here are dozens of differentiated lenses produced by a variety of manufacturers for [multiple] . . . corrective needs," differing in "many" dimensions and innovations to meet the varied needs of patients.. (Doc. S-537 at 21-33 (Cremieux Report ¶¶ 43-61) (detailing examples of different product innovations by Defendant Manufacturers)). Dr, Solow responds that the contact lens market is a homogeneous commodity:

> The wholesale market is highly concentrated with the defendants controlling a large share of production. Disposable contact lenses are largely homogeneous across producers and there is little opportunity for consumers to substitute other products in response to higher prices for their

147

> contact lenses. There are significant barriers to entry, meaning that successful collusion would not be undermined by lost sales to producers of other products or new entrants.

(Docs. 397 at 39; S-405 at 39 (Solow Report ¶ 67); see also id. at 24 (Solow Report ¶ 39 (discussing factors that tend to make a market more favorable to effective collusion)). Given the unique structure of the contact lens market, Defendants' argument that the contact lens market is highly differentiated and that a common impact from Defendants' alleged conduct cannot be established is unavailing. Even recognizing Defendants' argument that product differentiation precludes common impact, "variations in products and complexities in a distribution chain do not preclude an estimation of whether an overcharge impacted end purchasers." In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583, 603 (N.D. Cal. 2010), amended in part, No. M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011).

"[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." Leyva v. Medline Indus., Inc., 716 F.3d 510, 514 (9th Cir. 2013).

> Proving damages proves injury because damages necessarily indicate that the plaintiff has been impacted or injured by the antitrust violation; the converse, however, is not necessarily true. That is, it is possible for a plaintiff to suffer antitrust injury-in-fact and yet have no damages because it has taken steps to mitigate the actual price paid through rebates, discounts, and other non-price factors such as lowered shipping costs, technical services, or any other type of purchase incentive. By expending resources to negotiate down from the supracompetitive prices established by the cartel, plaintiffs who have suffered no damages may still have suffered an injury-in-fact from the antitrust conspiracy. The fact that a plaintiff may have successfully employed bargaining power to fend off the *effect* of the conspiratorial practices does not mean that it has not been put in a worse position but-for the conspiracy.

Ethylene Propylene Diene Monomer (EPDM), 256 F.R.D. at 88-89; see also In re Urethane Antitrust

Litig., 251 F.R.D. 629, 638 (D. Kan. 2008) ("[E]vidence of a standardized pricing structure, which (in light of the alleged conspiracy) presumably establishes an artificially inflated baseline from which any individualized negotiations would proceed, provides generalized proof of class-wide impact."); In re Urethane Antitrust Litig. ("Urethane I, Polyester Polyol"), 237 F.R.D. 440, 450-51 (D. Kan. 2006) (accepting the plaintiffs' expert's structural analysis of the urethane market and opinion that price lists can be used as proof of common impact; "conspiratorial behavior elevates list prices and list prices serve as a reference or benchmark for pricing or pricing negotiations"); Fears v. Wilhelmina Model Agency, Inc., No. 02 Civ-4911 HB, 2003 WL 21659373, at *6 (S.D.N.Y.2003) (noting that, even if the plaintiffs had been able to negotiate for a lower commission rate with the defendant modeling agencies, they were nonetheless impacted by the conspiracy because those negotiations still began at the "artificially elevated rate" established by the cartel); In re Indus. Diamonds Antitrust Litig., 167 F.R.D. 374, 383 (S.D.N.Y.1996) (noting that "[t]he theory that underlies these decisions is, of course, that the negotiated transaction prices would have been lower if the starting point for negotiations had been list prices set in a competitive market. Hence, if a plaintiff proves that the alleged conspiracy resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury"). "Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that . . . the price range was affected generally." In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 523 (S.D.N.Y.1996).

Plaintiffs' damages model must establish "that damages are capable of measurement on a classwide basis" to show Rule 23(b)(3) predominance, and questions of individual damage calculations cannot overwhelm questions common to the class. Comcast, 569 U.S. at 34.  Here,

Plaintiffs' damages model for class-wide damages, proffered through the expert testimony of Dr. Williams, is sufficient to meet Plaintiffs' burden of establishing predominance of impact. Dr. Williams utilized the "before and after" "but for" regression analysis to calculate the impact of the UPPs. As set forth above, courts have accepted this regression analysis in antitrust class actions. E.g., Kleen Prods., 306 F.R.D. at 602 ("Multiple regression analysis is common in antitrust cases, where the plaintiffs use it to show that an alleged 'conspiracy' has a statistically significant impact on the dependent variable - usually price." (citing Rubinfeld, Reference Guide on Multiple Regression 305-07)); Terazosin Hydrochloride, 220 F.R.D. at 699 ("These economic methods are widely accepted and have been used in numerous other antitrust class actions." (citing cases)). Dr. Williams' use of averaging of aggregate data as a part of his regression analysis is an appropriate statistical tool used to "average out" idiosyncratic outliers. The rationale cited by the court in Static Access (SRAM), supra, is persuasive in this regard:

> The damages question *for trial* is presumably not about whether a specific . . . price increase found its way through the distribution chain and resulted in an increase in the price paid by a specific class member. Rather, the question is how a series of [defendant's] price increases, and/or a series of [defendant's] failures to reduce prices, impacted the price each consumer paid.

Static Access (SRAM), 264 F.R.D. at 614 (emphasis added) (quoting Gordon v. Microsoft Corp., No. MC 00-5994, 2003 WL 23105550, at *3 (D. Minn. Dec. 15, 2003)); see also id. at 606, 614 (certifying indirect purchasers' national injunctive relief class action alleging defendants who possessed 60-70% of the market share of total product sales, conspired to fix and maintain artificially high prices during a 10-year period, finding that "the use of averaged and aggregated data is not fatal to [indirect purchasers] Plaintiffs' econometric models.").

150

Defendants' criticism that Dr. Williams regression methodology lacks precision and is based upon flawed underlying assumptions is not sufficient to defeat class certification. At the class certification stage, the Court need not resolve which expert testimony and approach—that proffered by the Plaintiffs or by the Defendants—"is best suited to the particularities of [the] case." Terazosin Hydrochloride, 220 F.R.D. at 699. "It is sufficient to note at this stage that there are methodologies available, and that Rule 23(c)(1) and (d) allow ample flexibility to deal with the individual damages issues that may develop." Id. (quotations and citation omitted). The Court is charged with making a "rigorous" screening of expert evidence when certifying a class to ensure that the Plaintiffs' damages model seeks to prove damages that flow from the harm alleged. Kleen Prods., 306 F.R.D. at 602 (citing Comcast, 133 S. Ct. at 1435).

"[I]ndividualized damages calculations are insufficient to foreclose the possibility of class certification, especially when, as here, the central liability question is so clearly common to each class member." Carriuolo, 823 F.3d at 988. In Carriuolo, the Eleventh Circuit observed that:

> Rule 23 permits a class action when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Nothing in this Rule requires plaintiffs to prove predominance separately as to both liability and damages.... [The Supreme Court in] Comcast simply requires that "any model supporting a plaintiff's damages case must be consistent with its liability case."

Id. (quoting Comcast, 569 U.S. at 35); see also Torres v. Mercer Canyons Inc., 835 F.3d 1125, 1136 (9th Cir. 2016) ("[E]ven a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct."); Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 375 (3d Cir. 2015) ("[I]ndividual damages calculations do not preclude class

certification under Rule 23(b)(3)." (citation omitted)); Roach v. T.L. Cannon Corp., 778 F.3d 401, 407

(2d Cir. 2015) ("Comcast held that a model for determining classwide damages relied upon to certify a

class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of

injury; but the Court did not hold that proponents of class certification must rely upon a classwide

damages model to demonstrate predominance."); Nexium, 777 F.3d at 21 (stating that post-Comcast,

"the Supreme Court . . . and the circuits in other cases have made clear that the need for some

individualized determinations at the liability and damages stage does not defeat class certification");

Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 823 (7th Cir. 2012) ("[S]ome class

members' claims will fail on the merits if and when damages are decided, a fact generally irrelevant to

the district court's decision on class certification."); In re Deepwater Horizon, 739 F.3d 790, 815 (5th

Cir. 2014) (rejecting defendants' argument that Comcast requires that class certification be denied

"where the class members' damages are not susceptible to a formula for classwide measurement . . .

Comcast held that a district court errs by premising its Rule 23(b)(3) decision on a formula for

classwide measurement of damages whenever the damages measured by that formula are incompatible

with the class action's theory of liability."). "[T]he district court is well situated to winnow out those

non-injured members at the damages phase of the litigation, or to refine the class definition." Torres,

835 F.3d at 1137 (citing Newberg on Class Actions § 2:3). "[P]ursuant to Rule 23, the court's task at

certification is to ensure that the class is not defined so broadly as to include a great number of

members who for some reason could not have been harmed by the defendant's allegedly unlawful

conduct." Id., 835 at 1138 (quoting Newberg on Class Actions § 2:3).  Plaintiffs' proposed putative

classes include only consumers who purchased contact lens brands for which the Manufacturer

Defendants had adopted UPPs.  Pursuant to Plaintiffs' theory, each and every putative plaintiff that

152

meets this class definition could have been harmed. Dr. Williams opines that nearly all putative

Plaintiffs experienced at least one overcharge transaction during the damages period. (Doc. S-723 at

13 (Williams 2d Supp. Decl. ¶¶ 19, 20)).

This is not to say that individual damages issues will not arise. But the individualized damages

questions have not been shown to be so complex and densely fact specific as to preclude Rule 23(b)(3)

certification. See Brown, 817 F.3d at 1240; Columbus Drywall & Insulation, Inc. v. Masco Corp.,

No. 1:04-CV-3066-JEC, 2009 WL 856306, at *10 (N.D. Ga. Feb. 9, 2009). Moreover, the

individualized damages questions that may arise here do not implicate individualized questions

regarding liability. Brown, 817 F.3d at 1240. Defendants have failed to establish how class-wide

adjudication of any antitrust liability on the part of Manufacturer Defendants and ABB and its class

wide impact will be subsumed in or overwhelmed by an individualized damages inquiry. See

Carriuolo, 823 F.3d at 989; see also In re Urethane Antitrust Litig., 768 F.3d at 1254 ("Under the

prevailing view, price-fixing affects all market participants, creating an inference of class-wide impact

even when prices are individually negotiated." (citing cases)).

Additionally, "[e]ven if the damages determination does ultimately necessitate individualized

calculations," the question of class certification can be revisited if the facts develop otherwise such that

separate damages determinations predominate. Carriuolo, 823 F.3d at 988.

> [T]he certification of a class is always provisional in nature until the final
> resolution of the case. See Fed. R. Civ. P. 23(c)(1)(C) (permitting
> amendment of a certification order at any time prior to judgment). As we
> have explained, the power of the district court to alter or amend class
> certification orders at any time prior to a decision on the merits "is critical,
> because the scope and contour of a class may change radically as discovery
> progresses and more information is gathered about the nature of the
> putative class members' claims."

Id. (quoting Prado–Steiman, 221 F.3d at 1273).

"[T]he reliability of the means of proving classwide impact frequently factors into the predominance determination in antitrust class actions." In re Rail Freight Fuel Surcharge Antitrust Litig., 292 F. Supp. 3d 14, 42 (D.D.C. 2017) (citation omitted), appeal filed No. 18-7010 (U.S. Jan. 23, 2018). The Court has determined that Plaintiffs' expert, Dr. Williams' multiple regression model is a reliable method for establishing classwide antitrust impact caused by Defendants' alleged illegal conduct. "At class certification, the Court must rule upon the conclusions generated by the principles and methodology, . . . to the extent that they are relevant to determining whether plaintiffs have satisfied Rule 23(b)." Rail Freight, 292 F. Supp. 3d at 43 (citations omitted). "Rule 23 also requires 'the Court to consider questions beyond the reliability' of expert testimony, such as whether the expert testimony is sufficient to demonstrate 'common impact or that there is a reliable means of proving damages on a classwide basis.'" Id. (quoting In re Processed Egg Prods. Antitrust Litig., 81 F. Supp. 3d at 417).

Addressing Defendants' argument that the Court must resolve the "battle of the experts" between the conflicting opinions of Defendants' experts Dr. Snyder and Dr. Cremieux and Plaintiffs' expert Dr. Williams, the Court turns to the recent decision in Navelski v. Int'l Paper Co., 261 F. Supp. 3d 1212 (N.D. Fla. 2017). There, the court declined to resolve the "battle of the experts" at the class certification stage, finding that the predominance requirement for class certification was satisfied, despite the experts' disagreement regarding causation. In doing so, the court stated that

> While a district court's class certification analysis "may entail some overlap
> with the merits of the plaintiff[s'] underlying claim, Rule 23 grants courts
> no license to engage in free-ranging merits inquiries at the certification
> stage." Amgen, 568 U.S. at 466 (citations omitted). Rather, "[m]erits

questions may be considered to the extent - but only to the extent - that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Id., quoted in Brown v. Electrolux Home Prods., 817 F.3d at 1234; see also Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181, 1187, 1188 n. 15 (11th Cir. 2003) ("Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied.").

Navelski,, 261 F. Supp. 3d at 1215-16. The court in Navelski found that the conflicting expert reports regarding whether dam failure caused flooding was not material to the question of whether Rule 23 predominance requirements were satisfied, observing that the dispositive question for Rule 23 purposes is whether predominance presents a common question susceptible to generalized classwide proof. Id. at 1216 (citing Tyson Foods, 136 S. Ct. 1036, 1045). In Navelski, the competing experts both agreed that the causation question regarding the collapsed dam and flooding claims could be proven or disproven on a classwide basis and was susceptible to generalized classwide proof and common questions predominated; the respective experts were in conflict related to the merits, and the court determined that it was unnecessary to resolve the conflict in order to certify a class with respect to causation. Id. at 1217.

Here, Defendants contend that there is "no class-wide method for determining whether someone was impacted by the existence of UPPs and averages cannot accurately answer the question for any member of the putative class." (Docs. 693 at 5; S-720 at 5). Defendants base their argument on their experts, who opine that the impact of Defendants' UPPs is not susceptible to classwide proof. (See Doc. S-538 at 44 (Snyder Report ¶ 92 n.56 ("By conducting these [regression] analyses, I am not endorsing the use of regression analyses as a common method of proof in this litigation.")); Doc. S-684 at 35-36 (Snyder Sur-Reply Report ¶ 79 (stating that he does not "advocate" the regression

155

approach.)); Doc. S-722 at 17 (Dr. Snyder states that he is "not offering any regression results that would serve as a basis for me to offer conclusions about injury." (citing Doc. 716-13 (unredacted copy not filed)))).    Restated, Defendants argue that there can be no nationwide class action arising out of their alleged agreement to set minimum prices for consumers because the variables involved and the impact of the alleged conspiracy is so vast.

Plaintiffs estimate that the proposed class will "number in the tens of millions." (Docs. 396 at 20; S-404 at 20 (citing Doc. S-405 at 12 (Solow Report ¶ 19)).  Dr. Williams has offered a viable solution to the problem by conducting a multiple regression analysis, a well accepted statistical approach, which plots the average movement of prices of contact lenses for which UPPs were adopted. He bases his averages on sufficient data, which he has supplemented as more becomes available to him through the ongoing discovery process.

Defendants' experts expose what they contend are flaws undermining Dr. Williams' multiple regression analysis. Dr. Williams responds to the criticisms, and provides extensive support for his analysis of classwide impact. As more data has become available, Dr. Williams has further refined his opinion, using the same methodology and reaching a consistent result. The "battle" or disagreement between Plaintiffs' expert Dr. Williams and Defendants' experts is over whether a multiple regression analysis can by employed to calculate impact of the Defendants' UPPs on a classwide basis, in order to satisfy the Rule 23(b) predominance requirement. In response to Dr. Williams' later "customer level" analysis, Defendants' expert Dr. Snyder characterizes Dr. Williams' multiple regression analysis as a "highly non-standard method of evaluating impact." (Doc. S-684 at 25 (Snyder 2d Supp. Report n.48)).  To the extent that the Defendants' experts opinions disagree with Dr. Williams on the question of whether Dr. Williams' multiple regression analysis represents generalized classwide proof

156

of impact, satisfying the Rule 23 predominance requirement, the Court resolves the conflict between

Defendants' experts and Dr. Williams in favor of Plaintiffs. Dr. Williams' expert Reports and

subsequent Declarations satisfy the rigorous *Daubert* requirements and are considered by the Court as

evidence in support of Plaintiffs' Motion for Class Certification. In so doing, the Court does not

reject the opinions of Drs. Snyder and Cremieux out of hand. The issues they cite, and the alleged

weaknesses and flaws in Dr. Williams' opinions, while not dispelling the Court's determination that

Dr. Williams' multiple regression analysis may be considered at this juncture as generalized common

proof of classwide impact and Rule 23 predominance, do raise legitimate questions that are the meat of

rigorous cross examination and resolution by the ultimate factfinder on the merits. Indeed, while

providing Plaintiffs a mechanism and evidence for establishing that Defendants' alleged conduct

resulted in generalized common impact and classwide harm in the form of an average percentage

overcharge, Dr. Williams' multiple regression analysis has its limitations, both brought on by

assumptions employed and selection of data and variables used by Dr. Williams in executing the

regression analysis, and by the fact that the average percentage overcharge does not capture each

individual consumer experience when purchasing a UPP-covered contact lens. However, a large

average overcharge makes it more likely than not that classwide impact occurred. See In re TFT-LCD

(Flat Panel) Antitrust Litig., MDL No. 1827, No. M 07-1827 SI, 2012 WL 555090, at *3, 5 (N.D. Cal.

Feb. 21, 2012).

Upon rigorous analysis and review of the parties' submissions and evidentiary record, the

Court determines that Plaintiffs have satisfied the predominance requirement of Rule 23(b)(3) based

on competent evidence common to the class.

## 2) **Superiority**

The superiority requirement of Rule 23(b)(3) focuses "not on the convenience or burden of a class action suit *per se*, but on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." Klay, 382 F.3d at 1269. The relevant factors are: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). "[T]he predominance analysis . . . has a tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." Klay, 382 F.3d at 1269.

Plaintiffs argue that "because 'there exist a large number of small or medium-sized claims against Defendants which would make individual litigation economically infeasible, a class action is a superior method of litigation.'" (Docs. 396 at 33; S-404 at 33) (quoting In re Disposable Contact Lens Litig., 170 F.R.D. at 533). Plaintiffs assert that "[a] class action is likely the only viable option for Class Members because, in light of the complexity and costs of antitrust litigation, individual cases will be cost-prohibitive for most Class Members." Id.; (see also Docs. 611 at 28; S-649 at 28). Plaintiffs argue that submission of a trial plan is not required to establish the superiority requirement. (Docs. 611 at 29; S-649 at 29) (citing Vega, 564 F.3d at 1279 n.20).

Defendants respond that given that Plaintiffs assert a "series of vertical conspiracies stacked on top of a horizontal conspiracy that involves (1) tens of thousands of supposed co-conspirators, each of whose individual pricing methods requires examination, and (2) millions of consumers, each of whose

individual purchases requires examination, making the proposed class action is "unmanageable."
(Docs. 505 at 15-16; S-450 at 15-16). Defendants argue that Plaintiffs have failed to propose a
feasible trial plan setting a course for trying the complex claims and defenses at issue. (Docs. 505 at
16, 54; S-540 at 16, 54 (citing Vega, 564 F.3d at 1279 n. 20 and Fed. R. Civ. P. 23 advisory committee
note to 2003 amendment)); (see also Docs. 674 at 23; S-681 at 23). Defendants contend that Plaintiffs'
horizontal claims cannot be tried in a single trial because of the need to resolve "countless individual
questions concerning issues such as standing and impact," and the need to apply three bodies of law -
federal, Maryland and California.  Id. at 55. They argue that the vertical claims "would have to be
adjudicated separately to take account of the facts specific to the relevant Manufacturer Defendant's
conduct." Id. at 55-56 (citing In re Fine Paper Antitrust Litig., 685 F.2d 810, 822 (3d Cir. 1982)
(granting class certification for horizontal antitrust conspiracy claims but denying class certification for
plaintiffs' vertical claims because proof would vary, depending on the identity of the merchants from
whom plaintiffs made purchases)); (See also Docs. 674 at 24; S-681 at 24 (arguing that each vertical
class "would require separate trials.").

Proceeding as a class action offers economies of time, effort and expense for the litigants and
for the Court. Multiple lawsuits brought by thousands of purchasers of contact lenses in multiple
states "would be costly, inefficient, and would burden the court system." Terazosin Hydrochloride,
220 F.R.D. at 700. "Further, as to the consumer class members, the class action device is particularly
appropriate where, as here, it is necessary to 'permit the plaintiffs to pool claims which would be
uneconomical to litigate individually.'" Id. (quoting Phillips Petroleum Co. v. Shutts, 472 U.S. 797,
809 (1985)). "The class action fills an essential role when the plaintiffs would not have the incentive
or resources to prosecute relatively small claims in individual suits, leaving the defendant free from

159

legal accountability." In re Checking Account Overdraft Litig., 307 F.R.D. 630, 649 (S.D. Fla. 2015);

see also e.g. Deposit Guar. Nat'l Bank of Jackson, Miss. v. Roper, 445 U.S. 326, 339 (1980) ("Where

it is not economically feasible to obtain relief within the traditional framework of a multiplicity of

small individual suits for damages, aggrieved persons may be without any effective redress unless they

may employ the class-action device."). This case is a clear example of the category of cases where the

individual members of the proposed class would lack incentive to pursue individual actions as the

possible recovery would likely be far outweighed by the expense of such action. Also, where, as here,

common issues predominate, it would be far more efficient to have the common issues raised by

Plaintiffs' claims litigated in a single action, as opposed to thousands or more individual actions. The

Court has determined that common issues predominate over individual issues, balancing the

superiority requirement in favor of a class action over thousands of individual lawsuits. The applicable

state bodies of law are not so divergent from federal antitrust law so as to preclude a single trial on all

three.

　　　To be sure, management of the class action will present challenges, but Defendants have failed

to suggest any superior alternatives. Individual claims may be too small for a separate action by each

class member. "Because common questions of law and fact predominate, class-wide adjudication

appropriately conserves judicial resources and advances society's interests in judicial efficiency,"

Carriuolo, 823 F.3d at 989 (citing Falcon, 457 U.S. at 155), and class treatment is superior to other

available methods for the fair and efficient adjudication of this controversy. The Court concludes that

the superiority requirement of Rule 23(b)(3) has been satisfied.

**IV.    Class Definition**

The Eleventh Circuit requires a class definition to "contain[ ] objective criteria that allow for class members to be identified in an administratively feasible way." Karhu v. Vital Pharm., Inc., 621 F. App'x 945, 946 (11th Cir. 2015). It appears that the administratively feasible way for Plaintiffs to identify class putative class members is through self identification affidavits, supported by receipts, banks or credit card statements. See Karhu, 621 F. App'x at 948; Delta/AirTran Baggage Fee, 317 F.R.D. at 692. The business records of each putative plaintiff's ECP may also provide information as to each putative plaintiff's contact lens purchases. Identifying putative class members must be ministerial in nature, and more administratively manageable than multiple individual lawsuits. "The Court is cognizant of the concerns raised by self-identification, but in a case such as this, where the charge at issue is so small that it is unlikely to induce fraudulent claims and class members can obtain objective records with relative ease that would confirm their membership in the class, those concerns are minimized." Delta/AirTran Baggage Fee, 317 F.R.D. at 692. Additionally, it is unclear whether contact lens prescriptions and refills by product can be tracked through Defendant Manufacturer's business records, and traced to individual consumers. Plaintiffs will be required to support each putative class member's inclusion in the respective class with verifiable documentation to eliminate the need for "a series of mini trials" as to the threshold issue of class membership, while at the same time protecting the Defendants' due process rights. See Karhu, 621 F. App'x at 947-49. "[A]s the process for submitting and confirming class members' claims is further developed, the Court (and no doubt Defendants) will remain vigilant that the process be structured in a manner to eliminate as much of the uncertainty as possible." Delta/AirTran Baggage Fee, 317 F.R.D. at 692.

The Court also approves of the creation of subclasses proposed by Plaintiffs to address variations in state law. See Klay, 382 F.3d at 1262 (observing that "class certification is appropriate

where 'variations [in state law] can be effectively managed through creation of a small number of subclasses grouping the states that have similar legal doctrines.'" (citation omitted)). "[T]he Court may certify multi-state classes even if different claims or issues are subject to different bodies of law that are not the same in functional content but nonetheless present a limited number of patterns that the court can manage by means of sub-classing." Checking Account Overdraft Litig., 307 F.R.D. at 652 (internal quotation marks and citation omitted).

The Court determines that the following definitions provide objective criteria for ascertaining who is a member of the class, that is not unlimited, overly broad, open-ended or vague, and that feasibly can be managed.

Horizontal Class:

> All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by Alcon, JJVC, or B&L from June 1, 2013 to the present (the "Class Period") for their own use and not for resale, where the prices for such contact lenses were subject to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are any purchases from 1-800Contacts of disposable contact lenses subject to B&L's Unilateral Pricing Policy, where the purchase occurred on or after July 1, 2015. Also excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any coconspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

The proposed Horizontal Class consists of the following subclasses:

(1) Maryland Subclass:

> All persons and entities residing in Maryland who made retail purchases of disposable contact lenses manufactured by Alcon, JJVC, or B&L from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were subject to a

"Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are any purchases from 1-800 Contacts of disposable contact lenses subject to B&L's Unilateral Pricing Policy, where the purchase occurred on or after July 1, 2015. Also excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any coconspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

(2) California Subclass:

All persons and entities residing in California who made retail purchases of disposable contact lenses manufactured by Alcon, JJVC, or B&L from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were subject to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are any purchases from 1-800 Contacts of disposable contact lenses subject to B&L's Unilateral Pricing Policy, where the purchase occurred on or after July 1, 2015. Also excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any coconspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

Vertical Classes:

(1) The JJVC Class

All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by JJVC from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were subject to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, all governmental entities, and any judges, justices, or jurors assigned to hear any aspect of this action.

(2) The Alcon Class:

All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by Alcon from June 1, 2013 to the date the Court certifies the Class for their own use and not for

resale, where the prices for such contact lenses were subject to a "Unilateral
Pricing Policy" and the purchase occurred during the period when the
Unilateral Pricing Policy was in effect.  Excluded from the Class are
Defendants, their parent companies, subsidiaries, and affiliates, any co-
conspirators, all governmental entities, and any judges, justices, or jurors
assigned to hear any aspect of this action.

(3) The B&L Class:

All persons and entities residing in the United States who made retail
purchases of disposable contact lenses manufactured by B&L from June 1,
2013 to the date the Court certifies the Class for their own use and not for
resale, where the prices for such contact lenses were subject to a "Unilateral
Pricing Policy" and the purchase occurred during the period when the
Unilateral Pricing Policy was in effect.  Excluded from the Class are any
purchases from 1-800 Contacts of disposable contact lenses subject to B&L's
Unilateral Pricing Policy, where the purchase occurred on or after July 1,
2015.  Also excluded from the Class are Defendants, their parent companies,
subsidiaries and affiliates, any co- conspirators, all governmental entities, and
any judges or justices assigned to hear any aspect of this action.

See (Docs. 611-1; S-649-1);  (Docs. 715 at 11; S-722 at 11).

## V.   Plaintiffs' Motion for Sanctions

Two days before the evidentiary hearing—on July 30, 2018—Plaintiffs filed a motion seeking

sanctions for the alleged destruction of evidence. (Doc. 854).[5]  The motion alleges that Defendants

JJVC and Alcon had a duty to preserve and disclose a Facebook group called "UPP Violations," which

was created and administered by Dr. Alan Glazier, an influential optometrist, sometime in 2014.

Plaintiffs allege that Defendants utilized the UPP Violations group to exchange non-public information

---

[5] On September 26, 2018, the Court ordered the parties to submit a joint notice indicating their respective
positions on whether the Court may consider the Plaintiffs' factual allegations regarding their motion as part of the
Court's determination of Plaintiffs' motion for class certification. (Doc. 894).  The parties' joint submission indicates
that the parties disagree on whether Plaintiffs' factual allegations should be so considered. (Doc. 902).  As the remainder
of this section indicates, the Court has decided to take Plaintiffs' motion under advisement.

and enforce their UPPs. Plaintiffs submitted evidence documenting that Defendants were aware of the group and utilized the group as an informal means of enforcing their UPPs. Plaintiffs suggest that this evidence is consistent with their allegations of conspiracy. Although the Court has already decided to grant class certification, information contained in the motion's sealed exhibits revealed the following:

- That information concerning Costco's noncompliance with JJVC's UPP was posted on the UPP Violations group and that JJVC was aware that the information had been posted on the group. (Doc. 854 Exs. 60, 62);

- That Dr. Glazier, through Facebook, encouraged Defendants to address violations listed on the UPP Violations group and described the relationship between the ODs and Defendants as a "partnership." (Id. Ex. 52);

- That Dr. Glazier would "tag" Defendants to notify them when violations had been posted to the UPP Violations group. (Id. Ex. 53);

- That at least two JJVC employees were members of the UPP Violations group, (Doc. 901 Exs.1–2), and encouraged other employees to join. (Doc. 854 Ex. 56);

- That the existence of the UPP Violations group was discussed in emails exchanged between Alcon employees. (Id. Ex. 36);

- That the existence of the UPP Violations group was discussed in emails exchanged between CV employees. (Id. Ex. 73).

In October 2017, the Court ordered Dr. Glazier—who is not a party to this litigation—to produce content from another Facebook group he created and administered called "ODs on Facebook." (Doc. 687). Plaintiffs allege that the ODs on Facebook group contained numerous references to the UPP Violations group, which, Plaintiffs suggest, is when they first became aware of the second

Facebook group. Plaintiffs' subsequent attempts to recover information from the UPP Violations group revealed that the group had been deleted by Dr. Glazier during the pendency of this litigation.

Plaintiffs have provided evidence that at least two employees of JJVC were members of the UPP Violations group, (Doc. 901 Exs.1–2), and that other JJVC employees were aware of the group's existence. (Id. Ex. 20; Doc. 881 Exs. 10–11). Alcon acknowledges that a number of its sales representatives had access to the group, but denies that any of the employees responsible for implementing and enforcing its UPP were members of the group, or asked anyone with access to monitor or post content within the group. (Doc. 886 at 5).[6]

In any case, Plaintiffs contend that the deletion of the UPP Violations' contents, which are not recoverable, deprived Plaintiffs of "likely thousands of Facebook posts and comments" supporting their present claims. (Doc. 854 at 2). As a consequence, Plaintiffs request that the Court impose severe sanctions on JJVC and Alcon in the form of "(1) an adverse presumption from the Court on class certification and summary judgment; and (2) a mandatory adverse jury instruction at trial that the content of the UPP Violations group was unfavorable to Defendants." (Id.). Plaintiffs also seek an order compelling B&L and ABB to promptly disclose all employees who had access to the group. (Id.). Defendants oppose the motion on various grounds.

"[S]poliation is defined as the destruction of evidence or the significant and meaningful alteration of a document or instrument." Green Leaf Nursery v. E.I. DuPont De Nemours & Co., 341 F.3d 1292, 1308 (11th Cir. 2003). Spoliation of electronically stored information (ESI) is now

---

[6] Plaintiffs are not currently seeking sanctions against Defendants B&L and ABB. B&L denies that any of its employees monitored, posted, or otherwise participated in the UPP Violations group. (Doc. 879). ABB avers that one of its document custodians was a member of the group, but that his membership was unrelated to his employment. (Doc. 882). Plaintiffs' request the Court to order B&L and ABB to conduct further investigations into whether its employees were members of the group.

governed by Federal Rule of Civil Procedure 37(e), which applies to all civil cases commenced after

December 1, 2015. See Wooden v. Barringer, No. 3:16-CV-446-MCR-GRJ, 2017 WL 5140518, at *3

(N.D. Fla. Nov. 6, 2017) ("[W]hen dealing with ESI, Federal Rule of Civil Procedure 37(e) now

governs a district court's power to sanction a party for spoliation of electronically stored

information."). As a consequence, Rule 37(e) "foreclose reliance on inherent authority to . . .

determine when certain measures should be used." Id. (quoting Fed. R. Civ. P. 37 Advisory

Committee's Note (2015)).

> The text of Rule 37 provides:
>
> > (e) If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> >
> > > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> > >
> > > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> > > > (A) presume that the lost information was unfavorable to the party;
> > > >
> > > > (B) instruct the jury that it may or must presume the information was unfavorable to the party;
> > > >
> > > > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37. Thus, assuming sanctions are justified, the severity of the sanctions imposed are

determined by the spoliating party's culpability in depriving its opponents of the information.

The Rule 37(e) determination is governed by a multi-step analysis. See Wooden, 2017 WL 5140518, at *5. The first step asks whether "there was a duty to preserve the data in issue." Id. If the Court determines that no such duty exists, the analysis ends. Id. at *7. Otherwise, the Court proceeds to answer whether "reasonable steps [were] taken to avoid the loss of the data." Id. at *5. Should the Court conclude that reasonable steps were not taken, and if the lost data cannot be acquired through other means of discovery, the Court must determine whether and to what extent the loss of information prejudiced the other party. Id. "If so, the Court may impose 'measures no greater than necessary to cure the prejudice.'" Id. (quoting Fed. R. Civ. P. 37(e)(1)). However, should the Court find that the data was lost "with the intent to deprive another party of the information's use in the litigation," the Court may impose the harsher sanctions delineated in Rule 37(e)(2).

Rule 37(e), however, "does not apply when information is lost before a duty to preserve arises." Fed. R. Civ. P. 37(e) Advisory Committee's Note (2015); Wooden, 2017 WL 5140518, at *7 ("If the Court finds [a party] . . . did not have a duty to preserve the evidence, the analysis ends.). Generally, a party's preservation duties attach only to evidence within that party's possession, custody, or control. See Watson v. Edelen, 76 F. Supp. 3d 1332, 1343 (N.D. Fla. 2015) ("For a spoliation sanction to apply, it is essential that the evidence in question be within the party's control, that is, the party actually destroyed or was privy to the destruction of the evidence. Further, the party having control over the evidence must have an obligation to preserve it at the time it was destroyed . . . .").

A party may nonetheless "be in control of information that it does not own or physically possess." Selectica, Inc. v. Novatus, Inc., No. 6:13-CV-1708-ORL-40, 2015 WL 1125051, at *4 (M.D. Fla. Mar. 12, 2015). "Control has been construed broadly by the courts as the legal right, authority or practical ability

168

to obtain the materials sought on demand" Id. (quoting NASDAQ Market-Makers Antitrust Litigation, 169 F.R.D. 493, 530 (S.D.N.Y. 1996)) (internal quotation marks omitted).

At the outset, it is important to note that Plaintiffs do not dispute that Dr. Glazier created and administered the UPP Violations group, controlled its membership, and ultimately deleted its contents. Moreover, Plaintiffs do not argue that JJVC's retention of Dr. Glazier as a paid consultant established JJVC's control over the UPP Violations group. Instead, Plaintiffs argue that because certain employees of JJVC and Alcon were members of the UPP Violations group—or at least monitored the group—their resultant access established in both Defendants the "practical ability" to control and preserve the group's contents.

Plaintiffs primarily rely on the Selectica case for the contention that "when a party has *access* to relevant evidence of Facebook, that evidence falls within that party's 'possession, custody, or control'. . . ." (Doc. 854 at 18-19) (emphasis in original). However, Selectica's articulation of the "practical ability" test undermines the extraordinarily broad interpretation Plaintiffs advance here:

> [Under the "practical ability" test], a party might control a non-party based upon their relationship. The attorney-client relationship and the corporate parent-subsidiary relationship are examples. A party may control a non-party if there is a contract empowering the party to obtain information from the non-party. Control may also exist if it is customary in the industry for the non-party to furnish the information to the party. On the other hand, if extraordinary, unethical, or illegal means are required, then there is no practical ability to obtain the information.
>
> The employer-employee relationship is one that may result in an employer party having the necessary control over information in the possession of a non-party employee. "Relationships which evidence a legal right of a party to obtain a document from nonparty include . . . an employer from current employees." Bleecker v. Standard Fire Ins. Co., 130 F. Supp. 2d 726, 739 (E.D.N.C. 2000). This is consistent with the holdings in cases discussing the control an employer may possess over former

> employees. See, e.g., Export–Import Bank of the U.S. v. Asia Pulp & Paper
> Co., Ltd., 233 F.R.D. 338, 341–42 (S.D.N.Y.2005) ("Analyzing
> the practical ability of corporations to obtain work-related documents from
> former employees, courts insist that corporations, at the very least, ask their
> former employees to cooperate before asserting that they have
> no control over documents in the former employees' possession."); In re
> Folding Carton Antitrust Litigation, 76 F.R.D. 420, 423 (N.D. Ill. 1977) ("In
> the meantime, we assume that, if defendants contact their former employees
> who still receive compensation from them, they will secure the requested
> documents and can produce them to plaintiffs.").

Id. at *5.

Thus, inherent in the "practical ability" test is some legal right of control over the information possessed by a non-party—a right established by, for instance, the existence of an employer-employee relationship, or a legal (e.g., a contractual) entitlement to the information possessed by the non-party. In other words, "practical ability" means something more than the naked ability to "access" information. See Bleecker v. Std. Fire Ins. Co., 130 F. Supp. 2d 726, 739 (E.D.N.C. 2000) (stating, "in order for material to be discoverable, [the] defendant must have some type of legal right to the material [the] plaintiff seeks to discover").[6]

Thus, access attributable to membership in a closed Facebook group would not suffice to confer Defendants a legal entitlement to information posted by non-party members within the group. And other than membership access, Plaintiffs fail to articulate any alternative basis from which the

---

[6] Bleecker's interpretation of "practical ability" as encompassing a legal right to information in the possession of a non-party has been reinforced by district courts within this Circuit. See, e.g., Siegmund v. Xuelian, No. 12-62539-CIV, 2016 WL 1359595, at *3 (S.D. Fla. Apr. 6, 2016) ("[E]ven under the most expansive interpretation of 'control', the 'practical ability' to demand production must be accompanied by a similar ability to enforce compliance with that demand." (quoting Klesch & Co. v. Liberty Media Corp., 217 F.R.D. 517, 520 (D. Colo. 2003))); Mamani v. De Lozada Sanchez Bustamante, No. 07-22459-CIV, 2017 WL 3456327, at *3 (S.D. Fla. Aug. 11, 2017) ("[The plaintiff] can be compelled to produce only documents that he has the 'legal right' to obtain 'upon demand' with the 'ability to enforce compliance with that demand.' ").

Court can conclude that any Defendant had the ability to control Dr. Glaizer, or otherwise enforce his compliance with discovery demands.[7]

It is also critical to note that courts routinely "decline[] to compel production of documents in the hands of one party when the material is equally available to the other party from another source." S.E.C. v. Strauss, No. 09 CIV. 4150 RMB/HBP, 2009 WL 3459204, at *11 (S.D.N.Y. Oct. 28, 2009); Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130, 138 (2d Cir. 2007) (stating, "We . . . think it fairly obvious that a party also need not seek such documents from third parties if compulsory process against the third parties is available to the party seeking the documents"); Valenzuela v. Smith, 04 Civ. 0900, 2006 WL 403842 at *2 (E.D. Cal. Feb. 16, 2006) ("Defendants . . . will not be compelled to produce documents that are equally available to plaintiff."); Bleecker, 130 F. Supp. 2d at 738 ("When information is readily attainable through a *subpoena duces tecum*, no compelling reason exists to expand the definition of control."); Blair v. Travelers Ins. Co., 9 F.R.D. 99, 99 (W.D. Mo.1949) (motion for production denied where "[n]early all the documents sought can be obtained by the plaintiff as easily as they can be obtained by the defendant").

Whether Plaintiffs were in fact aware of the UPP Violations group at the time they subpoenaed Dr. Glazier in July of 2016 is a matter of dispute. What is not in dispute, however, is that Plaintiffs

---

[7] Plaintiffs cite a litany of cases for the proposition that "when a party has access to relevant evidence on Facebook, that evidence falls within that party's 'possession, custody, or control' and must be preserved and/or produced." (Doc. 854 at 19). Plaintiffs' cases, however, all involve the social media posts of persons who were *a party* to the litigation. See Painter v. Atwood, No. 2:12-CV-01215-JCM, 2014 WL 1089694, at *4 (D. Nev. Mar. 18, 2014) (adverse inference granted in part where the *plaintiff* deleted Facebook posts and pictures created and maintained by the *plaintiff*); Howell v. Buckeye Ranch, Inc., No. 2:11-CV-1014, 2012 WL 5265170, at *2 (S.D. Ohio Oct. 1, 2012) (motion to compel production of relevant information contained within the *plaintiff's* private social media accounts granted); Higgins v. Koch Dev. Corp., No. 3:11-CV-81-RLY-WGH, 2013 WL 3366278, at *3 (S.D. Ind. July 5, 2013) (compelling *plaintiffs* to produce their own Facebook posts); Federico v. Lincoln Military Hous., LLC, 2014 U.S. Dist. LEXIS 178943, *18 (E.D. Va. Dec. 31, 2014) (motion for sanctions granted in part for the *plaintiffs'* failure to turn over their own social media posts in timely manner).

were aware, likely before the commencement of this litigation, that Dr. Glazier controlled information that they believed was relevant to the case.[8]

That Plaintiffs were able to subpoena Dr. Glazier—and also obtain an order from this Court enforcing that subpoena—reflects that Plaintiffs possessed sufficient means to procure the now-deleted information for themselves. The conclusion is only bolstered in considering that Judge Klindt's enforcement order explicitly noted Defendants' lack of control over Dr. Glazier's ODs on Facebook group. (Dkt. 881-56 (stating, in regard to the ODs on Facebook group, "it does not appear that Defendants have in their control the majority of the information Plaintiffs seek," and "the information is appropriately sought from Dr. Glazier, as the groups administrator"). As such, it would be inappropriate to compel, much less sanction, Defendants for failing to preserve materials—materials controlled by a non-party—that Plaintiffs had the ability to obtain themselves. See Bleecker, 130 F. Supp. 2d at 738 ("When information is readily attainable through a *subpoena duces tecum*, no compelling reason exists to expand the definition of control.").

Finally, Plaintiffs contend that subpoenas issued on Defendants between October 2014 and May 2015 by New York's Attorney General triggered preservation obligations with respect to Plaintiffs. However, this argument—the "shifting duty" argument—has been considered and uniformly rejected by district courts within the Eleventh Circuit. See In re Delta/AirTran Baggage Fee Antitrust Litig., 770 F. Supp. 2d 1299, 1308 (N.D. Ga. 2011) (rejecting the shifting duty argument and stating, "Plaintiffs have not cited any authority that would support such a sweeping and novel theory of spoliation"); In re Abilify (Aripiprazole) Prod. Liab. Litig., No. 3:16-MD-2734, 2018 WL 4856767, at

---

[8] Plaintiffs' First Amended Consolidated Complaint, filed in November of 2015, refers to the "ODs on Facebook" group twice. (See Doc. 133).

*5 (N.D. Fla. Oct. 5, 2018) ("The fatal flaw . . . to Plaintiffs' argument concerning the DOJ investigation is that other courts addressing the same shifting duty argument have rejected it."); Stanfill v. Talton, 851 F. Supp. 2d 1346, 1366 (M.D. Ga. 2012) ("The Court is not aware of any decision by a court in this circuit adopting the 'shifting duty' argument urged by the Plaintiff, and on the facts here, this Court declines the opportunity to be the first."); Point Blank Sols., Inc. v. Toyobo Am., Inc., No. 09-61166-CIV, 2011 WL 1456029, at *24 (S.D. Fla. Apr. 5, 2011) ("The shifting duty theory is incompatible with the basic rule that a duty is owed to a specific party.").

In sum, Plaintiffs' arguments and submitted evidence, at present, do not justify the imposition of sanctions for spoliation. The Court, however, is cognizant of the fact that Plaintiffs learned of the UPP Violations group late in the case, and may not have had adequate time to sufficiently develop evidence concerning the connection between Defendants and Dr. Glazier or the UPP Violations group. For that reason, the Court will take Plaintiffs' motion for sanctions under advisement. The Court will revisit the motion at trial before the jury instructions are finalized; after the parties have had further opportunities to develop the record with respect to the spoliation issue. The Court will also reopen discovery, for only 60 days, with respect to Defendants B&L and ABB for the limited purpose of investigating whether any connection existed between those Defendants and the UPP Violations group.

## VI.    Trial Plan

In light of the fact that seven motions for summary judgment are currently pending, (Docs. 872–874, 877, 906, 908, 912), the Court will not order the parties to submit a Trial Plan until those motions are resolved. The parties are hereby notified that resolution of the motions may require the pretrial conference and trial be rescheduled for a later date.

173

Accordingly, it is hereby **ORDERED**:

1.  Defendants' Motion to Strike Portions of the Expert Report of Dr. John L. Solow and Preclude Testimony Regarding Purported Collusion Between the Defendants, Pursuant to Fed. R. Evid. 702 and *Daubert* (Doc. 500, Doc. S-531) is **DENIED**.

2.  Defendants' Motion to Exclude or Strike the Expert Report of Dr. Michael A. Williams Under Fed. R. Evid. 702 and Fed. R. Civ. P. 37(c)(1)  (Doc. 503; Doc. S-535) is **DENIED**.

3.  Defendants' Motion to Exclude the Supplemental Report of Dr. Michael A. Williams Under Fed. R. Evid. 702 and *Daubert* (Doc. 693; Doc. S-720) is **DENIED**.

4.  Plaintiffs' Motion for Class Certification.  (Doc. 396; Doc. S-404) is **GRANTED**.

5.  The Court certifies the following classes as to Plaintiffs' claims brought in Plaintiffs' Interlineation To Corrected Consolidated Class Action Complaint (Doc. 395):

Horizontal Class:

> All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by Alcon, JJVC, or B&L from June 1, 2013 to the present (the "Class Period") for their own use and not for resale, where the prices for such contact lenses were subject to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are any purchases from 1-800 Contacts of disposable contact lenses subject to B&L's Unilateral Pricing Policy, where the purchase occurred on or after July 1, 2015. Also excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any coconspirators, all

174

governmental entities, and any judges or justices assigned to hear any aspect of this action.

The proposed Horizontal Class consists of the following subclasses:

(1) <u>Maryland Subclass</u>:

> All persons and entities residing in Maryland who made retail purchases of disposable contact lenses manufactured by Alcon, JJVC, or B&L from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were subject to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are any purchases from 1-800 Contacts of disposable contact lenses subject to B&L's Unilateral Pricing Policy, where the purchase occurred on or after July 1, 2015. Also excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any coconspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

(2) <u>California Subclass</u>:

> All persons and entities residing in California who made retail purchases of disposable contact lenses manufactured by Alcon, JJVC, or B&L from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were subject to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are any purchases from 1-800 Contacts of disposable contact lenses subject to B&L's Unilateral Pricing Policy, where the purchase occurred on or after July 1, 2015. Also excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any coconspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

Vertical Classes:

(1) The JJVC Class

> All persons and entities residing in the United States who made retail purchases of disposable contact lenses

175

manufactured by JJVC from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were subject to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, all governmental entities, and any judges, justices, or jurors assigned to hear any aspect of this action.

(2) The Alcon Class:

All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by Alcon from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were subject to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, all governmental entities, and any judges, justices, or jurors assigned to hear any aspect of this action.

(3) The B&L Class:

All persons and entities residing in the United States who made retail purchases of disposable contact lenses manufactured by B&L from June 1, 2013 to the date the Court certifies the Class for their own use and not for resale, where the prices for such contact lenses were subject to a "Unilateral Pricing Policy" and the purchase occurred during the period when the Unilateral Pricing Policy was in effect. Excluded from the Class are any purchases from 1-800 Contacts of disposable contact lenses subject to B&L's Unilateral Pricing Policy, where the purchase occurred on or after July 1, 2015. Also excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co- conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

6.    The determination of the definition of the classes is conditional and may be

amended or modified prior to any decision on the merits and final judgment. See Fed. R. Civ. P.

23(c)(1)(C).

7.   Hausfeld LLP, Robins Kaplan LLP, and Scott + Scott LLP remain appointed as class counsel.

8.   The following Plaintiffs are appointed as class representatives:

Rachel Berg

Alexis Ito

Miriam Pardoll

Jennifer Sineni

Pamela Mazzarella

Joseph Felson

Tamara O'Brien

Susan Gordon

Catherine Dingle

Elyse Ulino

Amanda Cunha

Sheryl Marean

Brett Watson

Kathleen Schirf

Cora Beth Smith

John Machikawa

7.   Pursuant to Rule 23(c)(2)(B), Federal Rules of Civil Procedure, the parties shall confer and submit to the Court, on or before **January 16, 2019**, a joint proposed class notice plan and form of notice. If the parties are unable to agree on a class notice plan and form of notice, the parties shall each submit one on or before **January 30, 2019**, accompanied by a memorandum explaining that party's position. Each party shall respond to the other's proposed notice plan and form of notice no later than **February 13, 2019**.

177

8.      Plaintiffs' "Motion for Spoliation Sanctions Against Defendants Johnson & Johnson Vision Care, Inc. and Alcon Laboratories, Inc." (Doc. 854) is **TAKEN UNDER ADVISEMENT.**

9.      Discovery shall be **REOPENED,** for **45 days**, with respect to Defendants B&L and ABB for the limited  purpose of investigating whether any connection exists between those Defendants and Dr. Glazier and the UPP Violations group.

**DONE AND ORDERED** in Jacksonville, Florida, this ⁄⁄ day of December, 2018.

HARVEY E. SCHLESINGER
United States District Judge

Copies To:
Counsel of Record

178