**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| In Re: | Case No. 3:15-md-2626-HES-JRK |
|---|---|
| **DISPOSABLE CONTACT LENS ANTITRUST LITIGATION** | **Judge Harvey E. Schlesinger** <br> **Mag. Judge James R. Klindt** |
| **THIS DOCUMENT RELATES TO:** <br><br> **Alcon Vision, LLC v. Lens.com, Inc., No. 3:19-cv-706-J-20JRK** | |

**MOTION AND SUPPORTING MEMORANDUM OF ALCON VISION, LLC TO DISMISS COUNTERCLAIMS III AND IV OF LENS.COM, INC.**

Pursuant to Fed. R. Civ. P. 12(b)(6) and Middle District Local Rule 3.01, Alcon Vision, LLC ("Alcon") hereby moves to dismiss the only claims asserted against Alcon by Lens.com, Inc. ("Lens.com"), including Counterclaims III and IV of Lens.com's First Amended Answer, Defenses, and Counterclaims (the "Counterclaims"), for the following reasons and as set forth more fully in the accompanying Memorandum of Law.

1. Lens.com's claims are time-barred. Lens.com's claims are subject to four-year statutes of limitations, which began to run from the alleged acts of misconduct. Lens.com alleges anticompetitive conduct dating back decades, and its allegations concerning Alcon's unilateral pricing policy ("UPP"), date back to at least as early as June 2013, when Alcon's UPP was implemented. Therefore, the statutes of limitations for these claims expired no later than June 2017, nearly two years before Lens.com asserted its counterclaims in February 2019. Hence, Lens.com's claims are time-barred.

1

2.      Lens.com also lacks antitrust standing to bring its UPP counterclaims. To establish antitrust standing, Lens.com must have suffered the kind of injury for which it is entitled to protection under the antitrust laws.  It did not.  Lens.com had no relationship with Alcon or its authorized distributors, and it was not obligated to—nor did it—comply with Alcon's UPP.  Lens.com sourced contact lenses internationally, where Alcon's UPP did not apply, and was able to sell contact lenses in the United States at whatever prices it chose. Accordingly, Alcon's UPP did not injure Lens.com; to the contrary, it benefitted Lens.com (by allegedly setting a higher prevailing market price, which Lens.com could undercut without consequence, thereby taking sales from ECPs and other retailers).  Thus, according to Lens.com's own allegations, Alcon's UPP allowed Lens.com to make more money than it otherwise would have by establishing allegedly inflated UPP prices.

3.      Finally, Lens.com cannot show anticompetitive effect, as is required to establish an unlawful vertical restraint.  To make out such a claim, Lens.com was required to plead facts to show that the challenged restraint had either potential anticompetitive effect or actual anticompetitive effect in a relevant product market.  By Lens.com's own account, Alcon occupied only 22.7% of the disposable contact lens market, which is presumptively insufficient to support an allegation of potential anticompetitive effect, and Lens.com's allegations of an Alcon-only market are legally defective.  Lens.com's allegations of actual anticompetitive effect are likewise meritless.  An allegation of an increase in retail prices is insufficient as a matter of law to plead the anticompetitive effect of a vertical restraint. Similarly, Lens.com's allegation that Alcon's UPP sought to exclude Lens.com from the

disposable contact lens market is insufficient, because, among other things, Alcon's UPP failed to exclude Lens.com from the market and was ultimately withdrawn.

WHEREFORE, Alcon respectfully requests that this Court grant Alcon's motion to dismiss Counterclaims III and IV with prejudice.

## MEMORANDUM OF LAW

### Preliminary Statement

This is a case about a gray market reseller of contact lenses (Lens.com) that seeks to deflect attention from its violations of Alcon's intellectual property rights by parroting the UPP allegations pending before this Court for more than four years.  Without Alcon's permission, Lens.com is selling Alcon contact lenses in a manner that infringes Alcon's trademarks, misleads consumers as to what they are purchasing, and deprives contact lens patients of important safety and usage information.  Alcon sued Lens.com in the United States District Court for the Eastern District of New York for trademark infringement, false designation of origin, deceptive trade practices, false advertising, and unfair competition.  In response, Lens.com belatedly asserted a long list of counterclaims, including two claims concerning Alcon's UPP, which Lens.com has known about since its adoption in 2013 (more than six years ago).  Lens.com tried to use its assertion of UPP counterclaims to have Alcon's entire trademark case transferred out of New York, whose laws it perceives as unfavorable, but that effort failed.  The Judicial Panel on Multidistrict Litigation ("JPML") declined to transfer either Alcon's claims or Lens.com's non-UPP counterclaims to this Court, and transferred only Lens.com's two UPP counterclaims, which are the only Lens.com claims

before this Court.  As is discussed in detail below, Lens.com's UPP counterclaims are rife with contradiction and fail as a matter of law.[1]

        *First*, Lens.com's counterclaims are time-barred.  The statutes of limitations concerning Lens.com's UPP counterclaims are four years and the asserted claims accrued, if at all, upon the occurrence of the alleged misconduct.  Lens.com alleges a multi-decade-long exclusionary conspiracy beginning in the early 1990s, including Alcon's adoption of a UPP in June 2013.  Therefore, the statutes of limitations concerning Lens.com's UPP counterclaims began accruing no later than June 2013 and expired as of June 2017 at the latest.  Because Lens.com did not bring its claims until February 2019, they are barred by the statutes of limitations.

        *Second*, Lens.com lacks antitrust standing to pursue its UPP counterclaims.  To establish antitrust standing, a plaintiff must demonstrate that it suffered an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful.  Lens.com benefitted from UPP prices in the market, because as an unauthorized gray market reseller, it could charge whatever it wanted for Alcon lenses and continue to source Alcon lenses from alternative, unauthorized sources, and it had the ability to make more money than it otherwise would have by undercutting the UPP price.  Moreover, Lens.com's alleged injury did not flow from the alleged conspiracy to implement the UPPs, because its purported injury of being unable to maintain a full product line was due

---

[1] Alcon is also in litigation with Allied Vision Group, Inc. ("AVG"), another gray market reseller, who like Lens.com, filed UPP counterclaims against Alcon that have been transferred to this Court.  By way of a separate motion filed therein, Alcon seeks to dismiss AVG's UPP counterclaims as well.  Because the UPP counterclaims filed by AVG and Lens.com are substantially the same, Alcon's motions as to each are substantially the same.

to its refusal to commit not to source from unauthorized or potentially unregulated sources of supply.

   *Third*, Lens.com fails adequately to plead anticompetitive effect in a relevant market as a whole.  Lens.com fails to plead potential anticompetitive effect because it alleges that Alcon occupies less than one quarter of the disposable contact lens market, which is insufficient as a matter of law, and its alternative allegation, that each brand and type of contact lenses is its own relevant market, is contrary to law.  Lens.com's allegations of actual anticompetitive effect are similarly without merit, as higher retail prices and a failed attempt to exclude a competitor are insufficient to allege actual anticompetitive effect in the relevant market.

   For at least these reasons, Lens.com's Counterclaims fail to state a claim on which relief can be granted and should be dismissed with prejudice.

## Statement of Facts[2]

A.   <u>The Parties</u>

   Alcon was founded in 1947 as a small pharmacy focused on sterile ophthalmic products, and has developed into a world-renowned developer and manufacturer of contact lenses, prescription eye care products, surgical devices for eye care practitioners, and over-the-counter eye care products.  (Ex. 1 (Alcon's Compl.) ¶ 6.)  Alcon's mission is to provide innovative products that enhance quality of life by helping people see better.  (*Id.*)  Alcon

---

[2] Although Alcon disputes Lens.com's allegations, this Motion assumes the truth of Lens.com's well-pled factual assertions, as is required on a motion to dismiss.  Citations herein to Lens.com's Counterclaims are given as "¶ __" or "¶¶ __".  Citations herein to exhibits are to the Exhibits to the Declaration of Gawon Go, which are given as "Ex. __."

sells its contact lenses directly to wholesalers, authorized distributors and certain contact lens retailers.  (¶¶ 67-68, 70.)  Authorized distributors, in turn, sell Alcon's contact lenses to eye care practitioners ("ECPs") and retailers, which then sell contact lenses to consumers. (¶¶ 68-70.)  Alcon allegedly occupied 22.7% of the disposable contact lens market as of 2013.  (¶ 67.)

Lens.com is a gray market reseller of contact lenses, including Alcon contact lenses, which means that it purchases contact lenses that are intended to be sold outside the United States and imports them into the United States for domestic resale.  (¶¶ 78-84.)  Lens.com claims to have "long been at the forefront of the development of [an] alternative channel of distribution" whereby it buys contact lenses wholesale, mostly from overseas sources for significantly less money, and then resells them to consumers over the internet.  (¶ 182.)  Alcon had discussions with Lens.com regarding opportunities for Lens.com to become an authorized dealer of, or to buy Alcon products directly from, Alcon, so that any Alcon contact lenses that Lens.com sold to its consumers were authentic and safe, in the appropriate U.S. packaging.  (18-cv-00407, ECF No. 20, ¶¶ 72-73.)  However, Lens.com rejected every Alcon proposal.  (*Id.* at ¶ 72.)  To this day, Lens.com does not buy contact lenses from Alcon or its authorized distributors, though Lens.com has used deceptive means (*i.e.*, setting up false dummy accounts) to attempt to purchase Alcon lenses from authorized distributors.  (¶¶ 223-24, 42-43.)

B.    Lens.com's U.S. Actions

Alcon sells certain contact lenses in the United States in U.S.-only packaging, which has features that promote safety, such as U.S.-specific lot numbers to facilitate

6

package tracking in the event of a recall.  (¶¶ 232-33.)  As they come off the manufacturing line, certain of Alcon's contact lens brands do not meet a certain FDA standard for sale in the United States.  Those lenses are segregated into a separate supply chain and sold only in markets outside of the United States that are not subject to a similar regulatory requirement.  (¶¶ 281-82.)

Rather than purchasing Alcon contact lenses from Alcon or its authorized distributors, Lens.com instead purchased them from outside of the United States, especially in India, and resold them to consumers within the United States.  (Ex. 1 (Alcon's Compl.) ¶ 79.)  These gray market Alcon products bore non-U.S. packaging, which lacks U.S. specific lot numbers, readily accessible detailed insertion and removal instructions, a toll-free patient helpline and email address to permit patients to easily contact Alcon directly with questions, and a dedicated website address for at-home and online support.  (*Id.* ¶¶ 84-85.)  Some of these gray market contact lenses had actually been discontinued as early as 2014 within the United States.  (*Id.* ¶¶ 90-93.)  Lens.com's sale of the products led consumers to believe that the products were approved for U.S. distribution, made recall more difficult, and compromised Alcon's quality control process.  (*Id.* ¶ 92.)

C.     Alcon's Lawsuit Against Lens.com

On January 19, 2018, Alcon brought an action against Lens.com in the United States District Court of the Eastern District of New York challenging Lens.com's sale of contact lenses that bear non-U.S. packaging within the United States.  (Ex. 1 (Alcon's

Compl.).)  Alcon's complaint asserts claims for trademark infringement, false designation of origin, deceptive trade practices, false advertising, and unfair competition.

Lens.com attempted to have the case transferred to the District of Nevada, whose laws it perceived as being more favorable, on purported convenience and interests of justice grounds.  (Ex. 2 (Lens.com's Mem. in Support of Mot. to Dismiss or Transfer Venue) at 1, 18-25.)  That request was denied.  (Ex. 3 (Op. and Order).)

D.     Lens.com's Counterclaims and Removal

Almost a year after Alcon filed its action, on February 14, 2019, Lens.com asserted a series of counterclaims against Alcon, including, but not limited to, claims alleging a group boycott, unlawful tying arrangements, trademark misuse, unlawful monopolization, attempted monopolization, exclusive dealing, false advertising and deceptive practices, and two claims concerning Alcon's UPP (the "Original Counterclaims").  (Ex. 4 (Lens.com's Answer and Countercl.).)[3]  By its counterclaims, Lens.com alleges a far-flung, ill-defined conspiracy dating back to the early 1990s, in which "[t]he ECP community [allegedly]

_____

[3] At a pre-motion conference in the Eastern District of New York, Judge Gershon noted that Lens.com's original counterclaims should be "dismissed if for no other reason than they violate" Federal Rules of Civil Procedure 8, 10 and 11, given that Lens.com's original counterclaims incorporated by reference the entirety of other complaints in different actions, making it essentially impossible for Alcon, as the counterclaim defendant, to answer the pleading.  (Ex. 5 (Pre-Mot. Conference Tr.) at 7; *see id.* at 8 (the court highlighting that "Lens.com's argument that it can simply say we have referred to all of these prior complaints and quote adopt them by reference is just simply wrong. . . . I cannot dismiss anything here without a motion, but my suggestion would be that you amend your pleading and then we will go from there.").)  The court also criticized the sufficiency of Lens.com's conspiracy allegations, noting "[D]on't you have to identify the co-conspirators?  And not just say, thought leader of ECPs or ECPs.  You cannot mean that every eye care provider is a co-conspirator," and explaining that "the secondary problem that I see with this is you say that Alcon does all of these things in order to ingratiate themselves with the eye care providers.  Well, I don't know that that makes an agreement.  Trying to please your . . . retailers, I don't know if that can be a conspiracy."  (*Id.* at 20-21.)  In an attempt to rectify these glaring deficiencies highlighted by Judge Gershon, Lens.com filed its First Amended Answer, Defenses, and Counterclaims.  (Ex. 6 (Lens.com's First Am. Answer and Countercl.).)  However, Lens.com's UPP-related counterclaims remain legally deficient for the reasons set forth herein.

demanded that manufacturers sell lenses only to ECPs, and manufacturers agreed to restrict sales to 'discounters' selling through alternate channels".  (¶ 4.)

Less than two weeks later, on February 27, 2019, Lens.com filed a Notice of Potential Tag-Along to the JPML, requesting that Alcon's action be transferred in its *entirety* to this Court.  (Ex. 7 (Notice of Potential Tag-Along).)  Lens.com based the request on its own assertion of UPP counterclaims, despite the fact that Alcon's UPP was implemented more than six years ago, in 2013; the consolidated class action complaint in *In re Disposable Contact Lens Antitrust Litigation* (the "MDL") was filed in 2015; Lens.com never alleged that it was harmed by Alcon's UPP or in any way challenged Alcon's policy until 2019, when Lens.com was sued for violating Alcon's rights; only two of Lens.com's eleven counterclaims concerned Alcon's UPP; and discovery has long closed in the MDL action in this Court.  (¶¶ 307-426.)

On June 5, 2019, the JPML issued a Transfer Order with Simultaneous Separation and Remand of Certain Claims.  (Ex. 8 (Transfer Order).)  In rejecting Lens.com's request to transfer the action in its entirety to this Court, the JPML "agree[d with Alcon that] the MDL is at a somewhat advanced stage, with discovery completed, and seven summary judgment motions" filed, and it recognized that "Lens.com would be a unique party to the MDL" given its status as a "gray market reseller[]".  (*Id.* at 2.)  The JPML expressed "concern[s] that transferring the entire *Alcon* action would add significant trademark-related allegations, among other issues raised by the counterclaims, that could unduly prolong the MDL proceedings".  (*Id.*)  Instead, the JPML transferred only the two claims that are related to Alcon's UPP—namely, Counterclaims III and IV.

9

E.      Lens.com's UPP Counterclaims

Lens.com's two UPP antitrust counterclaims assert claims under the Sherman Act, the Clayton Act, and the Donnelly Act.  In Counterclaim III, Lens.com alleges a horizontal hub-and-spoke conspiracy among Alcon, other contact lens manufacturers, distributors and ECPs to adopt and implement the UPPs.  (¶¶ 329-337.)  In Counterclaim IV, Lens.com alleges a vertical conspiracy among Alcon, ECPs and other retailers to do the same.  (¶¶ 338-47.)

Lens.com's UPP-related Counterclaims assert that Alcon's allegedly anticompetitive conduct has "one purpose: to *increase* [retail] prices" of disposable contact lenses in the United States.  (¶ 257 (emphasis added).)  Lens.com alleges that Alcon's implementation of its UPP was tailored to "artificially prop up prices charged to patient-consumers" (¶ 211), and that the "goal of UPPs was to eliminate price competition" by requiring all retailers to sell at or above a minimum retail price.  (¶ 165.)  Lens.com contends that these policies "help[ed] ECPs raise profit margins", increased retail prices to consumers, and ultimately caused "the loss of ability [by Lens.com] to sell the products covered by the UPPs if [it] refuse[d] to abide by the UPPs' terms".  (¶ 166, 332, 344.)  Lens.com alleges that it has been "injured in its business and its property in that it has been unable to maintain a full product line, suffered damage to its reputation, lost customer goodwill, and been forced to purchase lenses through gray-market sellers and other alternative suppliers", though it does not describe such injuries in any detail or explain how the UPP caused such injuries. (¶¶ 336, 345.)

Despite Lens.com's conclusory allegations of injury, Alcon's UPP did not stop Lens.com from buying and selling gray market contact lenses.  (¶ 14.)  Lens.com alleges that it "purchase[s] products from international sources" and this business model "produces a special value to consumers" whereby "[i]ts primary competitive advantages . . . are price and convenience:  Lens.com deals in high volumes and seeks out the lowest possible price for the lenses it sells, then passes these savings along to its customers".  (¶¶ 78-82.)  According to Lens.com, "purchasing contact lenses from Lens.com is typically more convenient than purchasing lenses from a ECP or a brick-and-mortar retailer".  (¶ 83.)[4]

### **Legal Standard**

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  It must provide "more than labels and conclusions … a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  An antitrust plaintiff must plead "enough data . . . so that each element of the alleged antitrust violations can be properly identified." *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp.*, 711 F.2d 989, 995-96 (11th Cir. 1983).  "Conclusory allegations that defendant violated the antitrust laws and plaintiff was injured thereby will not survive a motion to dismiss." *Quality Foods*, 711 F.2d at 995.

---

[4] As stated, Lens.com's two UPP counterclaims were belatedly asserted in the United States District Court for the Eastern District of New York in a failed effort by Lens.com to transfer the entire trademark action to this Court.  Lens.com's nine counterclaims against Alcon and Alcon's six claims against Lens.com remain pending in the New York action.

## **Argument**

### I.   LENS.COM'S CLAIMS ARE TIME-BARRED

Under both federal and New York State antitrust laws, "[t]he basic rule is that damages are recoverable . . . only if suit therefor is 'commenced within four years after the cause of action accrued'". *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338-39 (1972) (citing 15 U.S.C. § 15b); *Stolow v. Greg Manning Auctions, Inc.*, 258 F. Supp. 2d 236, 251 (S.D.N.Y. 2003), *aff'd*, 80 F. App'x 722 (2d Cir. Nov. 17, 2003) (stating that a four-year statute of limitations governs antitrust claims under N.Y. Gen. Bus. Law § 340(5)).

"[A] cause of action accrues and the statute [of limitations] begin to run when a defendant commits an act that injures the plaintiff's business." *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 827 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000); *accord Bray v. Bank of Am., Corp.*, No. 15 Civ. 2532, 2017 WL 10276705, at *3 (M.D. Fla. Jan. 23, 2017).  Where, as here, a plaintiff alleges a refusal to deal with the plaintiff, "if the initial refusal is final, then the statute of limitations begins to run then, and no new cause of action is created when [the plaintiff] makes subsequent futile efforts to deal with [the defendant] and is rebuffed." *Kaw Valley Elec. Co-Op. Co., Inc. v. Kansas Elec. Power Co-Op., Inc.*, 872 F.2d 931, 934 (10th Cir. 1989); *see also Z Techs. Corp. v. Librizol Corp.*, 753 F.3d 594, 598 (6th Cir. 2014) ("even when a plaintiff alleges a continuing violation, an *overt act* by the defendant is required to restart the statute of limitations and the statute runs from the last overt act") (emphasis in original).

As stated, Lens.com alleges anticompetitive conduct dating back decades. (¶ 35.)  According to Lens.com, it "has long attempted to buy from manufacturers" like

Alcon (¶ 42), Alcon has "consistently refused to sell to Lens.com" (¶ 43), and Alcon has only offered to do business with Lens.com "if Lens.com would sign Alcon's 'standard' agreement for online resellers". (¶ 45.) Because the refusal to deal that allegedly injured Lens.com has been "consistent[]" over decades, the statutes of limitations applicable to Lens.com's counterclaims began to run and expired long ago. (¶ 43)

Even if Lens.com had not alleged a single conspiracy dating back decades, its counterclaims concerning Alcon's UPP would be time-barred. Alcon adopted its UPP in June 2013, more than six years ago. (¶ 122.) The policy was clear on its face that Alcon would not deal with any reseller that did not price Alcon's contact lenses at the minimum retail price. (¶¶ 122, 132, 168.) The policy was final and not conditional, and remained in effect without any substantive change until it was withdrawn in 2016. (*Id.*) Lens.com failed to allege that Alcon's UPP was modified, suspended, applied differently or changed in any way with respect to it after Alcon's initial adoption of the policy in 2013. Thus, even if the UPP-specific conduct alleged here started the applicable statutes of limitations, they began to run no later than June 2013 and expired no later than June 2017, nearly two years before Lens.com filed its UPP counterclaims.

In an apparent attempt to extend the statutes of limitation, Lens.com alleges that "in October 2014, Alcon acknowledged . . . [that] it had directed ABB 'not to sell to Lens.com' and that the same instruction had been passed onto 'all [Alcon] distributors'", and that in August 2015, in response to an ECP's email complaining that "Alcon had not acted swiftly to stop Lens.com from selling lenses at a discount [contrary to the UPP's terms]", "Alcon told ABB not to sell lenses to Lens.com". (¶¶ 194, 198-99.) However, neither the

October 2014 nor the August 2015 allegations could be construed as "an *overt act* by the defendant [which] restart[s] the statute of limitations." *Z Techs. Corp.*, 753 F.3d at 598 (emphasis in original).  Notably, even if the October 2014 allegation is treated as Alcon's initial refusal to deal with Lens.com, Lens.com's claims would have expired no later than October 2018, and its claims, filed in February 2019, would still be time-barred.  In any case, these alleged refusals to deal merely "implement a prior refusal to deal", namely, the 2013 implementation of the UPP, "and [thus] do not restart the statute of limitations." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1052 (8th Cir. 2000); *see, e.g.*, *David Orgell, Inc. v. Geary's Stores*, 640 F.2d 936, 938 (9th Cir. 1981), *cert. denied*, 454 U.S. 816 (1981) (finding that any injury to the plaintiff resulted from the defendant's initial 1965 refusal, and the subsequent refusals merely restated a previous final decision, such that the action was time-barred).  Because the UPP was adopted in 2013, Alcon's refusal to deal under that policy was final, and because Lens.com did not file its Original Counterclaims until February 14, 2019, Lens.com's Counterclaims are time-barred.

## II.  LENS.COM LACKS ANTITRUST STANDING

To maintain a claim under the federal antitrust laws, an antitrust plaintiff must prove that it has "antitrust standing".  "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007).  The doctrine of antitrust standing prevents private plaintiffs from "recover[ing] damages under § 4 . . . merely by showing injury causally linked to an illegal presence in the market." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (internal quotation marks

14

omitted).  Rather, to establish antitrust standing, a plaintiff must demonstrate that it suffered "antitrust injury", or an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Lens.com's counterclaims fail to do so.

A.   Lens.com Benefitted from UPP Prices in the Market

Lens.com's UPP-related Counterclaims assert that Alcon's allegedly anticompetitive conduct has "one purpose: to *increase* [retail] prices" of disposable contact lenses in the United States.  (¶ 257 (emphasis added).)  Lens.com alleges that Alcon's implementation of its UPP was tailored to "artificially prop up prices charged to patient-consumers" (¶ 211), and that the "goal of UPPs was to eliminate price competition" by requiring all retailers to sell at or above a minimum retail price.  (¶ 165.)  Lens.com contends that these policies "help[ed] ECPs raise profit margins" and increased retail prices to consumers.  (¶ 166.)

Lens.com did not suffer an antitrust injury from the alleged conspiracy to raise the retail prices of contact lenses—quite the opposite.  In fact, Lens.com would have *benefitted* from any such conspiracy.  Given that Lens.com did not purchase contact lenses from Alcon or any authorized distributor, it could charge whatever it wanted for Alcon lenses and continue to source Alcon lenses from alternative, unauthorized sources.  (¶ 186.)  Thus, if prevailing retail prices in the market were higher because other retailers who were subject to and abiding by the UPP were charging allegedly supracompetitive prices, then Lens.com had the ability to *make more money* than it otherwise would have, by undercutting the UPP price, taking sales away from ECPs and other retailers who were abiding by the UPP, and

increasing its own profit margins at the same time.  Where a plaintiff stands "to gain from any conspiracy to raise the market price," courts have consistently found that that the plaintiff has suffered no injury and cannot recover damages.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582-83 (1986); *see also Dentsply Int'l Inc. v. Dental Brands for Less*, LLC, No. 15 Civ. 8775, 2016 WL 6310777 (S.D.N.Y. Oct. 27, 2016) (granting motion to dismiss counterclaims of a discount dental supplier, finding it lacked standing to challenge the alleged price-fixing because a competitor cannot recover damages for a conspiracy to raise prices).

A gray goods importers like Lens.com benefits from the UPPs because its entire business model is based on importing lower-priced overseas goods into the United States and then taking advantage of higher United States prices.  *See Original Appalachian Artworks, Inc. v. Granada Elecs., Inc*., 816 F.2d 68, 74 (2d Cir. 1987) (affirming dismissal of counterclaims on antitrust injury grounds because "gray goods importers . . . would have *benefited*" from anticompetitive conduct that raises prices) (emphasis added).  Allegedly inflated United States retail prices allowed gray goods sellers, like Lens.com, to (1) buy lenses abroad (where no UPPs are alleged to apply) and import them, (2) undercut competitors' retail prices and steal market share from competitors, and/or (3) sell them at inflated prices and realize increased profits.  Accordingly, Lens.com was in no "'worse position' as a consequence of the [alleged] conduct."  *GATT Commc'ns, Inc. v. PMC Assocs. LLC*, 711 F.3d 68, 76 (2d Cir. 2013) (citation omitted); *see also Atl. Richfield Co.*, 495 U.S. at 337 ("Even if the maximum-price agreement ultimately had acquired all of the attributes of a minimum-price-fixing scheme, respondent still would not have suffered antitrust injury

because higher ARCO prices would have worked to USA's advantage.  A competitor 'may

not complain of conspiracies that . . . set minimum prices *at* any level.'") (quoting

*Matsushita*, 475 U.S. at 585 n.8) (emphasis in original).)  As the Supreme Court has stated:

> [Plaintiffs cannot] recover damages for any conspiracy by petitioners to charge
> higher than competitive prices in the American market.  Such conduct would
> indeed violate the Sherman Act, but it could not injure respondents: as
> petitioners' competitors, respondents stand to gain from any conspiracy to raise
> the market price.

*Matsushita*, 475 U.S. at 582-83 (internal citations omitted).  Accordingly, Lens.com lacks

standing to challenge the alleged price-fixing conspiracy to adopt and implement UPPs and

increase retail prices.

> B.   Lens.com Does Not Allege Any Other Price-Fixing Related Injury

Lens.com fails adequately to allege any other injury flowing from the UPPs.

Lens.com was supposedly harmed by the UPPs because it "has been unable to maintain a full

product line, suffered damage to its reputation, lost customer goodwill, and been forced to

purchase lenses through gray-market sellers and other alternative suppliers." (¶¶ 336, 345.)

However, each of these alleged injuries fails to support antitrust standing.

As an initial matter, these alleged injuries cannot be reconciled with

Lens.com's allegation that purchasing lenses at lower prices through the gray market actually

*benefits* Lens.com, allowing it to provide a "special value" to its customers.  (¶ 80.)  *See, e.g.*,

*Morning Star Packing Co. v. SK Foods, L.P.*, 754 F. Supp. 2d 1230, 1235 (E.D. Ca. 2010)

(finding that "Plaintiffs . . . cannot show antitrust injury deriving solely from Defendants'

alleged price fixing practices" where the alleged price fixing "would likely confer a benefit").

Moreover, Lens.com's claim of lost sales due to Alcon's UPP does not flow from that which makes the alleged conspiracy to implement UPPs unlawful. *See GATT*, 711 F.3d at 77.  Lens.com claims that its sales were "restricted because it could not obtain all of the Alcon contact lens products it could have sold."  (¶ 188.)  But Lens.com's contention that this injury was caused by the UPP is belied by its own allegations.  According to Lens.com, Alcon has "conspired with others, *for more than 20 years*, to engage in a persistent pattern" of unlawful conduct designed to limit sales of its products to Lens.com.  (¶ 179 (emphasis added).)  Given that Alcon's UPP lasted for only three years—from 2013 to 2016—it is not plausible that Lens.com's supposed injury of being unable to obtain enough Alcon lenses back in 1999 had anything to do with the UPP.  Moreover, as explained in Lens.com's own counterclaims, the reason Alcon would not sell to Lens.com is that Alcon does not sell to retailers that source gray market goods, often purchased in other countries and not necessarily approved by regulators for retail sale in the United States.  (¶ 191.)  When, in October 2014, Lens.com pushed back and objected to being required to purchase only from approved sources, Alcon informed Lens.com that they would not "budge" on the issue. (¶ 192.)  Thus, Lens.com's purported injury of being unable to maintain a full product line was due to its refusal to commit not to source from unauthorized or potentially unregulated sources of supply.  This injury does not "flow" from that which Lens.com contends was an unlawful conspiracy to adopt a UPP.  *Brunswick*, 429 U.S. at 489.

Furthermore, assuming (contrary to fact) Alcon's UPP was unlawful, it would have been unlawful because it was allegedly the result of concerted action to fix prices at artificially high levels.  But, critically, Lens.com's alleged injury does not flow from any

price fixing—Lens.com does not claim that it purchased any lenses from an alleged participant in the price fixing conspiracy at an artificially high price; nor does it allege that it lost profits by being required to charge supracompetitive prices and losing business to other retailers.  Accordingly, while Lens.com may claim that its injury was "causally linked" to the asserted price fixing violation, it does not in fact "flow[] from that which makes defendants' acts unlawful."  *Brunswick*, 429 U.S. at 489; *see also Atl. Richfield Co.*, 495 U.S. at 337 (respondent has not suffered "*antitrust* injury," since its losses do not flow from the aspects of vertical, maximum price fixing that render it illegal) (emphasis in original); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 710-11 (11th Cir. 1984) ("Incidental or consequential injury or injury remotely caused by an antitrust violation does not give a plaintiff standing"); *see also Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 123 (2d Cir. 2007) (holding, in an alleged monopolization case, that a terminated dealer did not have standing to assert claims under Sherman Act § 2 "because their particular injury was not caused by an exercise of the defendant's newly acquired power to raise prices.  Instead, the dealer's injury was caused by the manufacturer's decision to terminate their relationship, something the manufacturer could have just as well done without having monopoly power.") (internal citations omitted).

The Second Circuit's decision in *Gatt Commc'ns, Inc. v. PMC Associations, L.L.C.* is instructive.  711 F.3d 68 (2d Cir. 2013).  In that case, the alleged illegal practice was "an illegal bid-rigging scheme," and plaintiff's alleged injury was "the harm it suffered as a consequence of its inability to continue selling Vertex products."  *Id.* at 77.  The court noted that "[t]his harm only supports antitrust injury, however, if it flows from that which

makes the bid-rigging scheme unlawful." *Id.*  In analyzing plaintiff's claim of injury, the court found that:

> [E]ven assuming that the alleged bid-rigging scheme is unlawful, it is so only because of the harm it may cause—increased prices—to purchasers of Vertex products.  **Gatt's lost revenue resulting from the Vertex termination, however, is not an injury that flows from that which makes bid-rigging unlawful**.  Gatt has not been forced to pay higher prices for a product, as customers who are victimized by price-fixing schemes might.   Instead, Gatt's injuries flow from its participation and then exclusion from a distribution network that, allegedly, featured intra-brand price-fixing, and in which it had no right *ab initio* to participate.  Even if the antitrust laws seek to prevent Vertex and PMC's alleged activities because of resulting harms to competition, these laws are not concerned with injuries to competitors such as Gatt resulting from their participation in or exile from such schemes.

*Id.* at 77 (emphasis added; internal citations omitted).[5]

Because Lens.com was not injured by that which would make the UPP unlawful, it did not suffer antitrust injury sufficient to support antitrust standing, and Counterclaims III and IV should be dismissed.  *See Dentsply Int'l Inc.*, 2016 WL 6310777, at *1-4 (dismissing price-fixing counterclaims where counterclaimant's "alleged injuries—lost business and litigation costs—may be injuries caused by Dentsply and associated with the alleged price fixing, but they are not antitrust injuries").

---

[5] *See also Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333 (11th Cir. 2017).  In *Feldman*, an employee sued his former employer for his termination resulting from an alleged conspiracy to freeze a competitor out of the restaurant linen market.  849 F.3d at 1339.  In finding that the plaintiff lacked antitrust injury to maintain suit, the Eleventh Circuit held that "[a]lthough [the plaintiff] lost his job with [his former employer] because of this alleged conspiracy . . . [t]hat one laborer suffered injury does not convert the conspiracy into one aimed at restraining competition in the labor market." *Id.* at 1341.  The Court further held that the plaintiff's "'financial injury' was 'secondary' to the goal of reduced competition in the market for restaurant linens," *id.* at 1341-42, such that it cannot sustain an antitrust injury.

### III.   LENS.COM FAILS TO PLAUSIBLY ALLEGE ANTICOMPETITIVE EFFECT

Finally, Lens.com fails adequately to allege vertical price-fixing (Counterclaim IV).  Vertical agreements are presumptively lawful under the federal antitrust laws and are to be "judged according to the rule of reason."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007).  To plead a viable claim, a plaintiff must allege either actual or potential harm to competition.  In this case, Lens.com has failed adequately to allege either.

### A.   Lens.com Fails Adequately to Allege Potential Anticompetitive Effect

A plaintiff that rests its claim on the potential for genuine adverse effect on competition must allege that the defendant exercised "market power, plus some other ground for believing that the challenged behavior could harm competition in the market."  *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns*, 376 F.3d 1065, 1073 (11th Cir. 2004); *see also Ohio v. Am. Express*, 138 S. Ct. 2274, 2285 n.7 (2018) (emphasizing that "the possibly anticompetitive manifestations of vertical arrangements can occur only if there is market power") (citation omitted).

Lens.com has not alleged that Alcon had market power in any relevant market.  According to Lens.com, Alcon occupied only 22.7% of the disposable contact lens market as of 2013.  (¶ 67.)  With less than even one-quarter share of the contact lens market, Alcon was not "capable of causing any substantial harm to competition".  *Dickson v. Microsoft Corp.*, 309 F.3d 193, 208 (4th Cir. 2002); *see, e.g.*, *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 ("A market share at or less than 50% is inadequate as a matter of law to constitute monopoly power") (citations omitted).  Firms with market shares below 30% are

21

"presumptively incapable of exercising market power", *Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 262 F. Supp. 2d 50, 74-75 (S.D.N.Y. 2003), and courts have found that market shares as high as 46% are insufficient to establish market power, *see Gordon v. Lewistown Hosp.*, 423 F.3d 184, 213 (3d Cir. 2005).  Alcon's alleged market share is insufficient as a matter of law.

Lens.com seeks to manufacture market power by alleging, in the alternative, that "[e]ach brand and type of contact lens . . . constitutes its own product market", offering "Alcon's DAILIES AQUACOMFORT PLUS lenses" as one example market and "Alcon's AIR OPTIX PLUS HYDRAGLIDE lenses" as another.  (¶ 75.)  However, "a manufacturer's own products do not themselves comprise a relevant product market."  *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004); *see also United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956) ("[O]ne can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power . . . is not the power that makes an illegal monopoly."); *L.H. Equity Investments LLC v. Wade*, 2010 WL 11505176, at *4 (S.D. Fla. Mar. 29, 2010) ("[C]ourts have 'routinely rejected' the argument that allegedly unique products, by virtue of customer preference for that product, create markets unto themselves."); *Deep S. Pepsi-Cola Bottling Co. v. Pepsico*, Inc., 1989 WL 48400, at *8 (S.D.N.Y. May 2, 1989) ("[T]the law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market.").[6]

---

[6] Lens.com cannot rely on *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, to allege that

Lens.com's allegations do not justify an exception to the rule.  In *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, the Supreme Court allowed a narrow exception, finding that the relevant product market could be defined as only those companies that serviced Kodak machines because Kodak equipment owners were "locked in" to Kodak parts and services.  504 U.S. 451, 482 (1992).  Here, contact lens customers do not face a comparable level of lock in.  Although consumers of Alcon lenses require prescriptions, the Alcon lens does not produce "compulsion by the product itself".  *Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997).  Lens.com alleges no facts to support its bald assertions that "prescriptions erect walls between brands and types" and that "there is an unusually low cross-elasticity of demand between contact-lens types".  (¶ 74.)  Consumers are free to request a different prescription from their eye care providers.  Indeed, Lens.com's allegations that a contact lens manufacturer that can "win[] the allegiance" of an ECP and thus "capture" that ECP's patient base, makes clear that ECPs can and do switch their patients' prescriptions and that various types of contact lenses have reasonable substitutes.  (¶ 90.)  Lens.com's alleged market for *specific types* of *specific brands* of contact lenses is untenable.[7]

---

each branded product constitutes its own relevant market.  2015 WL 9987969, at *13 (M.D. Fla. Nov. 4, 2015).  In *Costco*, the Court made clear that "courts *repeatedly* have rejected markets that are defined by a company's trademark" and that "a single branded product may, *in rare cases*, constitute its own relevant market".  *Id.* (emphasis added).  Lens.com has failed to plead circumstances warranting an exception to the general rule.

[7] Lens.com's claim that Alcon had market power is belied by its allegations that it is ECPs that controlled the market.  (¶ 71 ("[T]he ECPs' 'gatekeeper' role in dictating brand and contact lens through prescription allows ECPs to pressure manufacturers"), ¶ 89 ("ECPs remain the dominant Retailers in the contact-lens industry"), ¶ 92 ("ECPs thus wield special power in the industry").)

B.      Lens.com Fails Adequately to Allege Actual Anticompetitive Effect

Because Lens.com cannot allege that Alcon's UPP had the potential for genuine adverse effect on competition, the only remaining avenue to allege anticompetitive effect is to allege an actual detrimental effect on competition in the relevant market.  "Actual harm is indicated by a factual connection between the alleged harmful conduct and its impact on competition in the market, and the plaintiff claiming it should point to the specific damages done to consumers in the market."  *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010) (internal quotation marks and citation omitted).  Lens.com has failed to allege such a connection here.

Lens.com alleges that the UPPs "increase[d retail] prices", that the UPPs sought to exclude Lens.com from the contact lens market, and that "[Alcon's conduct] harm[ed] competition—and it harm[ed] Lens.com as well".  (¶¶ 144, 174, 255-59, 54-55.)  However, Lens.com's Counterclaims make no effort to establish the competitive level above which the UPPs allegedly artificially raised prices, as required by *Jacobs*.  626 F.3d at 1339.  In that case, the plaintiff had alleged that the defendant manufacturer had entered into a vertical conspiracy with its distributors to set the minimum retail price for the defendant's mattresses, and that this alleged conspiracy harmed competition by causing consumers to lose "millions of dollars".  *Id.*  The Eleventh Circuit, in affirming the district court's dismissal of the action, held that "beyond the bald statement that consumers lost hundreds of millions of dollars", the complaint failed to allege "how competitors react[ed] to the allegedly higher prices" and that "[t]his sparse allegation is precisely the type of bare legal conclusion that was insufficient in *Twombly* and *Iqbal*."  *Id.* at 1340.

24

That the UPP allegedly sought to exclude Lens.com cannot be an anticompetitive effect either, because Lens.com itself has admitted that the UPP ultimately "failed" to achieve its purported goal. (¶¶ 9-14.) In any event, "[t]he counterclaim[s] fail[] to plead sufficient anticompetitive injury [where t]here is no allegation of harm to *competition*". *Glades Pharms., LLC v. Murphy*, 2006 WL 3694625, at *5 (N.D. Ga. Dec. 12, 2016) (emphasis added). And Lens.com's "bald assertion[s] of 'harm to competition' [are] insufficient to state a claim upon which relief can be granted". *Id.* at *3 (dismissing an antitrust claim where the plaintiffs only alleged that the anticompetitive effect of the alleged conspiracy was that it "reduce[d] prices" and "harm[ed] competition"); *see also Patel v. Scotland Memorial Hosp.*, 1996 WL 383920, at *3-4 (4th Cir. Jul. 10, 1996) (affirming the district court's dismissal of the antitrust claim because the "complaint was completely void of any allegations as to the effect of the defendants' actions on competition in the market for anesthesiology services" and "the complaint focused on the injuries [the plaintiff] incurred"); *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n.*, 884 F.2d 504, 507 (9th Cir. 1989) (affirming the district court's grant of motion to dismiss a Sherman Act § 1 claim because "removal of one or a few competitors need not equate with injury to competition").[8]

## Conclusion

Accordingly, Lens.com's two UPP-related counterclaims should be dismissed.

---

[8] Lens.com fails to state a claim under the Donnelly Act. The Donnelly Act "was modeled on the Sherman Act and has generally been construed in accordance with federal precedents." *Williams v. Citigroup Inc.*, 659 F.3d 208, 211 n.2 (2d Cir. 2011). Thus, the Donnelly Act claims should be dismissed for the reasons stated above. In addition, the claims should be dismissed because the Donnelly Act applies only to "conduct that is alleged to have a significant intrastate or local anticompetitive impact . . . with minimal interstate consequences." *Two Queens, Inc. v. Scoza*, 745 N.Y.S.2d 517, 519 (1st Dep't 2002); *see also In re Wiring Device Antitrust Litig.*, 498 F. Supp. 79, 82 (E.D.N.Y. 1980).

RESPECTFULLY SUBMITTED this 3rd day of September, 2019.

/s/ David R. Marriott

David R. Marriott
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: 212-474-1000
Facsimile: 212-474-3700
dmarriott@cravath.com

A. Graham Allen (Florida Bar No. 117110)
James. M. Riley (Florida Bar No. 700411)
Samuel J. Horovitz (Florida Bar No. 0059015)
ROGERS TOWERS, P.A.
1301 Riverplace Boulevard, Suite 1500
Jacksonville, FL 32207
Telephone: 904-398-3911
Facsimile: 904-396-0663
gallen@rtlaw.com
shorovitz@rtlaw.com

*Attorneys for Alcon Vision, LLC.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of September, 2019, I electrically filed a copy of the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of the electronic filing to be sent to all CM/ECF participants for this matter.

/s/ David R. Marriott 
Attorney
