# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| In re:<br><br>**DISPOSABLE CONTACT LENS ANTITRUST LITIGATION** | Case No. 3:15-md-2626-HES-LLL<br><br>**Judge Harvey E. Schlesinger**<br>**Magistrate Judge Laura Lothman Lambert** |
| **THIS DOCUMENT RELATES TO:**<br><br>**Alcon Vision, LLC v. Lens.com, Inc.**<br>**No. 3:19-cv-00706-HES-LLL** | |

## LENS.COM'S MEMORANDUM IN OPPOSITION TO DEFENDANT ALCON VISION, LLC's MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................1

II.   RESPONSE TO ALCON'S STATEMENT OF FACTS ..............................1

III.  LENS.COM'S STATEMENT OF MATERIAL FACTS ..............................2

    A.    Overview of the Contact Lens Industry .................................2

        1.    Manufacturing and Channels of Distribution ............................2

        2.    ECPs and the Prescription Requirement. ...................................3

    B.    Alcon's Unlawful Agreements in Restraint of Trade...........................4

        1.    Alcon's Horizontal Conspiracy with the Other Manufacturers ........................................................................4

        2.    Alcon's Vertical Conspiracy with Its Distributors and ECPs ........................................................................................8

        3.    The Contact Lens Markets........................................................9

    C.    Alcon's Targeting of Lens.com for Refusing to Comply with Alcon's UPP........................................................................11

    D.    Lens.com's Harm from Alcon's UPP .........................................13

IV.  LEGAL STANDARD ...................................................................14

V.   ARGUMENT ............................................................................14

    A.    Alcon Entered Agreements in Restraint of Trade. ...........................15

        1.    Alcon entered into a horizontal conspiracy. .............................16

        2.    Alcon also entered into vertical agreements with distributors and ECPs. ..........................................................17

    B.    Lens.com Has Defined the Product Markets. ...................................17

        1.    The evidence supports a market of all contact lenses. ..............18

        2.    An Alcon-only Market can also be defined based on the evidence. ..............................................................................19

    C.    Alcon's Agreements Injured Both Competition, Generally, and Lens.com. ....................................................................24

        1.    Lens.com would not have been harmed but for Alcon's UPP. ...............................................................................24

        2.    Alcon's UPP also injured competition more generally.............25

    D.    Lens.com Has Established Cognizable Damages..............................27

        1.    All products included in Klenk's analysis were proper. ............28

        2.    Klenk was correct to exclude any purported benefits of Alcon's UPP. ........................................................................29

VI.  CONCLUSION ...........................................................................30

<u>**TABLE OF AUTHORITIES**</u>

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...................................................................................14

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ........................................................................ 19, 22, 23

*Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*,
  710 F.2d 752 (11th Cir. 1983) ...................................................................28

*Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*,
  2015 WL 9987969 (M.D. Fla. Nov. 4, 2015) ............................................. 21, 26

*DeLong Equip. Co. v. Washington Mills Abrasive Co.*,
  887 F.2d 1499 (11th Cir. 1989) .................................................................15

*Dunnivant v. Bi-State Auto Parts*,
  851 F.2d 1575 (11th Cir. 1988) .................................................................14

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1993) ........................................................................... 18, 19

*ES Dev., Inc. v. RWM Enters., Inc.*,
  939 F.2d 547 (8th Cir. 1991) ....................................................................15

*Florida Seed Co., Inc. v. Monsanto Co.*,
  105 F.3d 1372 (11th Cir. 1997) .................................................................24

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
  386 F.3d 485 (2d Cir. 2004) .....................................................................20

*Godix Equip. Exp. Corp. v. Caterpillar, Inc.*,
  948 F. Supp. 1570 (S.D. Fla. 1996) ...........................................................29

*Hayden Pub. Co., Inc. v. Cox Broad. Corp.*,
  730 F.2d 64 (2d Cir. 1984) .......................................................................18

ii

*Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.*,
   818 F.2d 1530 (11th Cir. 1987) ................................................................................14

*Home Depot USA, Inc. v. Lafarge North Am., Inc.*,
   59 F.4th 55 (3d Cir. 2023) ......................................................................................2

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
   424 F.3d 363 (3d Cir. 2005) ..................................................................................28

*In re Aggrenox Antitrust Litig.*,
   94 F. Supp. 3d 224 (D. Conn. 2015) .....................................................................20

*In re Cardizem CD Antitrust Litig.*,
   200 F.R.D. 297 (E.D. Mich. 2001) ........................................................................30

*In re Delta / AirTran Baggage Fee Antitrust Litig.*,
   317 F.R.D. 675 (N.D. Ga. 2016) ...........................................................................30

*In re Disposable Contact Lens Antitrust*,
   215 F. Supp. 3d 1272 (M.D. Fl. 2016) ..................................................................15

*In re General Motors Corp.*,
   99 F.T.C. 464 (1982) ........................................................................................ 18, 22

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   562 F. Supp. 2d 392 (E.D.N.Y. 2008) ..................................................................18

*In re Zantac (Ranitidine) Products Liability Litig.*,
   2023 WL 3455427 (S.D. Fla. May 15, 2023) ..........................................................2

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
   626 F.3d 1327 (11th Cir. 2010) .............................................................................26

*Malcolm v. Marathon Oil Co.*,
   642 F.2d 845 (5th Cir. 1981) .................................................................................28

*Martin v. City of Atlanta, Georgia*,
   2009 WL 10668302 (N.D. Ga. July 27, 2009) .....................................................29

*McWane, Inc. v. F.T.C.*,
   783 F.3d. 814 (11th Cir. 2015) ......................................................................... 20, 24

iii

*Pierce v. Ramsey Winch Co.*,
   753 F.2d 416 (5th Cir. 1985)............................................................28

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995)............................................................30

*SmithKline Corp. v. Eli Lilly & Co.*,
   575 F.2d 1056 (3d Cir. 1978)............................................................20

*Spanish Broad. Svs. v. Clear Channel Commc'ns*,
   376 F.3d 1065 (11th Cir. 2004) ..................................................14, 25

*Todorov v. DCH Healthcare Auth.*,
   921 F.2d 1438 (11th Cir. 1991) ........................................................14

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
   7 F.3d 986 (11th Cir. 1993).......................................................19, 20

*United States v. Archer–Daniels–Midland Co.*,
   866 F.2d 242 (8th Cir.1988)............................................................20

*United States v. Bausch & Lomb Optical Co.*,
   321 U.S. 707 (1944) ......................................................................17

*United States v. Parke, Davis & Co.*,
   362 U.S. 29 (1960) ........................................................................17

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019)..............................................................18

*Vacation Break U.S.A., Inc. v. Mktg. Response Grp. & Laser Co., Inc.*,
   169 F.Supp.2d 1325 (M.D. Fla. 2001) ..............................................24

*Walker Process Equip., Inc. v. Ford Mach. & Chem. Corp.*,
   382 U.S. 172 (1965) ......................................................................22

*Williamson Oil Co. v. Philip Morris USA*,
   346 F.3d 1287 (11th Cir. 2003) ..................................................14, 15

*Wilson P. Abraham Const. Corp. v. Texas Indus., Inc.*,
   604 F.2d 897 (5th Cir. 1979).............................................................2

iv

**Statutes**

15 U.S.C. § 1 ...................................................................................................... 1, 15

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................14
Fed. R. Evid. 401–403 ...........................................................................................2

**Regulations**

21 C.F.R. §§ 886.5925(b)(1), (b)(2) ......................................................................3

**Other Authorities**

Fed. Prac. & Proc. Civ. § 2732.1 .........................................................................14

## I.   <u>PRELIMINARY STATEMENT</u>

In June 2013, Defendant Alcon Vision, LLC ("Alcon") rolled out its so-called unilateral pricing policy ("UPP"). The UPP was part of a conspiracy to inflate contact lens prices. Plaintiff Lens.com, Inc. ("Lens.com"), a discount contact lens reseller, refused to participate in the conspiracy. In response, Alcon and some of its co-conspirators retaliated against Lens.com by cutting off its supply of lenses.

Lens.com initially brought suit against Alcon in New York, asserting both anti-trust claims and other claims. On June 5, 2019, the Judicial Panel on Multidistrict Litigation transferred Count III and Count IV of that action to this Court as part of *In re: Disposable Contact Lens Antitrust Litigation*, MDL No. 2626. Count III alleges a per se violation of 15 U.S.C. § 1 based on a hub-and-spoke conspiracy between Alcon and other contact lens manufacturers, distributors, and eyecare professionals ("ECPs"). *See* Ex. 01 ¶¶ 332–334.[1] Count IV alleges a rule-of-reason violation based on a vertical conspiracy between Alcon, its distributors, and the ECPs. *See id.* ¶¶ 343–345. Alcon now seeks summary judgment on those claims. But because triable issues of fact exist as to both counts, summary judgment is improper.

## II.   <u>RESPONSE TO ALCON'S STATEMENT OF FACTS</u>

**The Trademark Lawsuit:** Alcon's Statement of Facts focuses more on claims asserted by Alcon in New York than it does the two counts transferred to this Court.

---

[1] All exhibits are cited herein as "Ex. __." An index of exhibits with additional information is attached to the Declaration of Nathan D. Thomas, filed concurrently herewith.

*See* Mot. at 5–7. Such references are irrelevant and immaterial to the pertinent question here. Lens.com objects accordingly. *See* Fed. R. Evid. 401–403.

**The Class Action:** Alcon asserts as a "fact" that this case is "materially different" from the related MDL class action. *See* Mot. at 7. But the two cases involve the same conspiracies and anticompetitive conduct.[2] And the fact that Lens.com's claims are directed only at Alcon is immaterial. *See Wilson P. Abraham Const. Corp. v. Texas Indus., Inc.*, 604 F.2d 897, 903–04 (5th Cir. 1979).

## III.   LENS.COM'S STATEMENT OF MATERIAL FACTS

### A.   Overview of the Contact Lens Industry

#### 1.   Manufacturing and Channels of Distribution

Four contact lens manufacturers—Alcon, Bausch + Lomb, Inc. ("B&L"), Cooper Vision, Inc. ("CVI"), and Johnson & Johnson Vision Care, Inc. ("JJVC")—control more than 97% of the U.S. contact lens market. *See* Ex. 02 ¶¶ 16, 45–49; Ex. 03 at 3. Alcon is the second largest manufacturer. *See* Ex. 04 at 40; Ex. 05 at 16. And high entry costs mean this is unlikely to change. *See* Ex. 02 ¶¶ 58–62.

These manufacturers primarily sell lenses to distributors rather than directly to consumers. *See* Ex. 02 ¶ 18. ABB Optical Group ("ABB") is the largest such distributor and holds a "█████████████████." *See* Ex. 06; Ex. 07 ¶¶ 206–207. Distributors

---

[2] The Court may appropriately take these similarities into account in reviewing Alcon's Motion. "In MDLs, like in other litigation, a district court may apply prior rulings to new cases if a party presents no new facts, evidence, or arguments to warrant a departure." *Home Depot USA, Inc. v. Lafarge North Am., Inc.*, 59 F.4th 55, 66 n.6 (3d Cir. 2023). Thus, this Court "may rely on its prior decisions as persuasive, and demand good reasons to change its mind." *Id.* at 65–66; *see also In re Zantac (Ranitidine) Products Liability Litig.*, 20-MD-2924, 2023 WL 3455427, at *10–11 (S.D. Fla. May 15, 2023).

in turn sell lenses to retailers, including ECPs, brick-and-mortar stores, and online re-
tailers like Lens.com. *See* Ex. 08 at 35:6–36:13; Ex. 02 ¶ 17. ECPs account for 40% of
contact lens sales. Ex. 02 ¶ 17. Online retailers typically sell lenses at a lower price than
other retailers, and Lens.com's prices, in particular, are consistently among the lowest
in the industry. *See* Ex. 02 ¶¶ 128, 143–151; Ex. 09 at 162:5–20. To achieve these lower
prices, ███████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ *See* Ex. 02 ¶ 20; Ex. 10 at
10:17–18; Ex. 11 at 16. While this approach leads to lower consumer prices, Lens.com
is, at times, unable to source a sufficient volume of lenses. *See* Ex. 02 ¶¶ 170–171. And
Lens.com's ability to procure enough lenses was seriously undercut in October 2014,
when Alcon ordered its distributors to stop selling to Lens.com. *See* Section III(C) *infra*.

## 2.    ECPs and the Prescription Requirement.

Contact lenses cannot be purchased by consumers without a prescription from
an ECP. *See* Ex. 02 ¶¶ 17, 21; *see also* 21 C.F.R. §§ 886.5925(b)(1), (b)(2). And ECPs
only prescribe contact lenses after conducting a fitting to ensure that the contact lens
in question is the most appropriate lens for the consumer's eye health and vision needs.
*See, e.g.*, Ex. 07 ¶ 40; Ex. 12 ¶ 48; Ex. 13 at 39:14–16.[3] After the fitting, the ECP must
provide a prescription that includes the brand and type of contact lens. *See* Ex. 02 ¶¶ 14,

---

[3] Fitting fees cost between $45 and $200, in addition to eye examination fees. *See* Ex. 02 ¶ 36; Ex. 14
¶ 50; Ex. 15 at 17:22–19:22, 75:4–76:23.

21. And by law, ████████████████████████████████████████

██████████████████████████ Ex. 16 at 235:7–12; *see also* Ex. 17; Ex. 18 at 11;

Ex. 19 at 5. Thus, the decision to purchase a certain brand and modality of contact

lens is "made at the point where [the ECP] writes a prescription[.]" Ex. 20 ¶ 8. ████

████████████████████████████████████████████████████████████

Ex. 12 ¶ 51; *see also* Ex. 13 at 43:6–25, 49:7–13.

ECPs defend these prescription requirements because "lenses are not inter-

changeable. . . . [W]hen a doctor is making a determination based on physiology, anat-

omy, the lifestyle of a patient, there's a brand choice that's made." Ex. 21 at 5; *see also*

Ex. 13 at 197:17–198:5; Ex. 14 ¶ 38; Ex. 15 at 36:23–37:5; Ex. 22 at 37:6–20. As a

result, it is the ECP, not the patient, who for all practical purposes "set[s] the brand[.]"

Ex. 23 at 6; *see also* Ex. 24 at 111:11–19 (ECPs are ████████████████████████

████████████████████████████); Ex. 18 at 11; Ex. 25 ¶ 17; Ex.

26 at 14:22–15:12; Ex. 27 at 112.[4]

**B.    Alcon's Unlawful Agreements in Restraint of Trade**

**1.    Alcon's Horizontal Conspiracy with the Other Manufacturers**

a.    Each major manufacturer adopted a unilateral pricing policy.

While "[c]ustomers must purchase the specific brand of contact lens specified

on their prescriptions," customers may take that prescription and purchase lenses from

---

[4] *See also* Ex. 18 at 11 ("[M]embers of the industry identify ECPs as 'gatekeepers,' discuss how patients are 'locked in' to a specific brand, and describe that consumers incur significant 'switching costs' given they must obtain a different prescription or visit another ECP if they desire a different brand.").

a different retail outlet. *See* Ex. 02 ¶¶ 17, 22. ECPs have long opposed this practice due to their perceived loss of retail sales. *See, e.g.*, Ex. 02 ¶¶ 82–83; Ex. 28; Ex. 29 at 4–5. Beginning in 2010, several ECPs began demanding that manufacturers adopt minimum retail prices for their lenses so that patients would be less incentivized to comparison shop. *See* Ex. 28 at 1; Ex. 29 at 5; Ex. 30 at 5.

In June 2013, Alcon became the first manufacturer to adopt a UPP for its new daily disposable contact lens, the Dailies Total1 ("DT1").[5] *See* Ex. 34. One prominent ECP, Dr. Barry Eiden, characterized this as an "industry changing event," and promised that other companies would be next. *See* Ex. 35; *see also* Ex. 36. As Dr. Eiden anticipated, the three other contact lens manufacturers followed in quick succession: B&L adopted its UPP in February 2014, JJVC in June 2014, and CVI in September 2014. *See* Ex. 02 ¶ 31, Tbl. 1. Dr. Eiden once again celebrated this development, declaring that he and Alcon had "changed the CL industry," while lamenting that "few if any will ever know it came from our efforts." Ex. 37.[6]

b.   The UPPs were motivated by pressure from ECPs and ABB.

Adopting UPPs presented both legal and business risks to the manufacturers. *See, e.g.*, Ex. 40 at 34 (                                    ); Ex. 41 at 17 (                                    ); Ex. 12 ¶ 208 (



---

[5] The DT1 was a "                    " product. Ex. 31 at 25:17–25; *see also* Ex. 32 at 2; Ex. 33 at 3.

[6] Alcon's own employees also celebrated these other UPPs. *See, e.g.*, Ex. 38 at 1 ("This was exactly what we had hoped would happen—the industry following our lead with pricing."); *see also* Ex. 39.

███████████████████████████████████████████); Ex. 42 at 76 (UPP would only work if Alcon was "willing to take the hit if a big online company says well, screw you"). Yet the manufacturers had little choice but to embrace this risky proposal due to the significant pressure campaign launched by ECPs and ABB. For example, ECPs threatened to stop prescribing the lenses of manufacturers that did not participate in the conspiracy. *See id.* (all manufacturers are going to adopt UPPs because "who is it that fits the lenses? The ECPs fit the lenses. . . . And if we don't fit them, they won't sell any[.]"); *see also* Ex. 36; Ex. 43 at 1; Ex. 44.[7]

ABB also played a critical role in compelling the manufacturers to embrace the UPPs.[8] ABB's CEO, Angel Alvarez, repeatedly bragged about ABB's central role in effectuating the conspiracy. *See, e.g.*, Ex. 52 at 1; Ex. 53 at 4; Ex. 54. Given ABB's █████████████████████, Alcon and the other manufacturers had little choice but to adhere to ABB's wishes and implement a UPP. *See, e.g.*, Ex. 06 (stating that ABB was capable of █████████████████████████████████████████ ████████████████); *see also* Ex. 55 at 169:3–9. In an ABB presentation to Alcon, ABB

---

[7] ECPs also pressured the manufacturers in other ways. *See, e.g.*, Ex. 45 at 3–4 (ECPs "adamant" that B&L circulate a new "pricing structure to share and discuss with" the ECPs); Ex. 46 (ECP wanted to "talk to . . . powers that be at [JJVC]" about its UPP); Ex. 47 ("Any updates on Cooper's adopting this strategy?"); Ex. 48 at 2 (CVI executive "just had dinner with Dr. Eiden and he had a strong opinion of the need for UPP"); Ex. 49 at 2 (CVI met ECPs to discuss UPP); Ex. 50 (pressuring B&L).

[8] ABB had clear financial motives to support industry-wide UPPs: "[A] non UPP protected brand could cost a distributor rep $4 MILLION in sales over the course of a year if one patient a day were to shop at retail/online." *See* Ex. 51.

6

stated █████████████████████████████████████████████████████

█████████████████████████████ *See* Ex. 56 at 12.

      c.    The ECPs and ABB facilitated interfirm communications.

Alcon and the ECPs recognized that their success depended upon each manufacturer's UPP being successful. Otherwise, the UPP—and associated higher margins and sales for ECPs—would be undermined by manufacturers that did not utilize a UPP.[9] The manufacturers therefore coordinated their respective UPPs directly and indirectly. For example, the four manufacturers were the sole members of the Contact Lens Institute ("CLI"), an industry lobbying group whose representatives met regularly. *See* Ex. 02 ¶ 80; *see also* Ex. 16 at 46–52. More commonly, Alcon and the other manufacturers used ECPs and ABB as go-betweens to facilitate their communications. For example, Alcon established an advisory board of ECPs and tasked it with determining Alcon's initial UPP prices. *See* Ex. 42 at 81–85; *see also* Ex 58. Then, after asking these ECPs to "be advocates in the market" for UPPs, *see* Ex. 42 at 80, Alcon hired two ECPs to write a favorable "advertorial" promoting the UPP. *See* Exs. 59–62. In another example, in early 2014, Dr. Eiden advised B&L regarding the implementation of its UPP, then reported back to Alcon. *See* Exs. 63–65.[10] And the ECPs' role in working with multiple manufacturers was never a secret. *See, e.g.*, Ex. 65; Ex. 75.

---

[9] *See* Ex. 57 at 1 ("Alcon loses if [JJVC] loses when it comes to [UPP.]"); Ex. 29 at 2 (████████████ ███████████████████); Ex. 02 ¶ 174; Ex. 12 ¶ 208.

[10] There are many examples of ECPs and ABB facilitating communications between manufacturers. *See, e.g.*, Ex. 66 at 191:1–12 (Dr. Eiden spoke with numerous individuals about adopting a UPP); Ex. 67 at 1 (ECP urged JJVC to meet with Eiden due to his insights about other UPPs); Ex. 68 ("Based

### 2. Alcon's Vertical Conspiracy with Its Distributors and ECPs

a. The UPP was an agreement between Alcon, distributors, and ECPs.

Alcon contends that its UPP was a unilateral policy but there is significant evidence that ECPs, distributors, and Alcon all understood it to be an agreement. While Alcon sometimes referred to UPP as an agreement indirectly,[11] it often simply called it what it was: an agreement. *See, e.g.*, Ex. 78 at 2 ("The Dr. will have to sign a MPP/UPP (this is a price agreement to not sell the product below a certain point)[.]"); Ex. 79 at 9 (instructing sales representatives to "gain [the ECPs] commitment to implement this pricing structure," as fit sets were reserved for ECPs that "agreed upon . . . UPP pricing"). Even Alcon's official Sales Playbook instructed sales representatives to "ensure account commitment" and confirm the ECP was "aligned to pricing." Ex. 80 at SE20–SE21. Given this, it is unsurprising that sales representatives and individual ECPs confirmed over and over again that the UPP was an agreement.[12]

---

upon feedback from ECP's we doubled down on" UPP); Ex. 69 at 3 ("[B]oth [Dr. Kassalow] and I [Dr. Eiden] have access to the higher ups at the major laboratories."); Ex. 70 (ABB coordinated Senate testimony with Alcon and JJVC); Ex. 71 (Eiden "spent time at AOA [conference] talking with the heads of B&L, Alcon and J&J" about UPP); *see also* Ex. 72 at 2; Ex. 73 at 1; Ex. 74.

[11] *See, e.g.*, Ex. 76 at 15 (Alcon needed ECPs "that support Minimum Retail Pricing"); Ex. 77 (ECPs must "implement retail pricing strategy," be "aligned to pricing," and "support the pricing").

[12] *See, e.g.*, Ex. 81 at 3–5 ("As long as the account agrees to UPP . . ."); Ex. 82 (ECP asks if account "is required . . . to sign the UPP agreement . . ."); Ex. 83 at 3 ("[A]ccounts. . . have verbally confirmed that they accept the UPP[.]"); Ex. 84 (seeking more copies "of the UPP agreement"); Ex. 85 (ECP complains competitors violated "the UPP pricing agreement"); Ex. 86 (ECP "does not want to jeopardize the contract he signed with Alcon"); Ex. 87 ("I have had no issues signing and abiding by that agreement[.]"); Ex. 88 ("We were under the impression that every account . . . signed the UPP agreement."); Ex. 89 (ECP "had to sign an agreement . . . agreeing to the UPP policy"). Even Alcon's corporate representative, David Dowd, ███████████████████████ Ex. 90 at 108:9–17.

8

b.    Alcon relied upon its distributors and ECPs to enforce its UPP.

Alcon's distributors and ECPs also committed to help Alcon enforce it. ECPs, for example, used social media and direct communications with Alcon to report violators. *See, e.g.*, Ex. 91; Ex. 92 at 4. Alcon also worked directly with one ECP to submit false prescriptions to online retailers to test their prices. *See* Exs. 93–96.

Similarly, Alcon created do-not-sell lists to instruct distributors to not sell to certain retailers. *See* Ex. 97 at 7; Exs. 98–100. The distributors complied with these do-not-sell lists even though it would cause lower sales revenue. *See, e.g.*, Ex. 101 at 4; Ex. 102 at 5; Exs. 103–104 §§ 4.01, 14. In other instances, ABB took the lead in bringing ECPs into compliance. *See* Exs. 105–107. Alcon's stated goal was "a true partnership relationship" with its distributors, Ex. 97 at 12, while ABB sought a █████████████ ████████████████████████████████████████████████, Ex. 56 at 12.

### 3.    The Contact Lens Markets

a.    The Contact Lens Market

Although other types of vision care exist, contact lenses constitutes its own unique market. *See, e.g.*, Ex. 33 at 36. For example, eyeglasses are less convenient than contact lenses and are often less desirable for cosmetic reasons. *See* Ex. 02 ¶¶ 23–24. And many contact lens wearers also have a pair of glasses that they use, suggesting that glasses are a complement to, not a substitute for, contact lenses. *See id.*; *see also* Ex. 07 ¶ 114. Similarly, corrective laser surgery is expensive, may not provide complete correction, may lead to undesirable complications, and is not appropriate for all individuals. *See* Ex. 02 ¶¶ 25–27; *see also* Ex. 33 at 36.

9

b.     The Alcon-Only Market

Because consumers can only purchase the specific brand of contact lens speci-

fied on their prescription, the contact lens industry operates "different than most other

product markets." Ex. 19 at 3.  "[T]he retailer of the product is also an essential gate-

keeper without whose permission in the form of a required medical prescription the

product simply cannot be purchased, it cannot be obtained. *Id.*; *see also* Ex. 02 ¶ 157.

In Alcon's words, ████████████████████████████████████████████████

████████████████████████████████████ Ex. 108 at 10; *see also* Ex. 109 at 11;

Ex. 110 at 8 (contact lens industry is more unusual than pharmaceutical industry be-

cause FDA does not permit generic contact lenses).

As a result of these unique industry characteristics, Alcon-brand contact lenses

have highly inelastic demand, creating a market for Alcon-branded contact lenses (the

"Alcon-only Market").[13] *See* Ex. 108 at 10 (████████████████████████████████

████████████████████████████████████); *see also* Ex. 109

at 11; Ex. 111 at 9; Ex. 112 at 3, 13–17. And Alcon knew that this inelastic demand

meant ████████████████████████████████████. *See* Ex.

111 at 8; Ex. 27 at 68. For example, Alcon's UPP resulted in ████████████████

████████████████████████ what would have prevailed without the UPP.

---

[13] When demand for a product is inelastic, consumers respond less to price changes and firms can raise prices without losing so many customers that the increase is unprofitable. *See* Ex. 02 ¶ 67.

10

*See* Ex. 07 ¶¶ 135–136.[14] Alcon's UPP also forced multiple internet retailers to ███████

███████████████. *See* Ex. 02 at Ex. 1. And Alcon's UPP prices were ███████████

████████████████████████████████████████ Ex. 08 at 89:24–90:9.[15]

## C.   Alcon's Targeting of Lens.com for Refusing to Comply with Alcon's UPP

As early as 2012, Alcon proposed that Lens.com sign an authorized retailer agreement to formalize their relationship. *See* Ex. 113. Negotiations over such an agreement continued on and off in the following years. In December 2013, Alcon debated a more limited agreement focused just on UPP products. *See* Ex. 114 at 2. By July 2014, however, Alcon concluded that an agreement was unlikely, and was "███████

██████████" by Lens.com's statements that it had been purchasing DT1 lenses and would soon begin selling them below the UPP price. *See* Ex. 115. Two months later, Alcon learned such Lens.com sales had begun. *See* Ex. 116.

Alcon was inundated with complaints from ECPs, both directly and through social media platforms that it monitored, *see* Exs. 102, 117–122, which caused internal alarm. *See, e.g.*, Ex. 102 at 4. In order to "████████████████████" Alcon swiftly began drafting talking points. Ex. 123; *see also* Exs. 124–125. Yet Alcon faced a problem: ███

████████████████████████████████████████████████████████████████

██████████████████. *See* Ex. 125. In fact, Alcon knew that Lens.com had purchased at least ████████ worth of lenses from ABB in 2014. *See* Ex. 101 at 2–4; *see also* Ex. 115.

---

[14] Sam's Club (and some internet retailers) significantly dropped their prices on Alcon's UPP products in the six months after Alcon rescinded its UPP. Ex. 02 ¶¶ 107–108 & Tbl. 4.

[15] ████████████████████████████████████████. *See* Ex. 111 at 6; Ex. 02 ¶ 110.

11

To address this problem, on October 22, 2014, Alcon issued a "do not sell" order to all of its distributors, barring them from supplying Lens.com with *any* Alcon lenses, whether or not subject to UPP (the "Cut-Off Order"). *See* Exs. 99–100; Ex. 33 at 31. That Cut-Off Order remains in place today. *See* Ex. 31 at 103:18–21. On October 23, 2014, Alcon's Dennis Kane held a phone call with Lens.com's principal, Cary Samourkachian. *See* Ex. 126 at 2. In an email recounting the call, ███████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ *Id.*[16] And Samour-kachian testified that ████████████████████████████████████ ████████████████████████ Ex. 10 at 138:5–18.

That the authorized retailer agreement explanation was pretextual is also evidenced by post-Cut-Off Order actions (or lack thereof). An Alcon spreadsheet circulated internally on September 21, 2015—almost one year after the Cut-Off Order—states, █████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[16] Alcon offered to rescind the Cut-Off Order if Lens.com signed an authorized retailer agreement, ███ ████████████████████████. *See* Ex. 127 at § 3(a); *see also* Ex. 31 at 178:4–10 (the retailer agreement ██████████████████████████████████████).

█████████████████████████████████████████ Ex. 128. Additionally, two spreadsheets from June and July 2016 ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ *See* Exs. 129–130; Ex. 31 at 156:8–157:11 & 158:14–17 ████████████████████████

██████████████████████████████████████████████████████████████.

D.    **Lens.com's Harm from Alcon's UPP**

Lens.com historically purchased Alcon products from various distributors, including ABB. *See* Ex. 02 ¶ 187 & Ex. 10 thereto. Alcon's Cut-Off Order has deprived Lens.com of this supply, and as a result, ████████████████████████████████████

████████████████████████████████████[17] ██████████████████████████████

████████████████████████████████████████████████████████

██████ Lens.com's expert, Jeffrey Klenk, constructed three specific models to compute Lens.com's lost profits. *See* Ex. 02 ¶¶ 170–189; Ex. 07 ¶¶ 238–240; Ex. 131 ¶¶ 9–10 & Tbls. 3–4. Klenk concludes that the damages arising from Alcon's anticompetitive restraint total ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ *See* Ex. 131 ¶¶ 7–10 & Tbls. 3–4; Ex. 132 at 230:10–231:4, 232:4–237:6. These harms are ongoing. *See* Ex. 02 ¶¶ 170–189; Ex. 07 ¶¶ 238–240.

---

[17] While Lens.com's sales of Alcon products ██████████████████████████████████████, ███████████████████████████████████████████████████████████████████. *See, e.g.*, Ex. 02 ¶¶ 174–178. He determined that there was also a ████████████████████████████████████ ██████████████ *See id.*

## IV.   LEGAL STANDARD

Summary judgment is not appropriate unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" factual dispute exists if "a reasonable jury could return a verdict for the nonmoving party" when viewing "the materials presented and all factual inferences in the light most favorable to the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1298 (11th Cir. 2003).  And, in particular, "summary judgment should be used cautiously in antitrust cases[.]" *Dunnivant v. Bi-State Auto Parts*, 851 F.2d 1575, 1584 (11th Cir. 1988); *see also* Wright & Miller, Fed. Prac. & Proc. Civ. § 2732.1, *Antitrust and Patent Actions* (4th ed.). An antitrust plaintiff need only "show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed" it. *Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1533–34 (11th Cir. 1987) (internal quotations omitted).

## V.   ARGUMENT

To prevail at trial, Lens.com must show an agreement among Alcon and at least one other entity that unreasonably restrains trade, affects interstate commerce, and causes antitrust injury and damages. *See Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1455, 1459 (11th Cir. 1991). To establish an unreasonable restraint in a rule-of-reason case, a plaintiff must "define the relevant market and establish that the defendants possessed power in that market." *Spanish Broad. Svs. v. Clear Channel Commc'ns*,

376 F.3d 1065, 1073 (11th Cir. 2004). Triable issues of fact exist such that summary judgment must be denied.

## A.     Alcon Entered Agreements in Restraint of Trade.

Lens.com must demonstrate the existence of a "contract, combination[,] . . . or conspiracy, in restraint of trade." *See* 15 U.S.C. § 1. The existence of such an agreement is frequently proven by circumstantial evidence including by "a pattern of parallel behavior" by conspirators, and other "plus factors that tend[] to exclude the possibility that [they] acted independently." *Williamson Oil Co.,* 346 F.3d at 1301; *see also DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989); *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 554 (8th Cir. 1991). These factors include:

> a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, evidence of a high level of interfirm communications . . . [and] complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason.

*In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1295 (M.D. Fl. 2016) (internal quotations omitted).

The Court previously held that there were triable issues of fact as to the existence of a horizontal conspiracy between Alcon and the other manufacturers and a vertical conspiracy between Alcon, its distributors, and ECPs.[18] *See* Order, Dkt. 1091. Because Lens.com's evidence is substantively identical to that advanced by the Class Plaintiffs, the same conclusion applies here.

---

[18] Alcon argues that Lens.com has necessarily abandoned any horizontal conspiracy claim by defining the relevant market to consist solely of Alcon lenses. This is not the case. *See* Section V(B), *infra*.

### 1.    Alcon entered into a horizontal conspiracy.

It makes little economic sense for Alcon to have *independently* launched a UPP. The first lens subject to its UPP, the DT1, was considered by optometrists and marketed by Alcon as a revolutionary product. *See* fn. 5, *supra*. Even without a UPP, Alcon could anticipate selling a significant number of such lenses.[19] Yet according to Alcon's own expert, a UPP at this juncture risked ███████████████████████████ ████ Ex. 12 ¶ 208. Why, then, would Alcon jeopardize its profits with a UPP?  First, Alcon and the other manufacturers were subject to immense pressure by ABB and ECPs to reduce competition from online retailers. *See* Section III(B)(1)(b), *supra*. Second, Alcon knew that the risks of its UPP could be mitigated if the other manufacturers also implemented UPPs. *See* fn. 9, *supra*.

As described above, there is substantial evidence that the manufacturers had the opportunity to engage in such a conspiracy through ABB's Retail Price Monitor; ECP advisory boards; social media groups such as ODs on Facebook and UPP Violations; industry associations; and trade shows. *See* Section III(B)(1)(c), *supra*. Meanwhile, prominent ECPs and distributors bragged about working behind the scenes to ensure each manufacturer adopted a UPP. *See* Section III(B)(1)(b)–(c), *supra*. Additionally, the contact lens industry is highly concentrated, *see* Section III(A)(1), *supra*, and each of the manufacturers did, in fact, undertake parallel action, rolling out UPPs within

---

[19] While Dowd suggests Alcon's increase in market share in mid-2013 is attributable to its UPP, Lens.com's expert explained that such profits are instead attributable to Alcon rolling out a new, innovative product at that time. *See* Ex. 02 ¶¶ 83–91. This is a dispute of fact derived from reasonable inferences that must be drawn in favor of Lens.com.

approximately one year of one another, *see* Ex. 02 ¶ 31, Tbl. 1. Such policies signified an unprecedented change in pricing, with Alcon, its distributors, and ECPs, boasting about the industry-wide shift. *See* Exs. 35–39. The foregoing is more than enough for a trier of fact to reasonably infer that a horizontal conspiracy existed.

### 2.    Alcon also entered into vertical agreements with distributors and ECPs.

Both ECPs and Alcon's own employees understood the UPP to be an agreement and regularly referred to it as such. *See* Section III(B)(2)(a), *supra.* It is also well established that even a purportedly unilateral policy may constitute an unlawful agreement in restraint of trade where, for example, the manufacturer relies on distributors (e.g., ABB) or other third parties (e.g., ECPs) for enforcement. *See, e.g.*, *United States v. Parke, Davis & Co.*, 362 U.S. 29, 45–46 (1960); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 716–20 (1944). As explained in *Parke Davis*:

> [I]f a manufacturer . . . takes affirmative action to achieve uniform adherence by inducing each customer to adhere to avoid . . . price competition, the customers' acquiescence is not then a matter of individual free choice prompted alone by the desirability of the product. . . . The manufacturer is thus the organizer of a price-maintenance combination or conspiracy . . . .

362 U.S. at 46–47. Given evidence that ECPs monitored and reported UPP violations, and that distributors relied on do-not-sell lists to enforce the UPP, *see* Sections III(B)(2)(b) and III(C), *supra*, triable issues of fact on this element clearly exist.

### B.    Lens.com Has Defined the Product Markets.

Market definition is a "deeply fact intensive inquiry" not well suited to summary judgment. *See, e.g.*, *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 55 (2d

Cir. 2019); *Hayden Pub. Co., Inc. v. Cox Broad. Corp.*, 730 F.2d 64, 70 n.8 (2d Cir. 1984). And Lens.com has identified and can support two appropriate product markets: (A) all contact lenses and (B) the Alcon-only Market.[20]

### 1.    The evidence supports a market of all contact lenses.

Citing to one small portion of the deposition of Lens.com's economic expert Jeffrey Klenk, Alcon argues that Lens.com's proposed market is limited to "all Alcon lenses and only Alcon lenses." Mot. at 12. Alcon disregards Klenk's testimony and reports, in which he explicitly opined that there are two plausible product markets:

> [O]ne plausible set of products … to consider… is that of contact lenses (i.e., not including other forms of vision correction … Another plausible product market to consider here is that of Alcon's own brand of contact lenses.

Ex. 02 ¶¶ 91, 97. Klenk reiterated this point during deposition: "[A]s I note in my report, that relevant market [the Alcon-only Market] *resides within a market of all contact lenses*. . ." Ex. 132 at 135:12–16 (emphasis added).[21]

Whether viewed as a question of technology, cost, or consumer preference, contact lenses and other forms of vision correction are not interchangeable. *See* Ex. 02 ¶¶ 23–27, 91–94; Ex. 07 ¶¶ 113–117. And interchangeability—along with commercial realities facing consumers—is a key inquiry in defining markets. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 399 (E.D.N.Y. 2008). Thus, as the court has

---

[20] There is no requirement confining antitrust plaintiffs to just one product market at summary judgment. *See, e.g.*, *Eastman Kodak Co.*, 504 U.S. at 481–82; *In re General Motors Corp.*, 99 F.T.C. 464 (1982).

[21] Klenk tried to further clarify this point at deposition but was cut off. Ex. 132 at 134:17–135:5.

already concluded and as Alcon itself has stated, a market of all contact lenses is appropriate. *See* Order, Dkt. 1091, at 7; Order, Dkt. 940, at 174; *see also* Ex. 33 at 36.

### 2.  An Alcon-only Market can also be defined based on the evidence.

"[W]ell-defined submarket[s] which, in themselves, constitute product markets for antitrust purposes" may also exist within a broader market. *See Brown Shoe Co.*, 370 U.S. at 325. Consistent with this theory, Klenk also proposes an Alcon-only Market.

> a.  The unique characteristics of the contact lens industry resolve interchangeability concerns.

Lens.com's proposed sub-market consisting of Alcon-only contact lenses is supported by expert testimony regarding the unique features of the contact lens industry and is appropriate under numerous precedents that make clear that a single brand of product may constitute its own market "where a product's characteristics make it unique or circumstances prevent consumers from substituting alternatives for the same purposes." *In re Payment Card*, 562 F. Supp. 2d at 403; *see also U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 998 (11th Cir. 1993), certified question answered, 443 S.E.2d 833 (1994). In fact, the Supreme Court has expressly declined to bar single-brand market definitions, something Alcon asks the court to do here. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481–82, 482 n.30 (1993).

Single-brand markets frequently arise in the pharmaceutical context due to the lack of consumer choice and alternatives. Like the contact lens industry,

> [t]he market for prescription pharmaceuticals is an unusual one, in part because consumers are typically insulated at least to some degree from both cost … and choice (which is at least limited and more likely substantially directed by the

> prescribing physician), so market features such as cost-sensitivity and elasticity of demand might therefore defy reasonable expectations.

*In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 246 (D. Conn. 2015); *see also Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (brand-name drug and generic drug were "in separate markets for antitrust analysis"); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1064 (3d Cir. 1978).[22]

Similarly, here, the requirement that a patient obtain a prescription for a lens prevents consumers from substituting one lens for another. *See* Section III(A)(2), *supra*. That is, ECPs act as gatekeepers as to which product a consumer can purchase and whether they may change to a different brand. *See* Ex. 02 ¶ 21; *see also* Ex. 19 at 3. And the evidence shows that demand for Alcon lenses is inelastic and that Alcon products lack cross-elasticity once prescribed. *See* Section III(B)(3), *supra*.

These unique characteristics of the contact lens industry impede a typical product interchangeability analysis. And that conclusion does not undercut the preceding argument that contact lenses as a whole may also, in some contexts, constitute an appropriate market.[23] There is no reason Alcon could not compete in the broader contact lenses market while, simultaneously, exercising pricing power over a smaller set of

---

[22] A lack of consumer choice may also arise outside of the prescription context and likewise justify a single-brand market. *See, e.g.*, *McWane, Inc. v. F.T.C.*, 783 F.3d. 814, 830 (11th Cir. 2015); *U.S. Anchor Mfg., Inc.*, 7 F.3d at 996; *United States v. Archer–Daniels–Midland Co.*, 866 F.2d 242, 248 (8th Cir.1988).

[23] Indeed, this Court has already found that a single manufacturer's contact lenses could be a proper market. *See Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, Case No. 3:15-cv-734-J-20JRK, 2015 WL 9987969, at *13 (M.D. Fla. Nov. 4, 2015).

products. *See* Ex. 07 ¶¶ 123–147.[24] To determine whether a subset of product comprise

their own market, one must analyze interchangeability from both the demand side (the

consumer's perspective) and the supply side (the producer's perspective). *See id.* ¶ 128.

If entry or transfer of productive assets would not readily occur in response to a price

increase, the sub-grouping likely constitutes its own relevant market. *See id.* ¶ 126.

Here, on the demand side, a consumer with a prescription is unlikely to change brands

due to the information gap between consumer and ECP, the costs of getting a new

prescription, and the fact that not all contact lenses—even those that treat the same

conditions—are interchangeable. *See* Section III(A)(2), *supra*. Similarly, there are no

equivalents to Alcon-branded lenses because the FDA bars other manufacturers from

producing comparable generic lenses. *See* Ex. 16. Indeed, Alcon has acknowledged

internally that increasing its own prices ███████████████████████████████

████████████████████████████████████████ Ex. 111. The Alcon-only

Market is therefore appropriate given the structure of the industry.

   b. The *Brown Shoe* factors do not lead to a contrary result.

  The "practical indicia" identified in *Brown Shoe* may be useful in defining a rel-

evant market,[25] but such an analysis is not necessary. *See In re General Motors Corp.*, 99

---

[24] The "existence of a relatively large relevant market does not preclude the existence of smaller relevant markets." Ex. 07 ¶¶ 126–128 (quoting Hovenkamp at § 3.2c). For example, the fact that 'motor vehicles' is a relevant market does not entail that a sub-grouping such as 'four-wheel-drive motor vehicles' or 'diesel fueled vehicles' could not be a relevant market as well." *Id.* ¶ 128.

[25] These indicia include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325.

21

F.T.C. 464, ¶ 329 (1982) ("There are a number of precedents . . . for the proposition that not all, or even most, of [the *Brown Shoe* factors] need be taken into account.") (collecting cases). Defining a relevant market "is not a goal in itself[.]" Areeda, Hovenkamp & Solow, Antitrust Law, ¶ 531a (1995 ed.). Indeed, Alcon's own expert has written that market definitions should not be required for antitrust liability.[26] In-stead, the market analysis seeks to provide the factfinder with a frame of reference for determining whether the defendant's market power is sufficient to accomplish its anti-competitive goals. *See id.*; *see also Walker Process Equip., Inc. v. Ford Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965). In other words, the goal of the market definition inquiry is to define the narrowest set of products over which Alcon wields market power.

Here, there is both direct and indirect evidence of Alcon wielding market power in the Alcon-only Market. Alcon has the ability to █████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████ Ex. 08, without losing a sub-stantial number of consumers. *See* Section III(B)(3)(b), *supra*. This shows that Alcon has market power over its brand of lenses. *See* Ex. 07 ¶¶ 108–112. Because market *power* is the goal of the analysis, an Alcon-only Market definition is appropriate.

---

[26] *See* Ex. 133; *see also* Ex. 134 at 5 ("[T]here are circumstances in which the effort to reach a formal evaluation as to the specific scope of the market can be distracting, if not misleading. In such cases, it will be beneficial to undertake the competitive effects analysis without necessarily reaching a formal conclusion on market definition[.]"); *id.* at 9.

Moreover, at least some of the practical indicia described in *Brown Shoe* support the Alcon-only Market in this case. Here, members of the industry have recognized submarkets based on the brand of contact lens, acknowledging that ECPs are making a brand choice at the time of prescription. *See* Section III(A)(2), *supra*; *see also* Ex. 21 at 5 (when prescribing a lens, "there's a brand choice that's made"); Ex. 02 ¶¶ 37–38. This conclusion is echoed by Alcon's own experts. *See* Ex. 20 ¶ 8; Ex. 12 ¶ 55. And Alcon-branded contact lenses display strongly inelastic demand. *See* Section III(B)(3), *supra.* The Alcon-only Market is not contrary to *Brown Shoe.*

c.     The Alcon-only Market satisfies the Hypothetical Monopolist Test.

Alcon also criticizes Klenk's Hypothetical Monopolist Test ("HMT") analysis because Klenk performed 'qualitative' rather than 'quantitative' HMTs. *See* Mot. at 20–21. But this was entirely proper. *See* Horizontal Merger Guidelines (Ex. 135) § 4.1.3 ("Even when the evidence necessary to perform the [HMT] quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to … market definition.").

First, based on the prescription requirement, Klenk considered what would happen if the price of Alcon lenses increased by five percent: it was unclear whether ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 02 ¶ 100. Second, he reviewed Alcon's statements on elasticity including explicit statements ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id.* ¶ 101 (reviewing Exs. 27, 42, 136).

23

Finally, he reviewed Alcon's own cross-elasticity of demand studies, which found that

███████████████████████████████████████████████████

███████████████████████████████████████████████ *See*

*id.* ¶¶ 102–103 (reviewing Ex. 112). Based on this, Klenk concluded that "[t]he high

degree of price inelasticity with respect to Alcon's own brand of contact lenses . . .

indicates that the relevant product market is, in fact, narrower than the contact lenses

of all manufacturers." *Id.* ¶ 103. This is a proper HMT analysis, as there is no require-

ment that an HMT be quantitative. *See McWane,* 783 F.3d at 829 (noting that "[c]ourts

routinely rely on qualitative economic evidence to define relevant markets").

## C.   Alcon's Agreements Injured Both Competition, Generally, and Lens.com.

Lens.com's third required showing is that Alcon's misconduct has resulted in

an "antitrust injury." *See Florida Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1374

(11th Cir. 1997). An antitrust injury includes both an "injury casually linked to an

illegal presence in the market [i.e., but for causation]" and an "injury of the type that

the antitrust laws were intended to prevent." *See Vacation Break U.S.A., Inc. v. Mktg.

Response Grp. & Laser Co., Inc.*, 169 F.Supp.2d 1325, 1333 (M.D. Fla. 2001) (brackets

in original); *see also Spanish Broad. Sys.*, 376 F.3d at 1071. Triable issues of fact exist as

to each aspect of the antitrust injuries alleged here.

### 1.   Lens.com would not have been harmed but for Alcon's UPP.

In evaluating antitrust injury, the Court should consider what is undisputed:

(a) on October 22, 2014, Alcon instructed its distributors to halt sales of *all* Alcon

lenses to Lens.com; (b) Alcon's authorized distributors complied with that instruction;

and (c) the do-not-sell order remains in effect today. *See* Section III(C), *supra*. In other words, Alcon is not disputing that Lens.com was harmed. Alcon instead claims the Cut-Off Order is not traceable to the UPP. This is belied by the evidence.[27]

Alcon and Lens.com tried to negotiate an authorized retailer agreement on and off for several years predating the UPP, without Alcon ever taking adverse action against Lens.com. Only in October 2014, when Alcon was inundated by complaints from ECPs regarding the availability of DT1 on Lens.com's website at prices below the UPP, did Alcon decide to take action. *See* Section III(C), *supra*. The plain inference to be drawn from the evidence is that it was these complaints *about the UPP* that led to the Cut-Off Order.[28] Indeed, an employee of Alcon admitted as much. *See* Ex. 10 at 138:5–18. And evidence that post-dates the Cut-Off Order reinforces this conclusion *See* Exs. 128–130; Ex. 31 at 156:8–157:11 & 158:14–17. The lack of a retailer agreement was not the basis for the Cut-Off Order.

### 2. Alcon's UPP also injured competition more generally.

Harm to competition is "indicated by a factual connection between the alleged harmful conduct and its impact on competition in the market . . . [T]he plaintiff

---

[27] Alcon portrays the deposition testimony of Lens.com's corporate representative as dispositive on this point. While she did testify, that at times, ███████████████████████████████ ██████████ Ex. 137 at 53:10–13, this statement is immaterial. Lens.com never claimed that it obtained 100% of its supply of Alcon lenses from Alcon distributors or that the Cut-Off Order was the sole reason for its lack of supply. That does not diminish the fact that Alcon's UPP directly harmed Lens.com by restricting its supply of Alcon lenses. *See, e.g.*, Ex. 02 ¶¶ 176–178. And in any event, Lens.com's representative also testified in the same deposition that, in her view, the Cut-Off Order and the UPP were directly interrelated. *See* Ex. 137 at 85:14–86:1.

[28] Even if Lens.com *had* signed on to an authorized retailer agreement, Alcon had repeatedly made clear that ███████████████████████████████████████████. *See* fn. 16.

claiming it should point 'to the specific damage done to consumers' in the market[.]" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010) (citations omitted). Examples of actual anticompetitive effects include, but are not limited to, a reduction in output, an increase in price, or a deterioration in quality. *Id.* Lens.com can prevail on this element by showing that Alcon's adverse action against it led to higher prices for consumers. *See, e.g.*, *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, Case No. 3:15-cv-734-J-20JRK, 2015 WL 9987969, at *10 (M.D. Fla. Nov. 4, 2015) ("[I]njury to plaintiff's ability to provide discounted service to customers constituted an antitrust injury[.]"). That is precisely what occurred here. *See, e.g.*, Ex. 07 ¶ 135; Ex. 02 ¶¶ 107–108, Tbl. 4, & Ex. 1 thereto; Ex. 08 at 89:24–90:9.

Alcon and the other manufacturers, distributors, and ECPs engaged in a conspiracy to inflate the prices of contact lenses. Lens.com's refusal to participate in this conspiracy led directly to Alcon's Cut-Off Order, and this not only harmed Lens.com directly, but also harmed competition more broadly. It is undisputed that Lens.com's prices are consistently among the lowest in the industry. Ex. 02 ¶¶ 143–151.[29] "[B]y taking steps to inhibit Lens.com's ability to sell Alcon-branded lenses, Alcon has been, and continues to be, inherently forcing consumers to pursue higher-priced options." Ex. 02 ¶ 143. Indeed, after analyzing the issue, Klenk concluded:

> . . . Alcon used its market power to implement its UPPs, which had the intended purpose of raising the retail prices paid by consumers of contact lenses. To the extent that consumers were unable to avoid these higher prices, those higher prices would have been to their detriment. Because Alcon was not

---

[29] Neither of Alcon's retained experts challenge this conclusion.

> completely effective at eliminating Lens.com as a low-price retailer, some consumers may have been able to avoid the adverse effects of Alcon's higher prices. However, there exist some consumers that tried to purchase contact lenses from Lens.com but were unable to do so . . . because . . . of Alcon's efforts to curtail Lens.com's sales as part of its efforts to maintain UPP pricing.

Ex. 02 ¶ 221. Such expert testimony creates triable issues of fact as to whether competition was harmed generally in the form of higher prices.

There also appears to be "no reliable economic basis to conclude that there was any apparent output-enhancing effect of the UPPs." Ex. 07 ¶ 38; *id.* at ¶¶ 98–100. Alcon's own expert similarly could not conclude that the UPPs were output-enhancing. Ex. 138 at 183:18–24. This disagreement among experts as to the existence of any such output-enhancing effects provides an independent basis for concluding that a trier of fact could reasonably conclude that there has been harm to competition.[30]

## D.   **Lens.com Has Established Cognizable Damages.**

Both Count III and Count IV seek "injunctive relief, treble damages, and attorneys' fees and costs" for the harm suffered as a result of Alcon's UPP. Counterclaim ¶¶ 337, 347. Alcon's Motion does not challenge the request for injunctive relief. Because Lens.com has been injured by Alcon's UPP, and that injury is ongoing, relief is available even if damages are not, which precludes summary judgment.

In any event, Alcon's criticisms of Lens.com's damages calculations are misplaced. "Once the fact of causation is established, the burden of proving damages is much less severe." *Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*, 710 F.2d 752,

---

[30] This lack of output-enhancing evidence seems troubling for Gilbert, given his statement that ████████ ████████████████████████████████████████████████████. *See* Ex. 12 ¶ 207.

785 (11th Cir. 1983). As discussed, there is evidence on which a jury can reasonably determine causation. *See* Section V(C)(1), *supra*. Thus, under established law, a "just and reasonable" inference of damage based upon relevant data is sufficient to prove damages. *See Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 864 (5th Cir. 1981) (citations omitted). Here, Klenk constructed three models to compute the lost profits[31] suffered by Lens.com as a result of Alcon's UPP: ████████████████████████████ ████████████████████████████████████ Ex. 02 ¶¶ 170–189; Ex. 07 ¶¶ 238–240; Ex. 131 ¶¶ 9–10 & Tbls. 3–4. This lost-profits analysis more than satisfies the "relaxed standard" required here.

### 1. All products included in Klenk's analysis were proper.

A plaintiff claiming lost profits "must disaggregate the lost profits . . . to eliminate the loss caused by the legal competitive action of the defendant." *Godix Equip. Exp. Corp. v. Caterpillar, Inc.*, 948 F. Supp. 1570, 1583 (S.D. Fla. 1996), aff'd sub nom. *Gonzalez v. Caterpillar, Inc.*, 144 F.3d 55 (11th Cir. 1998). Lens.com meets this standard.

First, as previously discussed, the Cut-Off Order is attributable to Alcon's UPP. *See* Section V(C), *supra*. As a result, Lens.com was cut off not only from those products covered by the UPP, but from all Alcon products. *See* Exs. 99–100; Ex. 33 at 31. That is, the anticompetitive effects of the UPP on Lens.com extended beyond just UPP

---

[31] Lost profits is the proper measure of damages. *See Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 429 (5th Cir. 1985); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 373 (3d Cir. 2005).

28

products ███████████████████████████████████████████

████████████████. *See* Ex. 132 at 233:1–9; Ex. 07 ¶ 257 n.540.

Second, Alcon argues that Lens.com's damages wrongfully include ████████

████████████████████. But Alcon has put forward no evidence regarding ██

████████████████████████████████████████████████

████████████████████████████. *See* Ex. 132 at 235:3–14.[32] In fact,

███████████████████████████████████████████████ *See*

Ex. 02 ¶ 145 & Ex. 2; Ex. 07 ¶ 257 n.540; Ex. 132 at 235:3–14. Thus, ████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████ *See* Ex. 132 at 236:5–22.

Third, Alcon's Cut-Off Order is still in place today, so Lens.com is still suffering

the effects of Alcon's UPP, notwithstanding Alcon's termination of the UPP in De-

cember 2016. *See* Ex. 07 ¶ 261. In other words, the end of the UPP did not result in the

end of Lens.com's damages traceable to the UPP.

### 2.    Klenk was correct to exclude any purported benefits of Alcon's UPP.

Finally, Alcon argues that Lens.com cannot establish damages because Klenk

did not take ████████████████████████████████████ Mot.

at 22.  At most, however, evidence of offsetting benefits goes only to the final

---

[32] Competing expert conclusions (*see* Mot. at 22), amount to a dispute of material fact that should not be decided on summary judgment. *See, e.g.*, *Martin v. City of Atlanta, Georgia*, No. 1:07-CV-326-BBM-RGV, 2009 WL 10668302, at *17 n.43 (N.D. Ga. July 27, 2009).

calculation of damages, not the fact of damages, and summary judgment is therefore improper.[33] *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 311–17 (E.D. Mich. 2001) (collecting cases and concluding that offsets "relate to the quantum of damages; not the fact of injury"); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1448 (9th Cir. 1995)). This is especially true here, where Klenk opines that ██████████ ████████████████████████████████████████. Ex. 132 at 278:1–11. Such testimony should be put before a jury, not addressed at summary judgment.

## VI.    <u>CONCLUSION</u>

Based on the foregoing, the Court should deny Alcon's Motion for Summary Judgment.

---

[33] The propriety of offsetting purported benefits in the context of price fixing is questionable. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 686 (N.D. Ga. 2016) ("[T]he nature of price-fixing is such that it would be inappropriate to allow a defendant to rely on alleged benefits of its anticompetitive conduct to reduce any damages it owes.").

Dated: September 6, 2023.

/s/ Crystal T. Broughan

PARSONS BEHLE & LATIMER
Nathan Thomas
(nthomas@parsonsbehle.com)
Michael Judd (mjudd@parsonsbehle.com)
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111
Tel.: (801) 532-1234
Fax: (801) 536-6111

MARKS GRAY, P.A.
Crystal T. Broughan
(cbroughan@marksgray.com)
Florida Bar No.: 0863343
Logan K. McEwen
(lmcewen@marksgray.com)
Florida Bar No.: 98683
Post Office Box 447
Jacksonville, Florida 32201
Tel.: (904) 398-0900
Fax: (904) 399-8440

THORPE NORTH & WESTERN
Mark Bettilyon (mark.bettilyon@tnw.com)
Peter M. de Jonge (dejong@tnw.com)
Jed Hansen (hansen@tnw.com)
175 S. Main Street, Suite 900
Salt Lake City, UT 84111
Tel.: (801) 566-6633

*Attorneys for Lens.com*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 6, 2023, I served a copy of the foregoing

*Lens.com's Memorandum in Opposition to Defendant Alcon Vision, LLC's Motion for Sum-*

*mary Judgment and Memorandum in Support* by email to the following:

David R. Marriott (dmarriott@cravath.com)
Margaret Anderson (meanderson@cravath.com)
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Tel.: 212-474-1000
Fax: 212-474-3700

A. Graham Allen (gallen@rtlaw.com)
James. M. Riley (jriley@rtlaw.com)
Samuel J. Horovitz (shorovitz@rtlaw.com)
ROGERS TOWERS, P.A.
1301 Riverplace Boulevard, Suite 1500
Jacksonville, FL 32207
Tel.: 904-398-3911
Fax: 904-396-0663

*Attorneys for Alcon Vision, LLC*

By:   /s/ Crystal T. Broughan