## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| In Re:<br><br>DISPOSABLE CONTACT LENS ANTITRUST LITIGATION | Case No. 3:15-md-2626-HES-LLL<br><br>Judge Harvey E. Schlesinger<br><br>Magistrate Judge Laura Lothman Lambert |
|---|---|
| THIS DOCUMENT RELATES TO:<br>Alcon Vision, LLC v. Lens.com,<br>Inc., No. 3:19-cv-706-HES-LLL | |

## O R D E R

This matter is before this Court on Defendant Alcon Vision, LLC's Motion for Summary Judgment and Memorandum of Law in Support (Dkt. 1379—sealed copy Dkt. 1393), Lens.com response (Dkt. 1388—sealed copy Dkt. 1400), and Alcon's Memorandum in Further Support of its Motion for Summary Judgment (Dkt. 1395).[1] Various documents and declarations have also been filed (Dkts. 1381, 1383, 1389, 1390, 1391, 1393, 1396, 1397, and 1401). This Court held a hearing on the motion and reviewed many, many documents.

### I.

Alcon is a leading producer of soft contact lenses and contact lens care

---

[1] This Court sought to avoid including sealed material in this Order. But this Court reviewed all the material in reaching the legal conclusions here.

products. Lens.com is a gray-market reseller of contact lenses. Lens.com buys other companies' lenses overseas for resale in the United States. Over the years, Alcon and Lens.com discussed Lens.com becoming an authorized retailer of Alcon lenses, but Lens.com refused to accept Alcon's terms.

In 2017, Alcon discovered Lens.com was selling Alcon products in the United States that did not follow Alcon-authorized United States-specific packaging. Alcon sued Lens.com in the United States District Court for the Eastern District of New York. Alcon's First Amended Complaint asserted claims for trademark infringement, false designation of origin, deceptive trade practices, false advertising, and unfair competition.

After the New York court denied its motion to dismiss/transfer, Lens.com asserted eleven counterclaims against Alcon, alleging a group boycott, unlawful tying arrangements, trademark misuse, unlawful monopolization, attempted monopolization, exclusive dealing, false advertising, and deceptive practices, as well as two claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, about Alcon's unilateral pricing policy (UPP). These counterclaims were based on a wide range of allegations, some of which related to Alcon's UPP. The allegations included: claims the eye-care providers (ECP) held "special power" in the contact lens industry; ECP and contact-lens manufacturers have long engaged in anticompetitive practices; and Alcon, seeking to gain favor

with ECPs, tried to push Lens.com from the contact lens market because of Lens.com's practice of selling lenses for less than the ECPs. (Dkt. 39, Case No. 3:19-cv-706-HES-LLL).

Lens.com sought to transfer the New York case, including all eleven counterclaims, to this Court for inclusion in *In re: Disposable Contact Lens Antitrust Litigation*, MDL No. 2626. On June 5, 2019, the Judicial Panel on Multidistrict Litigation transferred Counts III and IV to this Court for pretrial purposed as part of MDL 2626. Count III alleged violations of the Sherman Act, 15 U.S.C. § 1, the Clayton Act, 15 U.S.C. § 15, and the New York Donnelly Act, GBL § 340 *et seq.*, based on a hub-and-spoke conspiracy between Alcon and other contact lens manufacturers, distributors, and ECPs. Count IV alleged violations of the Sherman Act, the Clayton Act, and the New York Donnelly Act, claiming a rule-of-reason violation based on a vertical conspiracy between Alcon, its distributors, and the ECPs.

Alcon seeks summary judgment on these claims. Alcon maintains: 1) Lens.com cannot prove but-for causation; 2) Lens.com cannot prove antitrust injury; 3) the alleged product market does not exist; 4) Lens.com cannot prove cognizable damages; and 5) there is no evidence of an unlawful agreement. Lens.com replies issues of fact prevent summary judgment.

## II.

Federal Rule of Civil Procedure 56(a) explains summary judgment is

appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court teaches "summary judgment is mandatory against a party failing to show the existence of an element essential to the proof of its case at trial." *Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990).

A court considering a motion for summary judgment should not "weigh the evidence and determine the truth of the matter" but should "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "In applying this standard, the court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor." *Snell v. United Specialty Ins. Co.*, 102 F.4th 1208, 1214 (11th Cir. 2024).

To deny a motion for summary judgment, "there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). Still, the nonmoving party "may not rest upon the mere allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing there is a genuine issue for trial. A mere 'scintilla' of evidence supporting the opposing party's position will not suffice." *Walker v.*

4

*Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990).[2]

### III.

Lens.com has alleged two counts under the Sherman and Clayton Acts. Count III alleges a hub-and-spoke conspiracy between Alcon and other contact lens manufacturers, distributors, and ECPs. While Count IV alleges a rule-of-reason violation based on a vertical conspiracy between Alcon, its distributors, and the ECPs.

Section 1 of the Sherman Act provides, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "The terms 'contract, combination . . ., or conspiracy' are used interchangeably to describe the requisite agreement between two or more persons to restrain trade. Section 1 does not proscribe conduct that is wholly unilateral." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1455 (11th Cir. 1991).

---

[2] The testimony from Lens.com conflicts with other record evidence, but this Court is not persuaded that no reasonable jury could not believe the testimony presented by Lens.com and its evidence. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (explaining, "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). The factual findings this Court makes here are not to be taken as true but only what the evidence shows that parties can produce. Thus, the evidence the parties have produced here creates a conflict of material fact.

The linchpin of § 1 is an agreement. *See Fisher v. City of Berkeley*, 475 U.S. 260, 266 (1986) (explaining, "Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of agreement."). Liability only attaches "to agreements designed unreasonably to restrain trade in, or affecting, interstate commerce; thus, before analyzing the reasonableness of any alleged restraint on trade, courts must first ensure that an agreement to restrain trade exists." *Todorov*, 921 F.2d at 1455.

To prevail Lens.com must show an agreement among Alcon and at least one other entity that unreasonably restrained trade, affected interstate commerce, and caused antitrust injury and damages. *See Id.* at 1455. To establish an unreasonable restraint in a rule-of-reason case, a plaintiff must "define the relevant market and establish that the defendants possessed power in that market." *Spanish Broad. Sys. v. Clear Channel Commc'ns*, 376 F.3d 1065, 1073 (11th Cir. 2004) (quoting *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1213 (11th Cir. 2002)).

## A. Agreement

The existence of an agreement to restrain trade is often proven by circumstantial evidence including by "a pattern of parallel behavior" by conspirators, and other "plus factors that 'tend[] to exclude the possibility that

[they] acted independently.'" *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). *See also DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989); *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 554 (8th Cir. 1991). These factors include:

> a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, evidence of a high level of interfirm communications . . . [and] complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason.

*In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1295 (M.D. Fla. 2016) (quoting *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015)).

A purportedly unilateral policy may be an unlawful agreement in restraint of trade where, for example, the manufacturer relies on distributors or other third parties for enforcement. *See, e.g.*, *United States v. Parke, Davis & Co.*, 362 U.S. 29, 45–46 (1960); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 716–20 (1944). "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).

> If a manufacturer
>
> takes affirmative action to achieve uniform adherence by inducing
> each customer to adhere to avoid such price competition, the
> customers' acquiescence is not then a matter of individual free
> choice prompted alone by the desirability of the product. The
> product then comes packaged in a competition-free wrapping—a
> valuable feature in itself—by virtue of concerted action induced by
> the manufacturer. The manufacturer is thus the organizer of a
> price-maintenance combination or conspiracy in violation of the
> Sherman Act.

*Parke, Davis & Co.*, 362 U.S. at 46–47.

Alcon insists it, as a manufacturer, is not legally required to do business with Lens.com so long as it acts unilaterally. In Alcon's view, Lens.com has failed to provide evidence Alcon is not acting unilaterally; there is no evidence of either a horizontal or vertical agreement. Alcon suggests by restricting the market to a single lens manufacturer—Alcon—Lens.com has foreclosed the possibility that Alcon combined or conspired with another manufacturer through a horizontal agreement within that market. Alcon also claims there is no evidence of a vertical agreement between Alcon and any distributor to adopt, implement or enforce Alcon's UPP against Lens.com. In sum, Alcon suggest it adopted the UPP independently without any agreement with any other company.

Yet there is substantial evidence that the manufacturers had the

opportunity to engage in a conspiracy through ABB's Retail Price Monitor; ECP advisory boards; social media groups such as ODs on Facebook and UPP Violations; industry associations; and trade shows. Meanwhile, prominent ECPs and distributors bragged about working behind the scenes to ensure each manufacturer adopted a UPP.

Both ECPs and Alcon's own employees understood the UPP to be an agreement and regularly called it such. Even a purportedly unilateral policy may be an unlawful agreement in restraint of trade where, for example, the manufacturer relies on distributors, like ABB, or other third parties, like ECPs, for enforcement. *See Parke, Davis & Co.*, 362 U.S. at 45–46; *Bausch & Lomb Optical Co.*, 321 U.S. at 716–21. This case seems to exemplify the warning in *Parke Davis*:

> [I]f a manufacturer . . . takes affirmative action to achieve uniform adherence by inducing each customer to adhere to avoid . . . price competition, the customers' acquiescence is not then a matter of individual free choice prompted alone by the desirability of the product. . . . The manufacturer is thus the organizer of a price-maintenance combination or conspiracy . . . .

362 U.S. at 46–47.

Lens.com has presented evidence that ECPs monitored and reported UPP violations, and that distributors relied on do-not-sell lists to enforce the UPP. Various exhibits reference the UPP as an agreement. There is more than adequate evidence before this Court to infer that the do-not-sell was caused by

the UPP and caused by Alcon's enforcement of the UPP. It was caused by Alcon seeking to punish Lens.com for its failure to play ball with its conspiracies.

While Alcon maintains it terminated the Lens.com supply because of a lack of an Authorized Internet Retailer Agreement. Alcon did not apply this requirement to other retailers in the same situation even in the year or two following the Cut-Off Order regarding Lens.com. Yet some of the evidence shows Alcon put Lens.com on a do-not-sell list because of its violation of UPP. Lens.com's expert opined that by seeking to inhibit Lens.com's ability to sell Alcon lenses, Alcon has been forcing consumers to pursue higher-priced options. Lens.com does not have the full supply it could have or had of Alcon lenses. This means fewer discount options in the market for consumers.

This Court had held that there were triable issues of fact as to the existence of a horizontal conspiracy between Alcon and the other manufacturers and a vertical conspiracy between Alcon, its distributors, and ECPs. (Dkt. 1091). Because Lens.com's evidence is substantively the same as that advanced by the Class Plaintiffs, the same conclusion applies here.

## B. Market

A Sherman Act claim based on either Section 1 or 2, requires a "plaintiff [to bear] the burden of proof on the alleged relevant market." *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1236 (N.D. Ala.

2011), *aff'd*, 721 F.3d 1281 (11th Cir. 2013) (citing *Ad–Vantage Tel. Dir. Consult. v. GTE Directories*, 849 F.2d 1336, 1341 (11th Cir. 1987)). "The relevant product market must also be accompanied by proof of the relevant geographic market. This is the 'area of effective competition' within which the parties operate." *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1342 (11th Cir. 1987).

When seeking to "define a market" a plaintiff must "identify producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services. The market is composed of products that have reasonable interchangeability." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1552 (11th Cir. 1996) (internal citations and quotations removed).

There must also be proof that a relevant product market includes "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."

*Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

Yet establishing a "[m]arket definition is ordinarily 'a deeply fact-intensive inquiry.'" *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 55 (2d Cir. 2019) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001)). "Although the parameters of a given market are questions of fact, antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010) (internal quotation and citation omitted).

Lens.com has identified and can support two appropriate product markets: all contact lenses; and an Alcon-only market. Whether viewed as a question of technology, cost, or consumer preference, contact lenses, and other forms of vision correction are not interchangeable. And interchangeability—along with commercial realities facing consumers—is a key inquiry in defining markets. *See Brown Shoe Co.*, 370 U.S. at 325.

Contact lenses constitutes a unique market. For example, eyeglasses are less convenient than contact lenses and are often less desirable for cosmetic reasons. And many contact lens wearers also have a pair of glasses they use, suggesting that glasses are a complement to, not a substitute for, contact lenses. Similarly, corrective laser surgery is expensive, may not provide

12

complete correction, may lead to undesirable complications, and is not appropriate for all individuals.

Because consumers can only buy the specific brand of contact lens specified on their prescription from an ECP, the contact lens industry is different than most other product markets. The retailer of the product, the ECP, is also an essential gatekeeper without whose permission, in the form of a required medical prescription, the product simply cannot be purchased. Because of these unique industry features, Alcon-brand contact lenses have highly inelastic demand, creating a market for Alcon-branded contact lenses ("Alcon-only Market")

This Court also determines this market is unique. This is not a normal commodities market because the goods are the subject of prescription. In this market a patient has little to no discretion in the actual product they buy. And with UPPs and a Cut-Off Order to Lens.com, patients have even less discretion on where they can buy it for a better price.

Single-brand markets exist because of unique situations such as this. The market definition traditionally asks about inelasticity or interchangeability, and what happens when prices go up. Here, as prices go up, consumers do not change brands because of the ECP and prescription-related barriers; meaning this is an inelastic market.

This Court finds, because of Alcon's market power and the gatekeeping function of the ECPs, Lens.com has adequately alleged facts to support two appropriate product markets: all contact lenses; and an Alcon-only market.

## C. Injury

Lens.com must show an antitrust injury. To do this Lens.com "must prove . . . injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997). *See also Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977) (teaching "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.").

Lens.com also "must show harm to competition rather than to competitors." *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1071. Alleging "damage to a single competitor, even as a result of deliberate misinformation, does not state a claim under Section One of the Sherman Act . . . ." *Id.* at 1072. Yet "[o]nce the fact of causation is established, the burden of proving damages is much less severe." *Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*, 710 F.2d 752, 785 (11th Cir. 1983).

Alcon maintains Lens.com's alleged damages could not possibly stem

from the UPP. It insists not only is Lens.com's damages methodology legally flawed, but also, when it is adjusted, Lens.com suffered no damages.

Yet there is more than a mere scintilla of evidence here supporting Lens.com's position. Triable issues of fact exist as to each part of the antitrust injuries alleged. Lens.com historically purchased Alcon products from various distributors, including ABB. But Alcon's Cut-Off Order deprived Lens.com of this supply, and Lens.com's expert outlined the damages arising from this action.

In addition, Lens.com can prevent summary judgment by demonstrating Alcon's adverse action against it led to higher prices for consumers. *See Jacobs*, 626 F.3d at 1339 (explaining "[a]ctual harm is indicated by a factual connection between the alleged harmful conduct and its impact on competition in the market, and the plaintiff claiming it should point 'to the specific damage done to consumers' in the market."); *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1059 (9th Cir. 1999) (explaining alleged injury to plaintiff's ability to provide discounted service to customers constituted an antitrust injury).

This is precisely what Lens.com has done. It presented evidence that by acting to inhibit Lens.com's ability to sell Alcon-branded lenses, Alcon has inherently forced consumers to pursue higher priced options.

Further, both Count III and Count IV seek "injunctive relief, treble damages, and attorneys' fees and costs" for the harm suffered because of Alcon's UPP. Alcon's Motion does not challenge the request for injunctive relief. Because Lens.com has been injured by Alcon's UPP, and that injury is ongoing, relief is available even if damages are not, which prevents summary judgment.

This Court concludes there is evidence on which a jury can reasonably determine causation. A "just and reasonable" inference of damage based on relevant data can prove damages. *See Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 864 (5th Cir. 1981) (citations omitted).

IV.

The contact lens industry has long been the subject of antitrust allegations—this Court has adjudicated antitrust allegations in the industry for close to 30 years.[3] This scrutiny springs in part from the uniqueness of this market. In this market the ECPs are the gatekeepers and have a significant voice; they determine what lenses, what brand, and what model a consumer will buy. Yet the ECPs are also retailers of those lenses.

---

[3] In truth this feels like the third act in a three-act play. The first act began in 1996 when this court certified a consumer class in a Class Action against contact lens manufactures. (MDL 1030). The second act occurred in 2019 when this Court determined a horizontal conspiracy existed between Alcon and the other manufacturers and a vertical conspiracy existed between Alcon, its distributors, and ECPs. (Case No. 3:15-md-2626-HES-LLL, Dkt. 1091). This is now the third act. Much, if not all, of the past Order, Dkt. 1091, could be repeated here. But for brevity's sake it will not be, yet the facts, legal analysis, and conclusions from that Order apply.

Four contact lens manufacturers—Alcon, Bausch + Lomb, Inc. (B&L), Cooper Vision, Inc. (CVI), and Johnson & Johnson Vision Care, Inc. (JJVC)— control over 97% of the United States contact lens market. Alcon is the second largest manufacturer. High entry costs mean this current arrangement is unlikely to change.

These manufacturers primarily sell lenses to distributors rather than directly to consumers. ABB Optical Group ("ABB") is the largest distributor. Distributors sell lenses to: retailers; ECPs; brick-and-mortar stores; and online retailers. Online retailers, like Lens.com, typically sell lenses at a lower price than other retailers, and Lens.com's prices are consistently among the lowest in the industry. In this market, ECPs account for 40% of contact lens sales.

A consumer interested in contact lenses cannot simply buy them. Instead, the purchase of contact lenses begins with an ECP. The purchase requires a medical prescription that an ECP must prepare and issue a medical prescription for them. The customer must undergo a fitting to make sure the contact lens is the most appropriate lens for the consumer's eye health and vision needs before receiving a prescription. After the fitting, the ECP provides a prescription that includes the brand, model, and type of contact lens. These prescription requirements are for the consumer's protection because lenses are not interchangeable, according to the ECPs. Consequently, it is the ECP—not

17

the patient—who establishes the brand the consumer will wear. These hurdles reduce consumer choice because consumers are not inclined to change lenses because of the cost of a new eye-exam and preparation of a new prescription. But an ECP must provide a copy if a consumer wishes to price-shop for a particular lens. In addition, most ECPs sell contact lenses to the patient they just prescribed.

This is where Lens.com engages in the market as an online retailer of lenses. Lens.com acquires lenses from several sources overseas and, traditionally, has obtained a certain percentage of its lenses from Alcon-authorized distributors. Lens.com sells contact lenses from all the major manufacturers directly to customers.

But ECPs were not pleased with the market and actively opposed the gray-market that Lens.com represented. The ECP's opposition springs from the potential for loss of retail sales. Several ECPs, starting in 2010, began to demand manufacturers adopt minimum retail prices for their lenses so patients would be less motivated to comparison shop.

In 2013, Alcon introduced into the market a new, innovative, disposable soft contact lens the Dailies Total1 (DT1). In June 2013, Alcon became the first manufacturer to adopt a UPP for its new daily disposable contact lens. A prominent ECP, Dr. Barry Eiden, characterized this as an "industry changing

event," and promised other companies would be next. Three other contact lens manufacturers followed in quick succession: B&L adopted a UPP in February 2014, JJVC in June 2014, and CVI in September 2014. Dr. Eiden again celebrated this development, declaring that he and Alcon had "changed the CL industry," while lamenting that "few if any will ever know it came from our efforts."

Alcon's employees celebrated these other UPPs. One conceded, "This was exactly what we had hoped would happen—the industry following our lead with pricing."

The ECPs encouraged the manufacturers to continue the UPPs. Yet the manufacturers had little choice but to embrace this proposal because of the significant pressure campaign launched by ECPs and ABB. For example, ECPs threatened to stop prescribing the lenses of manufacturers that did not participate in the UPPs.

ABB also helped compel the manufacturers to embrace the UPPs. ABB's CEO, Angel Alvarez, repeatedly bragged about ABB's central role in bringing about the agreement. Because of ABB's position in the market, Alcon and the other manufacturers had little choice but to adhere to ABB's wishes and start a UPP.

Alcon and the ECPs recognized that their success depended on each

manufacturer's UPP succeeding. Otherwise, the UPP would be undermined by manufacturers that did not use a UPP. The manufacturers coordinated their UPPs directly and indirectly. For example, the four manufacturers were the sole members of the Contact Lens Institute ("CLI"), an industry lobbying group whose representatives met regularly. Alcon and the other manufacturers also used ECPs and ABB as go-betweens to help with their communications. For example, Alcon established an advisory board of ECPs and tasked it with determining Alcon's initial UPP prices. Then, after asking these ECPs to "be advocates in the market" for UPPs, Alcon hired two ECPs to write a favorable "advertorial" promoting the UPP. In another example, in early 2014, Dr. Eiden advised B&L regarding the implementation of its UPP, then reported to Alcon. The ECPs' role in working with multiple manufacturers was not a secret.

Alcon contends that its UPP was a unilateral policy, but the evidence shows that ECPs, distributors, and Alcon all understood it to be an agreement. While Alcon sometimes referred to UPP as an agreement indirectly, it often called it what it was: an agreement. Even Alcon's official Sales Playbook instructed sales representatives to "ensure account commitment" and confirm the ECP was "aligned to pricing." Given this, sales representatives and individual ECPs confirmed repeatedly the UPP was an agreement.

Alcon's distributors and ECPs also committed to help Alcon enforce the

20

UPP. ECPs, for example, used social media and direct communications with Alcon to report violators. Alcon also worked directly with one ECP to submit false prescriptions to online retailers to test their prices.

Alcon also created do-not-sell lists to instruct distributors not to sell to certain retailers. The distributors followed these do-not-sell lists even though it would cause lower sales revenue. In other instances, ABB took the lead in bringing ECPs into compliance. Alcon's stated goal was "a true partnership relationship" with its distributors while ABB sought an agreement with Alcon.

Lens.com operated this way, regarding Alcon lenses, for many years. Alcon was aware of this and repeatedly sought, as early as 2012, to enter into a direct relationship with Lens.com. Negotiations over an agreement continued on and off in the following years. By July 2014, however, Alcon concluded that an agreement was unlikely.

Around this same time, Lens.com announced it had been buying DT1 lenses and would soon begin selling them below the UPP price. Two months later in September, Alcon learned these DT1 sales had begun.

Alcon was besieged with complaints from ECPs, both directly and through social media platforms it monitored, which caused internal alarm. To address this problem, on October 22, 2014, Alcon issued a "do not sell" order to all of its distributors, barring them from supplying Lens.com with any Alcon lenses

21

(Cut-Off Order). That Cut-Off Order remains in place. Lens.com historically bought Alcon products from various distributors, including ABB. Alcon's Cut-Off Order deprived Lens.com of this supply.

V.

For the reasons listed above, the motion for summary judgment will be denied.

Accordingly, it is **ORDERED**:

1. Defendant Alcon Vision, LLC's Motion for Summary Judgment and Memorandum of Law in Support (Dkt. 1379—sealed copy Dkt. 1393) is **DENIED**;

2. The Judicial Panel on Multidistrict Litigation transferred Counts III and IV to this Court as part of MDL 2626 for "coordinated or consolidated pretrial proceedings." Those proceedings have ended, so the MDL should return 3:19-cv-706-HES-LLL to the Eastern District of New York; and

3. The Clerk is directed to terminate all pending motions and close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 8t day of July, 2024.

_____
HARVEY E. SCHLESINGER
UNITED STATES DISTRICT JUDGE

22

Copies to:
A. Graham Allen, Esq.
David R Marriott, Esq.
James M. Riley, Esq.
Michael B. Miller, Esq.
Sabrina Larson, Esq.
Sarah Lenore Prutzman, Esq.
Janie C. Buckley, Esq.
Jennifer Lee Taylor, Esq.
Joyce Liou, Esq.
Jamie A. Levitt, Esq.
Crystal T. Broughan, Esq.
Catherine M. Maness, Esq.
Mark M. Bettilyon, Esq.
Nathan D. Thomas, Esq.
Peter M. DeJonge, Esq.
William J. Natbony, Esq.